ACCEPTED
07-17-00047-CR
SEVENTH COURT OF APPEALS
AMARILLO, TEXAS
8/2/2017 3:07 PM
Vivian Long, Clerk

**No. 07-17-00047-CR**

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS
8/2/2017 3:07:59 PM
VIVIAN LONG
CLERK

# In the Court of Appeals for the Seventh Judicial District of Texas

## In Amarillo, Texas

_____

Alfredo Suarez Jr., Appellant,

*v.*

The State of Texas, Appellee.

_____

Appeal from Cause Number CR-16C-064 from the 222nd Judicial District Court of Deaf Smith County, Texas, Honorable Roland Saul Presiding

_____

**Brief for the Appellee**

_____

Chris Strowd
*Assistant Criminal District Attorney*
*235 East Third, Room 401*
*Hereford, Texas 79045*
*Telephone: (806) 364-3700*
*Facsimile: (806) 363-7039*
*cstrowd@deafsmithcounty.texas.gov*
*State Bar No. 19425400*

# Table of Contents

Page

Statement Regarding Oral Argument …………………………………………iii

Table of Authorities…...…………………………………………..……...…iii

Statement of the Case ...………………………….………….…………….2

Statement of Facts.………...…………………….………….……...………..8–8

Summary of the Argument …….………………………….………………9–10

Argument and Authorities:

  Reply to Point of Error One:  Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime of aggravated assault with a deadly weapon beyond a reasonable doubt…………………………………………………………...………..10–12

  A. After viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that Suarez was the person who intentionally, knowingly, or recklessly shot Reyes and Torres with a firearm beyond a reasonable doubt………………………………………….12–13

  B. After viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that Suarez shot Reyes and Torres, using a deadly weapon, to-wit: a firearm, beyond a reasonable doubt..............................................................................................14–15

Prayer……………………………………………………..……….……15

Certificate of Compliance....…………………………………………...16

Certificate of Service………………………………………….……16

## Statement Regarding Oral Argument

That State is not requesting oral argument.

## Table of Authorities

Cases:                                                                                    Page


*Barnes v. State,* 876 S.W.2d 316 (Tex.Crim.App. 1994)…………………..….…11

*Clayton v. State,* 235 S.W.3d 772 (Tex.Crim.App. 2007)………………………..10

*Curry v. State,* 30 S.W.3d 394 (Tex.Crim.App. 2000)……………….……….12

*Fields v. State,* 932 S.W.2d 97 (Tex.App.—Tyler 1996, pet. ref'd)…..………….14

*Guevara v. State,* 152 S.W.3d 45 (Tex.Crim.App. 2004)…………….………..13

*Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 560
(1979)………...…………………………………………….…........10, 13

*Lancon v. State,* 253 S.W.3d 699 (Tex.Crim.App. 2008)………………….…..15

*Lee v. State,* 239 S.W.3d 873 (Tex.App.—Waco 2007, pet. ref'd)……………….12

*Malik v. State,* 953 S.W.2d 234 (Tex.Crim.App. 1997)………………………..11

*Pendleton v. State,* No. 07-15-00108-CR (Tex.App.—Amarillo
2015, no pet.) (not designated for publication)……………………………….11, 12

*Welch v. State,* 993 S.W.2d 690 (Tex.App.—San Antonio 1999, no pet.)……….15


Statutes, Codes, and Rules:

TEX. R. APP. P.  3.2 (West 2003)……………………….…………….................1

TEX. R. EVID. ANN. 702 (Vernon Supp. 2016)………………………….......14

# In the Court of Appeals for the Seventh Judicial District of Texas

_____

No. 07-17-00047-CR

Alfredo Suarez Jr., Appellant,

*v.*

The State of Texas, Appellee.

_____

Appeal from Cause Number CR-16C-064 from the 222nd Judicial District Court of Deaf Smith County, Texas, Honorable Roland Saul Presiding

_____

**Brief for the Appellee**

_____

To the Honorable Justices of the Court of Appeals:

COMES NOW the State of Texas, in the above-entitled and numbered cause, and respectfully submits this Reply Brief. Based on Rule 3.2 of the Texas Rules of Appellate Procedure, the parties will be referred to by their real names. Citation to the Clerk's Record will be "C" and a page number and citation to the Reporter's Record will be first to the volume number, then "R," followed by page number(s).

## Statement of the Case

Alfredo Suarez Jr., appellant, was charged in a two-count indictment with the offenses of aggravated assault with a deadly weapon. (C. 4–5). These offenses were alleged to have occurred on the same day, and the deadly weapon for each was described in the indictment as a firearm. *Id.* The indictment also included enhancement paragraphs that, if true, would raise the level of offense from a second-degree felony to a first. *Id.*

When the case was called for trial, both parties announced ready. (3 R. 14). The jury returned guilty verdicts for the indicted charges. (C. 53). And Suarez pleaded true to the enhancement paragraphs. (5 R. 52–53). Having elected the jury to assess punishment, they returned a verdict of 15 years' and 5 years' confinement on count one and two, respectively, finding the enhancement paragraphs true. (C. 40, 54–59). Notice of appeal was timely filed on January 20, 2017. (C. 41).

## Statement of Facts

### 1. Gunfire at the Cowboy Car Wash.

On the evening of February 8, 2016, Luis Reyes (Reyes), the victim alleged in count one, was at his house working on his truck along with Omero Torres (Torres), the victim alleged in count two. (3 R. 203; 4 R. 116; C. 4). Afterwards, Reyes agreed to drive Torres into town to his father's home. (4 R. 117). They left together in Reyes's gray Mitsubishi Eclipse—Reyes was driving and Torres was

2

riding in the passenger seat. (3 R. 204, 206). Before dropping Torres off, they stopped at a dollar store and Reyes bought glass cleaner and towels. (4 R. 117). They then drove to the Cowboy Car Wash to clean the interior of Reyes's vehicle. (3 R. 203–04; 4 R. 118). At the car wash, Reyes parked his vehicle by a vacuum cleaner station. (3 R. 136; 7 R. State's 31-B).

While at the vacuum cleaner station, Reyes heard Torres state, "Here is – Tejano is coming. Let's get out of here. Let's get out of here." (4 R. 119). Sometime earlier, "Tejano" had threatened to kill Reyes. (4 R. 115). At the time of this earlier threat, Reyes was standing outside his residence and "Tejano" was in a green pickup. *Id*. Reyes, however, did not drive away from the car wash because he claimed to not be afraid of "Tejano." (4 R. 119).

"Tejano" was identified by Reyes and Torres to be Suarez. (3 R. 119–23, 125, 201; 4 R. 18, 113). Torres stated in court that he knows Suarez as "Tejano." (3 R. 201). Daniel Garcia, a Hereford Police Department officer, also knew that Suarez went by the name "Tejano." (3 R. 169–70).

Reyes recognized Suarez as the driver of the green Ford pickup. (4 R. 123). Suarez was alone in the vehicle and stopped by Reyes's vehicle. (4 R. 119–20). When Suarez got out of his pickup, Reyes saw that he had a gun in his hand as he walked up to Reyes's vehicle. (4 R. 119–20, 123–25). Next, Reyes heard a loud

3

noise and felt pain. (4 R. 120–21). Reyes then heard Suarez state that the next time he would kill him. *Id.*

Meanwhile across the street at the Fast Stop convenience store, Savannah Soto (Soto), a clerk, heard a pop that sounded like fireworks and saw a Ford pickup pulling away from the car wash. (3 R. 223–26). A man then entered the store and claimed to have been shot and wanted her to call the police. *Id.* He told her that he was with a friend and that he thought his friend was dying. (3 R. 226–27). When Soto saw blood, she realized it was not a prank and called 911. *Id.* The 911 call she made was at approximately 8:34 P.M.—she told the 911 operator that a person had been shot at the car wash next to Fast Stop. (3 R. 30-31; 7 R. State's 1). After Soto reported the shooting, the man left the store and walked back towards the car wash. (3 R. 229).

Reyes drove Torres to the Hereford Regional Medical Center (HRMC) emergency room because he was bleeding from his arm. (4 R. 126). Instead of staying at the hospital with Torres, Reyes drove home. (4 R. 127–28). Surveillance cameras at the hospital recorded Torres being dropped off from a small gray vehicle and Torres entering the emergency room lobby. (7 R. State's 2).

At HRMC, Torres was initially assessed by Rita San Miguel (San Miguel), a registered nurse. (3 R. 37, 40). While being assessed, he repeatedly told San Miguel that he had been shot. (3 R. 40, 42–43). San Miguel noticed that he was

4

bleeding from his arm from what she described as entry and exit wounds. (3 R. 46). The injury appeared to her to be a gunshot wound. *Id.* Dr. Earl Chase, an emergency room physician, described the trauma to Reyes's arm as a penetrating injury to the right forearm that was consistent with a gunshot wound. (3 R. 102, 106–08). After the initial medical treatment at HRMC, Torres was transferred to Northwest Texas Hospital in Amarillo. (3 R. 45).

Later, Reyes was brought by ambulance from his residence to the HRMC emergency room. (3 R. 46; 4 R. 59–61). He had what appeared to be a gunshot injury to his face. *Id.* The medical records for Torres and Reyes were admitted into evidence. (3 R. 41–42; 7 R. State's 36 & 37). The paramedic who treated Reyes at his residence stated in the medical records that Reyes's injury was a gunshot wound to the face, but that the incident had occurred at a different location while Reyes was sitting in his vehicle. (4 R. 55–56; 7 R. State's 36). Reyes told the paramedic that while he was sitting in his vehicle, he looked towards the driver's side window before being shot in the face with a pistol. (3 R. 54).

Once Reyes arrived at the emergency room, he was treated by Dr. John Thomas Gregg, a surgeon who headed the trauma team at HRMC. (4 R. 89–92). He described Reyes's injury as a penetrating injury that disrupted teeth and fractured the underlying top of his mandible. *Id.* According to Dr. Gregg, the injury to Reyes was consistent with a gunshot wound. (4 R. 95). And based on the

5

severity of this injury, Reyes too was transferred to Northwest Texas Hospital for further medical treatment. (4 R. 94).

## 2. The trail to Alfredo Suarez Jr.

The Cowboy Car Wash was equipped with surveillance cameras, and the police accessed the video recordings of this incident. (3 R. 153). Segments of these recordings were played in court. (3 R. 153–55; 7 R. State's 31-B). In the video, Reyes's car is seen parked next to a vacuum cleaner station. (3 R. 136, 155–57; 7 R. State's 31-B). The camera then recorded a green Ford pickup driving along the front of Reyes's parked vehicle and stopping next to it; the driver of this vehicle is then seen on the video getting out and approaching the driver's side door of Reyes's vehicle. (3 R. 155–57; 7 R. State's 31-B). This same person is also seen leaning in towards Reyes's vehicle. *Id.* Next, Torres is seen getting out of Reyes's vehicle from the passenger side and quickly walking towards the Fast Stop convenience store. *Id.* While Torres is walking away, he is seen on the video shaking his right arm and looking over his left shoulder in the direction of Reyes's parked vehicle. (7 R. State's 31-B). The camera also captured the driver of the green Ford pickup getting back into his vehicle and driving away as Reyes's vehicle remained at the vacuum cleaner station. *Id.*

The police photographed the crime scene, including the blood trail that led from the car wash to the convenience store. (3 R. 130; 7 R. State's 62–63, 66, 70–

6

82, 93–120; 8 R. 121–30, 132–33).   Blood was also discovered inside Reyes's vehicle along with a human tooth. (4 R. 83, 85–86; 7 R. State's 26-A).  A firearm was never recovered; however, bullet fragments were discovered in various locations at and near the vacuum cleaner station where Reyes had parked his car that evening. (3 R. 158–59; 4 R. 67, 70–72, 74–77).  These fragments were marked and photographed in their location by the police. (4 R. 72–73; 8 R. 169–76, 178–81).

When Reyes arrived home that evening, he told his wife that "Tejano" had hit him. (4 R. 130).  While in the emergency room, he identified "El Tejano" as the person responsible for his injuries. (4 R. 31).  And while he was in the hospital in Amarillo, Kirsten Williams, a Hereford police officer that was not directly involved in the investigation, presented to Reyes a photographic lineup that consisted of six photographs. (3 R. 119–23).  Reyes identified the photograph of Suarez as the person responsible for shooting him. (3 R. 119–23; 4 R. 133, 135).  His level of certainty in this identification was 100%.  (3 R. 125).

The investigation was furthered when Martin Hood (Hood), a Texas Ranger, met with Torres to get a recorded statement from him concerning this incident. (3 R. 175–76).  During this meeting, Torres appeared to be afraid and in hiding. (4 R. 10, 14).  Hood showed him a photographic lineup. (3 R. 178–80).  Although Torres

7

was reluctant to cooperate, he selected the photograph of Suarez from the lineup, indicating a level of certainty of 100%. (3 R. 178–80; 4 R. 18).

The police attempted to identify and locate the green Ford pickup that was used by the shooter. Officer Garcia went to Suarez's residence. (3 R. 181–82). Parked at this residence was a green Ford pickup. *Id.* Officer Garcia took photographs of this vehicle, which were admitted at trial. (3 R. 182–83; 7 R. State's 136–37). This vehicle was registered to Suarez's father. (3 R. 184). It was further described as a green, extended cab Ford pickup with a gold or copper stripe; it had a Whiteface Ford sticker just below the tailgate handle, a toolbox in its bed, and damage to its left rear fender. (3 R. 184–86). In officer Garcia's opinion, the pickup parked at Suarez's residence was the same one that was used during the shooting and captured on the car wash video. (3 R. 186–87). Erik Huerta, a Deaf Smith County deputy, testified that he had seen Suarez driving the same green Ford pickup that was recorded on the car wash video. (4 R. 43). And Hereford Police Department corporal Somchai Thongngoen testified that in the past, he had conducted a traffic stop on Suarez while he was driving a green, extended cab Ford pickup. (3 R. 88–89). Further, in his opinion, the pickup on the car wash video appeared to be the same one driven by Suarez during the traffic stop. (3 R. 89–91).

8

**Summary of the Argument**

The evidence was legally sufficient to support the conviction of Suarez in count one and two of the indictment for the offense of aggravated assault with a deadly weapon. Reyes, the victim alleged in count one, identified Suarez by the street name "Tejano." During the investigation, Reyes selected Suarez from a photographic lineup as the one responsible for his injuries. Reyes also identified Suarez in court as the person who injured him. Reyes saw Suarez with a pistol in his hand as he approached his vehicle at the car wash on the evening of the shooting. Torres, the victim alleged in count two, also selected Suarez from a photographic lineup conducted during the investigation. He too testified in court that he knew Suarez as "Tejano." The vehicle used by the shooter was the same vehicle that had been previously used by Suarez. This same vehicle was parked at Suarez's residence after the shooting.

A firearm was used by Suarez to cause the injuries to Reyes and Torres. The penetrating injuries to both Reyes and Torres were described by medical professionals as being consistent with gunshot wounds. Bullet fragments were found by the police at the crime scene. That evening, a clerk at a nearby convenience store heard a pop that sounded like fireworks. And Reyes and Torres both claimed to have been shot. The evidence, viewed in the light most favorable to the verdict, supports the conclusion that a rational juror could find beyond a

9

reasonable doubt that Suarez committed the offenses with a deadly weapon as alleged in the indictment.

## Argument and Authorities

**Reply to Point of Error One: Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime of aggravated assault with a deadly weapon beyond a reasonable doubt.**

Under point of error one, Suarez essentially argues that the evidence was legally insufficient to connect him to a firearm and to the shooting. (Appellant's brief at 27–28). The State asserts that there was ample evidence to identify Suarez as the perpetrator of these offenses.

In applying the legal sufficiency standard set out in *Jackson v. Virginia,* "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Clayton v. State,* 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed. 560 (1979) (emphasis in original). This standard accounts for the fact finder's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* "Therefore, in analyzing legal sufficiency, [the court] determines whether the necessary

10

inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Id.*

The review of "all the evidence includes evidence that was properly and improperly admitted." *Id.* "When the record supports conflicting inferences, the [court] presumes that the fact finder resolved the conflicts in favor of the prosecution and therefore defer to that determination." *Id.* "Direct and circumstantial evidence are treated equally: circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Id.* The fact finder is the sole judge of the credibility of the witnesses and of the weight to be afforded their testimony. *Barnes v. State,* 876 S.W.2d 316, 321 (Tex.Crim.App. 1994).

"The sufficiency standard set forth in *Jackson* is measured against a hypothetically correct jury charge." *Pendleton v. State,* No. 07-15-00108-CR at 7 (Tex. App.—Amarillo 2015, no pet.) (not designated for publication); see *Malik v. State,* 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge will accurately state the law, is authorized by the indictment, will not increase the State's burden of proof nor restrict the State's theories of liability, and will adequately describe the offense for which the defendant was tried. *Id.* The statutory elements of the offense as supplemented by the charging instrument is the

11

law as authorized by the indictment. *Pendleton v. State,* No. 07-15-00108-CR at 7; *Curry v. State,* 30 S.W.3d 394, 404 (Tex.Crim.App. 2000).

In the instant case, the indictment charged Suarez with intentionally, knowingly, or recklessly causing bodily injury to Luis Reyes and Omero Torres by shooting them with a firearm. (C. 4). On appeal, Suarez has not complained of the trial court's charge, nor any other element of the charged offense other than identity and the use of a firearm.

**A. After viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that Suarez was the person who intentionally, knowingly, or recklessly shot Reyes and Torres with a firearm beyond a reasonable doubt.**

In *Lee v. State,* the court found that the evidence was legally sufficient to show that the defendant was the person who shot the victim, as an element of aggravated assault, because the victim identified the defendant from a photographic lineup and identified the defendant as the shooter at trial. 239 S.W.3d 873, 878 (Tex. App.—Waco 2007, pet. ref'd).

In the instant case, there was both direct and circumstantial evidence that established the identity of the shooter. Suarez was identified by Reyes and Torres from photographic lineups. Each knew Suarez by the street name "Tejano." Reyes consistently stated that "Tejano" was responsible for his injury. Even officer

12

Garcia knew that Suarez went by the name "Tejano." In court, Reyes identified Suarez as the shooter.

The vehicle used in the shooting, and captured on the car wash video, was shown to have been driven in the past by Suarez. This same vehicle was discovered parked at Suarez's residence after the shooting. And Suarez had threatened to kill Reyes before the shooting took place.

While Torres refused to identify Suarez in court as the shooter, the jury was entitled to weigh and judge the credibility of Torres, fairly resolve conflicts in testimony, weigh all the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Jackson v. Virginia,* 443 U.S. at 318–19, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979). In short, the jury was free to disregard Torres's trial testimony in favor of his pretrial identification of Suarez and accept Reyes's testimony along with the other evidence that established Suarez's identity as the shooter. Each fact need not point directly and independently to the defendant's guilt, as long as the cumulative effect of all the incriminating facts is sufficient to support the conviction. *Guevara v. State,* 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). Reyes and Torres were both injured inside the vehicle because of the shooting at the car wash. Suarez was identified as that shooter. After viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential element of identity beyond a reasonable doubt.

13

**B. After viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that Suarez shot Reyes and Torres, using a deadly weapon, to-wit: a firearm, beyond a reasonable doubt.**

The use of expert testimony is admissible if it will help the jury understand the evidence or determine a fact in issue. *Fields v. State,* 932 S.W.2d 97, 108 (Tex. App.—Tyler 1996, pet. ref'd); see TEX. R. EVID. ANN. 702 (Vernon Supp. 2016). "An expert witness is one who will testify to matters requiring 'scientific, technical, or other specialized knowledge.'" *Id.* The expert's qualifications may be based on his "knowledge, skill, experience, training, or education." *Id.* Suarez has not challenged Dr. Chase or Dr. Gregg's expertise in the field of medicine.

The testimony of Dr. Chase and Dr. Gregg, as fact and expert witnesses, helped the jury understand the nature of the injury to Reyes and Torres. The testimony of paramedic Nathaniel Miller also assisted the jury in this regard. The doctors described each injury as penetrating and consistent with a gunshot wound. Reyes testified that he was shot. Bullet fragments were found at the scene of the crime by officers Garcia and Ruland. The clerk at the Fast Stop stated that she heard a loud pop that sounded like fireworks. Torres told the clerk that he had been shot. As noted above, the probative value of direct and circumstantial evidence is the same. In the instant case, both types of evidence were present. The jury was free to believe Dr. Chase and Dr. Gregg and concluded that the injuries

14

were gunshot wounds. The jury was also free to believe that the bullet fragments that were recovered by the police at the crime scene were the same ones that had been used in a firearm that ultimately caused the injuries to Reyes and Torres. It is within the exclusive purview of the jury to determine the credibility of the witnesses and the weight to be given their testimony. *Lancon v. State,* 253 S.W.3d 699, 707 (Tex. Crim.App. 2008). A jury is entitled to accept one version of the facts and reject another, or reject any part of a witness's testimony. *Id.* The jury also maintains the power to draw reasonable inferences from basic facts to ultimate facts. *Welch v. State,* 993 S.W.2d 690, 693 (Tex. App.—San Antonio 1999, no pet.). After viewing this evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential element that a deadly weapon, to-wit: a firearm, was used by Suarez to shoot Reyes and Torres beyond a reasonable doubt.

## Prayer

Because the cumulative evidence supported a rational juror's finding that Suarez was guilty of aggravated assault with a deadly weapon as alleged in count one and two of the indictment, the State prays the Court overrule Suarez's point of error and affirm the judgment of the trial court.

15

Respectfully submitted,


/s/ Chris Strowd
Chris Strowd
Assistant Criminal District Attorney
235 East Third, Room 401
Hereford, Texas 79045
Telephone: (806) 364-3700
Facsimile: (806) 363-7039
Email: cstrowd@deafsmithcounty.texas.gov
State Bar No. 19425400


## Certificate of Compliance

The undersigned certifies that according to the Microsoft Word count tool, this document contains 4,166 words.


/s/ Chris Strowd
Assistant Criminal District Attorney
Deaf Smith County, Texas


## Certificate of Service

This is to certify that a true and correct copy of the above and foregoing Brief for the State has been served on W. Brooks Barfield Jr., attorney for appellant, by placing a copy into the United States mail addressed to P.O. Box 308, Amarillo, Texas 79105, on August 2, 2017.


/s/ Chris Strowd
Chris Strowd



Caution
As of: Aug 02, 2017

**ODELL BARNES, JR., Appellant v. THE STATE OF TEXAS, Appellee**

**No. 71,291**

**COURT OF CRIMINAL APPEALS OF TEXAS**

*876 S.W.2d 316*; *1994 Tex. Crim. App. LEXIS 21*

**February 9, 1994, Delivered**

**SUBSEQUENT HISTORY:** [**1] As Amended March 21, 1994.
Rehearing denied by, 03/23/1994
Writ of certiorari denied *Barnes v. Texas, 513 U.S. 861, 115 S. Ct. 174, 130 L. Ed. 2d 110, 1994 U.S. LEXIS 6187 (1994)*
Writ of habeas corpus denied, Certificate of appealability denied *Barnes v. Johnson, 184 F.3d 816, 1999 U.S. App. LEXIS 17458 (5th Cir. Tex., 1999)*

**PRIOR HISTORY:** Appeal from LUBBOCK County on Change of Venue from WICHITA County

**DISPOSITION:** Finding no reversible error, we affirm the judgment of the trial court.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant sought review of his conviction of capital murder pursuant to *Tex. Penal Code Ann. § 19.03(a)(2)*, entered in the Lubbock County Court (Texas), asserting that the evidence was insufficient to sustain his conviction and sentence, and that the trial court committed various error relating to jury selection, evidence admission, and jury instruction, inter alia.

**OVERVIEW:** Appellant was convicted of capital murder after he stabbed and beat his victim in the course of a robbery or burglary, then shot her point blank through the head. He appealed, asserting various error. The court affirmed. It first found the evidence sufficient to sustain

appellant's conviction, as well as the jury's finding of future dangerousness. The court also rejected appellant's assertion that the trial court erred in sustaining a prosecutorial challenge for cause to a jury venireperson where the person was a perfect example of a vacillating venireman on the death penalty issue. The court found no error in the admission of six photographs of the victim, holding that their probative value was not outweighed by the danger of unfair prejudice. In addition, the court found no error in the denial of appellant's reasonable doubt instruction even though recent precedent required such an instruction because the precedent was only to be applied prospectively. The court also found no error in the placement of the burden of proving mitigating factors on appellant because neither legislation nor the constitution required the prosecution to negate mitigating circumstances.

**OUTCOME:** The court affirmed appellant's capital murder conviction, rejecting his arguments that the evidence did not support his conviction, that the trial court erred in sustaining a prosecutorial challenge for cause, that photographs were improperly admitted, that his reasonable doubt instruction was improperly refused, and that the burden of proving mitigating factors was improperly placed upon him.

**LexisNexis(R) Headnotes**

*Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*

Page 2

876 S.W.2d 316, *; 1994 Tex. Crim. App. LEXIS 21, **

*Evidence > Procedural Considerations > Weight & Sufficiency*

[HN1] In reviewing a sufficiency question, an appellate court must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Where the state's case is based on circumstantial evidence and was tried prior to the 1991 decision abandoning the exclusion of the reasonable hypothesis standard, an appellate court will use the exclusion of reasonable hypotheses approach as the method for analyzing sufficiency. It is not necessary that every fact point directly and independently to a defendant's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances.

*Criminal Law & Procedure > Appeals > Standards of Review > General Overview*
*Evidence > Procedural Considerations > Weight & Sufficiency*

[HN2] In reviewing the evidence, it is proper to consider the events that occurred before, during, and after the commission of an offense.

*Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > General Overview*
*Criminal Law & Procedure > Witnesses > Credibility*
*Evidence > Procedural Considerations > Weight & Sufficiency*

[HN3] The jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony.

*Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*
*Evidence > Procedural Considerations > Weight & Sufficiency*

[HN4] An appellate court must hold the evidence sufficient if the exculpatory aspects of an appellant's version of events necessarily contradict or conflict with inculpatory inferences drawn from other circumstantial evidence presented by the state, and when all the evidence viewed in the light most favorable to the verdict would rationally support a jury verdict of guilt to a degree of confidence beyond a reasonable doubt.

*Criminal Law & Procedure > Appeals > Standards of Review > General Overview*
*Evidence > Procedural Considerations > Weight & Sufficiency*

[HN5] In reviewing the sufficiency of the evidence at the punishment phase, an appellate court views the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could make the finding beyond a reasonable doubt. The burden is on the state to prove punishment issues beyond a reasonable doubt. *Tex. Code Crim. Proc. Ann. art. 37.071(c)*.

*Criminal Law & Procedure > Sentencing > Imposition > Factors*
*Evidence > Scientific Evidence > Psychiatric & Psychological Evidence*

[HN6] A jury is permitted to consider a variety of factors when determining whether a defendant will pose a continuing threat to society. Among those factors are: the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; the calculated nature of the defendant's acts; the forethought and deliberateness exhibited by the crime's execution; the existence of a prior criminal record, and the severity of the prior crimes; the defendant's age and personal circumstances at the time of the offense; whether the defendant was acting under duress or the domination of another at the time of the offense; psychiatric evidence; and character evidence. This list is not exhaustive.

*Criminal Law & Procedure > Sentencing > Imposition > Factors*

[HN7] In its determination of special issues, a jury is entitled to consider all the evidence presented at the guilt/innocence phase of the trial, in addition to the evidence presented at the punishment phase. The circumstances of the offense and the events surrounding are sometimes sufficient in themselves to sustain a yes answer to the second special issue regarding future dangerousness.

*Criminal Law & Procedure > Criminal Offenses > Homicide > Murder > General Overview*
*Criminal Law & Procedure > Accusatory Instruments > Indictments > General Overview*

[HN8] An indictment need not allege the constituent elements of the aggravating feature which elevates murder to capital murder.

*Criminal Law & Procedure > Juries & Jurors > Challenges to Jury Venire > General Overview*
*Criminal Law & Procedure > Trials > Judicial Discretion*

Page 3

876 S.W.2d 316, *; 1994 Tex. Crim. App. LEXIS 21, **

[HN9] Where more than 100 jurors are called for regular service, the decision to grant a special venire is within the discretion of the trial court. *Tex. Code Crim. Proc. Ann. art. 34.01.*

*Criminal Law & Procedure > Juries & Jurors > Challenges to Jury Venire > Death Penalty > General Overview*
[HN10] In a capital case, the state is entitled to jurors who will impartially consider and decide the facts and conscientiously apply the law as charged by the court.

*Criminal Law & Procedure > Juries & Jurors > Challenges to Jury Venire > Bias & Prejudice > General Overview*
*Criminal Law & Procedure > Juries & Jurors > Challenges to Jury Venire > Equal Protection Challenges > General Overview*
[HN11] *Tex. Code Crim. Proc. Ann. art. 35.14* provides a vehicle with which to exclude potential jurors that an advocate believes are prejudiced against his cause. These peremptory challenges may be made for any reason so long as they are not exercised in a racially discriminatory manner. *Tex. Code Crim. Proc. Ann. art. 35.261.*

*Criminal Law & Procedure > Juries & Jurors > Challenges to Jury Venire > Death Penalty > General Overview*
*Criminal Law & Procedure > Juries & Jurors > Peremptory Challenges > General Overview*
*Criminal Law & Procedure > Sentencing > Capital Punishment > Death-Qualified Jurors*
[HN12] Subject to the constraints of *Tex. Code Crim. Proc. Ann. art. 35.261*, a party need not assign a reason for exercising his peremptory strikes, even where the discernable purpose of the strike is to exclude a prospective juror who is not in favor of the death penalty.

*Evidence > Demonstrative Evidence > Photographs*
*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
[HN13] A court may consider many factors in determining whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice. These factors include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black and white, whether they are close-up, and whether the body depicted is clothed or naked. A court, however, should not be limited by this list. The availability of other means of proof and the cir-

cumstances unique to each individual case should also be considered.

*Criminal Law & Procedure > Witnesses > Presentation*
*Criminal Law & Procedure > Jury Instructions > Particular Instructions > General Overview*
[HN14] Error in admitting improper testimony may be corrected by a withdrawal and an instruction to disregard unless it appears the evidence is clearly calculated to inflame the minds of the jury and is of such character as to suggest the impossibility of withdrawing the impression produced on their minds.

*Criminal Law & Procedure > Search & Seizure > Search Warrants > Affirmations & Oaths > General Overview*
[HN15] Generally, incorporating the appendices to an affidavit by reference is preferred. It does not invariably follow that absent such an incorporation the affidavit must fail.

*Criminal Law & Procedure > Search & Seizure > Search Warrants > Affirmations & Oaths > General Overview*
[HN16] Affidavits for search warrants must be tested and interpreted by magistrates and courts in a common sense and realistic fashion.

*Criminal Law & Procedure > Jury Instructions > Particular Instructions > Reasonable Doubt*
[HN17] Although a definitional instruction of the term reasonable doubt is now required by recent case law, this holding is applied prospectively only.

*Criminal Law & Procedure > Trials > Continuances*
*Criminal Law & Procedure > Trials > Defendant's Rights > Right to Fair Trial*
*Criminal Law & Procedure > Witnesses > Presentation*
[HN18] If a witness's name is not furnished a defendant before trial despite a court order, any error in allowing that witness to testify over a claim of surprise is made harmless by defendant's failure to object or move for a continuance.

*Criminal Law & Procedure > Sentencing > Capital Punishment > Bifurcated Trials*
*Criminal Law & Procedure > Sentencing > Guidelines > Adjustments & Enhancements > Criminal History > General Overview*

Page 4

876 S.W.2d 316, *; 1994 Tex. Crim. App. LEXIS 21, **

*Criminal Law & Procedure > Sentencing > Imposition > Evidence*
[HN19] A trial court may admit any evidence it deems relevant to sentencing at the punishment phase of a capital murder trial.

*Criminal Law & Procedure > Trials > Judicial Discretion*
*Criminal Law & Procedure > Sentencing > Imposition > General Overview*
*Evidence > Procedural Considerations > Exclusion & Preservation by Prosecutor*
[HN20] That a defendant committed another crime while already on probation for other offenses has a bearing on the question of whether he would pose a future danger to society. *Tex. Code Crim. Proc. Ann. art. 37.071(b)(2).*

*Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion > Evidence*
*Evidence > Procedural Considerations > Exclusion & Preservation by Prosecutor*
[HN21] Absent a clear abuse of discretion, a trial court's ruling on the admission of evidence will not be disturbed.

*Criminal Law & Procedure > Appeals > Standards of Review > General Overview*
*Evidence > Procedural Considerations > Exclusion & Preservation by Prosecutor*
[HN22] A trial court need never sort through challenged evidence in order to segregate the admissible from the excludable, nor is a trial court required to admit only the former part or exclude only the latter part. If evidence is offered and challenged which contains some of each, a trial court may safely admit it all or exclude it all, and the losing party, no matter who he is, will be made to suffer on appeal the consequences of his insufficiently specific offer or objection.

*Evidence > Hearsay > Rule Components > Nonverbal Conduct*
*Evidence > Procedural Considerations > Exclusion & Preservation by Prosecutor*
*Evidence > Procedural Considerations > Rulings on Evidence*
[HN23] A trial court is not required, in the face of a global hearsay objection, to cull through a defendant's pen packet and exclude whatever particular matters he may find there that meet that description. Tex. R. Crim. Evid. 103(a)(1).

*Criminal Law & Procedure > Juries & Jurors > Jury Nullification > Jury Instructions*
*Criminal Law & Procedure > Jury Instructions > Particular Instructions > General Overview*
*Criminal Law & Procedure > Sentencing > Capital Punishment > Mitigating Circumstances*
[HN24] In instances where mitigating evidence is presented, all that is constitutionally required is a vehicle by which the jury is able to consider and give effect to the mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime. This vehicle commonly takes the form of a jury nullification instruction or a fourth special issue.

*Criminal Law & Procedure > Sentencing > Capital Punishment > Mitigating Circumstances*
[HN25] It is not unconstitutional to place a burden on a defendant to establish sufficient mitigating circumstances by a preponderance of the evidence.

*Criminal Law & Procedure > Sentencing > Capital Punishment > Mitigating Circumstances*
[HN26] Neither legislation nor constitution places a burden of proof upon the state to negate the existence of mitigating evidence.

**COUNSEL:** For Appellant: Reginald R. Wilson, Wichita Falls, Tx. Marty Cannedy, Wichita Falls, Tx.

For Appellee: Barry L. Macha, D. A. & John W. Brasher, Asst. D. A., Wichita Falls, Tx. Robert Huttash, State's Attorney, Austin, Tx.

**JUDGES:** EN BANC. McCormick, Baird

**OPINION BY:** PER CURIAM

**OPINION**

 **[\*319]** *OPINION*

Appellant was convicted of the offense of capital murder under V.T.C.A. *Penal Code, § 19.03 (a)(2).* The offense originated in Wichita County, where appellant was indicted. Pursuant to defense motion, venue was changed to Lubbock County. The jury answered the special issues affirmatively and punishment was assessed accordingly at death. *Article 37.071(b), V.A.C.C.P.* [1] Appeal to this Court is automatic. Article 37.071(h). Appellant raises fifteen points of error. We will affirm.

Page 5

876 S.W.2d 316, *; 1994 Tex. Crim. App. LEXIS 21, **

1   Unless otherwise indicated, all references to articles are to those in the Texas Code of Criminal Procedure.

**[\*\*2] Sufficiency of the Evidence.**

In his fourth point of error, appellant contends that the evidence is insufficient to establish his guilt. In his fifth point of error, he asserts that the evidence is insufficient to establish any of the aggravating circumstances required to raise murder to a capital offense, in this case, burglary or robbery. [2] He further argues the evidence is insufficient to show appellant intended to cause the death of Helen Bass.

2   In appellant's indictment it was alleged he committed murder in the course of committing burglary, robbery, and aggravated sexual assault. V.T.C.A. *Penal Code, § 19.03(a)(2).* At trial, however, the trial court instructed the jury as to the aggravating offenses of robbery and burglary only.

The evidence at trial established the following: Bass returned home from work at approximately 11:30 p.m. on November 29, 1989. The next day, Nary Barnes, appellant's mother and Bass' friend, went to Bass' home to pick her up for work. No one answered the door. After [\*\*3] arriving at work Barnes became concerned and phoned Sharon Mergerson, Bass' neighbor and ex-sister-in-law, to check on the situation. Mergerson immediately went to Bass' home. Upon arrival, she noticed a back door had been forcibly kicked in. She found Bass' body at approximately 4:00 p.m. Mergerson went home and phoned the police.

Bass died of a .32-caliber gunshot wound to the head. Time of death was estimated to be in the early morning hours of November 30th. She was found naked and beaten in her bedroom. Aside from the gunshot wound, Bass had been stabbed twice, hit with a .22-caliber rifle, and struck in the head with a blunt object. A knife covered with blood was discovered in Bass' kitchen. A bloody lamp with a dent in the base was found in Bass' bedroom, along with a .22-caliber rifle that had been broken in half. The police discovered the lamp's mate in another bedroom of the home. Mergerson testified that the lamps had been recently purchased. A box for a .32-caliber handgun was also found. However, no gun was recovered at the scene.

Bass did own a .32-caliber handgun. Willie Bass, Jr., her son, bought her the handgun in April, 1988. [3] Malrie Wilson, Bass' friend, saw [\*\*4] the gun in her possession on the morning of November 29th. Wilson had shown Bass how to load the weapon and was attempting to familiarize her with it on Monday, November 27th,

and Wednesday, November [\*320] 29th. The gun was fully loaded at that time. Wilson had suggested Bass keep the gun in her bedroom.

3   The transaction papers filled out when Willie Bass purchased the gun list the gun's serial number as NB003602. The gun recovered by the police, see text *post,* bears the same serial number.

Bass' bedroom was found in disarray. Dresser drawers had been moved and some pulled out. The contents of two purses had been dumped out onto the bed. Bass' checkbook was on the floor. A coin purse was found open. A jewelry box was open and appeared to have been gone through. An identification card and personal papers belonging to Bass were found outside near her chain-link fence. Approximately $ 200 cash was also found in the home.

Johnny Ray Humphrey, appellant's co-worker, had been with appellant at approximately [\*\*5] 10:00 p.m. on November 29th, when he dropped appellant off near his home. Appellant was wearing dark-colored coveralls. At approximately 10:30 p.m., Robert Brooks, a neighbor, saw appellant in Bass' yard. Appellant hurdled Bass' wooden fence, fell down, and rolled into the street. Appellant then got up and went back over Bass' chain-link fence. [4] Brooks testified appellant was wearing dark green or blue coveralls and a stocking cap. Between 2:00 a.m. and 3:00 a.m. on November 30th, Patrick Williams saw appellant with a gun and wearing coveralls at the Holliday Creek Apartments. The apartments are near Bass' home.

4   Bass had both a wooden and a chain-link fence on different parts of her property.

After work on November 30th, Humphrey, appellant, and Joseph Barnes, appellant's brother, stopped by the Barnes' home. Appellant stated he had "confiscated" a gun from his father and wished to sell it. Appellant went to his bedroom, retrieved the gun from under his bed, and gave it to Humphrey. Humphrey later sold [\*\*6] the gun to Williams. Humphrey identified the gun at trial as the one he obtained from appellant.

Williams testified that the gun that he bought from Humphrey on the afternoon of November 30th was the same one he had seen appellant with earlier the same day. He further stated that a bullet was missing from the gun when he purchased it. Williams later returned the gun to Humphrey's sister, Deborah Ann, when he learned of the murder. Deborah Ann then turned the gun over to the police. Willie Bass identified the gun as the one he had given his mother.

Page 6

876 S.W.2d 316, *; 1994 Tex. Crim. App. LEXIS 21, **

The police recovered dark green coveralls from Joseph Barnes' car. Joseph told the officers that the coveralls belonged to appellant. [5] Humphrey testified that the coveralls were the same coveralls he had seen appellant wearing on the evening of November 29th. Blood later removed from the coveralls by a forensic serologist was determined to be type 0 blood, which was the same as Bass'. Appellant has type A blood. The forensic serologist testified that fifty percent of all African-Americans have type 0 blood. [6] The blood on the coveralls, however, also had genetic markers consistent with Bass' blood.

> 5    Joseph testified that he believed the coveralls actually belonged to his father, but that appellant "wore them all the time."

[**7]

> 6    Bass was an African-American.

Larry Fletcher, a firearms examiner, testified the bullet removed from Bass' head was the same type that would be fired from the .32-caliber revolver in evidence. When comparing the fatal bullet to a test bullet fired from the revolver, Fletcher could not make a positive determination whether or not the fatal bullet was fired from this exact pistol, because it sustained too much damage on impact. However, there were other consistencies between the test bullet and the one removed from Bass.

Dr. Jeffrey Barnard, Chief Medical Examiner of Dallas County, performed the autopsy. Barnard testified that Bass' injuries were consistent with having been caused by the handgun, lamp, broken rifle, and knife recovered by the police. James Cron, a fingerprint and footprint expert, testified that appellant's fingerprint appeared on the lamp. Further, he stated that the shoeprint pattern found on the back of Bass' checkbook matched the shoe pattern on appellant's shoes. Cron admitted that millions of shoes with that pattern have been produced.

[*321] [HN1] In reviewing a sufficiency [**8] question, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)*; *Butler v. State, 769 S.W.2d 234, 238 (Tex. Cr. App. 1989)*. Because the State's case is based on circumstantial evidence and was tried prior to this Court's decision in *Geesa*, [7] we will use the "exclusion of reasonable hypotheses" approach as the method for analyzing sufficiency. *Garrett v. State, 682 S.W.2d 301, 304 (Tex. Cr. App. 1984)*, cert. denied, *471 U.S. 1009, 105 S. Ct. 1876, 85 L. Ed. 2d 168 (1985)*. It is not necessary that every fact point directly and independently to the defendant's guilt. *Russell v. State, 665 S.W.2d 771, 776 (Tex. Cr. App. 1983)*, cert. denied, *465 U.S. 1073, 104 S.

Ct. 1428, 79 L. Ed. 2d 752 (1984)*. It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Id.*

> 7    *Geesa v. State, 820 S.W.2d 154 (Tex.Cr.App. 1991)*

[**9] Appellant contends that the presence of his fingerprint on the lamp does not show he had ever been in decedent's home unlawfully. [8] He argues the presence of his fingerprint was not unusual because he had helped do repair work on Bass' home three years before and Bass had allowed appellant to have a party in another building on her property. Appellant's mother testified that appellant had done work for Bass a few weeks before her death. Appellant cut down some limbs and looked for a leak in the back of the house. There is evidence, however, that the lamps were purchased shortly before Bass' death, and were kept in a front bedroom.

> 8    Appellant also argues that his presence outside of a house thirty minutes before a crime occurs does not lead ineluctably to his guilt. Further, he argues that the footprint on the checkbook and blood on the coveralls are inconclusive pieces of evidence. [HN2] In reviewing the evidence it is proper to consider the events that occurred before, during, *and* after the commission of the offense. (emphasis added). *Thompson v. State, 697 S.W.2d 413, 416 (Tex. Cr. App. 1985)*. It is enough if the conclusion of guilt is warranted by the combined and cumulative force of all the incriminating circumstances. *Russell, 665 S.W.2d at 776.*

[**10] Appellant next argues that Humphrey fabricated his testimony and implicated appellant in order "to avoid his own date with the hangman." Appellant supports this hypothesis with the following evidence at trial: Marquita Mackey testified that she saw Humphrey at 5:00 p.m. on November 30, 1989, wearing a pair of blood-stained dark coveralls. Humphrey had the gun with him at the time and he delivered it to Williams in her presence. She also stated that she later saw the coveralls thrown behind a local playhouse. Nary Barnes testified appellant arrived home between 11:45 and 11:50 p.m. on November 29th and did not leave the house until the next morning, although she admits that she was asleep for part of that time. Joseph Barnes testified that appellant did not go into his home on November 30th and retrieve the gun. He testified that Humphrey got a paper sack from his own home and then traded it with someone at the Holliday Creek Apartments.

[HN3] The jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony. *Lafoon v. State, 543 S.W.2d 617, 620 (Tex.

Page 7

876 S.W.2d 316, *; 1994 Tex. Crim. App. LEXIS 21, **

*Cr. App. 1976).* Appellant's argument that Humphrey was the real perpetrator of the crime **[\*\*11]** was apparently rejected by the jury. [HN4] We must hold the evidence sufficient if the exculpatory aspects of appellant's version of events necessarily contradict or conflict with inculpatory inferences drawn from other circumstantial evidence presented by the State, and when all the evidence viewed in the light most favorable to the verdict would rationally support a jury verdict of guilt to a degree of confidence beyond a reasonable doubt. *Gunter v. State, 858 S.W.2d 430, 439* (Tex. Cr. App.), *cert. denied, U.S. , 114 S. Ct. 318, 126 L. Ed. 2d 265 (1993). Girard v. State, 631 S.W.2d 162, 164 (Tex. Cr. App. 1982).* The combined and cumulative force of all the incriminating circumstances leads us to conclude that there was sufficient evidence for any rational trier of fact to conclude beyond a reasonable doubt that appellant was guilty **[\*322]** of capital murder, and to exclude every other reasonable hypothesis except for that of guilt. *Russell, supra, at 776*; *Johnson v. State, 803 S.W.2d 272, 280 (Tex. Cr. App. 1990), cert. denied, U.S. , 111 S. Ct. 2914, 115 L. Ed. 2d 1078 (1991), overruled on other grounds, Heitman* **[\*\*12]** *v. State, 815 S.W.2d 681 (1991).*

Appellant separately contends that the State offered no evidence to prove appellant intended to cause Bass' death. The record shows that Dr. Barnard, testified the gunshot wound sustained by Bass was a "contact wound." He stated a contact wound occurs when the barrel of a gun is in contact or almost in contact with the victim's skin at the time the gun is fired. Further evidence was brought in showing that the gun had been fired through two pillows placed closely to Bass' head. Her head had also been wrapped in a shirt after the beatings, but prior to the gunshot wound. Dr. Bernard testified this would prevent blood from splattering. The jury could infer that the firing of the gun through two pillows and a shirt would muffle the sound of the shot and prevent blood from splattering. Further, the jury could infer that appellant would not fire a gun at such a close range to Bass' head unless he intended to kill her. Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have accepted these inferences and from them found the element of intent beyond reasonable doubt. *See Jackson v. Virginia, 443 U.S.* **[\*\*13]** *at 319*. We overrule points of error four and five.

Appellant's eighth point of error contends that the evidence was insufficient for the jury to make an affirmative finding that he would be a "continuing threat to society." Article 37.071(b)(2) (second special issue). He argues that of the eight factors listed in *Keeton v. State, 724 S.W.2d 58, 61 (Tex. Cr. App. 1987)*, most should be decided in his favor.

[HN5] In reviewing the sufficiency of the evidence at the punishment phase, we again view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could make the finding beyond a reasonable doubt. *See Stoker v. State, 788 S.W.2d 1, 7 (Tex. Cr. App. 1989), cert. denied, 498 U.S. 951, 111 S. Ct. 371, 112 L. Ed. 2d 333 (1990).* The burden was on the State to prove the punishment issues beyond a reasonable doubt. Article 37.071(c). [HN6] A jury is permitted to consider a variety of factors when determining whether a defendant will pose a continuing threat to society. Among those factors are:

> 1. the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties;
>
> 2. **[\*\*14]** the calculated nature of the defendant's acts;
>
> 3. the forethought and deliberateness exhibited by the crime's execution;
>
> 4. the existence of a prior criminal record, and the severity of the prior crimes;
>
> 5. the defendant's age and personal circumstances at the time of the offense;
>
> 6. whether the defendant was acting under duress or the domination of another at the time of the offense;
>
> 7. psychiatric evidence; and 8. character evidence.

*Keeton, 724 S.W.2d at 61*. As appellant admits, this list is not exhaustive.

Appellant argues that the evidence produced at trial did not show that appellant's killing of decedent was calculated or deliberate. He contends that the State's evidence at the punishment phase did not show that his past crimes were violent because no one was hurt and, in one instance, the gun used was not real. He further notes that the record is bare of psychiatric evidence. He asserts that the fact that he came from a broken and abusive home and that he was capable of remorse over his past misdeeds should weigh in his favor.

[HN7] In its determination of the special issues, the jury was entitled to consider all the evidence presented **[\*\*15]** at the guilt/innocence phase of the trial, in addition to the evidence presented at the punishment phase. *Valdez v. State, 776 S.W.2d 162, 166-67 (Tex. Cr. App. 1989), cert. denied, 495 U.S. 963, 110 S. Ct. 2575, 109 L.*

Page 8

876 S.W.2d 316, *; 1994 Tex. Crim. App. LEXIS 21, **

*Ed. 2d 757 (1990).* The circumstances of the offense and the events surrounding **[\*323]** are sometimes sufficient in themselves to sustain a "yes" answer to the second special issue. *See Vuong v. State, 830 S.W.2d 929, 935* (Tex. Cr. App.), *cert. denied, U.S. , 113 S. Ct. 595, 121 L. Ed. 2d 533 (1992); Stoker, 788 S.W.2d at 7.* The evidence in the instant case revealed that appellant murdered Bass in the course of robbery or burglary. She was beaten and stabbed, and then shot point blank through the head in a calculated fashion. Although we hesitate to conclude this evidence alone would support a finding of future dangerousness, there was more.

At the punishment phase of trial, the State introduced evidence of various extraneous offenses. Appellant was convicted of the following: (1) in February, 1987, appellant broke into a home, hit the female resident over the head with an iron, threatened her with a gun, threatened to **[\*\*16]** kill her daughter, sexually assaulted her, and then burglarized the home; (2) on May 18, 1987, appellant, using a gun to threaten the employees, robbed a Golden Fried Chicken restaurant; (3) three days later on May 21, 1987, appellant, again using a gun, robbed a McDonald's restaurant; and (4) on January 20, 1988, while on probation for the previous offenses, appellant robbed a Domino's Pizza, using a toy gun to threaten an employee. In each of these instances, appellant threatened, essentially, to "blow [the victims'] brains out" [9] if they did not cooperate with him. On November 15, 1989, in an unadjudicated offense, appellant attempted to choke and sexually assault an acquaintance who was nine months pregnant at the time. Appellant threatened to kill her if she would not stop screaming. The woman managed to get away.

9    Specifically, in each offense, appellant stated, respectively: (1) "Do not look at me. If you look at me I'm going to kill you. I will blow your fucking brains out. If you look at me I will kill you"; (2) he would "blow [her] mind out"; (3) if the manager did not give him all the money, he would "blow [her] fucking brains out"; and (4) "If you don't hurry up and open that safe, I'm going to pop a cap on you."

**[\*\*17]** Despite appellant's assertions, the record shows he repeatedly threatened to kill others during his previous offenses and did harm his victims on more than one occasion. It was not necessary for the State to buttress its case on future dangerousness with psychiatric testimony. *Narvaiz v. State, 840 S.W.2d 415, 425 (Tex. Cr. App. 1992), cert. denied, U.S. , 113 S. Ct. 1422, 122 L. Ed. 2d 791 (1993).; Huffman v. State, 746 S.W.2d 212, 224 (Tex. Cr. App. 1988).* Considering the record as a whole, we conclude there was sufficient evidence to support the jury's affirmative finding that there was a probability that appellant would be a continuing threat to society. Appellant's eighth point of error is overruled.

**Guilt/Innocence Phase**

In his thirteenth point of error, [10] appellant complains that the trial court erred in failing to quash the indictment. Because appellant was charged with murder in the course of a burglary, he believes that fair notice dictates that the State should have been required to "allege burglary with intent to commit . . . theft or a felony offense."

10    The remaining points of error will be addressed in the order in which they occurred at trial.

**[\*\*18]** Appellant acknowledges that we have repeatedly held that [HN8] an indictment need not allege the constituent elements of the aggravating feature which elevates murder to capital murder. *Beathard v. State, 767 S.W.2d 423, 431 (Tex. Cr. App. 1989)* (need not allege the constituent elements of burglary); *Marquez v. State, 725 S.W.2d 217, 236 (Tex. Cr. App.), cert. denied, 484 U.S. 872, 108 S. Ct. 201, 98 L. Ed. 2d 152 (1987)* (aggravated sexual assault); *Hammett v. State, 578 S.W.2d 699, 708 (Tex. Cr. App. 1979), cert. denied, 448 U.S. 725, 100 S. Ct. 2905, 65 L. Ed. 2d 1086 (1980)* (robbery). He raises no novel argument to persuade us to revisit these holdings. Point of error thirteen is overruled.

By way of his twelfth point of error, appellant contends that the trial court erred in denying his request for special venire, after having earlier granted same. Prosecution of this cause originated in Wichita County before Judge Driver. Prior to change of venue to Lubbock County, Judge Driver granted appellant's motion for a special **[\*324]** venire. Article 34.01. Appellant argues that Judge Driver should not have rescinded the original order without his permission.

**[\*\*19]** Following the change of venue, trial commenced on March 25, 1991. Appellant objected when Judge Driver, who had been assigned to Lubbock County for the duration of the case, began to select venirepersons from the regular jury panel rather than a special venire. In overruling his objection, Judge Driver quoted Article 34.01 which leaves the empanelment of a special venire to the discretion of the trial court where more than 100 jurors have been summoned for regular service.

At trial, the State and appellant stipulated to the following: Wichita County does not have continuous jury weeks. It is general practice not to summon more than 100 jurors per week. Because of this practice, the method to obtain jurors for a capital case in Wichita County is by a special venire procedure. In Lubbock County, a capital case is generally heard by regular jurors summoned for service the week a capital case is set for trial. For the

Page 9

876 S.W.2d 316, *; 1994 Tex. Crim. App. LEXIS 21, **

week of March 25th, 625 jurors were summoned for regular jury service in Lubbock County. Of those summoned, 264 appeared for service and 125 were assigned to the instant case.

The State also offered into evidence a letter dated March 13, 1991, from Judge William R. Shaver **[\*\*20]** of Lubbock County to Judge Driver. The letter confirms that "it is agreeable with you [Judge Driver] for us to handle the Central Jury Pool in the usual method; . . . ." Appellant admitted to having reviewed the letter in the judge's chambers, although he never agreed or disagreed with the procedure. The trial court subsequently rescinded the previous order and overruled appellant's motion for special venire.

[HN9] Because more than 100 jurors were called for service the week of appellant's trial, the decision to grant a special venire was within the discretion of the trial court. Article 34.01. Therefore, we will defer to the trial court's ruling. *Id.* Point of error twelve is overruled.

In his ninth point of error, appellant maintains that the trial court erred in sustaining the State's challenge for cause of prospective juror Brown because of her personal opinion regarding the death penalty. Specifically, he argues that her testimony indicates that she could set aside her disfavor of capital punishment and answer the special issues based on the evidence presented to her.

Brown is the quintessential "vacillating venireman." *Perillo v. State, 758 S.W.2d 567, 576 n.10 (Tex.* **[\*\*21]** *Cr. App. 1988), cert. denied, 492 U.S. 925, 109 S. Ct. 3263, 106 L. Ed. 2d 608 (1989).* During voir dire, after the State explained the function of the special issues during the punishment phase, *see* Article 37.071, Brown stated that she could not answer the special issues "yes" knowing that the death penalty would be imposed. She further stated that she would answer "no" to avoid the result even if the evidence supporting a "yes" answer was overwhelming. The State then challenged Brown for cause.

On cross voir dire, Brown continued to reiterate her opposition to the death penalty. However, after appealing to her sense of duty as a juror, defense counsel was able to elicit the following:

BY [DEFENSE COUNSEL]:

Q That once you heard the evidence, that, you know, you felt very strongly that Question Number one should be answered "Yes," Question Two should be answered "Yes," and if it was appropriate and submitted Question Three answered the same.

You could make that answer based upon the evidence?

A Yes. I would have to, you know - - the evidence.

But on redirect Brown again insisted that no matter how much evidence the prosecutors could put on **[\*\*22]** she would still automatically answer "no" to one or more of the special issues in order to give the defendant a second chance. Brown repeated her contradictory answers on subsequent recross and redirect. The trial court then granted the State's challenge for cause. Defense counsel objected to Brown's excusal.

[HN10] In a capital case, the State is entitled to jurors who will impartially consider and decide the facts and conscientiously apply the **[\*325]** law as charged by the court. *Perillo, 758 S.W.2d at 577*; *Adams v. Texas, 448 U.S. 38, 45, 100 S. Ct. 2521, 65 L. Ed. 2d 581 (1980).* We agree with appellant that venireman Brown at times stated that she could set aside her personal feelings and answer the special issues based upon the evidence. However, she just as firmly maintained that she would ignore the evidence no matter how great and answer "no" to at least one of the special issues in order to avoid the death penalty. When presented with a record such as this, we must afford great deference to the trial court's discretion in deciding whether a venireman should be excused on the basis of an inability to follow the law. Article 37.071; *Perillo, 758 S.W.2d at 577*. Although **[\*\*23]** some of Brown's answers indicated that she could answer the special issues in accordance with the evidence, the record contains sufficient testimony to the contrary to hold that the trial court could reasonably have found that her testimony as a whole indicated that she would not have been able to perform her duties as a juror. *Perillo, 758 S.W.2d at 577*; *Wainwright v. Witt, 469 U.S. 412, 420, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985).* [11] Since there is sufficient support in the record, we hold that the trial court did not err in granting the State's challenge for cause. Appellant's ninth point of error is overruled.

11 Compare *Riley v. State,* S.W.2d ( No. 69,738, (Tex. Cr. App., delivered November 10, 1993) (*1993 Tex. Crim. App. LEXIS 178*, *10-*11) (venireman did not at any time state that he would not follow the law).

By way of point of error ten, appellant complains that the trial court erred in allowing the State to use a peremptory challenge against prospective juror **[\*\*24]** Green because of her views on the death penalty. Appellant contends that it is a violation of his Sixth and Fourteenth Amendment rights under the United States Con-

Page 10

876 S.W.2d 316, *; 1994 Tex. Crim. App. LEXIS 21, **

stitution for the State to utilize a peremptory strike to exclude a prospective juror who is not in favor of the death penalty. [12] We disagree.

> 12    Appellant relies on *Brown v. Rice, 693 F. Supp. 381 (W.D.N.C. 1988)*, to support his argument. *Brown* has since been reversed in part by *Brown v. Dixon, 891 F.2d 490 (4th Cir. 1989), cert. denied, 495 U.S. 953, 110 S. Ct. 2220, 109 L. Ed. 2d 545 (1990)*.

[HN11] Article 35.14 provides a vehicle with which to exclude potential jurors that an advocate believes are prejudiced against his cause. These peremptory challenges may be made for any reason so long as they are not exercised in a racially discriminatory manner. Article 35.261; *Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)*. [HN12] Subject to the constraints of Article 35.261, we have held that a party need not assign [**25] a reason for exercising his peremptory strikes, even where the discernable purpose of the strike is to exclude a prospective juror who is not in favor of the death penalty. *Hernandez v. State, 819 S.W.2d 806, 818 (Tex. Cr. App. 1991), cert. denied, U.S. , 112 S. Ct. 2944, 119 L. Ed. 2d 568 (1992)*; *May v. State, 738 S.W.2d 261, 267-68* (Tex. Cr. App.), *cert. denied, 484 U.S. 872, 108 S. Ct. 206, 98 L. Ed. 2d 158 (1987)*. We overrule appellant's tenth point of error.

In his second point of error, appellant complains about the admission of six photographs depicting Bass as she appeared at the crime scene and her wounds as viewed at the autopsy. Appellant specifically complains the probative value of State's Exhibits 37, 38, 39, 68, 69, and 70 is greatly outweighed by their prejudicial effect.

At trial, appellant objected to the admission of State's exhibit 39 only on the basis of repetition. Since his trial objection does not comport with the issue raised on appeal, he has preserved nothing for our review. *Thomas v. State, 723 S.W.2d 696, 700 (Tex. Cr. App. 1986)*; *Johnson, 803 S.W.2d at 293*. Therefore, we will address appellant's argument [**26] only as to the remaining five exhibits. Appellant does not challenge the relevancy of these exhibits.

Appellant cites *Burdine v. State, 719 S.W.2d 309, 316 (Tex. Cr. App. 1986), cert. denied, 480 U.S. 940, 107 S. Ct. 1590, 94 L. Ed. 2d 779 (1987)*, to argue that the photographs were submitted by the State purely to "inflame the passion of the jury." The Texas Rules of Criminal Evidence, however, have since modified *Burdine*. See Tex. R. Cr. *Evid. 401, 402*, and *403*; *see also Long v. State, 823 S.W.2d 259, 271 (Tex. Cr. App. 1991)*, [*326] *cert. denied, U.S. , 112 S. Ct. 3042, 120 L. Ed. 2d 910 (1992)*. Our review is limited to determining whether the probative value of the photos is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. *Rule 403*, supra; *Long, 823 S.W.2d at 271*, citing *Montgomery v. State, 810 S.W.2d 372, 389 (Tex. Cr. App. 1991)* (Opinion on Rehearing).

[HN13] A court may consider many factors in determining whether the probative value of evidence is substantially outweighed by the [**27] danger of unfair prejudice. These factors include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black and white, whether they are close-up, and whether the body depicted is clothed or naked. *Long, 823 S.W.2d at 272*. A court, however, should not be limited by this list. The availability of other means of proof and the circumstances unique to each individual case should also be considered.

Appellant does not explain why he believes the photographs were inflammatory except to note that they "were especially gruesome in their detailed and vivid depiction of the murder scene and Ms. Bass's subsequent autopsy." State's exhibits 37 and 38 are 8" X 10" color photographs of decedent as she appeared at the scene of the crime. State's exhibit 37 is a close-up of decedent's shirt-wrapped head and depicts the injury to her eye. State's exhibit 38 shows the upper-portion of decedent, laying face down. The photo shows the impression wounds in her left shoulder and the direction the blood flowed from the initial head injuries. Although the photographs are gruesome and detailed, they are not enhanced in any way and portray no more [**28] than the injuries inflicted. *See Narvaiz, 840 S.W.2d at 429*. The trial court did not err in admitting these photographs.

State's exhibits 68, 69, and 70 are 8" X 12" color photographs of decedent at the coroner's office. State's exhibit 68 shows Bass nude and face down on the examining table. The body has been cleaned of the dried blood. The exhibit gives an overall view of the various injuries Bass received prior to the gunshot. State's exhibit 69 is a close-up of the head injuries. Bass' hair has been shaved from around the injuries in order to depict their shape. The exhibit was used during trial to show the semi-circular injury that was believed to have been caused by the lamp upon which appellant's fingerprint was found. State's exhibit 70 is the only photo of the stab wound to Bass' neck.

It is doubtful the State's case would have been rendered significantly less persuasive without the introduction of these photographs. Testimony was presented at trial regarding the cause of death and the effect of the blows to decedent. However, the photographs "are not, in our estimation, so horrifying or appalling that a juror of normal sensitivity would necessarily encounter difficulty

Page 11

876 S.W.2d 316, *; 1994 Tex. Crim. App. LEXIS 21, **

[**29] rationally deciding the critical issues of this case after viewing them." *Fuller v. State, 829 S.W.2d 191, 206 (Tex. Cr. App. 1992), cert. denied, U.S. , 113 S. Ct. 2418, 124 L. Ed. 2d 640 (1993).* Further, as regards the nudity in State's exhibit 68, the photo is not so vulgar or indecent as to draw attention away from the wounds that are the focus of the exhibit.

We are not persuaded that the danger of unfair prejudice substantially outweighed the probative value of the above photographs. Therefore, we hold that the trial court committed no error in admitting the exhibits. Point of error two is overruled.

In his third point of error, appellant argues that the trial court erred in not granting a mistrial after a nonresponsive answer was given by a witness. Appellant refers to a portion of witness Wilson's testimony where he stated he told Bass to keep a gun by her bed "because of what had been taking place in Wichita Falls." Appellant alleges that this statement was so inflammatory and prejudicial that the trial court's instruction to the jury to disregard was insufficient, and that his request for a mistrial should have been granted.

[HN14] Error in admitting [**30] improper testimony may be corrected by a withdrawal and an instruction to disregard unless it appears the evidence is clearly calculated to inflame [*327] the minds of the jury and is of such character as to suggest the impossibility of withdrawing the impression produced on their minds. *Waldo v. State, 746 S.W.2d 750, 752 (Tex. Cr. App. 1988).* Here the arguable testimony occurred as follows:

BY [PROSECUTION]:

Q OK. I think I just have one last area of questioning, Mr. Wilson.

With regard to the revolver, the .32-caliber, did you make any suggestion to Mrs. Bass as to where to keep that weapon?

A Yes, I did sir.

Q And where did you suggest or recommend that she keep the weapon?

A Well, sir, I recommended to her to keep it on the stand near her bed there, because of what had been taking place in Wichita Falls.

When appellant objected, the trial court sustained the objection and instructed the jury to disregard the statement. Appellant then moved for mistrial, but his request was denied.

The State's line of questioning immediately prior to Wilson's statement was referring to the location of evidentiary items prior to the offense. Appellant [**31] argues that Wilson's statement about "what had been taking place in Wichita Falls" would naturally lead the jury to believe that other criminal activity similar to facts in this case had been happening in the area and that appellant was responsible for those episodes too. However, Wilson's statement was general and did not refer to appellant in any way. Viewing the nonresponsive answer in context, we find that neither the question nor Wilson's response was "clearly calculated to inflame the minds of the jury." *Waldo, 746 S.W.2d at 752.* We hold that the trial court's instruction to disregard cured any error. The point of error is overruled.

In his first point of error, appellant asserts that the trial court erred in admitting the fruits of a search carried out pursuant to an invalid search warrant. Specifically, he argues that because the attached appendices to the search warrant affidavit were not incorporated by reference into the body of the affidavit, the search warrant was not supported by probable cause. Appellant concedes that if the appendices were incorporated, the search warrant would probably be valid.

The search warrant incorporates the affidavit by reference. Attached [**32] to the sworn-to and signed affidavit are appendices A and B. Each appendix is entitled "Affidavit for evidence search warrant." Neither appendix is itself signed or individually sworn to. Nor does the affidavit expressly incorporate the appendices by reference.

[HN15] Generally, incorporating the appendices to an affidavit by reference would be preferred. It does not invariably follow that absent such an incorporation the affidavit must fail. *Cf. U.S. v. Beaumont, 972 F.2d 553, 561 (5th Cir. 1992), cert. denied, Beaumont v. U.S., U.S. , 113 S. Ct. 1953, 123 L. Ed. 2d 657 (1993)* (a warrant does not necessarily fail absent incorporation by reference of the affidavit); *see also Commonwealth v. Truax, 397 Mass. 174, 490 N.E.2d 425, 431 (1986)* (affidavit valid even though pages attached to warrant were not signed or sworn to). The Supreme Court has cautioned that "[HN16] affidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a common sense and realistic fashion." *U. S. v. Ventresca, 380 U.S. 102, 109, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965).*

There was testimony elicited at a motion to suppress hearing conducted during trial [**33] that the issuing magistrate essentially considered the attached appendices as part and parcel of the warrant affidavit. The appendices are physically attached to the affidavit, and the matter contained therein is an obvious continuation of

Page 12

876 S.W.2d 316, *; 1994 Tex. Crim. App. LEXIS 21, **

that paragraph of the affidavit setting forth the basis for probable cause. The magistrate even suggested a handful of changes to appendix A before he signed the warrant. These changes were made by hand and initialed by both the magistrate and the affiant. [13] Under these unusual circumstances it is apparent that the magistrate considered the affiant's oath to extend not **[*328]** only to matters contained on the face of the affidavit page, but also to the information contained in the attached appendices. The trial court could reasonably have concluded that the appendices were implicitly incorporated within the affidavit. Appellant's first point of error is overruled.

13    At the suppress ion hearing appellant argued the magistrate thus abandoned his detached and neutral status. He does not reiterate this argument, however, on appeal.

**[**34]** In his sixth and seventh points of error, appellant contends that the trial court erred by denying his requested jury instruction on "reasonable doubt" in both the guilt/innocence and punishment phases of trial. He argues that because he requested an instruction similar to the one required in *Geesa v. State, supra*, the holding in that case should be given retroactive application to his case. During both phases of trial, appellant requested the following definition:

A reasonable doubt is based upon reason and common sense, and not the mere possibility of guilt. A reasonable doubt is the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt, therefore, must be proof of such convincing character that a reasonable person would not hesitate to act and rely on it.

Appellant now argues that because his definition essentially tracks the one required by *Geesa, 820 S.W.2d at 162*, and because he preserved error by requesting the definition, that *Geesa* should; be applied retroactively to his case.

We find appellant's argument unpersuasive. At the time appellant was tried, it was not a requirement that the trial court define **[**35]** "reasonable doubt." *Goss v. State, 826 S.W.2d 162, 169 (Tex. Cr. App. 1992), cert. denied, U.S. , 113 S. Ct. 3035, 125 L. Ed. 2d 722 (1993)*; *McGinty v. State, 723 S.W.2d 719, 720-21 (Tex. Cr. App. 1986)*. [HN17] Although we have subsequently held that a definitional instruction of the term is required, we declared in *Geesa* that this holding would be applied prospectively only. *Geesa, supra, at 165*; *Goss, supra, at 169*. Appellant does not argue we erred to limit appli-

cation of *Geesa* to cases tried after it was handed down, and we do not address that question here. [14] He contends only that because he preserved error, he should be excepted from the prospective-only rule. But to hold that a change in the law will have only a prospective application is essentially to hold that there was no error previously to preserve. Points of error six and seven are overruled.

14    This Court has seen a number of arguments in recent months that our prospective-only holding in *Geesa* was in error, under the rationale of *Harper v. Virginia Department of Taxation, 509 U.S. , 113 S. Ct. 2510, 125 L. Ed. 2d 74 (1993)*. Appellant makes no such argument here, however, and in fact cites only *Geesa* itself in support of this point of error.

**[**36] Punishment Phase**

In appellant's fifteenth point of error, he contends that the trial court erred in permitting three punishment-phase witnesses to testify because their names were not on the State's witness lists. On appeal, he further objects that the testimony resulted in surprise.

[HN18] If a witness' name is not furnished a defendant before trial despite a court order, any error in allowing that witness to testify over a claim of surprise is "made harmless" by defendant's failure to object or move for a continuance. *Youens v. State, 742 S.W.2d 855, 860 (Tex. App. - Beaumont 1987, pet. ref'd)*, citing *Hubbard v. State, 496 S.W.2d 924, 926 (Tex. Cr. App. 1973)*. In the instant case, appellant objected [15] but failed to move for a continuance in order to interview the witnesses or determine the matters about which they were to testify. Having failed to do so, he "cannot now be heard to complain." *Hubbard v. State, supra*. We overrule appellant's fifteenth point of error.

15    Appellant did not object on the basis of surprise during trial. Therefore, nothing was preserved for review on that point. *See Thomas, 723 S.W.2d at 700*.

**[**37]** In point of error fourteen, appellant complains that the trial court erred in allowing extraneous documents to be admitted as part of appellant's pen packet. During the punishment phase of trial, appellant's pen packet was admitted into evidence. Included in the packet was a motion to revoke probation, **[*329]** an order issuing an arrest warrant, and an arrest warrant for cause numbers 24,599-C and 24,371-C. Appellant contends that these documents contain "extraneous hearsay material" and the "jury could interpret these documents to be a comment on the weight of the evidence by the court in the jury's mind." We disagree.

Page 13

876 S.W.2d 316, *; 1994 Tex. Crim. App. LEXIS 21, **

We address first that part of appellant's multifarious argument that the motion to revoke, the order, and the warrant were "extraneous." [HN19] The trial court may admit any evidence it deems relevant to sentencing at the punishment phase of a capital murder trial. *Felder v. State, 848 S.W.2d 85, 98 (Tex. Cr. App. 1992), cert. denied, U.S. , 114 S. Ct. 95, 126 L. Ed. 2d 62 (1993).* Appellant argues that the above documents were not necessary or required in order to prove the prior convictions because the indictments, judgments, and sentences **[**38]** were all admissible for that purpose. Appellant overlooks, however, that the trial court may have deemed them relevant to one of the special issues. [HN20] That appellant committed another crime while already on probation for other offenses has a bearing on the question of whether he would pose a future danger to society. Article 37.071(b)(2). It was within the trial court's discretion to determine if the documents had relevance to either of the special issues. [HN21] Absent a clear abuse of discretion, the trial court's ruling will not be disturbed. *Id.*

As for appellant's contention that the motion to revoke, the order issuing the arrest warrant, and the warrant itself were all hearsay, we note that appellant did not object specifically that these documents were hearsay. Instead he made what he himself characterized at trial as a "general" objection that the entire pen packet was hearsay. In *Jones v. State, 843 S.W.2d 487, at 492 (Tex.Cr.App. 1992)*, we opined:

[HN22] The trial court need never sort through challenged evidence in order to segregate the admissible from the excludable, nor is the trial court required to admit only the former part or exclude only the latter part. If evidence **[**39]** is offered and challenged which contains some of each, the trial court may safely admit it all or exclude it all, and the losing party, no matter who he is, will be made to suffer on appeal the consequences of his insufficiently specific offer or objection.

Appellant does not now contend that the entire pen packet was hearsay. [HN23] The trial court was not required, in the face of a global hearsay objection, to cull through the pen packet and exclude whatever particular matters he may find there that meet that description. See Tex. R. Cr. *Evid. 103(a)(1).* Appellant's fourteenth point of error is overruled.

Finally, in his eleventh point of error appellant contends the trial court erred in its instruction during the punishment phase regarding mitigating evidence, [16] commonly referred to as the *Penry* instruction. *See Penry v. Lynaugh, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989).* Specifically, he complains that the trial court did not place the burden of proof on the State to negate the mitigating circumstances.

16    The jury was instructed, in part:

When you deliberate on the questions posed in the special issues, you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the state or the defendant.

* * * *

If you find that there are mitigating circumstances in this case, you must decide how much weight they deserve, if any, and thereafter, give effect answering the issue under consideration. If you determine, when giving effect to the mitigating evidence, if any, that the appropriate punishment for the defendant, based on his background, character or the circumstances of this case, should be a life sentence rather than a death sentence, you are instructed to answer "no" to at least one of the special issues.

Whether this is an adequate *Penry* instruction is not before us. See, however, *Rios v. State, 846 S.W.2d 310, 316 (Tex. Cr. App. 1992), cert. denied, U.S. , 113 S. Ct. 1946, 123 L. Ed. 2d 651 (1993).*

**[**40]** [HN24] In instances where mitigating evidence is presented, all that is constitutionally required is a vehicle by which the jury is able to consider and give effect to the mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime. *Penry, 492 U.S. at 329*; *Johnson v. Texas, 509 U.S. , [*330] 113 S. Ct. 2658, 2667, 125 L. Ed. 2d 290 (1993)* In Texas, this vehicle commonly takes the form of a jury nullification instruction, as in the instant case, or a fourth special issue. *See Fuller, 829 S.W.2d at 209* (jury nullification charge), *State v. McPherson, 851 S.W.2d 846, 847-50 (Tex. Cr. App. 1992)* (fourth special issue).

Page 14

876 S.W.2d 316, *; 1994 Tex. Crim. App. LEXIS 21, **

Neither this Court nor the Texas legislature has ever assigned a burden of proof on the issue of mitigating evidence. *See* Article 37.071. [17] The Eighth and Fourteenth Amendments do not require that a burden be placed on the State. In a plurality opinion, the United States Supreme Court in *Walton v. Arizona* affirmatively declined to "adopt as a constitutional imperative a rule that would require the court to consider the mitigating circumstances claimed by a defendant unless the State negated **[**41]** them by a preponderance of the evidence." *497 U.S. 639, at 650, 110 S. Ct. 3047, at 3055, 111 L. Ed. 2d 511, at 526 (1990)* (plurality opinion). The plurality in *Walton* further held that [HN25] it is not unconstitutional to place a burden on the defendant to establish sufficient mitigating circumstances by a preponderance of the evidence. *Id. U.S. at 649-651*, S.Ct. at 3055-56, L. Ed. 2d at 525-27. Because [HN26] neither legislation nor constitution places a burden of proof upon the State to negate the existence of mitigating evidence, we refuse to fault the trial court for failing to give the jury such an instruction. Therefore, appellant's eleventh point of error is overruled.

17    Currently, Article 37.071 mandates that a jury that finds beyond a reasonable doubt, as required by Subsection (c), that the special issues under Subsection (b) should be answered affirmatively must go on pursuant to Subsection (e) to decide whether mitigating circumstances nevertheless warrant a life sentence. However, neither Subsection (c) nor Subsection (e) itself expressly assigns a particular burden of proof on the issue of mitigation. It might be argued, although we certainly have no occasion here to hold, that Subsection (c) implicitly assigns the burden of proof to the beneficiary of a finding of "sufficient mitigating . . . circumstances to warrant that a sentence of life . . . be imposed." Cf. *Arnold v. State, 786 S.W.2d 295, at 298 (Tex. Cr. App. 1990)* (State has burden of proof to establish harmless error under Tex. R. App. P. 81(b)(2), as beneficiary of the error). That, of course, would be the defendant. But at the time of appellant's trial there was no statutory authority for a *Penry* instruction of any kind, much less a legislative assignment of burden of proof, either express or implied.

**[**42]**   Finding no reversible error, we affirm the judgment of the trial court.

PER CURIAM

(Delivered: February 9, 1994)

EN BANC

McCormick, P.J. and Baird, J.




Caution
As of: Aug 02, 2017

**LEVIYAS JAMAIL CLAYTON, Appellant v. THE STATE OF TEXAS**

**NO. PD-1311-05**

**COURT OF CRIMINAL APPEALS OF TEXAS**

***235 S.W.3d 772*; *2007 Tex. Crim. App. LEXIS 1385***

**October 10, 2007, Delivered**

**NOTICE:**     PUBLISH

**SUBSEQUENT HISTORY:** On remand at *Clayton v. State, 2008 Tex. App. LEXIS 4098 (Tex. App. Corpus Christi, June 5, 2008)*

**PRIOR HISTORY:   [**1]**
   ON STATE'S PETITION FOR DISCRETIONARY REVIEW FROM THE THIRTEENTH COURT OF APPEALS HARRIS COUNTY.
*Clayton v. State, 169 S.W.3d 254, 2005 Tex. App. LEXIS 3439 (Tex. App. Corpus Christi, 2005)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** A jury found defendant guilty of murder under *Tex. Penal Code. Ann. § 19.02(b)* (1994). The Thirteenth Court of Appeals Harris County, Texas, reversed and entered a judgment of acquittal, holding that the evidence was legally insufficient to support the jury's verdict. The court granted further review.

**OVERVIEW:** Defendant testified that he discovered the victim in the backseat of a car covered in blood and that he left after trying and failing to move the car. In finding the evidence legally insufficient, the court of appeals reasoned in part that defendant's bloody fingerprints were not evidence that he was with the victim before the shooting. On further review, the court held that the court of appeals incorrectly applied the Jackson standard when considering the circumstantial evidence by failing to

properly consider the combined and cumulative force of the evidence and view the evidence in the light most favorable to the jury's guilty verdict. The argument that there were more bloody prints than were justified by defendant's explanation supported an inference that he was lying and provided incremental circumstantial evidence that he was the shooter. Other incriminating circumstances included defendant's flight, his failure to report the shooting to animal-control officers who were near the scene, his failure to turn himself into police on an arrest warrant, and the timing of events, which supported an inference that defendant was with the victim at the time of the shooting.

**OUTCOME:** The court reversed the judgment of the court of appeals and remanded the case to that court for consideration of defendant's factual sufficiency claim.

**LexisNexis(R) Headnotes**

*Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*
*Evidence > Procedural Considerations > Circumstantial & Direct Evidence*
[HN1] When the Texas Court of Criminal Appeals reviews a court of appeals's application of the Jackson legal sufficiency standard, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This standard accounts for the factfinder's

Page 2

235 S.W.3d 772, *; 2007 Tex. Crim. App. LEXIS 1385, **

duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Therefore, in analyzing legal sufficiency, the court determines whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. The court's review of all of the evidence includes evidence that was properly and improperly admitted. When the record supports conflicting inferences, the court presumes that the factfinder resolved the conflicts in favor of the prosecution and therefore defers to that determination. Direct and circumstantial evidence are treated equally: Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.

*Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Fleeing & Eluding > Consciousness of Guilt*
*Evidence > Procedural Considerations > Circumstantial & Direct Evidence*
[HN2] A factfinder may draw an inference of guilt from the circumstance of flight.

**COUNSEL:** For APPELLANT: Kurt B. Wentz, Houston, TX.

For STATE: Bridget Holloway, ASSISTANT DISTRICT ATTORNEY, Houston, TX.

**JUDGES:** KEASLER, J., delivered the opinion of the Court in which KELLER, PRICE, WOMACK, JOHNSON, HERVEY, HOLCOMB, and COCHRAN, JJ., joined. MEYERS, J., did not participate.

**OPINION BY:** KEASLER

**OPINION**

[*774] A jury found Leviyas Jamail Clayton guilty of the murder of James Playonero. The Thirteenth Court of Appeals held that the evidence was legally insufficient to support the jury's verdict. [1] We disagree and reverse the judgment of the court of appeals.

1 *Clayton v. State, 169 S.W.3d 254, 255 (Tex. App.-Corpus Christi 2005).*

**Facts**

On June 14, 2001, Angela Davis, an employee with City of Houston Animal Control, stopped to render assistance when the truck in front of her veered off the road into a ditch near the entrance to Brock Park in Harris County, Texas. Her partner, who was following behind her in another car, also stopped. Approximately ten to twenty minutes after the truck veered off the road, Davis looked into the park and noticed something moving. She went to investigate and discovered James Playonero, covered in blood and suffering from several gunshot wounds. Davis called the police for help. Although Playonero attempted [**2] to speak to Davis, she could not understand what he was saying because he was mumbling. Playonero died before the ambulance arrived--approximately ten minutes after he was discovered. According to Davis, between the time she stopped to assist the driver of the truck that veered off the road and the time she went to investigate the movement in the park, she did not hear any gunshots or see any other people or vehicles.

Davis discovered Playonero near a 1995 Toyota Avalon, which Playonero had borrowed from a friend named Angel Ayala earlier that morning. The car appeared to have rolled into a tree and was stuck in the mud. The gear-shift was in neutral, and the ignition was in the accessory position. Police suspected that a tire iron found in the front seat of the car had been wedged against the accelerator so the car could propel itself into the trees. Based on the discovery of a wad of burned paper lodged in the gas manifold, police also concluded that someone had tried to set the car on fire by igniting the gas tank.

An assistant medical examiner with the Harris County Medical Examiner's Office testified that Playonero was shot at close range and that Playonero died within five to ten [**3] minutes after suffering the wounds. He also stated that, based on his training and experience, there was no possible way that Playonero could have lived for twenty [*775] to thirty minutes after receiving those wounds.

The evidence at trial showed that there was a significant amount of blood inside the car and a moderate amount on the outside of the car. A latent-fingerprint examiner with the Houston Police Department testified that he identified prints belonging to Playonero, Ayala, and Clayton. He testified that he identified three sets of prints, stamped in blood--one on the middle console, one on the gear shift, and one on the steering wheel. These prints belonged to Clayton. The prints identified as belonging to Playonero and Ayala were not bloody.

Sergeant Boyd Smith, one of the first homicide officers on the scene, testified that there were no witnesses at the park who saw Playonero get shot. Although bullet fragments were discovered in the car, there were no bullet holes inside the car. Sergeant Smith believed that Playonero was shot both in and outside the car and that the shooting did not take place in the park because there

Page 3

235 S.W.3d 772, *; 2007 Tex. Crim. App. LEXIS 1385, **

were no shell-casings found outside the car. He suspected [**4] that Playonero's murder involved a drug deal when he learned that Ayala and Playonero were Columbian and because of the nature of Playonero's gunshot wounds. Referring to the wounds, Sergeant Smith stated:

> The fact that he was shot in both legs, twice in both legs, once in the forearm, once through and through in the flesh and the stomach, shot in the penis, shot in the middle of the back of the neck, they were torturing him or trying to get information or getting information from something over a bad drug deal.

Jesus Sosa, an officer with the Homicide Division, was assigned to investigate Playonero's death. Clayton became the focus of his investigation based on the print identification. After Officer Sosa obtained an arrest warrant for Clayton in mid-July, he first attempted to find Clayton at his grandmother's house, which was located three to four miles from Brock Park. He also tried to locate Clayton at his girlfriend's apartment and the homes of various relatives. Despite Officer Sosa's efforts, Clayton was not arrested until he was stopped for a traffic violation in March 2002, some eight months later.

Explaining what his investigation revealed, Officer Sosa testified that he did [**5] not speak with any witnesses who saw Clayton in the park on June 14th or who witnessed Clayton shoot Playonero. He also testified that he did not interview any witnesses who could connect Clayton to Playonero.

Concurring with Sergeant Smith's opinion about why Playonero had been murdered, Officer Sosa testified that, based on his investigation, he believed that Playonero was conducting a drug transaction in the park and that the deal had "gone bad." During his investigation, Officer Sosa verified his initial suspicions about Playonero's involvement with drugs. He stated that Playonero's wife told him that Playonero was involved in the drug business and that he would disappear for several days at a time and return with money. In furtherance of his theory, Officer Sosa also referred to Playonero's wounds:

> The way he was shot, the manner in which he was shot, the wounds he received, to me somebody wanted to hurt him.
>
> . . .

> They didn't execute him. An execution is a gunshot wound to the head and that's it. This guy was hurt.
>
> . . .

> Not one of the wounds was a life-threatening injury. It's possible that the final or finishing touch to the back of the [*776] neck was going to be the ultimate, but whoever [**6] shot him in the back of the neck messed that up too.

Finally, offering another factor that supported his theory, Officer Sosa pointed to the car, noting that it had been covered in blood.

Officer Sosa also testified that he eliminated Ayala as a suspect when he interviewed Ayala to determine his involvement. Ayala told Officer Sosa that he was at home alone when Playonero was shot.

The police never recovered a firearm linked to the shooting.

Clayton was the only defense witness. He testified that he went to the park on June 14th about a quarter before noon to meet a woman he had met at a nightclub two weeks earlier. Immediately before he entered the park, he saw a blue car exiting at a high rate of speed. He did not see any other cars in the park when he first arrived. But when he was half-way into the park, he noticed a white Avalon wrecked in front of a tree with the engine running and the rear passenger's door open. Clayton got out of his car and walked toward the car. He saw Playonero lying in the backseat covered in blood. With both hands, Clayton grasped Playonero's left hand for a few seconds and, in response, Playonero began to mumble but Clayton did not understand what he was [**7] saying. Clayton then got in the driver's seat, sat on the tire iron, and "tried to put the car in reverse, but the gravel around the car was - - where the ground was wet and the mud was, the car wouldn't move." Although he tried to move the car two times, the tires just spun. During direct examination by his attorney, Clayton stated that he did not remember touching the console of the car but that he did remember touching the gear-shift handle and the steering wheel. According to Clayton, the gear-shift was in the drive position before he moved it, and when the car would not move, he put the gear-shift in neutral and turned the engine off. Clayton then saw a truck veer off the road outside of the park; he panicked, got in his car, and left the park. As he left the park, he saw two animal control trucks parked behind the truck that veered off the road across the street. Clayton then headed to the house that he shared with his grandmother.

Page 4

235 S.W.3d 772, *; 2007 Tex. Crim. App. LEXIS 1385, **

On cross-examination, the prosecutor challenged Clayton's testimony about his attempts to move the Avalon out of the mud:

Q [Prosecutor]. [Y]ou got the car in reverse. You're spinning the tires in the mud, and no mud gets thrown on that front fender; [**8] is that correct? You saw the picture. There's no mud on it?

A [Clayton]. There's no mud on that car in the picture.

Q. Now I want you to look at this picture again. You notice on this front tire that the mud is only half way kind of, almost half moon shape on the tire?

A. Yes, sir.

Q. And you said that when you first walked up to this car, it was stuck down in the mud, right? It was stuck?

A. Yes, sir.

Q. What we're looking at here, if that's the mud line, where the car was stuck in the mud on that tire.

Defense Counsel: Judge, I object. He's asking him to speculate again.

Prosecutor: He's there, Judge, he should know.

. . .

Court: All right. You give me a chance to rule. He can answer it if he knows.

Q [Prosecutor]. You see what I'm talking about right here, all the mud caked on the tire right there?

A. Yes, sir.

[*777] Q. That's the mud from where the car was stuck in the mud, right?

A. Yes, sir.

The prosecutor also questioned Clayton about why he left the park without telling either of the animal control officers about Playonero:

Q [Prosecutor]. You'd have to agree it's a pretty heinous crime, a pretty bad crime, right?

A [Clayton]. Yes, sir.

Q. And the man's still alive as you're leaving, right?

A. Yes, [**9] sir.

Q. And you can tell that it's serious life-threatening injuries, correct?

A. Yes, sir.

Q. And those animal control officers are right there. Can you help me? You don't go up to them?

. . .

A. Sir, I was scared. I just left.

Q. You were scared of the animal control officers?

A. I was scared when I heard the truck flip over. I didn't know what was going on, sir.

And when the prosecutor questioned him about whether he called 911 when he got home, Clayton admitted that he did not call and stated that he went to his room, sat on his bed for a while thinking about what he had seen, and cried for a few minutes. Although Clayton testified that he often confided in his grandmother, he stated the he did not tell her about what he had seen even though she was there when he came home. Finally, when asked by the prosecutor if any of his family members told him that the police had a warrant for his arrest, Clayton stated that he did not know about the warrant until he was arrested during the traffic stop in March.

**Procedural History**

The jury convicted Clayton of murder [2] and sentenced him to thirty years' imprisonment. Clayton appealed his conviction, claiming "that the evidence was legally and factually [**10] insufficient to prove he committed murder." [3] Without addressing Clayton's factual sufficiency claim, the Thirteenth Court of Appeals held that the evidence was legally insufficient, reversed the trial court's judgment, and entered a judgment of acquittal. [4]

2 *TEX. PENAL CODE. ANN. § 19.02(b)* (Vernon 1994).
3 *Clayton, 169 S.W.3d at 255.*
4 *Id.*

Considering Clayton's bloody prints first, the court of appeals stated that the bloody prints "are not evidence that [Clayton] was with the victim before the shooting,

Page 5

235 S.W.3d 772, *; 2007 Tex. Crim. App. LEXIS 1385, **

and an inference to that effect can be reached only by first assuming that appellant was the perpetrator of the murder and then working backwards." [5] The court concluded that the prints only proved that Clayton was at the crime scene after Playonero was shot and that Clayton's presence after the murder is not enough to prove guilt. [6]

> 5 *Id. at 258.*
> 6 *Id.* (citing *Solomon v. State, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)*; *Medina v. State, 7 S.W.3d 633, 641 (Tex. Crim. App. 1999)*; *Miles v. State, 918 S.W.2d 511, 515 (Tex. Crim. App. 1996)*).

Next, the court noted that an individual's failure to notify law-enforcement officials about a crime is not enough to prove guilt. [7] The court then focused **[**11]** on proof of motive. While observing that motive is **[*778]** not an element of murder, the court stated that "when identity is called into question, as it is here, proof of motive might be the glue that holds the entire case together." [8] The court pointed to the absence of any evidence connecting Clayton to Playonero and then determined that drug-deal-gone-bad theory was unreliable, stating, "Such strained speculation is far too weak and attenuated a connection to prove a motive sufficient to establish beyond a reasonable doubt [Clayton's] identity as the murderer." [9]

> 7 *Id.* (citing *Medina, 7 S.W.3d at 641*).
> 8 *Id.* (citing *Guevara v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004)*; *King v. State, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000)*).
> 9 *Id.*

We granted review to determine whether the Thirteenth Court of Appeals erred in its legal sufficiency analysis and erred in holding that the evidence was legally insufficient to support Clayton's murder conviction. We conclude that it did and remand this case to the court of appeals for consideration of Clayton's factual sufficiency claim.

**Law and Analysis**

[HN1] When we review a court of appeals's application of the legal sufficiency standard set out in *Jackson v.* **[**12]** *Virginia,* [10] "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [11] This standard accounts for the factfinder's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." [12] Therefore, in analyzing legal sufficiency, we "determine whether the necessary inferences are reasonable based upon the combined and cu-

mulative force of all the evidence when viewed in the light most favorable to the verdict." [13] Our review of "all of the evidence" includes evidence that was properly and improperly admitted. [14] When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. [15] Direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." [16]

> 10 *443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).*
> 11 *Id. at 319* (emphasis **[**13]** in original).
> 12 *Id.*
> 13 *Hooper v. State, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007).*
> 14 *Conner v. State, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).*
> 15 *Jackson, 443 U.S. at 326.*
> 16 *Hooper, 214 S.W.3d at 13.*

After a thorough review of the record and the opinion below, we hold that the court of appeals incorrectly applied the *Jackson* standard when considering the circumstantial evidence supporting Clayton's conviction. The court failed to properly consider the combined and cumulative force of the evidence and view the evidence in the light most favorable to the jury's guilty verdict. The court did not consider all of the evidence in its sufficiency analysis and, in conducting its cursory review of the evidence, the court improperly used a divide-and-conquer approach, systematically isolating and then discounting the evidence supporting Clayton's conviction. Giving proper deference to the jury's verdict, **[*779]** we find the evidence legally sufficient to sustain Clayton's conviction.

The jury was presented with two conflicting theories--the State's and Clayton's. The jury was able to assess the credibility and demeanor of the witnesses who testified at trial. And most importantly, the jury was able to assess **[**14]** Clayton's credibility and demeanor when he explained the presence of his bloody prints in the Avalon. From the guilty verdict, it is clear that the jury rejected Clayton's exculpatory explanation. With these things in mind, we consider the evidence in the light most favorable to the verdict.

We begin with Clayton's bloody prints. When evaluating the legal sufficiency in burglary cases, we have said that "the fingerprints of an accused, which necessarily must have been made at the time of the burglary, are sufficient to sustain a conviction without further identification evidence." [17] In burglary cases, fingerprints constitute direct evidence of the ultimate fact to be

Page 6

235 S.W.3d 772, *; 2007 Tex. Crim. App. LEXIS 1385, **

proved--illegal entry. [18] In this case, the ultimate fact to be proved is the identity of Playonero's killer. [19] Clayton's bloody prints do not constitute direct evidence of the ultimate fact to be proved--that Clayton shot Playonero. The prints establish only that Clayton was at the crime scene some time after Playonero was shot. Therefore, the court of appeals correctly concluded that the prints, standing alone, do not sufficiently establish that Clayton shot Playonero. However, the prints constitute circumstantial evidence [**15] and, by considering the prints in isolation, the court failed to recognize their significance when considered with the remaining circumstantial evidence admitted at Clayton's trial.

> 17 *Phelps. v. State, 594 S.W.2d 434, 435 (Tex. Crim. App. 1980)* (quoting *Dues v. State, 456 S.W.2d 116, 117 (Tex. Crim. App. 1970)).*
> 18 *Eiland v. State, 509 S.W.2d 596, 598 (Tex. Crim. App. 1974).*
> 19 *See id.*

In addition to establishing Clayton's presence at the crime scene after Playonero was shot, the bloody prints provide an additional, incremental piece of circumstantial evidence that support an inference that Clayton was the shooter. During the State's closing argument, the prosecutor used the quantity of bloody prints to discredit Clayton's explanation and further its trial theory. Directing the jury's attention to a photograph of Playonero's body, the prosecutor stated that Playonero's hands "were fairly clean." Reminding the jury that Clayton testified that he only grasped one of Playonero's hands, the prosecutor argued, "That's not enough blood on the man's hand to be able to leave it behind to be able to leave that many prints. And to leave that much blood on the center console, gear shift, door, didn't [**16] happen." In considering the evidence relied on by the prosecutor, a rational juror could infer that Clayton lied about the extent of his involvement with Playonero and therefore lied about his involvement in Playonero's death. And, when considered with Sergeant Smith's testimony about the unlikelihood that Playonero was shot at the crime scene, a juror could rationally infer that, in order to dispose of the evidence, Clayton drove Playonero to the park in the Avalon after he was shot. Indeed, such an inference would be consistent with Davis's statement that she did not see any vehicles leave the park when she was assisting the driver of the truck outside of the park's exit as well as the medical examiner's testimony that Playonero would be able to live for only five to ten minutes after sustaining the gunshot wounds.

[*780] We have recognized that [HN2] a factfinder may draw an inference of guilt from the circumstance of flight. [20] Clayton's flight from the park, which the court of appeals failed to consider, constitutes an additional piece of incriminating circumstantial evidence. And, in this case, an inference of guilt based on flight was heightened by the obvious conflict between Clayton's stated [**17] reason for fleeing the park and his explanation accounting for the presence of the bloody prints. Although the court of appeals accurately determined that Clayton's failure to inform authorities about Playonero is not enough to establish guilt, [21] the court disregarded this circumstance as it related to the incongruity between Clayton's testimony accounting for the bloody prints and his flight. Explaining the presence of his prints, Clayton testified that, after discovering Playonero bloody in the backseat of the car, he was concerned and tried to move the car to get help for Playonero. Clayton stated that he spent two minutes trying to remove the car from the mud but that he was unsuccessful because the tires would spin in the mud. Yet, contrary to his stated objective, Clayton testified that he quickly abandoned his efforts to help Playonero:

> Q [Prosecutor]. You hear the crash, what do you do?
>
> A [Clayton]. I get in my car and leave.
>
> Q. What about the man in the backseat of the car? Did anyone help him?
>
> A. I was trying to help him; but when I heard the truck flip over, I didn't know what to do.
>
> Q. You're going to leave the park to go get him help?
>
> A. I was just trying to get away, sir. [**18] Get away from there, that's it.
>
> Q. So you had decided to stop helping this man and you're just leaving. You're done with it. You can't get the car out. You're on your own, Buddy, I'm leaving; is that correct?
>
> A. Yes, sir.

Clayton also admitted that he failed to stop and tell the animal-control officers about Playonero even though they were just across the street from the park's exit assisting the truck driver. Indeed, Clayton conceded that he failed to call 911 or notify anyone about Playonero after he left the park. In short, Clayton's sudden flight does not comport with Clayton's "Good Samaritan" explanation for the presence of the prints. Additionally, Clayton's "Good Samaritan" explanation was also inconsistent with evidence showing that there was no mud thrown on the front fender of the Avalon. Therefore, a rational juror

Page 7

235 S.W.3d 772, *; 2007 Tex. Crim. App. LEXIS 1385, **

considering Clayton's explanation could draw a strong inference of guilt based on his flight from the park.

> 20    *Hardesty v. State, 656 S.W.2d 73, 78 (Tex. Crim. App. 1983)*; *Jones v. State, 481 S.W.2d 900, 902 (Tex. Crim. App. 1972)*.
> 21    *Clayton, 169 S.W.3d 258*.

Similar to flight, although a marginally less inculpatory piece of circumstantial evidence, is Clayton's failure [**19] to turn himself into police on the arrest warrant. The warrant was issued eight days after Clayton was identified through the bloody prints. Officer Sosa testified that he and his partner tried to locate Clayton over the course of a week after the warrant was issued. He testified that he informed Clayton's grandmother, mother, girlfriend, and father's girlfriend about the warrant. He also stated that Clayton's attorney contacted his partner on July 30th about the warrant. Clayton denied knowing about the warrant until he was arrested the following March, eight months after the warrant was issued. When the prosecutor [*781] asked Clayton where he had been during the eight months, Clayton said he had been at his grandmother's house, mother's house, father's house, and girlfriend's house. A rational juror considering this evidence, could infer that Clayton knew about the warrant and intentionally avoided apprehension. As with the circumstance of flight, under the specific facts of this case, a juror could reasonably draw an inference of consciousness of guilt based on Clayton's failure to turn himself into authorities.

When considering motive, the court of appeals correctly recognized that although [**20] motive is not an element of murder, [22] it may be a circumstance that is indicative of guilt. [23] Noting that there was no evidence connecting Clayton to Playonero, the court stated that Officer Sosa's theory that the murder was drug-related because of Playonero's involvement in dealing drugs did not "prove a motive sufficient to establish beyond a reasonable doubt" that Clayton shot Playonero. In reaching this conclusion, however, the court failed to acknowledge all of the circumstantial evidence that supported the State's theory that Playonero's murder was drug-related.

> 22    *Id.* (citing *Ates v. State, 21 S.W.3d 384, 390 (Tex. App.-Tyler 2000, no pet.)*; *Reeves v. State, 969 S.W.2d 471, 479 (Tex. App.-Waco 1998, pet. ref'd)*).
> 23    *Id.* (citing *Guevara v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004)*; *King v. State, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000)*).

The State's theory rested on more than Officer Sosa's testimony about Playonero's involvement with drugs. Drawing on his training and experience, Officer Sosa

opined that, based on his investigation and his review of the crime scene photos and the autopsy report and photographs, Playonero's murder was likely drug-related. In offering [**21] his opinion, Officer Sosa emphasized the nature of Playonero's wounds, the fact that Playonero was left for dead, the fact that the car was covered in blood, and the fact that someone tried to burn the car in an effort to destroy evidence. Sergeant Smith offered the same opinion. Based on his training and experience, his investigation at the park, the nature of Playonero's wounds, and the fact that Playonero was Columbian, Sergeant Smith theorized that it was a drug-related killing. A juror considering the testimony of Officer Sosa and Sergeant Smith could rationally infer that Playonero's murder was drug-related. Even though the court of appeals gave short-shrift to the circumstantial evidence supporting the State's theory, its ultimate conclusion about the evidentiary value of the proof of motive was correct. Because there was no evidence of a prior relationship between Clayton and Playonero and no evidence that Clayton was involved with drugs, the circumstantial evidence of motive was insufficient to establish Clayton's identity as Playonero's killer; it only provided the jury with an explanation for Playonero's death. As a result, a juror weighing this evidence could not rationally [**22] draw an inference of guilt from this evidence alone.

Finally, we consider the timing of the events surrounding Playonero's death. As stated above, Clayton's own testimony, together with his bloody prints, establish that he was with Playonero in the park after Playonero was shot. Clayton testified that he was with Playonero for at least two to three minutes after Playonero was shot. Referring to Playonero's neck injury, the medical examiner testified: "I think that five to ten minutes would be the outer limit of how long [Playonero] would have been able to survive this type of injury." Davis testified that Playonero [*782] died in her arms approximately ten minutes after she discovered him, which was approximately fifteen to twenty minutes after the truck veered off the road. She stated that she did not see anyone enter or leave the park and did not hear any gunshots while she was assisting the truck driver. She also testified that she did not see anyone else in the park when she discovered Playonero.

In resolving the conflicting testimony offered by Davis and the medical examiner about how long Playonero survived after being shot, a rational juror could reasonably place Clayton in Playonero's [**23] presence at the time of the shooting. Playonero had, at most, a survival time of ten minutes after he was shot in the neck. Given Davis's testimony that Playonero lived for some time after she discovered him and the evidence indicating that no one other than Clayton was with Play-

Page 8

235 S.W.3d 772, *; 2007 Tex. Crim. App. LEXIS 1385, **

onero during the final minutes of his life, it is rational to infer that Clayton was with Playonero when he was shot. And when considered with the combined and cumulative force of the incriminating circumstantial evidence discussed above, we hold that a rational juror could find, beyond a reasonable doubt, that Clayton was responsible for killing Playonero.

After reviewing the evidence under the *Jackson* standard, we hold that the evidence is legally sufficient to support the jury's guilty verdict.

**Conclusion**

Because we hold that the court of appeals erred in holding that the evidence was legally insufficient to support Clayton's conviction for murder, we reverse the judgment of the court of appeals and remand this case so the court can consider Clayton's factual sufficiency claim. [24]

24 *Watson v. State, 204 S.W.3d 404 (Tex. Crim. App. 2006).*

DATE DELIVERED: October 10, 2007

PUBLISH




Questioned
As of: Aug 02, 2017

STEVEN TROY CURRY, Appellant v. THE STATE OF TEXAS

NO. 1521-99

COURT OF CRIMINAL APPEALS OF TEXAS

*30 S.W.3d 394*; *2000 Tex. Crim. App. LEXIS 87*

September 20, 2000, Date Delivered

**PRIOR HISTORY:** [**1] FROM THE EIGHTH COURT OF APPEALS, HARRIS COUNTY.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Criminal appellant and State petitioned for discretionary review from a court of appeals (Texas) holding that the trial court erred in granting State's motion to amend indictment against appellant to delete phrase that appellant used and threatened to use deadly force, a firearm, after appellant was charged with aggravated kidnapping.

**OVERVIEW:** Criminal appellant was charged with aggravated kidnapping. At trial, the victim testified appellant and two other individuals forced him into a car and beat him. The victim originally told police appellant had a gun, but denied saying that at trial. The State's indictment initially included the language that appellant committed the kidnapping by using and threatening to use deadly force, namely, a firearm. Over objection, after the State rested its case it moved to delete that phrase. The motion was granted. On appeal, the court held the ruling on the deletion was error, but that the evidence was sufficient to support appellant's conviction. Both parties petitioned for discretionary review. The court affirmed the appellate court's ruling upholding the conviction. The court held that since the language was not mere surplusage, but described the manner or means of the abduction, it should not have been deleted. The court then held the

sufficiency of the evidence should have been measured by using a hypothetically correct jury charge including the deleted language. Applying that standard, the court held that the evidence supported the conviction.

**OUTCOME:** Conviction affirmed because even though trial court erred in granting the State's motion to amend indictment, since language it sought to delete was not mere surplusage, a proper sufficiency analysis using a hypothetically correct jury charge conducted with that language included showed the evidence was sufficient to support the conviction.

**LexisNexis(R) Headnotes**

*Criminal Law & Procedure > Accusatory Instruments > Accusatory Instruments Generally > Contents > Sufficiency*
*Criminal Law & Procedure > Accusatory Instruments > Accusatory Instruments Generally > Due Process*
*Criminal Law & Procedure > Accusatory Instruments > Indictments > Due Process*
[HN1] Both the U.S. Constitution and the Texas Constitution guarantee an accused the right to be informed of the nature and cause of the accusation against him. The charging instrument must convey sufficient notice to allow the accused to prepare a defense. The legislature has provided some guidance as to the adequacy of notice through ch. 21 of the Code of Criminal Procedure. In particular, *Tex. Code Crim. P. Ann. art. 21.03* provides

Page 2

30 S.W.3d 394, *; 2000 Tex. Crim. App. LEXIS 87, **

that everything should be stated in an indictment which is necessary to be proved.

*Criminal Law & Procedure > Accusatory Instruments > Indictments > Contents > Sufficiency*
[HN2] An indictment is generally sufficient to provide notice if it follows the statutory language. But tracking the language of the statute may be insufficient if the statutory language is not completely descriptive, so that more particularity is required to provide notice. For example, when a statute defines the manner or means of commission in several alternative ways, an indictment will fail for lack of specificity if it neglects to identify which of the statutory means it addresses. On the other hand, the State need not plead evidentiary matters.

*Criminal Law & Procedure > Accusatory Instruments > Indictments > Contents > Surplusage*
[HN3] Allegations not essential to constitute the offense, and which might be entirely omitted without affecting the charge against the defendant, and without detriment to the indictment are treated as mere surplusage, and may be entirely disregarded. The exception to that rule is when the unnecessary matter is descriptive of that which is legally essential to charge a crime. Extra language is descriptive of an element of the offense if it defines the offense more narrowly, places it in a specific setting, or describes the method by which it was committed. Such language must be proven as alleged, even though needlessly stated.

*Criminal Law & Procedure > Grand Juries > Procedures > Return of Indictments > Motions to Quash*
*Criminal Law & Procedure > Accusatory Instruments > Indictments > General Overview*
[HN4] Whether an indictment fails to charge an offense at all is an entirely different issue from whether the indictment fails to provide adequate notice and is therefore subject to a motion to quash.

*Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Kidnapping > Elements*
[HN5] The Texas Penal Code does not merely describe circumstances in which an abduction is unlawful; it defines an abduction as a restraint accompanied by an intent to prevent liberation. *Tex. Penal Code § 20.01(2).*

*Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Kidnapping > General Overview*

[HN6] Abduction adds to "restraint" the intent to prevent liberation in one of two ways: either by secreting or by the use or threat of deadly force. *Tex. Penal Code § 20.01(2).* An essential element of abduction is that the defendant intended to prevent the liberation of the complainant.

*Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution*
*Criminal Law & Procedure > Jury Instructions > Particular Instructions > Use of Particular Evidence*
[HN7] A hypothetically correct jury charge is one which accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. This list is not necessarily exhaustive.

*Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Kidnapping > General Overview*
[HN8] The language of the aggravated kidnapping statute alleges that a defendant acted toward the victim with the intent to either (1) hold him for ransom or reward; (2) use him as a shield or hostage; (3) facilitate the commission of a felony or the flight after the attempt or commission of a felony; (4) inflict bodily injury on him or violate or abuse him sexually; (5) terrorize him or a third person; or (6) interfere with the performance of any governmental or political function. *Tex. Penal Code § 20.04(a).*

*Criminal Law & Procedure > Verdicts > Inconsistent Verdicts*
*Criminal Law & Procedure > Appeals > Standards of Review > General Overview*
*Evidence > Procedural Considerations > Weight & Sufficiency*
[HN9] In reviewing the sufficiency of the evidence, an appellate court must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. An appellate court resolves inconsistencies in the testimony in favor of the verdict.

*Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Kidnapping > General Overview*

Page 3

30 S.W.3d 394, *; 2000 Tex. Crim. App. LEXIS 87, **

*Criminal Law & Procedure > Criminal Offenses > Weapons > Use > Simple Use > Elements*
[HN10] An abduction is a continuous, ongoing event. There is no time limit for an abduction.

COUNSEL: Charles Freeman, Houston.

Jeffrey L. Van Horn, First. Assist. St. Att., Austin.

JUDGES: Keasler, J., delivered the opinion of the Court, in which McCormick, P.J., and Mansfield, Keller, Price, Holland, and Womack, J.J., joined. Johnson, J., delivered a dissenting opinion in which Meyers, J., joined.

OPINION BY: Keasler

OPINION

[*396] ON APPELLANT'S AND STATE'S PETITIONS FOR DISCRETIONARY REVIEW

The State's indictment of Steven Curry charged him with aggravated kidnapping "by using and threatening to use deadly force namely, a firearm." Over Curry's objection, the trial court permitted the State to delete this phrase after trial began. We must decide whether the trial court erred in allowing this deletion, and whether a sufficiency analysis should include this allegation. We conclude that once the State made this allegation, it had to prove it. We also conclude that the sufficiency of the evidence must be analyzed by using this phrase. And in conducting this analysis, we find the evidence sufficient to support Curry's conviction.

FACTS

Jetterson Williams testified that he was in the parking lot of the Spices Nightclub at about 8 p.m. when Curry and two other individuals "put" him into a car and drove off. He [**2] testified that he did not want to be in the car. While in the car, Curry beat him up with his hands. Curry twisted Williams' knee and arm and punched Williams in the head. Williams did not recall the length of the beating, whether the car made any stops, whether Curry said anything to him, or whether Curry got a gun at any time. Williams admitted previously telling the police that Curry had dragged him to the car, that Curry and the other men had beaten him with a brick, that Curry had tied him up and put a plastic bag over his face, that Curry had gone by a friend's house and obtained a .38 pistol, that Curry had exited the car at one point and Williams had heard three gunshots, and that Curry had forbidden Williams to tell to anyone what had happened.

Williams then testified that he never told the police that Curry had a gun, that Curry had gotten out of the car, or that Curry had threatened him. The State impeached Williams' credibility with the statements that he had previously made to the police. On cross-examination, Williams testified that he had no recollection of anything he said to anyone from the time he was thrown in the car until the time he awoke at the hospital. On [**3] re-direct examination, Williams admitted that, after the incident, he was placed in a holdover cell with Curry and had been concerned for his safety. Later in the trial, Williams got back on the stand and testified [*397] that Curry was not the person who kidnapped him and beat him up.

Williams was found by emergency medical technicians in a warehouse district. He was tied up with his pants around his ankles and was shaking uncontrollably. He was hospitalized for a dislocated knee and elbow, trauma to the head, and gross instability.

Tracy Jacobs testified that he saw Curry that night getting out of a similar-looking car and holding a gun. Curry shot and killed another individual, then returned to the car and the car drove off. Other testimony revealed that Curry's home had been burglarized the day before. The burglars had broken into his home by breaking down the door. Curry suspected that Williams was responsible for the burglary. Williams was a petty thief who routinely sold stolen jewelry at the Spices Club. He had several theft convictions.

Curry presented an alibi defense. John McCalep testified that he was working on Curry's front door from about 5 p.m. to about 11 p.m. that [**4] night. He testified that Curry was either in the apartment or nearby the entire time. Curry testified similarly.

The State refuted that testimony with the testimony of Cynthia Floyd, Curry's girlfriend at the time. She testified that she was at the apartment the entire time while McCalep was working on the door, but Curry left the apartment around 7 or 8 p.m. and never returned. She also testified that Curry told her to say that she was with him that evening.

PROCEDURAL BACKGROUND

The State indicted Curry for aggravated kidnapping. The indictment alleged that Curry "abducted Jetterson Williams . . . without his consent, with intent to prevent his liberation by using and threatening to use deadly force namely, a firearm, on [Williams] and with intent to inflict bodily injury on [Williams] and to terrorize [Williams] and to violate and abuse [Williams] sexually."

After the State rested its case, it moved to delete the phrase "by using and threatening to use deadly force

Page 4

30 S.W.3d 394, *; 2000 Tex. Crim. App. LEXIS 87, **

namely, a firearm, on [Williams]" from the indictment. The trial court granted that motion over Curry's objection.

On appeal, the court of appeals held that it was error under Art. 28.10(b) for **[\*\*5]** the trial court to grant the State's motion, and the error harmed Curry. [1] On Curry's sufficiency point, the court of appeals held that the evidence was sufficient to convict. [2] Curry filed a petition for discretionary review in which he argued that the court of appeals erred in its sufficiency analysis by failing to apply *Malik v. State*. [3] We agreed and remanded the case to the court of appeals to reconsider Curry's sufficiency point in light of *Malik*. [4]

> 1   *Curry v. State, 966 S.W.2d 203, 205-06* (Tex. App. -- El Paso 1998).
> 2   *Id. at 207.*
> 3   *953 S.W.2d 234 (Tex. Crim. App. 1997).*
> 4   *Curry v. State, 975 S.W.2d 629 (Tex. Crim. App. 1998).*

On remand, the court of appeals again found that the trial court's ruling on the State's motion to amend the indictment was error and the error harmed Curry. [5] In its sufficiency analysis, the court concluded that it was "bound by the theory alleged in the indictment as amended." [6] Since **[\*\*6]** neither the jury charge given nor the amended indictment required proof that Curry used a firearm, the court found the evidence sufficient to support a conviction. [7]

> 5   *Curry v. State, 1 S.W.3d 175, 177-79* (Tex. App. -- El Paso 1999).
> 6   *Id. at 181.*
> 7   *Ibid.*

Both the State and Curry filed petitions for discretionary review, from which we **[\*398]** granted three grounds. The State, through the State Prosecuting Attorney and the Harris County District Attorney, contends that the phrase at issue in the indictment was surplusage, unnecessary to the indictment, so the State was permitted to "abandon" the language even after trial began. Curry argues that the court of appeals erred in its sufficiency analysis, because under *Malik*, the hypothetically correct jury charge would have included the phrase which the State was improperly allowed to abandon. Since the resolution of Curry's claim depends on our resolution of the State's contention, we address the State's claim first.

**[\*\*7]   MODIFICATION OF INDICTMENT**

Initially, we note that this case does not really involve an "abandonment" of an allegation. The State was permitted to delete its specific allegation regarding the type of abduction it sought to prove. As a result, it was permitted at trial to prove either definition of abduction.

Rather than "losing" the allegation it deleted, it essentially retained that allegation and added the alternative definition of abduction, giving it the opportunity to prove either one in order to obtain a conviction. By deleting the words it did, the State actually broadened the scope of the offense alleged so as to include both theories of abduction. This is not like a standard "abandonment," which results in the State limiting its theories at trial. We will refer to the deletion of the phrase in this case as a modification of the indictment, rather than an abandonment.

**Legal Background**

[HN1] Both the U.S. Constitution and the Texas Constitution guarantee an accused the right "to be informed of the nature and cause of the accusation" against him. [8] The charging instrument must convey sufficient notice to allow the accused to prepare a defense. [9] The Legislature **[\*\*8]** has provided some guidance as to the adequacy of notice through Chapter 21 of the Code of Criminal Procedure. [10] In particular, Art. 21.03 provides that "everything should be stated in an indictment which is necessary to be proved." [11]

> 8   *U.S. CONST., AMEND. VI.*; *TEX. CONST. Art. I, § 10.*
> 9   *State v. Mays, 967 S.W.2d 404, 406 (Tex. Crim. App. 1998).*
> 10   *Ferguson v. State, 622 S.W.2d 846, 849 (Tex. Crim. App. 1981)* (op. on reh'g).
> 11   *TEX. CODE CRIM. PROC.  Art. 21.03.*

[HN2] An indictment is generally sufficient to provide notice if it follows the statutory language. [12] But tracking the language of the statute may be insufficient if the statutory language is not completely descriptive, so that more particularity is required to provide notice. [13] For example, when a statute defines the manner or means of commission in several alternative ways, an indictment will fail for lack of specificity if it neglects to identify which of the statutory means it addresses. [14] **[\*\*9]** On the other hand, the State need not plead evidentiary matters. [15]

> 12   *Olurebi v. State, 870 S.W.2d 58, 62 (Tex. Crim. App. 1994).*
> 13   *Ibid.*
> 14   *Mays, 967 S.W.2d at 407.*
> 15   *Berg v. State, 747 S.W.2d 800, 809 (Tex. Crim. App. 1984)* (op. on reh'g).

Not every list of alternatives in a statute will constitute a "manner or means" of committing the offense. For example, in *Thomas v. State*, we held the State need not allege which statutory definition of "owner" it seeks to

Page 5

30 S.W.3d 394, *; 2000 Tex. Crim. App. LEXIS 87, **

prove in a theft case. [16] We reached this conclusion because the term "owner" did not "go to an act or omission of the defendant." [17] Similarly, we held the State need not further define the phrase "without effective consent," as **[\*399]** that phrase did not constitute an act or omission on the part of the defendant. [18] In contrast, in *Ferguson v. State*, we held the State did need to allege, in the face of a motion to quash, which method of delivery it sought to prove **[\*\*10]** in a delivery of controlled substance prosecution. [19] This was because delivery was "the act by the [defendant] which constituted the criminal conduct." [20]

> 16   *Thomas v. State, 621 S.W.2d 158, 164 (Tex. Crim. App. 1981)* (op. on reh'g).
> 17   *Ibid.*
> 18   *Id. at 161.*
> 19   *Ferguson, 622 S.W.2d at 850-51.*
> 20   *Id. at 850.*

More recently, in *Saathoff v. State*, [21] we extended the concept beyond acts and omissions to conduct. [22] There, we held that the State must allege, in the face of a motion to quash, which type of intoxication it seeks to prove in a prosecution for involuntary manslaughter. [23] The State argued that intoxication was not an act or omission, but merely a condition. We held the State interpreted the concept of "act or omission" too narrowly. [24] We concluded that "if the prohibited conduct is statutorily defined to include more than one manner or means of commission," the State must allege, upon timely request, **[\*\*11]** which manner or means it seeks to establish. [25]

> 21   *891 S.W.2d 264 (Tex. Crim. App. 1994).*
> 22   *TEX. PENAL CODE § 1.07(a)(10)* (conduct means an act or omission and its accompanying mental state).
> 23   *891 S.W.2d at 267.*
> 24   *Id. at 266.*
> 25   *Ibid.*

Sometimes the State alleges evidentiary matters in its indictment which are not "necessary to be proved" under Art. 21.03. These allegations are considered "surplusage." In *Burrell v. State*, [26] we explained that "[HN3] allegations not essential to constitute the offense, and which might be entirely omitted without affecting the charge against the defendant, and without detriment to the indictment are treated as mere surplusage, and may be entirely disregarded." [27] The exception to that rule is when "the unnecessary matter is descriptive of that which is legally essential to charge a crime." [28] In *Upchurch v. State*, we explained that extra language is "descriptive" of an element **[\*\*12]** of the offense if it "defines the offense more narrowly, places it in a specific setting, or describes the method by which it was committed." [29] Such language "must be proven as alleged, even though needlessly stated." [30]

> 26   *526 S.W.2d 799 (Tex. Crim. App. 1975).*
> 27   *Id. at 802.*
> 28   *Ibid.*
> 29   *Upchurch v. State, 703 S.W.2d 638, 641 (Tex. Crim. App. 1985).*
> 30   *Id. at 640, citing Burrell*, 526 S.W.2d at 802.

It is important to distinguish two concepts. [HN4] Whether an indictment fails to charge an offense at all is an entirely different issue from whether the indictment fails to provide adequate notice and is therefore subject to a motion to quash. [31] We are concerned today only with what the indictment must allege to provide notice to the defendant.

> 31   *Olurebi, 870 S.W.2d at 62 n.5.*

**[\*\*13] Application**

To determine whether the phrase in this case was surplusage, we review our cases on surplusage. The vast majority of our surplusage cases involve language that is not derived from any statute. In those cases, the language at issue is either unnecessary language that need not be proved [32] or descriptive language that must **[\*400]** be proved even though needlessly alleged. [33]

> 32   *Eastep v. State, 941 S.W.2d 130, 135 (Tex. Crim. App. 1997)* (abandonment of some appropriations in theft indictment permissible where aggregate value of remaining appropriations was still over $ 20,000); *Swope v. State, 805 S.W.2d 442 (Tex. Crim. App. 1991)* (State need not allege, to provide notice, acts defendant charged as party committed which constituted manner or means in which he solicited, encouraged, directed, or aided primary actor); *Mays v. State, 726 S.W.2d 937, 941-42 (Tex. Crim. App. 1986)* (allegation of conduct of another person was surplusage and need not be proved because did not describe any conduct of defendant's); *Upchurch, supra* (allegation that vehicle was "exempt" was not descriptive of any element of offense of failure to maintain financial responsibility so was surplusage and need not be proved); *Carberry v. State, 701 S.W.2d 255 (Tex. Crim. App. 1985)* (excessive markings by bank on tenor of check alleged in forgery indictment were surplusage and need not be proved); *Ex parte Williams, 622 S.W.2d 876, 877 (Tex. Crim. App. 1981)* (allegations in credit card abuse indictment that card

Page 6

30 S.W.3d 394, *; 2000 Tex. Crim. App. LEXIS 87, **

was "owned by complainant" and stolen "from complainant" were surplusage and need not be proved, even though alleged); *Hardie v. State, 588 S.W.2d 936, 938-39 (Tex. Crim. App. 1979)* (allegation of culpable mental state was surplusage and need not be proved where not an element of offense); *Smallwood v. State, 607 S.W.2d 911, 912 (Tex. Crim. App. 1979)* (allegation in robbery indictment that property stolen was "three pair women's slacks" was surplusage because property taken not essential element of offense so need not be proved, even though alleged); *Green v. State, 578 S.W.2d 411 (Tex. Crim. App. 1979)* (allegation in criminal mischief indictment that property was "seven miles north of Palo Pinto County" was unnecessary and not descriptive of what was legally essential, so was surplusage, and need not be proved, even though alleged); *Ferguson v. State, 572 S.W.2d 521, 524 (Tex. Crim. App. 1978)* (word "copy" on tenor of security in indictment was surplusage and need not be proved because not descriptive of offense); *Davis v. State, 532 S.W.2d 626 (Tex. Crim. App. 1976)* (allegation of money stolen in robbery was surplusage and need not be proved where indictment also alleged automobile was stolen and robbery prosecution did not require proof that all the property alleged was in fact stolen); *Collins v. State, 500 S.W.2d 168, 169 (Tex. Crim. App. 1973)* (allegation of value "over $ 5.00" surplusage, as statute only required value be below $ 50.00); *Malazzo v. State, 308 S.W.2d 29, 31, 165 Tex. Crim. 441 (1957)* (allegation of value "in excess of $ 25" surplusage and need not be proved).

**[**14]**

33    *Langston v. State, 855 S.W.2d 718, 721-22 (Tex. Crim. App. 1993)* (allegation in trespass case that property was "owned by Karen Johnson" was unnecessary but once alleged, had to be proved, presumably because it was descriptive of property); *Polk v. State, 749 S.W.2d 813, 816 (Tex. Crim. App. 1988)* (allegation that individual was "unknown" to grand jurors was descriptive of element of "another," so once alleged, had to be proved); *Huffman v. State, 726 S.W.2d 155, 156-57 (Tex. Crim. App. 1987)* (allegation of "Black Hat Bar" was unnecessary but descriptive of "licensed premises" so once alleged, had to be proved); *Wray v. State, 711 S.W.2d 631, 634 (Tex. Crim. App. 1986)* (allegation "by pointing said deadly weapon at Mary Ann Henderson" was descriptive of element of threatening another with imminent bodily injury, so once alleged, had to be proved); *Clark v. State, 665 S.W.2d 476,*

*484 (Tex. Crim. App. 1984)* (allegation that defendant used instrument "known as a psychological stress evaluator" was descriptive of "instrument" element of offense, so once alleged, had to be proved); *Franklin v. State, 659 S.W.2d 831 (Tex. Crim. App. 1983)* (unnecessary allegation that defendant knew property was stolen from Elmer L. Herzberg was descriptive of stolen property element of offense, so once alleged, had to be proved); *Windham v. State, 638 S.W.2d 486, 487 (Tex. Crim. App. 1982)* (phrase "by shooting at her with a gun" was allegation of act amounting to more than mere preparation so had to be proven); *Garcia v. State, 595 S.W.2d 533 (Tex. Crim. App. 1980)* (allegation that defendant did "take, steal, appropriate and carry away" was unnecessary but once alleged, had to be proved); *Weaver v. State, 551 S.W.2d 419 (Tex. Crim. App. 1977)* (allegation that gun was a "Ruger" was descriptive of deadly weapon element of offense, so once alleged, had to be proved); *Rowland v. State, 523 S.W.2d 676 (Tex. Crim. App. 1975)* (allegation "on F.M. 1632" was descriptive of "upon a public highway" element of offense, so once alleged, had to be proved); *Cohen v. State, 479 S.W.2d 950, 951 (Tex. Crim. App. 1972)* (allegation "in the 12,300 block of Westheimer Road" was unnecessary, but descriptive of "in the city of Houston, Texas," an element of offense, so once alleged, had to be proved); *McClure v. State, 296 S.W.2d 263, 163 Tex. Crim. 650 (1956)* (allegation "at the Alamo Cafe located at Cleveland and Second Streets" was descriptive of location element of offense so once alleged, had to be proved).

**[**15]**  But in the case at hand, the language at issue comes directly from a statute, specifically, *Penal Code § 20.01(2)(B)*. We only have a handful of surplusage cases concerning statutory language. Some of those cases hold that statutory language **[*401]**  must be proved if alleged. [34] Others hold that excessive statutory language is surplusage and need not be proved. [35] The State relies on this latter line of authority for its contention that the statutory language alleged here was surplusage and need not have been proved.

34    *Thomas v. State, 753 S.W.2d 688, 692 (Tex. Crim. App. 1988)* (allegation that owner did not give his "assent in fact" was unnecessary but descriptive of element of lack of effective consent, so once alleged, had to be proved); *Reynolds v. State, 723 S.W.2d 685, 686-87 (Tex. Crim. App. 1986)* (statutory alternatives for type of restraint, whether by moving victim from one place to another or confining victim, must be alleged in face

Page 7

30 S.W.3d 394, *; 2000 Tex. Crim. App. LEXIS 87, **

of motion to quash); *Gibbons v. State, 652 S.W.2d 413, 415 (Tex. Crim. App. 1983)* (State must allege which type of abduction it seeks to prove in face of motion to quash), *overruled in part*, *Adams v. State, 707 S.W.2d 900, 902-03 (Tex. Crim. App. 1986)* (error does not result in automatic reversal); *Ferguson, 622 S.W.2d at 850-51* (State must allege which type of delivery it seeks to prove in face of motion to quash).

[**16]

35    *Berg, 747 S.W.2d at 809* (allegation that appropriation was "without owner's effective consent" was not element of offense of theft so was surplusage and need not be proved, even though alleged); *Ward v. State, 642 S.W.2d 782, 783 (Tex. Crim. App. 1982)* (false imprisonment indictment need not allege that restraint was "without consent"; that phrase is within definition of "restrain" and would be surplusage); *Jackson v. State, 633 S.W.2d 897, 899 (Tex. Crim. App. 1982)* (allegation that habitation "was not then open to the public" was unnecessary in burglary indictment so need not be proved, even though alleged).

We have already held contrary to the State's position with regard to this precise statute. In *Gibbons*, we held in an aggravated kidnapping case that the State must allege, in the face of a motion to quash, which type of abduction it seeks to prove. [36] The State argues that our holding in *Gibbons* was incorrect, conflicts with *Berg*, *Ward*, and *Ex parte Porter*, [37] and should be overruled. We disagree.

36    *Gibbons, 652 S.W.2d at 415.*

[**17]

37    *827 S.W.2d 324, 327 (Tex. Crim. App. 1992)* (op. on reh'g)

In *Porter*, we held that the State need not allege which definition of "forgery" it seeks to prove. The State contends that "abduct" is no different than "forge." But *Porter* concerns the allegations the State must make in order for an indictment to allege an offense. It does not concern which allegations the State needs to make in order to provide notice. We did state that the particular definition of forgery was merely an evidentiary matter. [38] But we also indicated that in the face of a motion to quash for lack of notice, the State would be required to make this allegation. [39] This reasoning seems to conflict with *Thomas*'s holding that evidentiary matters need not be alleged even in the face of a motion to quash. [40] But since the holding in *Porter* was that the indictment was not fundamentally defective, the statements regarding notice are merely dicta. *Porter*'s holding is irrelevant to the issue before us, and its dicta, though it refutes the

State, is questionable. *Porter* does not conflict [**18] with *Gibbons*.

38    *Ibid.*
39    *Ibid.*
40    *Thomas, 621 S.W.2d at 161.*

The State also argues that *Berg* [41] conflicts with *Gibbons*. In *Berg* we stated that the term "appropriate" need not be further defined. [42] The State contends that "appropriate" and "abduct" are the same. We disagree. Appropriation itself is not defined in the Penal Code. Rather, the Code describes in which circumstances an appropriation is unlawful. [43] We explained in *Berg* that the "manner of acquisition or circumstances surrounding the acquisition [*402] are merely evidentiary matters." [44] We relied on *McClain v. State*. [45] In *McClain*, we explained that the manner of acquisition is irrelevant under the Penal Code. [46] While earlier versions of the Code had set out distinct theft offenses based on the manner of acquisition, the current Code removes that focus entirely. [47]

41    *Berg, 747 S.W.2d at 809.*

[**19]

42    *Ibid.*; *but see Coats v. State, 712 S.W.2d 520 (Tex. Crim. App. 1986)* (term appropriate must be defined); *Coleman v. State, 643 S.W.2d 124 (Tex. Crim. App. 1982)*, (same); *Gorman v. State, 634 S.W.2d 681 (Tex. Crim. App. 1982)* (same).
43    *TEX. PENAL CODE § 31.03(b).*
44    *Berg, 747 S.W.2d at 809.*
45    *687 S.W.2d 350 (Tex. Crim. App. 1985).*
46    *Id. at 353-55.*
47    *Id. at 353.*

The term "abduct" is different from "appropriate." First, unlike "appropriate," "abduct" is defined in the Penal Code. [HN5] The Penal Code does not merely describe circumstances in which an abduction is unlawful; it defines an abduction as a restraint accompanied by an intent to prevent liberation. [48] So the treatment of the terms "appropriate" and "abduct" in the Penal Code is different. Second, there is no legislative history pertaining to the kidnapping statute similar to that of the theft statute. There has been no effort on the Legislature's part to codify [**20] many different types of kidnapping into a single statute. We conclude the rationale behind *Berg* and *McClain* is not applicable to the kidnapping statute.

48    *TEX. PENAL CODE § 20.01(2).*

In *Ward*, the issue was whether informations charging false imprisonment were fundamentally defective for failing to allege that the restraint was "without consent." [49] In holding the informations were not defective, we

Page 8

30 S.W.3d 394, *; 2000 Tex. Crim. App. LEXIS 87, **

stated that the phrase "without consent" was surplusage. [50] This case is also distinguishable. First, "abduct" is conduct, but "without consent" is neither an act, omission, nor conduct. [51] So under *Thomas*, *Ferguson*, and *Saathoff*, "abduct" must be defined while "without consent" need not be.

49    *642 S.W.2d at 783*.
50    *Ibid*.
51    *See Thomas, 621 S.W.2d at 161* (allegation of "without effective consent" in theft indictment not act or omission of defendant).

**[**21]** More importantly, there are no statutory alternative manner or means for the "without consent" element of restraint. Restraint is defined as restricting a person's movement without consent while preventing his liberation in either of two ways. [52] Restraint is not restraint unless it is without consent. Since there are no alternatives to "without consent," there would be no need for the State to make this allegation in an indictment to provide notice. It is a given under the statute that all restraint is without consent. In contrast, the only thing "given" about an abduction is that it includes restraint. The intent element is not a given, since there are two statutory alternatives. So *Ward* is distinguishable.

52    *TEX. PENAL CODE § 20.01(1)*.

Although the State does not rely on *Jackson* or *Marrs v. State*, [53] we note that they, too, are distinguishable. In *Jackson*, the State alleged in a burglary-of-a-habitation indictment that the habitation was "not then open to the public. **[**22]** " [54] This language appears in the portion of the statute criminalizing burglary of a building, not a habitation. [55] We held the State did not need to make the allegation and it was surplusage. [56] This case is distinguishable because the statutory language at issue was not even an element of the offense which the State was seeking to prove.

53    *647 S.W.2d 286 (Tex. Crim. App. 1983)*.
54    *633 S.W.2d at 898-99*.
55    *TEX. PENAL CODE § 30.02(a)(1)*.
56    *633 S.W.2d at 899*.

Finally, there is no conflict between *Marrs* and *Gibbons*. We held in *Marrs* that "enter" need not be further defined in a burglary indictment. "Enter" is defined in the Penal Code as intruding any part of the body or intruding any physical object **[*403]** connected with the body. [57] We explained in *Marrs* that the "act" involved in entering is the intrusion. [58] The statutory alternatives listed do not differentiate between methods of intrusion, because both are essentially **[**23]** the same. [59] Both require the defendant to use his body, either directly or indirectly. [60] Professors Dix and Dawson have

described the statutory alternatives here as the "peripheral aspects" of the act of entering. [61]

57    *TEX. PENAL CODE § 30.02(b)*.
58    *647 S.W.2d at 290*.
59    *Ibid*.
60    *Ibid*.
61    41 GEORGE E. DIX & ROBERT O. DAWSON, CRIMINAL PRACTICE AND PROCEDURE § 20.119 (1995).

[HN6] Abduction is different. It adds to "restraint" the intent to prevent liberation in one of two ways: either by secreting or by the use or threat of deadly force. [62] An essential element of abduction is that the defendant intended to prevent the liberation of the complainant. [63] Without this accompanying mental state, there is no abduction; there is only restraint. The accompanying mental state is what transforms mere restraint into abduction. So there is nothing "peripheral" about this intent element. The two alternative mental states provided in the statute are **[**24]** the "manner or means" of engaging in the conduct of abduction.

62    *TEX. PENAL CODE § 20.01(2)*.
63    *Carpenter v. State, 551 S.W.2d 724, 726 (Tex.Crim.App. 1977)*.

The rationale in *Marrs* involved the specific definition of "enter" in the burglary statute. It did not set forth any general principle of statutory construction. The Penal Code's definition of "enter" is simply not analogous to its definition of "abduct."

We have never before held that a statutory alternative "manner or means" of engaging in an act, omission, or conduct constitutes surplusage. Indeed, we held the opposite in *Gibbons*, *Reynolds*, [64] and *Ferguson*. [65] We decline the State's invitation to create this new rule today. Instead, we reaffirm our decision in *Gibbons* and hold that the State must allege, in the face of a motion to quash, which type of abduction it seeks to prove in order to give the defendant notice. The phrase "by using and threatening to use deadly force namely, **[**25]** a firearm" was not surplusage, and the trial court erred in allowing the State to delete this phrase over Curry's objection after trial had begun.

64    *723 S.W.2d at 686-87* (State must allege, in face of motion to quash, which statutory alternative manner or means of restraint it seeks to prove, whether by moving victim from one place to another or confining victim).
65    *622 S.W.2d at 850* (State must allege which type of delivery it seeks to prove in prosecution for delivery of controlled substance).

Page 9

30 S.W.3d 394, *; 2000 Tex. Crim. App. LEXIS 87, **

Within its argument on this issue, the State urges us to overrule the exception to the surplusage rule which provides that if a phrase is descriptive of an essential element of the offense, it must be proved and cannot be surplusage. But the phrase in this case was not merely descriptive of an element of the offense; it was a manner or means of committing an element of the offense. Since the phrase here does not fall within the exception to the surplusage rule, we need not (and should **[\*\*26]** not) decide whether to abandon the exception to the surplusage rule.

## SUFFICIENCY OF THE EVIDENCE

We next address Curry's contention that the court of appeals erred in its sufficiency analysis. In its original opinion, the court of appeals stated without elaborating that it agreed with Curry "that the record contains no . . . evidence" that Curry abducted Williams "by using and threatening to use deadly force namely, a firearm." [66] **[\*404]** The court did not explain why it agreed with Curry or give any rationale for its conclusion. It made this statement without reciting the facts of the case or examining any relevant caselaw. Nevertheless, the court held the evidence sufficient because it measured the evidence against the jury charge given, and that charge did not require the jury to find that Curry abducted Williams by using a firearm. [67] We remanded for the court to apply *Malik*. [68]

66  *966 S.W.2d at 207.*
67  *Ibid.*
68  *975 S.W.2d at 630.*

On remand, the court of appeals **[\*\*27]** stated as follows:

As we have found in our discussion of Curry's first point of error, Curry's remedy for error in amending the indictment after trial began is a new trial. The error is adequately addressed with this remedy and we need not fashion an additional remedy of acquittal based on failure of the evidence as measured under the original indictment. [69]

69  *1 S.W.3d at 180.*

We disagree. If the evidence is insufficient to support Curry's conviction, the remedy is acquittal. That remedy is greater than simply granting Curry a new trial. Curry's sufficiency point of error must be addressed, regardless of the fact that he has prevailed on his point of error concerning an erroneous amendment of the indictment.

The court of appeals then briefly addressed Curry's sufficiency point. It held that it was "bound by the theory alleged in the indictment as amended." [70] Since the

court's charge, as measured against that indictment, did not require the jury to find that Curry used a firearm, the court **[\*\*28]** found it "irrelevant whether the evidence supported such a finding." [71]

70  *Id. at 181.*
71  *Ibid.*

## Hypothetically Correct Jury Charge

In considering the court of appeals' analysis, we look to *Malik*. Under *Malik*, sufficiency of the evidence is to be measured against the hypothetically correct jury charge. [HN7] A hypothetically correct jury charge is one which "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." [72] This list is not necessarily exhaustive. [73]

72  *Malik*, 953 S.W.2d at 240.
73  *Id. at 240 n.5.*

Determining the "law" as "authorized by the indictment" **[\*\*29]** first requires that we determine which indictment: the State's original indictment or the amended indictment. Since we have concluded the indictment was erroneously amended, the hypothetically correct jury charge must be one which is authorized by the original indictment, not the amended indictment.

We believe the "law" as "authorized by the indictment" must be the statutory elements of the offense of aggravated kidnapping as modified by the charging instrument. That is to say, Curry's hypothetically correct jury charge could not simply quote the language of the statute, instructing the jury to find Curry guilty if it found that he abducted "another person," because the indictment specifically charges that Curry abducted Williams, and the State was required to prove that element of the offense.

Similarly, the hypothetically correct jury charge could not simply track [HN8] the statute, alleging the Curry abducted Williams "with the intent to [either] (1) hold him for ransom or reward; (2) use him as a shield or hostage; (3) facilitate the commission of a felony or the flight after the attempt or commission of a felony; (4) inflict bodily injury on him or violate or abuse him sexually; **[\*\*30]** (5) terrorize him or a third person; **[\*405]** or (6) interfere with the performance of any governmental or political function." [74] The indictment specifically limited the State's allegations to options (4) and (5). So in terms of "setting out the law" as "authorized by the indictment," Curry's hypothetically correct jury charge would have to instruct the jury that, to find

Page 10

30 S.W.3d 394, *; 2000 Tex. Crim. App. LEXIS 87, **

Curry guilty, they must find that he intentionally or knowingly abducted Williams with the intent to inflict bodily injury on him, violate or abuse him sexually, or terrorize him.

74    *TEX. PENAL CODE § 20.04(a).*

In that same vein, the "law" defines two different methods of "abduction," but the indictment alleges only one of those methods. So the hypothetically correct jury charge would have to include the phrase "by using and threatening to use deadly force namely, a firearm." Curry's indictment would not "authorize" a conviction on less than proof of this element, because this phrase is not surplusage; once alleged, it had **[\*\*31]** to be proved.

We next consider whether including that phrase operates to "unnecessarily increase the State's burden of proof." The indictment charged that Curry abducted Williams with intent to prevent his liberation by using and threatening to use deadly force. Including the phrase "by using and threatening to use deadly force namely, a firearm" in the hypothetically correct jury charge does not increase the State's burden of proof. Rather, it keeps the State's burden of proof exactly the same. The State is simply required to prove what it alleged. In contrast, to delete that phrase from the charge would result in a decrease in the State's burden of proof.

Finally, we consider whether inclusion in the jury charge of the phrase "using and threatening to use deadly force namely, a firearm" would "adequately describe the particular offense for which [Curry] was tried." The offense for which Curry was tried was aggravated kidnapping. An "adequate" description of that offense, again, must mean an incorporation of the elements of the charging instrument. Without incorporating those elements, the offense is not "adequately described." Here, the indictment specifically alleged that **[\*\*32]** Curry acted "by using and threatening to use deadly force namely, a firearm." So in this case, an "adequate description of the offense" for which Curry was tried would include this manner and means of abduction.

Our conclusion comports with the rationale we expressed in *Malik.* There, the trial court charged the jury concerning the legality of the defendant's detention. [75] We noted that this charge merely related to the admissibility of evidence, not to any "element of the offense." [76] We explained that a judgment of acquittal should be reserved for those instances in which there is an "actual failure in the State's proof of the crime." [77]

75    *953 S.W.2d at 235, 240.*
76    *Id. at 240.*
77    *Ibid.*

Here, the language at issue is a manner or means of an element of the offense. If the State failed to prove that manner or means, then there was an "actual failure in the State's proof of the crime." So under *Malik,* it follows that this phrase must factor into a sufficiency **[\*\*33]** analysis. We conclude that Curry's hypothetically correct jury charge would have instructed the jury to convict Curry if it found that he intentionally or knowingly abducted Williams with the intent to prevent his liberation by using or threatening to use deadly force namely, a firearm, on Williams and with intent to inflict bodily injury on Williams or to terrorize Williams or to violate and abuse Williams sexually.

**Application**

We next consider whether the evidence was sufficient to convict Curry under this hypothetically correct charge. [HN9] **[\*406]** In reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. [78] We resolve inconsistencies in the testimony in favor of the verdict. [79]

78    *Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979).*
79    *Moreno v. State, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988).*

**[\*\*34]**   Williams testified that around 8 p.m. Curry put him in a car against his will. He testified that Curry beat him up and broke his knee and arm. Though he later testified that it was not Curry who took him and beat him up, the jury was free to find his initial testimony more credible. The State impeached Williams' credibility with statements he had previously made to the police. The jury could have found that Williams was not an entirely credible witness, but that some portions of his testimony were true while others were not.

Jacobs testified that he saw Curry that same night, getting out of a similar-looking car, and holding a gun. He saw Curry shoot and kill someone, then return to the car. Floyd testified that Curry left their apartment around 7 or 8 p.m. and did not return the entire evening. She also testified that Curry asked her to say that he was with her that evening. The evidence also revealed that Curry suspected that Williams was involved in the burglary of his home. Although Curry and McCalep testified that Curry was at the apartment the entire evening, the jury was free to believe Floyd and disbelieve Curry and McCalep.

Based on this testimony, the jury could reasonably **[\*\*35]** have believed that Curry restricted Williams's movement without his consent and that Curry intended to

Page 11

30 S.W.3d 394, *; 2000 Tex. Crim. App. LEXIS 87, **

inflict bodily injury on Williams or terrorize him. The jury could have believed that Curry had a motive, in that the jury could have believed that Curry wanted revenge against Williams for the break-in. The jury also could have believed that Curry asked Floyd to lie for him because he had violated the law that evening.

The only remaining question is whether the jury rationally could have found that Curry restrained Williams with intent to prevent his liberation "by using or threatening to use deadly force namely, a firearm." We believe the jury could have reached this conclusion. [HN10] An abduction is a continuous, ongoing event. [80] There is no time limit for an abduction. [81] So the abduction did not cease once Williams was put in the car. It continued throughout the entire time he was in the car until he was released in the warehouse district. Since Jacobs testified that he saw Curry with a gun that night, the jury could have believed that Curry had that gun and used it during the course of the abduction to prevent Williams' liberation. In addition, since Williams' credibility was **[\*\*36]** impeached by the State, the jury was free to disbelieve Williams' testimony that Curry did not have a gun and that Curry did not threaten him. The jury reasonably could have believed that Williams denied these things at trial because he was afraid of retribution from Curry.

> 80  *Weaver v. State, 657 S.W.2d 148, 150 (Tex. Crim. App. 1983).*
> 81  *Ibid.*

We deem the evidence sufficient for a rational jury to find that the State proved all the elements of the offense beyond a reasonable doubt.

## CONCLUSION

We conclude that the phrase "by using and threatening to use deadly force namely, a firearm" was not surplusage. The trial court erroneously permitted the State to delete this allegation over Curry's objection after trial had begun. The court of appeals has determined that this error **[\*407]** harmed Curry, and we did not grant review of that issue. We therefore affirm the court of appeals' holding which grants Curry a new trial.

We also find that Curry's hypothetically correct jury charge would **[\*\*37]** have included the "deadly force" phrase, and that the evidence was sufficient to convict Curry under such a charge. We affirm, albeit for different reasons, the court of appeals' holding that the evidence was sufficient to convict.

DATE DELIVERED: September 20, 2000

**DISSENT BY:** Johnson

**DISSENT**

Johnson, J., *filed a dissenting opinion, in which* Meyers, J., *joined.*

DISSENTING OPINION

I agree with the majority that once the state alleged aggravated kidnapping "by using and threatening to use deadly force namely, a firearm," it was required to prove that allegation. I also agree that the sufficiency of the evidence must be analyzed using this allegation. However, I respectfully dissent from the final disposition

In the instant case, the court of appeals concluded that the hypothetically-correct jury charge did not include the phrase "by using and threatening to use deadly force namely, a firearm, on the Complainant." *Curry v. State, 1 S.W.3d 175, 180-81* (Tex. App.--El Paso 1999). The majority finds that this was error, and that the hypothetically-correct jury charge would include this phrase. *Ante, 30 S.W.3d 394, 405.* Thus, the court of appeals **[\*\*38]** is found to have applied the wrong standard in its sufficiency analysis. The majority then performs its own sufficiency analysis using the proper hypothetically-correct jury charge. *Ante, 30 S.W.3d 394, 404.*

Such action is inconsistent with our precedents *See, e.g., Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)* (judgment of court of appeals vacated and cause remanded for that court to apply correct standard of review in analyzing sufficiency of the evidence); *Curry v. State, 975 S.W.2d 629 (Tex. Crim. App. 1998)* (judgment of court of appeals vacated and cause remanded for reconsideration of defendant's sufficiency claim in light of *Malik*); *Blanco v. State, 962 S.W.2d 46 (Tex. Crim. App. 1998)* (judgment of court of appeals vacated and cause remanded for reconsideration in light of *Malik*). As we have previously stated, our jurisdiction is limited to review of decisions by the courts of appeals. *Garcia v. State, 15 S.W.3d 533, 536-37 n.5 (Tex. Crim. App. 2000)*; *see also* TEX. CODE CRIM. PROC. 4.04, § 2; TEX. R. APP. P. 66.1. Because the court of appeals did not apply the appropriate **[\*\*39]** sufficiency analysis, the majority's application of the appropriate standard is not a review of the court of appeals' decision; it is an application of that standard in the first instance. We should remand this cause and allow the court of appeals to conduct the appropriate sufficiency analysis. To do otherwise is beyond our authority.

Johnson, J.

Date delivered: September 20, 2000




Caution
As of: Aug 02, 2017

**JIMMIE FIELDS, JR., APPELLANT v. THE STATE OF TEXAS, APPELLEE**

**NO. 12-93-00283-CR**

**COURT OF APPEALS OF TEXAS, TWELFTH DISTRICT, TYLER**

*932 S.W.2d 97*; *1996 Tex. App. LEXIS 1372*

**March 31, 1996, delivered**
**March 31, 1996, filed**

**SUBSEQUENT HISTORY:** [**1] Appellant's Petition for Discretionary Review Refused September 18, 1996. Released for Publication November 15, 1996.

**PRIOR HISTORY:** APPEAL FROM THE 8TH JUDICIAL DISTRICT COURT OF HOPKINS COUNTY, TEXAS.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant challenged his conviction, entered by the 8th Judicial District Court, Hopkins County (Texas), for aggravated possession of more than 400 grams of cocaine.

**OVERVIEW:** Appellant was convicted of aggravated possession of more than 400 grams of cocaine. The jury assessed punishment at life imprisonment and a fine. Appellant raised numerous points of error on appeal. The appellate court rejected appellant's contentions and affirmed his conviction. The court found that the evidence was legally sufficient to support the conviction, that the state proved that appellant exercised care, custody, control, or management over the cocaine found in the vehicle he was occupying, and that appellant knew that the substance was cocaine. The court further found that the trial court properly denied appellant's motion to suppress evidence because the officer had reasonable suspicion to stop appellant and did not exceed the scope of appellant's consent to search. The court also found that certain evidence was seizable under the plain view exception to the warrant requirement because the officer was lawfully in the vehicle and it was immediately apparent that the evidence was seizable evidence of a crime.

**OUTCOME:** The appellate court affirmed appellant's conviction for possession of more than 400 grams of cocaine. The court found that the state proved that appellant exercised care, custody, control, or management over the cocaine found in the vehicle he was occupying, and that appellant knew that the substance was cocaine and, therefore, the evidence was legally sufficient to support the conviction.

**LexisNexis(R) Headnotes**

*Criminal Law & Procedure > Criminal Offenses > Controlled Substances > Possession > General Overview*
[HN1] See *Tex. Health & Safety Code Ann. § 481.115* (Supp. 1993).

*Criminal Law & Procedure > Criminal Offenses > Controlled Substances > Possession > General Overview*
[HN2] Possession is defined in *Tex. Health & Safety Code Ann. § 481.002(38)* (Supp. 1993) as meaning actual care, custody, control or management of the contraband.

*Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*
*Evidence > Procedural Considerations > Exclusion & Preservation by Prosecutor*
[HN3] In reviewing the legal sufficiency of the evidence, the appellate court must examine all of the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. The standard of review is the same for both direct and circumstantial evidence, and the state need not exclude every reasonable hypothesis other than the defendant's guilt.

*Criminal Law & Procedure > Criminal Offenses > Controlled Substances > Possession > Simple Possession > Elements*
*Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution*
[HN4] In order to establish the unlawful possession of a controlled substance, the state must prove that the defendant (1) exercised care, control, or management over the contraband, and (2) knew what he possessed was contraband. To establish control and knowledge of the cocaine, the state must prove more than that the defendant was merely in the vicinity of the controlled substance; it must provide "affirmative links" between the accused and the contraband, i.e., facts and circumstances in addition to mere presence that raise a reasonable inference of the accused's knowledge and control of the contraband.

*Criminal Law & Procedure > Criminal Offenses > Controlled Substances > Possession > General Overview*
[HN5] A variety of factors may link an accused to contraband; these include whether the contraband: (1) was in plain view; (2) was conveniently accessible to the accused; (3) was in a place owned by accused; (4) was in a car driven by accused; (5) was found on the same side of the car as accused; (6) was found in an enclosed space; or (7) emitted an odor. Additional links include whether: (8) paraphernalia to use the contraband was in view of or found on the accused; (9) conduct of the accused indicated a consciousness of guilt; (10) the accused had a special relationship to the contraband; (11) occupants of the automobile gave conflicting statements about relevant matters; (12) the physical condition of the accused indicated recent consumption of the contraband found in the car; and (13) affirmative statements connect the accused to the contraband.

*Criminal Law & Procedure > Pretrial Motions & Procedures > Suppression of Evidence*
*Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion > General Overview*
[HN6] The appellate court must view the evidence offered at a suppression hearing in the light most favorable to the trial court's ruling. The trial judge is the sole and exclusive factfinder at a hearing on a motion to suppress. On appeal, the court does not engage in its own factual review but decides whether the trial court's fact findings are supported by the record. If the findings are so supported, the court is not at liberty to disturb the trial court's findings, and, on review, the court addresses only the question of whether the trial court improperly applied the law to the facts. The totality of the circumstances must be considered in determining whether the trial court's findings are supported by the record, and those findings will not be disturbed absent a clear abuse of discretion. If the trial court's decision is correct on any applicable theory of law, it will be sustained.

*Criminal Law & Procedure > Search & Seizure > Warrantless Searches > Investigative Stops*
[HN7] Law enforcement officers are permitted to ask questions of citizens. If the questioning results in a detention, it must have been supported by reasonable suspicion. This reasonable suspicion must be based upon articulable facts suggesting that criminal activity may be taking place. In other words, there must be some level of objective justification for making the stop beyond a mere "hunch."

*Criminal Law & Procedure > Jury Instructions > Particular Instructions > Reasonable Doubt*
*Criminal Law & Procedure > Jury Instructions > Requests to Charge*
*Evidence > Procedural Considerations > Exclusion & Preservation by Prosecutor*
[HN8] *Tex. Code Crim. Proc. Ann. art. 38.23* prohibits the admission of any evidence obtained in violation of the accused's rights and requires that in any case where the legal evidence raises an issue under the rule, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of the article, then and in such event, the jury shall disregard any such evidence so obtained. Where a reasonable suspicion arises from articulable facts, an officer is permitted to make a temporary investigation detention. Where the facts relied upon by the state are uncontroverted, their sufficiency is a question of law for the court.

*Criminal Law & Procedure > Search & Seizure > General Overview*
*Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > General Overview*
*Criminal Law & Procedure > Jury Instructions > Particular Instructions > Use of Particular Evidence*
[HN9] The trial court is required by *Tex. Code Crim. Proc. Ann. art. 38.23* to instruct the jury to disregard any evidence illegally obtained when there is a fact issue as to the legality of the search and seizure.

*Criminal Law & Procedure > Search & Seizure > Warrantless Searches > Inventory Searches*
*Criminal Law & Procedure > Search & Seizure > Warrantless Searches > Plain View*
[HN10] Evidence will be admissible under the plain view exception provided the evidence establishes that the officer was lawfully on the premises, and it was immediately apparent that evidence was seizable evidence of a crime.

*Criminal Law & Procedure > Search & Seizure > Search Warrants > Probable Cause > Personal Knowledge*
*Criminal Law & Procedure > Search & Seizure > Warrantless Searches > Plain View*
[HN11] The "immediately apparent" prong of the plain view analysis does not require actual knowledge of incriminating evidence. The focus is whether the officer has probable cause to believe that the evidence discovered is associated with criminal activity.

*Evidence > Testimony > Experts > General Overview*
[HN12] Expert testimony is admissible if it will help the jury understand the evidence or determine a fact in issue. *Tex. R. Crim. Evid. 702.* An expert witness is one who will testify to matters requiring scientific, technical, or other specialized knowledge. An expert may be qualified to speak on such matters by virtue of his knowledge, skill, experience, training, or education.

*Evidence > Relevance > Relevant Evidence*
*Evidence > Scientific Evidence > Toxicology*
[HN13] The Texas Rules of Criminal Evidence define relevant evidence as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence. *Tex. R. Crim. Evid. 401.*

*Criminal Law & Procedure > Trials > Closing Arguments > Fair Comment & Fair Response*
*Criminal Law & Procedure > Appeals > Reversible Errors > General Overview*
[HN14] The four areas of acceptable jury argument are: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument of opposing counsel, and (4) plea for law enforcement. For error to be reversible, the comment, viewed in light of the record as a whole, must be extreme or manifestly improper, violative of a mandatory statute or must inject into the trial new facts harmful to the accused. In arriving at its decision, an appellate court is to determine whether there is a reasonable possibility that the comment made subject of complaint might have contributed to the conviction or the punishment assessed.

*Criminal Law & Procedure > Trials > Closing Arguments > General Overview*
*Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > General Overview*
[HN15] To preserve any error in jury argument for appeal, counsel must have asserted a proper objection. Moreover, the basis of complaint at trial is the only one that may be asserted on appeal.

**COUNSEL:** MONTSERRAT, ROBERT A.

LONG, FRANK.

**JUDGES:** RAMEY, TOM (AUTHOR), HOLCOMB, CHARLES, HADDEN, ROBY

**OPINION BY:** TOM B. RAMEY, JR.

**OPINION**

 **[*100]**   A jury convicted Jimmie Fields, Jr., ("Fields") of the offense of aggravated possession of more than 400 grams of cocaine. The jury assessed punishment at life imprisonment and a $ 100,000 fine. Fields appeals, raising eleven points of error. We will affirm.

Fields' sixth point of error challenges the legal sufficiency of the evidence to support his conviction, and we will address that point first. Fields asserts that the evidence was insufficient because the State did not prove that he exercised care, custody, control or management over the cocaine found in the vehicle he was occupying, nor that he knew that the substance was cocaine.

Trooper Bruce Roberts ("Roberts"), a 19 year veteran with the Texas Department of Public Safety ("DPS"), testified that on the afternoon of March 15, 1993, as he entered the ramp **[**2]**   onto Interstate 30 ("I-30"), a

beige/gold Lincoln Continental Towncar passed him at a high rate of speed. Roberts, who was driving his DPS vehicle and accompanied by citizen observers Frank Bell and his niece, pursued the Lincoln. He clocked it at 61 miles per hour in a 50 mile per hour zone where construction was in progress. Once through the construction area, Roberts activated his overhead flashing lights and signalled the Lincoln to stop, which it did. As Roberts exited his vehicle, he noticed that **[*101]** the Lincoln bore an Avis rental car sticker and that there were two people in the vehicle. Roberts approached the driver, later identified as Larry Johnson ("Johnson"), and asked to see his driver's license; instead, Johnson handed him a "Malibu Gran Prix" racing license. When Roberts asked him if he had a valid driver's license, Johnson appeared nervous, moved his head around a lot, and stated that he had one but he was not sure where it was. Johnson then conducted a cursory search between the seats and reached for the glove box, explaining that he was looking for his license. As Roberts waited, he noted that there was no luggage in the car's interior. Unable to find his **[**3]** license in the glove box, Johnson began to look for it in the trunk. Roberts accompanied him to the rear of the car. Upon opening the trunk, Roberts observed three items: a small sports bag, a garment bag, and a pair of silver-tipped boots. Johnson then began rifling through the sports bag. With regard to Johnson's search of the first bag, Roberts testified: "Again, he was looking in it real rapidly. I don't see how he could have found anything if it was in there. He went through it real fast." Next, Johnson opened the garment bag which he stated belonged to the passenger, Fields. When Roberts asked him why his license would be in the passenger's garment bag, Johnson grew visibly more nervous.

Johnson never found his license, so at Roberts' request, Bell, who had accompanied Roberts, took down Johnson's correct name and date of birth. Roberts testified, however, that because Johnson was so nervous and stuttering so badly, it took Roberts quite awhile to get Johnson's correct name and date of birth from him. Roberts stated that it was obvious to him that something was wrong. When asked from where they had been travelling, Johnson informed Roberts that they had been in Grand Prairie, **[**4]** Texas, for five days helping Johnson's uncle level a house. Roberts then approached Fields who produced a Tennessee Driver's License correctly identifying him as Jimmie Fields, Jr. When asked, Fields informed Roberts that his girlfriend had rented the Lincoln for them.

After talking with Fields, Roberts returned to his patrol vehicle to run computerized driver's license and criminal history checks on both men. From these inquiries, Roberts learned that Fields' driver's license had been suspended; consequently, he called for back up assis-

tance and placed Johnson under arrest for driving while license suspended. Shortly thereafter, Trooper Jeff Maeker arrived, and Roberts informed him that he believed the occupants were transporting drugs in the Lincoln. Roberts explained to Maeker that Johnson had been acting extremely nervous, was shifting his weight from one side to the other, and would not look at him. Roberts stated, however, that Johnson said there were no drugs in the Lincoln and that they could search the car if they wanted to.

Roberts then informed Fields as to why they had arrested Johnson. He also asked Fields where they had been. Fields told Roberts that they had been **[**5]** in Grand Prairie looking for a site for his home. He then attempted to show Roberts a set of plans. When asked if there were any drugs in the car, Fields replied "no" and invited Roberts to search the Lincoln. When further back-up support arrived, Roberts informed Fields and Johnson that he suspected that they were carrying drugs, and they would take the Lincoln to the Hopkins County's Sheriff's Office to search it. Neither suspect protested.

Bell then drove the Lincoln to the Sheriff's office where he and Trooper Boggs stayed with the vehicle while Roberts went with the vehicle occupants inside the office. While Roberts was inside, he was notified by another officer that drugs had been found under the hood of the Lincoln. Roberts then went into the sally port, where he was handed a bag that had been removed from the hood of the vehicle and which contained State's exhibits 1-A, 1-B and 1-C. At trial, Roberts identified State's exhibit 2 as the same bag that had been removed from the Lincoln on March 15, 1993. Roberts also identified State's several exhibits as items found inside the Lincoln during an inventory search.

Exhibit 13, a container of air freshener, was identified as an **[**6]** item Roberts found under **[*102]** the seat of the car the day following the arrests. With regard to that exhibit, Roberts testified that because the Lincoln was to be picked up by the rental company, he had to determine that all of the parties' belongings had been retrieved from the vehicle. These items consisted of two beepers--one of which may not have been in Roberts' possession--two pagers which he already had in his possession, a radar detector, luggage and a pair of boots. He further stated that in checking the vehicle's interior, he found the container of air freshener under the passenger's seat which had been occupied by Fields and which had not been listed on the vehicle inventory form. Roberts thus testified that he retrieved the air freshener and possibly one of two beepers that had been listed on the inventory along with the parties' luggage and boots. Roberts stated that because the duffle bag of drugs found under the hood had emitted a strong perfume smell, he

deduced that the air freshener was the scent used to mask the drugs' odor and was thus evidence in the case.

On cross-examination, Roberts testified that neither scales nor other drug paraphernalia was found **[**7]** in the Lincoln, and neither suspect attempted to escape. Moreover, he testified that while Johnson was shaking quite a bit, it was cold and misty outside while he was questioning the occupants.

Frank Bell, a citizen who often rode with Roberts on patrol, testified that after the arrest, at Roberts' direction, he drove the Lincoln to the sally port of the Hopkins County Jail. Bell testified that he neither put anything in nor took anything out of the Lincoln, but he stated that he was present when the drugs were found under the hood of the Lincoln.

Ricky Jones, the canine narcotics officer for the Franklin County Sheriff, testified that on March 15, 1993, the Hopkins County Sheriff's office requested his assistance. In response to that request, he and Marko, the narcotics detection dog under his supervision, went to the Hopkins County Sheriff's department. Upon their arrival, they were directed to the sally port to conduct a narcotics search on a 1990 Lincoln. Marko, who is trained to detect the odor of marijuana and cocaine, "alerted" on the Lincoln at the area between the front tire and fender. In response to the dog's reaction, Jones opened the Lincoln's hood and discovered a **[**8]** purple duffle bag, which had been placed on top of the engine. Inside the duffle bag were two white towels, three packages of a substance and then another towel between them. Jones took the bag into his custody, borrowed a knife and stuck it into one of the packages. When he extracted the knife, it was covered with a white powdery residue. Several pictures of the packages and duffle bag were taken. Then Jones and another officer took the packages into the Sheriff's office, weighed each and marked its weight on the outside of the package. He then returned the packages to the container and took more photographs. Afterwards, Jones placed the packages in Roberts' custody. Following this testimony, Jones identified State's exhibits 1-A, 1-B, and 1-C as the packages he had removed from the purple duffle bag.

Following Jones' testimony, Karen Shumate, a chemist with the Texas DPS Crime Lab in Tyler, Texs, identified State's exhibits 1-A, 1-B, and 1-C as the exhibits she received from Bruce Roberts. Shumate testified that after receiving the exhibits, she tested and weighed them, and their combined weight was 3.00 kilograms or 6.6 pounds. Shumate further testified that the three exhibits **[**9]** contained 81 percent pure cocaine.

As its next witness, the State called Keith Allen, a lieutenant with the DPS narcotics service. Allen testified that based upon his experience, 6.6 pounds of cocaine would sell for approximately $ 60,000 wholesale in the Northeast Texas area. He further testified that at retail prices, that amount of cocaine would sell for as much as $ 900,000 on the street.

Allen testified that through his work, he was familiar with the patterns and activities of people who transported narcotics. He then testified that characteristically, such people: (1) do not drive vehicles registered to them; (2) are deceptive as to their destination and the length of time they will be travelling; (3) carry an inadequate quantity of clothing for the number of occupants in the vehicle and their projected stay; (4) generally **[*103]** display wealth while their stated employment would not support such wealth; (5) are generally very friendly; and (6) carry electronic pagers. On cross-examination, however, Allen admitted that hundreds of thousands of people who are not drug traffickers drive rented vehicles and carry pagers. He further testified that he had no personal knowledge **[**10]** as to whom the cocaine in evidence here belonged. Additionally, Allen testified that drug traffickers often carry a lot of money with them.

As its last witness, the State re-called Trooper Bruce Roberts. On re-direct examination, Roberts testified that Johnson informed him that he worked as a clerk for J & S Grocery. Following Roberts' testimony, the State rested its case. Thereafter, Fields moved for an instructed verdict based upon insufficient evidence. After hearing arguments on the motion, the trial court denied the motion, and the parties closed the evidence. The case was thereafter submitted to the jury on the court's charge, which contained instructions on the law of parties.

The offense of aggravated possession of cocaine is set forth in *TEX. HEALTH & SAFETY CODE § 481.115* (Vernon Supp. 1993). That section provides:

> [HN1] (a) Except as authorized by this chapter, a person commits an offense if the person knowingly or intentionally possesses a controlled substance listed in Penally Group 1, unless the person obtained the substance directly from or under a valid prescription or order of a practitioner acting in the course of professional practice.

...

> (c) **[**11]** A person commits an aggravated offense if the person commits an offense under Subsection (a) and the amount of the controlled substance possessed is, by aggregate weight, including adulterants and dilutants, 28 grams or more.

(d) An offense under subsection (c) is:

...

(2) punishable by confinement in the Texas Department of Corrections for life or for a term of not more than 99 years or less than 10 years, and a fine not to exceed $ 100,000, if the amount of the controlled substance is, by aggregate weight, including adulterants and dilutants, 400 grams or more.

[HN2] Possession is defined in *§ 481.002(38)* as meaning "actual care, custody, control or management" of the contraband.

[HN3] In reviewing the legal sufficiency of the evidence, this Court must examine all of the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia, 443 U.S. 307 at 320, 61 L. Ed. 2d 560, 99 S. Ct. 2781, 2789 (1979)*; *Jones v. State, 833 S.W.2d 118, 122 (Tex. Cr. App. 1992), cert denied, 507 U.S. 921, 113 S. Ct. 1285, 122 L. Ed.* **[**12]** *2d 678 (1993)*. The standard of review is the same for both direct and circumstantial evidence, and the State need not exclude every reasonable hypothesis other than the defendant's guilt. *Geesa v. State, 820 S.W.2d 154, 161 (Tex. Cr. App. 1991)*.

[HN4] In order to establish the unlawful possession of a controlled substance, the State must prove that the defendant (1) exercised care, control, or management over the contraband, and (2) knew what he possessed was contraband. *Cude v. State, 716 S.W.2d 46, 47 (Tex. Cr. App. 1986)*; *Hurtado v. State, 881 S.W.2d 738, 743 (Tex. App. - Houston [1st Dist] 1994, no pet.)*; *Gonzales v. State, 809 S.W.2d 778, 780 (Tex. App. - Houston [14th Dist.] 1991, pet ref'd)*. To establish Field's control and knowledge of the cocaine, the State must prove more than that he was merely in the vicinity of the controlled substance; it must provide "affirmative links" between the accused and the contraband, *i.e.*, facts and circumstances in addition to mere presence that raise a reasonable inference of the accused's knowledge and control of the contraband. *Hurtado, 881 S.W.2d at 743*. In *Gilbert v. State, 874 S.W.2d 290*, the First Court **[**13]** of Appeals cataloged [HN5] a variety of factors that may link the accused to the contraband; these include whether the contraband: (1) was in plain view; (2) was conveniently accessible to the accused; (3) was in a place owned by **[*104]** accused; (4) was in a car driven by accused; (5) was found on the same side of the car as accused; (6) was found in an enclosed space; or (7) emitted an odor. Additional links include whether: (8) paraphernalia to use the contraband was in view of or found on the accused; (9) conduct of the accused indicated a consciousness of guilt; (10) the accused had a special relationship to the contraband; (11) occupants of the automobile gave conflicting statements about relevant matters; (12) the physical condition of the accused indicated recent consumption of the contraband found in the car; and (13) affirmative statements connect the accused to the contraband. *Gilbert v. State, 874 S.W.2d 290, 298* (Tex. App. - Houston [1st Dist.], 1994, pet ref'd).

In the instant case, the following evidence linked Appellant to the contraband: (1) inasmuch as the Lincoln had been rented by Fields' girlfriend, Bostik, Fields had had posession of the vehicle for the **[**14]** preceding five or more days while Fields & Johnson had been in Grand Prairie; (2) the drugs were found concealed beneath the closed hood of the Lincoln, and the hood latch was controlled from the interior of the car; (3) a can of air freshener was located under the seat occupied by Fields, and the air freshener odor matched the scent of the contraband when found; (4) Fields untruthfully denied his prior drug offenses; (5) Fields and Johnson gave conflicting stories as to their purpose for coming to Texas and activities while in Texas; (6) Fields carried an inadequate amount of clothing for a five day trip; (7) Fields exhibited unnatural equanimity and lack of concern throughout the temporary detention and the subsequent investigation.

Reviewing the evidence in the light most favorable to the verdict, we conclude that the evidence presented provided an affirmative link from which the jury could rationally find that Fields had control of the cocaine and knew the cocaine was contraband. Accordingly, we overrule point of error six.

In his first two points of error, Fields asserts that the trial court erred in overruling his motion to suppress the fruits of the search of the Lincoln Towncar **[**15]** driven by Johnson, in which Fields was the only other occupant. In point one, Fields contends that there were no facts justifying an investigatory detention of Fields or his arrest. In his second point, Fields asserts that Trooper Bruce Roberts ("Roberts") exceeded the search consent that Fields gave him.

At the suppression hearing that preceded the commencement of the guilt/innocence phase of the trial, only Roberts was called as a witness. His testimony at the suppression hearing tracked his subsequent testimony at the guilt/innocence phase of the trial as previously described.

In our consideration of these points, [HN6] we must view the evidence offered at the suppression hearing in the light most favorable to the trial court's ruling. *Laca v. State, 893 S.W.2d 171, 176* (Tex. App. - El Paso 1995, pet ref'd). The trial judge is the sole and exclusive fact-finder at a hearing on a motion to suppress. *Romero v. State, 800 S.W.2d 539 (Tex. Cr. App. 1990).* On appeal, we do not engage in our own factual review but decide whether the trial court's fact findings are supported by the record. *Laca, 893 S.W.2d at 177.* If the findings are so supported, we are not at liberty to disturb **[**16]** the court's findings, and, on review, we address only the question of whether the trial court improperly applied the law to the facts. *Romero, 800 S.W.2d at 543.* The totality of the circumstances must be considered in determining whether the trial court's findings are supported by the record, and those findings will not be disturbed absent a clear abuse of discretion. *Dancy v. State, 728 S.W.2d 772, 777 (Tex. Cr. App. 1987), cert. denied, 484 U.S. 975, 108 S. Ct. 485, 98 L. Ed. 2d 484 (1987).* If the trial court's decision is correct on any applicable theory of law, it will be sustained. *Romero, 800 S.W.2d at 543.*

Johnson was arrested; he was charged with driving the Lincoln with a suspended driver's license. Fields was not removed, nor did he alight from the Lincoln until Roberts advised him after the consent to search was granted that the search of the automobile would be performed at the Sheriff's office. Other than the movement of the Lincoln for the search, to which Fields did not object, Fields' liberty or movement was **[*105]** not restricted or restrained; thus there was no arrest. *Amores v. State, 816 S.W.2d 407, 411 (Tex. Cr. App. 1991).* Fields **[**17]** was handcuffed for the purpose of transporting him in the DPS vehicle to the Sheriff's office in accordance with department policy. Fields was arrested only after the discovery of the large quantity of contraband under the hood of the Lincoln. There is no dispute in the record that this handcuffing procedure was required by departmental policy while Fields was in transit in the DPS vehicle.

Fields complains of the initial stop. The Lincoln had been stopped for the offense of speeding. Most of Roberts' post-stop conversation involved the car's driver, Johnson. [HN7] Law enforcement officers are permitted to ask questions of citizens. *Daniels v. State, 718 S.W.2d 702, 704 (Tex. Cr. App. 1986), cert. denied, 479 U.S. 885, 107 S. Ct. 277, 93 L. Ed. 2d 252 (1986), overruled on other grounds, Juarez v. State, 758 S.W.2d 772, 780 (Tex. Cr. App. 1988).* If Roberts' questioning resulted in the detention of Fields, it must have been supported by reasonable suspicion. *Terry v. Ohio, 392 U.S. 1, 19 n.16, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).* This reasonable suspicion must be based upon articulable facts suggesting that criminal activity may be taking place. In other words, there **[**18]** must be some level of objective justification for making the stop beyond a mere "hunch." *Howe v. State, 874 S.W.2d 895, 900* (Tex. App. - Austin 1994, no pet.). Here, the excessive speed of the car, the apparent extreme nervousness of the driver, his suspended license, Fields' apparent possion of the vehicle (Fields stated that the overdue rental of the vehicle was to his absent girlfriend, Bostik), Roberts' knowledge that (despite Fields' initial denial) Fields had a history of drug offenses, the travellers' inconsistent versions of their recent activities, and the total circumstances surrounding the vehicle support the less demanding level of suspicion required for a temporary detention and the abbreviated inquiries of Fields. Fields' first point is overruled.

As to whether Roberts exceeded the alleged consent to search, the record reflects that Fields' consent followed his denial that there were any drugs in the Lincoln. It appears that Roberts had informed Fields and Johnson that he suspected that there were drugs in the Lincoln. Fields' oral consent to the search was voluntary, not requested by Roberts. In a separate conversation, Johnson also offered his consent to search **[**19]** the Lincoln for drugs. No DPS written consent form was executed by either occupant. Roberts decided to move the Lincoln to the Sheriff's office for the search because the stop had been made on an interstate highway in a construction area and the weather was inclement. Neither Fields nor Johnson objected to the movement of their vehicle or the place or nature of the search. No limitation upon the search was expressed. Fields' second point of error is overruled.

In his third point of error, Fields complains that the trial court erred in denying his requested jury charge pursuant to [HN8] *Article 38.23 of the TEX. CODE CRIM. PROC.,* which prohibits the admission of any evidence obtained in violation of the accused's rights and requires that:

In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

Where a reasonable suspicion arises from articulable facts, an officer is permitted to make a temporary investigation detention. *Stone v.* **[**20]** *State, 703 S.W.2d 652, 654-55 (Tex. Cr. App. 1986).* Where the facts relied upon by the State are uncontroverted, their sufficiency is

a question of law for the court. *Rose v. State, 470 S.W.2d 198, 200 (Tex. Cr. App. 1971)*.

Fields offered no proof in the case; therefore, though he objected at the suppression hearing to the search and seizure, he offered no proof that any of the State's evidence was obtained in violation of his rights. Neither did the cross-examination of the State's witness raise a fact issue or call into question the validity of the detention or the consent to the search and seizure of evidence. Fields did not present any evidence **[*106]** to challenge the State's assertion that the Lincoln was speeding, that Johnson's license was suspended, that the vehicle was rented by a third party, Fields' girffriend, which rental agreement had expired, that Fields had a criminal history of drug transactions, or that both Fields and Johnson consented to the search.

[HN9] The trial court is required by Article 38.23 to instruct the jury to disregard any evidence illegally obtained when there is a fact issue as to the legality of the search and seizure. *Brooks v. State,* **[**21]** *642 S.W.2d 791, 799 (Tex. Cr. App. 1982)*; *Moreno v. State, 916 S.W.2d 654* (Tex. App. - El Paso 1996). Here there is no such question presented by the evidence. Absent some controversion of some of the critical evidence, the ruling of the trial court is sustained. Fields' third point of error is overruled.

By his fourth point of error, Fields alleges that the trial court erred in admitting into evidence over his objection the can of air freshener found in the Lincoln because Trooper Roberts did not inadvertently find this evidence but intentionally went looking for it. Fields claims that because Roberts returned to search the car again 24 hours after it had originally been inventoried and searched, and without a warrant or probable cause, both the search of the vehicle and the seizure of the air freshener were unreasonable under the Fourth Amendment.

As his sole authority for this position, Fields cites *Arizona v. Hicks, 480 U.S. 321, 323-24, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987)*. In *Hicks,* an officer seized stolen stereo equipment found in an apartment during an investigation related to a shot fired from that apartment. The court held that the seizure of the stereo **[**22]** equipment, being unrelated to the shooting crime under investigation, was an unlawful seizure. In so holding, the court noted that before the plain view doctrine can be invoked, there must be probable cause to believe that the item in question is evidence of a crime.

The State, in turn, argues that this was not an unlawful search of the vehicle and that the plain view doctrine was designed to allow the seizure of evidence in this type of scenario. Citing *Coolidge v. New Hampshire, 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)*

and *White v. State, 729 S.W.2d 737, 739 (Tex. Cr. App. 1987)*, the State sets forth the following three factors that must be satisfied to allow admission of evidence under the plain view doctrine: (1) the officer must lawfully be on the premises; (2) the discovery must be "inadvertent"; and (3) it is "immediately apparent" that the incriminating evidence is seizable as evidence of a crime. *Id.* It then asserts that "inadvertence" is the only factor seriously challenged by Fields, and argues that the evidence establishes that factor.

While the three-part test of *Coolidge* served as the standard for admissibility of evidence under the **[**23]** plain view doctrine for many years, in 1990, the United States Supreme Court modified these criteria by deleting the element of "inadvertence." *Horton v. California, 496 U.S. 128, 110 S. Ct. 2301, 2304, 110 L. Ed. 2d 112 (1990)*; *see State v. Haley, 811 S.W.2d 597, 599 (Tex. Cr. App. 1991)*. Thus, [HN10] the air freshener will be admissible provided the evidence establishes that Roberts was lawfully in the Lincoln, and it was immediately apparent that the air freshener was seizable evidence of a crime. *Id.*

The evidence at trial with regard to Roberts' presence in the vehicle showed that after the initial search and inventory of the Lincoln, Roberts had it impounded in a secured yard, and he retained its key. Further, it was the local law enforcement officers' policy to leave inventoried items inside the impounded vehicle. The following morning, Roberts contacted the Lincoln's rental agency, and informed it of the Lincoln's location. The agency, in turn, informed Roberts that it would send someone to obtain possession of the Lincoln that day. Because the Lincoln was being released, Roberts went to the impounded vehicle to locate and remove all personal effects and belongings from **[**24]** the vehicle. At that time, Roberts had with him a copy of the Lincoln's inventoried contents. Although Fields argues that everything Roberts needed from the inventory was contained in the trunk, we cannot disregard Roberts' testimony that department policy was to leave inventoried items in the locked **[*107]** vehicle, that he believed he may have retrieved an inventoried beeper from inside the vehicle's interior, and that items other than those originally found in the trunk were also contained on the inventory. From the evidence presented, we thus hold that Trooper Roberts discovery of the air freshener inside the Lincoln was lawful. *See Haley, 811 S.W.2d at 599.*

Having satisfied the first element of *Coolidge,* we must next determine whether in discovering the air freshener, it was immediately apparent that Roberts had discovered evidence of a crime. [HN11] The "immediately apparent" prong of the plain view analysis does not require actual knowledge of incriminating evidence. *Texas v. Brown, 460 U.S. 730, 103 S. Ct. 1535, 75 L. Ed.*

*2d 502 (1983)* (reasonable person standard applied to officer's knowledge regarding drugs transported in balloons). "The focus is whether the officer **[**25]** has probable cause to believe that the evidence discovered is associated with criminal activity." *Joseph v. State, 807 S.W.2d 303, 308 (Tex. Cr. App. 1991)*.

In the instant case, Roberts testified that when the duffle bag from underneath the hood was opened, he noticed that it emitted a strong perfume odor. Then, the next day, when Roberts saw the air freshener, he recalled the strong perfume smell that the duffle bag had emitted and believed that the bag might have been sprayed with the air freshener found in the Lincoln. Thereafter, he seized the container as evidence.

In *Hicks*, unlike the instant case, on finding the stereo components, the equipment had to be moved and serial numbers had to be checked before it was determined that the equipment had been stolen. Moreover, those officers were in the defendant's apartment on an unrelated shooting crime. Here, on the other hand, the air freshener was seized in connection with the possession crime for which Fields had already been arrested. *Joseph* is likewise distinguishable from the instant case. In *Joseph*, during execution of a search warrant in connection with a case for possession of marijuana, officers seized an **[**26]** envelope containing a greeting card. On appeal, the court noted that the record was devoid of evidence showing that it was immediately apparent to the police officer that the greeting card was evidence of a crime. Only after the officer read the contents of the card did he realize its incriminating nature. *Joseph, 807 S.W.2d at 309*. Consequently, the Court found that the card was the product of an unreasonable search and seizure.

Here, unlike *Joseph* and *Hicks*, Trooper Roberts connected the air freshener with the duffle bag of cocaine upon discovering it. Fields argues in passing that Roberts had to have sprayed the air freshener before he recognized it as evidence. We disagree. At trial, Roberts testified as follows with regard to the air freshener's immediate connection with the duffle bag:

> When we retrieved the bag at the Sheriff's Office, it had a strong smell, a perfume scent on it. When I saw that [the air freshener] in the car I thought that is what they used to cover the scent. That is something that is done when people haul drugs. They use this to spray on their drugs to help mask or cover the scent.

Thus, the fact that he may have later compared **[**27]** its odor with that contained in the duffle bag is inconsequential. [1]

> 1 In response to the State's later question as to whether the odor that "emanated or that comes out of" the air freshener can was the same as that on the towels in the duffle bag, Roberts merely answered that it was. Thus, there is even some evidence that the container emanated an odor without being sprayed.

Given the facts before us, we hold that the evidence established it was immediately apparent to Roberts that the air freshener was seizable evidence in connection with the posession offense. Fields' fourth point of error is overruled.

In his fifth point of error, Fields argues that the trial court erred in overruling his objection to Lieutenant Allen's testimony as to drug trafficker patterns and characteristics because they were not relevant to the instant case, and even if they were, their prejudicial effect outweighed any probative value they might have had.

The State called Keith Allen, a lieutenant with the D.P.S. narcotics service **[**28]** as an expert **[*108]** witness. [HN12] Expert testimony is admissible if it will help the jury understand the evidence or determine a fact in issue. TEX. R. CRIM. EVID. 702. An expert witness is one who will testify to matters requiring "scientific, technical, or other specialized knowledge." *Id.* An expert may be qualified to speak on such matters by virtue of his "knowledge, skill, experience, training, or education." *Id.* Allen's expertise in the area of investigation of narcotics crimes is not challenged by Appellant.

As stated, Allen testified that based upon his experience, 6.6 pounds of cocaine would sell for approximately $ 60,000 wholesale in the Northesst Texas area, and that the same amount would sell for as much as $ 900,000 on the street. Allen's testimony as to the value of the cocaine found in the duffle bag under the Lincoln's hood is not challenged on appeal. Allen also testified, however, that through his work, he was familiar with the patterns and characteristics of people who transport narcotics. He then testified over timely objections based on relevance and TEX. R. CRIM. EVID. 403 that the following characteristics or patterns commonly existed among "people **[**29]** who would be traveling with quantities" of controlled substances and particularly cocaine: they (1) do not drive vehicles registered to them; (2) are deceptive as to their destination and the length of time they will be travelling; (3) carry an inadequate quantity of clothing for their projected stay, that often being only one change of clothes between the individuals that occupy the vehicle; (4) generally display wealth

while their stated employment would not support such wealth; (5) are generally very friendly; and (6) carry electronic pagers. On cross-examination, however, Allen admitted that hundreds of thousands of people who are not drug traffickers drive rented vehicles and carry pagers. He further testified that he had no personal knowledge as to whom the cocaine in evidence belonged. Additionally, Allen testified that drug traffickers often carry a lot of money with them.

[HN13] The TEXAS RULES OF CRIMINAL EVIDENCE define relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." TEX. R. CRIM. EVID. 401. Appellant cites *Nelms v. State, 834* [**30] *S.W.2d 110* (Tex. App. - Houston [1st Dist.] 1992, pet. ref'd) in support of his contention that Allen's testimony was irrelevant. In *Nelms,* the appellant was arrested at a convenience store for posession of cocaine after he was seen dropping two rocks of cocaine beside a video game. At the time of his arret, the appellant was wearing a pager. At trial, two of the prosecution's witnesses, *repeatedly* testified over the appellant's objection that the appellant was wearing a beeper and that almost all drug dealers wear beepers. On appeal, the court of appeals held:

> The testimony was inadmissible evidence of extraneous criminal conduct under rule 404(b). This evidence invited the jury to convict appellant of possession because he was a drug dealer in general? The evidence about drug dealing was not relevant to any issue in the case and was calculated to prejudice the jury by refening to extraneous matters for which appellant was not on trial. We hold it was error to admit the evidence under rule 404(b).

*Id. at 114.*

*Nelms* is readily distinguishable from the instant case. First, the case at bar does not involve a rule 404(b) objection. Furthermore, [**31] Allen's testimony did not characterize Fields and Johnson as "drug dealers" nor did it lead the jury astray from the issue of possession. Instead, Allen's testimony succinctly presented various factors common among persons transporting drugs via automobile. This testimony coupled with Allen's testimony on the wholesale and street values of 6.6 pounds of cocaine was relevant to the issue of the parties' knowledge that the drug was present under the hood. From Allen's testimony, the jury could also glean that the

presence of drugs in an automobile under circumstances like those here was often the result of team work, and thus, tended to negate the possibility that either codefendant was unaware of the contraband's presence under the hood. Accordingly, the trial court did not abuse its discretion in overruling [*109] Fields' objection as to the relevance of Allen's testimony.

A finding of relevance, however, does not end our inquiry. We must next determine whether under rule 403, the probative value of Allen's testimony was outweighed by the danger of unfair prejudice. Fields relies on *Stewart v. State, 874 S.W.2d 752* (Tex. App. - Houston [1st Dist.] 1994, pet. ref'd), to [**32] support his position that Allen's testimony was highly prejudicial. In *Stewart,* the appellant was arrested for possession of a small quantity of cocaine found in his motel room. At trial, the arresting officer was allowed to testify at length regarding his knowledge of drug trafficker conduct allegedly in order to establish his expertise regarding street level drug trafficking. During his testimony, the officer testified extensively about the meanings of various drug terminology and the purposes and uses of various types of drug paraphernalia, some of which was found in the appellant's hotel room. [2] On appeal, the court found that the officer's "experience dealing with narcotics trafficking was relevant to his qualifications as an expert on the use of drug paraphernalia. His testimony about the use of drug paraphernalia was, in turn, relevant to the showing of knowing possession." *Id., at 756*. The court, however, concluded that the State had used the wrong line of questioning to qualify the officer as an expert: "The State should have qualified Officer Thane as an expert on the usage of drug paraphernalia through testimony about his arrests of suspects for drug possession, [**33] and through testimony of his training and education on the subject. It should not have elicited testimony of his experience with drug dealers." *Id.* The court then concluded that because the officer's testimony about the drug trade may have interfered with the jury's deliberations on guilt, the prejudicial effect of the officer's testimony outweighed is probative force. *Id.*

2    This is but one example of the detailed testimony the State elicited from Officer Thane during the *Stewart* trial:

> [OFFICER]: A known drug dealer is a phrase that we give to a person that has been documented as a narcotics trafficker or dealer because of prior convictions of narcotics, arrests or information received and documented that he is actually trafficking in narcotics at the present time.

[STATE]: Now, how is crack or rock used?

[OFFICER]: Crack cocaine is utilized by inhaling it or smoking it. The way that it is ingested into the body is usually by utilizing a crack pipe. It is sometimes smoked in marijuana cigarettes, which is called a 151 or, like, in regular Marlboro cigarettes or Kool cigarettes. It can be introduced into the body that way.

The way it's introduced is it's chipped up in real small pieces. Those pieces are put into the cigarette or into the crack pipe, and then the heat source is applied to it. It turns the crack from the solid form to a liquid form to a gas form, and then it's inhaled into the body, and then it goes from the lungs into the bloodstream.

[STATE]: What is a tamping rod?[OFFICER]: A tamping rod is used--it's usually either a very small stick, a toothpick, a piece of coat hanger, something that is very small, cylinder in shape, that has got a point on it that can be used to push down the piece of rock into the crack pipe. *Stewart, 874 S.W.2d 752 at 754-55.*

[**34] In the instant case, the State presented no such dissertation on drug use or trafficking. Instead, Lieutenant Allen merely gave brief testimony as to his ten and a half years' employment with the Department of Public Safety and his involvement as Task Force Commander over the Narcotics Task Force Unit, which enforces narcotics laws in Hopkins, Wood, Rains, Camp, Franklin and Titus County. Having reviewed Allen's testimony, we conclude that the instant case is readily distinguishable from *Stewart,* and that the probative value of Allen's testimony outweighed any prejudicial effect it might have had. Accordingly, the trial court did not abuse its discretion in admitting the evidence.

Having found Allen's testimony both relevant and probative on the issue of knowing possession, we overrule Fields' fifth point of error.

In his seventh, eighth, ninth, tenth and eleventh points of error, Fields alleges that the trial court erred in failing to sustain his objections during closing argument. The Court of Criminal Appeals has held that [HN14] the four areas of acceptable jury [*110] argument are: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument [**35] of opposing counsel, and (4) plea for law enforcement. *Darden v. State, 629 S.W.2d 46, 52 (Tex. Cr. App. 1982)*; *Alejandro v. State, 493 S.W.2d 230, 231 (Tex. Cr. App. 1973)*. For error to be reversible, the comment, viewed in light of the record as a whole, must be extreme or manifestly improper, violative of a mandatory statute or must inject into the trial new facts harmful to the accused. *Allridge v. State, 762 S.W.2d 146, 155 (Tex. Cr. App. 1988), cert. denied, 489 U.S. 1040, 109 S. Ct. 1176, 103 L. Ed. 2d 238 (1989)*. In arriving at our decision, this Court is to determine whether there is a reasonable possibility that the comment made subject of complaint might have contributed to the conviction or the punishment assessed. *Id.*

In his seventh point of error, Fields asserts that the trial court erred in overruling his objection to the State's argument that he had the burden to put on witnesses. The prosecutor had argued that an unidentified individual only referred to as "Uncle" could have been called to testify as to what Fields and Johnson had been doing the preceding five days while they were in Dallas. The State's reference to "Uncle" was in response [**36] to Johnson's attorney's argument in which he listed on the blackboard potential witnesses that had not been called by the State. State's counsel had suggested that the list could have been supplemented by adding "Uncle"; it was not argued that Fields had the burden or obligation to summon this witness. Furthermore, Fields cites no authority to support his contention on this point. [3] For these reasons, we conclude there is no merit to the point and it is overruled.

3 In his brief, Fields' entire presentation on this point is as follows:

"During the guilt-innocence phase of trial, the State argued that the defense had the burden to put on witnesses. (SF 375-376). Counsel objected, the objection was overruled. (SF 375-376). This is reversible error.

Fields' eighth point complains that the State improperly argued in the punishment phase of the trial that he was going to multiply the value of the cocaine. The State's attorney stated:

The law says that you can't have more than four hundred grams [**37] of cocaine and get less of a sentence than ten years. Four hundred grams is less than a pound. These men chose to possess six point six pounds of cocaine. They could have chosen not to have any cocaine. They know what the consequences of violating the laws are. They know that if you violate the laws of Texas or Tennessee or the Federal Government you get punished and you go to prison. But the reward was great enough that they took the risk. The reward was great enough to be in possession of sixty-six thousand dollars worth of cocaine that you can turn into three hundred thousand dollars to nine hundred thousand dollars.

Attorneys for the defense objected to this argument on the basis that there was no evidence that Fields or Johnson were going to turn the cocaine into that amount of money. They also asserted that "this is a possession case, not a delivery case." The trial court then overruled the objection stating: "All right. The jurors will recall the testimony as they recall it to be. Overrule your objections."

On appeal, Fields argues that the State's argument was highly inflammatory since this was a possession and not a delivery case. In support of his position, he cites [**38] *Turrentine v. State, 536 S.W.2d 219, 220 (Tex. Cr. App. 1976).* In that case, the appellants had been convicted of possessing 8.15 ounces of marijuana. In *Turrentine,* during closing argument at the punishment phase, the State commented:

Now, I don't smoke marihuana and I assume you don't either, and there's no evidence about how much of the stuff it would take to make a marihuana cigarette, but you can call for it and look at it if you want it. I submit it's a reasonable deduction from the evidence there's enough marihuana to make a man and wife high and keep them high until the year 1990. I submit this is more marihuana than this man and wife ever intended for their own personal use, and it's a reasonable deduction from the evidence that they are not only smoking **[*111]** it but probably giving it away or selling it.

On appeal, the court found the argument quoted above tended to greatly exaggerate the amount of marihuana found in appellant's possession. It then noted that although a "reasonable deduction from the evidence," the exaggeration as to quantity and the conclusion that "they are not only smoking it, but probably giving it away or selling [**39] it" were not justified by the evidence and thus constituted error.

For obvious reasons, Fields' case is distinguishable from *Turrentine.* The argument here contains no exaggeration and draws no conclusion that Fields intended to sell the cocaine. Instead, the State merely deduced from the evidence that since there was a severe penalty for possessing such a large quantity of cocaine, Fields and Johnson must have been significantly rewarded for daring to possess it. The State was not arguing that Fields and Johnson were going to sell the cocaine themselves for a large profit. The State's argument provides a reasonable summation of the evidence of value followed by a reasonable deduction from that evidence. *See Layne v. State, 752 S.W.2d 690, 695* (Tex. App. - Houston [1st Dist.] 1988, pet ref'd). Appellant's eighth point of error is overruled.

In his ninth point, Fields contends that the State improperly argued:

If you folks want to go home tonight and sleep, if you want to be sleeping fifteen years from now or twenty years from now or thirty years from now and know that Mr. Fields and Mr. Johnson aren't able to be driving up and down the road with their cocaine, you [**40] know what you need to do.

The court overruled Fields objection that the argument "puts the jury in the position of a future alleged victim." He cites two precedents, both of which involved specific direct victims of the respective offenses. *Boyington v. State, 738 S.W.2d 704* (Tex. App. - Houston [1st Dist.] 1985, no pet.); *Everett v. State, 707 S.W.2d 638 (Tex. Cr. App. 1986).* No such error is presented in this possession case where there is no evidence of a victim at the time of the offense or in the future. We construe this argument as one for law enforcement. The ninth point is overruled.

By his tenth point of error, Fields asserts that the following argument was improper:

You folks have got a hard job to do. Its always hard to send somebody to prison. But did you hear one reason why you shouldn't? Did you hear one single reason why these two shouldn't go to prison? Did

anybody's uncle or sister or girlfriend or mother --

On appeal, Fields urges that this argument was improper in the punishment phase because it suggests that Fields had been abandoned by his family. At trial, however, Fields objected on the ground that the Defendants were not **[\*\*41]** required to call any witnesses and that the State's argument shifted the burden and was contrary to the charge.

[HN15] To preserve any error in jury argument for appeal, counsel must have asserted a proper objection. *Green v. State, 682 S.W.2d 271, 295 (Tex. Cr. App. 1984), cert. denied, 470 U.S. 1034, 105 S. Ct. 1407, 84 L. Ed. 2d 794 (1985).* Moreover, the basis of complaint at trial is the only one that may be asserted on appeal. *Miller v. State, 566 S.W.2d 614, 619* & 621 (Tex. Cr. App. 1978). In the instant case, Field's complaint on appeal differs from that raised at trial. Consequently, the point has not been preserved for review. Point ten is overruled.

By his eleventh point of error, Fields alleges that the trial court erred in overruling his objection to the State's argument at punishment regarding community expectation. At the conclusion of the State's closing argument, the State's attorney argued:

> Folks, you go upstairs and write down life in that block where it says number of years and write a hundred thousand dollars fine where it says fine, and each and everyone of you ought to be able to go home tonight knowing what you did was right for yourself, your **[\*\*42]** family, your children, and everybody in this community and across the State.

Defense counsel objected stating: "We will object to the prosecutor asking for a life sentence in that the community expects that kind of sentence or that the children of these **[\*112]** jurors will benefit from assessing the defendants. We object to that." On appeal, Fields argues that this is the same type of argument which resulted in a reversal in *Cortez v. State, 683 S.W.2d 419, 420-21 (Tex. Cr. App. 1984).* In *Cortez,* the State's attorney argued: "Now, the only punishment that you can assess that would be any satisfaction at all to the people of the county would be life [imprisonment]." *Id., at 420.*

The instant case is readily distinguishable from *Cortez.* Here, the State merely argued that if the jurors assessed the maximum sentence, they could be assured that they had made the right decision for themselves, their community and the citizens of this State. Despite Fields' counsel's attempt to recharacterize this argument through his trial objection as an improper one, the State did not inappropriately argue the demands and expectations of the community; it simply made a proper **[\*\*43]** plea for law enforcement. *See Luna v. State, 461 S.W.2d 600, 601 (Tex. Cr. App. 1970)* (holding no reversible error in prosecutor's argument that "people that have such ideas in this county in the future will be put on notice that the citizens of this county are not going to put up with it"); and *Lawson v. State, 896 S.W.2d 828, 833* (Tex. App. - Corpus Christi 1995, pet. ref'd) (holding that argument requesting jury to "send a very strong message to this man and everyone else in this community or whatever who thinks it's okay to get out there and poison the community with drugs" was proper plea for law enforcement). Fields' eleventh and final point of error is overruled.

The judgment of the trial court is affirmed.

TOM B. RAMEY, JR.

Chief Justice

Opinion delivered March 31, 1996.




Caution
As of: Aug 02, 2017

**JAMES GEORGE GUEVARA, Appellant v. THE STATE OF TEXAS**

**NO. 0424-03**

**COURT OF CRIMINAL APPEALS OF TEXAS**

*152 S.W.3d 45*; *2004 Tex. Crim. App. LEXIS 1750*

**October 20, 2004, Delivered**

**SUBSEQUENT HISTORY:** [**1]
Rehearing denied by *In re Guevara, 2005 Tex. Crim. App. LEXIS 50 (Tex. Crim. App., Jan. 12, 2005)*
On remand at, Remanded by *Guevara v. State, 2005 Tex. App. LEXIS 10128 (Tex. App. San Antonio, Dec. 7, 2005)*

**PRIOR HISTORY:** ON STATE'S AND APPELLANT'S PETITIONS FOR DISCRETIONARY REVIEW FROM THE FOURTH COURT OF APPEALS. BEXAR COUNTY.
*Guevara v. State, 103 S.W.3d 549, 2003 Tex. App. LEXIS 960 (Tex. App. San Antonio, 2003)*

**DISPOSITION:** Affirmed in part, reversed in part, and remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant was convicted of murder as a party to the offense, *Tex. Penal Code Ann. §§ 7.02(a)(2)*, *19.02(b)*. On appeal, the Fourth Court of Appeals, Bexar County, Texas, found that sufficient evidence supported the verdict, but reversed based on a jury-charge error. Defendant sought further review as to the sufficiency of the evidence, and the State sought further review as to the harm analysis on the jury-charge error.

**OVERVIEW:** Defendant was convicted as a party to his mistress's murder of his wife based on circumstantial evidence. The court found that, while each piece of evi-

dence lacked sufficiency in isolation, the consistency of the evidence and the reasonable inferences drawn therefrom were sufficient to support the verdict. The circumstances included his motive, specifically a long-standing affair and his right to the wife's substantial retirement account on her death. He also made several false statements to the authorities, took the mistress to a shooting range for practice, and ensured that he had an alibi for the time of the murder. Shell-casing evidence connected him to the murder weapon. The court reversed the court of appeals as to its decision under *Tex. R. App. P. 44.2(b)* that defendant was harmed by the jury charge, which included a legal-duty theory, as well as an aiding theory. In applying *Tex. R. App. P. 44.2(b)*, the court of appeals had relied on a case that dealt with error in the admission of evidence. The court explained, however, that error in a criminal jury charge was reviewed under *Tex. Code Crim. Proc. Ann. art. 36.19*, as interpreted by the court.

**OUTCOME:** The court reversed the judgment of the court of appeals and remanded the case to that court to conduct a harm analysis under the appropriate standard.

**LexisNexis(R) Headnotes**

*Criminal Law & Procedure > Accessories > Aiding & Abetting*
[HN1] The Texas Penal Code provides three separate ways by which a person can be criminally responsible for the conduct of another. *Tex. Penal Code Ann. § 7.02(a)*. The first way encompasses a situation in which a person

Page 2

152 S.W.3d 45, *; 2004 Tex. Crim. App. LEXIS 1750, **

causes an innocent person to engage in criminal conduct. *§ 7.02(a)(1)*. The second situation occurs when a person solicits, encourages, directs, aids, or attempts to aid another person in committing an offense. *§ 7.02(a)(2)*. The last situation allows a person to be convicted of a crime if he does not make a reasonable effort to prevent the commission of an offense when he has a legal duty to prevent the commission of that offense. *§ 7.02(a)(3)*.

*Criminal Law & Procedure > Accessories > Aiding & Abetting*
[HN2] An appellate court refers to *Tex. Penal Code § 7.02(a)(2)* as the aiding theory of criminal responsibility for the conduct of another.

*Criminal Law & Procedure > Accessories > Aiding & Abetting*
[HN3] An appellate court refers to *Tex. Penal Code § 7.02(a)(3)* as the legal-duty theory of criminal responsibility for the conduct of another.

*Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution*
[HN4] The Fourteenth Amendment's guarantee of due process of law prohibits a criminal defendant from being convicted of an offense and denied his liberty except upon proof sufficient to persuade a rational fact finder of guilt beyond a reasonable doubt.

*Criminal Law & Procedure > Jury Instructions > Particular Instructions > Reasonable Doubt*
*Criminal Law & Procedure > Appeals > Reversible Errors > Jury Instructions*
*Evidence > Procedural Considerations > Weight & Sufficiency*
[HN5] In assessing the legal sufficiency of the evidence to support a conviction, an appellate court considers all the record evidence in the light most favorable to the jury's verdict and determines whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found the accused guilty of all of the elements of the offense beyond a reasonable doubt. Furthermore, when the trial court's charge authorizes the jury to convict on more than one theory, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories. The law does not require any further speculation as to the guilt of the appellant. If, given all of the evidence, a rational jury would necessarily entertain a reasonable doubt as to the defendant's guilt, the due process guarantee requires that the court reverse and order a judgment of acquittal.

*Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*
*Evidence > Procedural Considerations > Circumstantial & Direct Evidence*
*Evidence > Relevance > Circumstantial & Direct Evidence*
[HN6] Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. Circumstantial evidence alone is sufficient to establish guilt. Furthermore, the standard of review on appeal is the same for both direct and circumstantial evidence cases.

*Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*
[HN7] In reviewing the sufficiency of the evidence, an appellate court should look at events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act. Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts are sufficient to support the conviction.

*Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*
[HN8] The evidence is sufficient if the conclusion of guilt is warranted by the combined and cumulative force of all the incriminating circumstances.

*Evidence > Procedural Considerations > Circumstantial & Direct Evidence*
[HN9] Motive is a significant circumstance indicating guilt. Intent may also be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant.

*Evidence > Procedural Considerations > Circumstantial & Direct Evidence*
[HN10] Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt. Lies about an actor's relationship with an accomplice are probative of unlawful acts.

*Criminal Law & Procedure > Accessories > Aiding & Abetting*

Page 3

152 S.W.3d 45, *; 2004 Tex. Crim. App. LEXIS 1750, **

[HN11] The Texas Penal Code does not require that a party actually participate in the commission of the offense to be criminally responsible. The Penal Code also does not require that a party to the crime be physically present at the commission of the offense.

*Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*
*Evidence > Procedural Considerations > Weight & Sufficiency*
[HN12] When multiple theories are submitted to a jury, the evidence is sufficient to support a conviction so long as the evidence is sufficient to support conviction for one of the theories submitted to the jury.

*Criminal Law & Procedure > Jury Instructions > Objections*
*Criminal Law & Procedure > Jury Instructions > Particular Instructions > Use of Particular Evidence*
*Criminal Law & Procedure > Appeals > General Overview*
[HN13] It is settled law in Texas that error in a criminal jury charge is reviewed under *Tex. Code Crim. Proc. Ann. art. 36.19.*

**COUNSEL:** For APPELLANT: Nancy B. Barohn, San Antonio, TX.

For STATE: Daniel Thornberry, ASSIST. DA, San Antonio, TX.

**JUDGES:** PRICE, J., delivered the opinion of the court, in which KELLER, P.J., and MEYERS, WOMACK, JOHNSON, KEASLER, HOLCOMB, and COCHRAN, JJ., joined. HERVEY, J., did not participate.

**OPINION BY:** PRICE

**OPINION**

[*46] **PRICE, J.,** *delivered the opinion of the court, in which* **KELLER, P.J., and MEYERS, WOMACK, JOHNSON, KEASLER, HOLCOMB,** *and* **COCHRAN, JJ.,** *joined.* **HERVEY, J.,** *did not participate.*

The appellant challenges his conviction for murder, claiming that the evidence presented [*47] at trial was insufficient to support his conviction as a party to the offense. The State challenges the judgment of the Court of Appeals with respect to the Court's harm analysis on jury-charge error. We conclude that the evidence was legally sufficient to support the appellant's conviction under *Texas Penal Code Sections 7.02(a)(2)* and

*19.02(b).* And we hold that the correct standard of review for jury-charge error is *Article 36.19 of the Code of Criminal Procedure.* [**2] We therefore affirm the Court of Appeals on the former issue and reverse on the latter.

I. Facts and Procedural Background

On May 26th, 1993, Minnie Salinas, the appellant's mistress, shot and killed Velia Guevara, the appellant's wife. Sometime before 9:00 a.m., Kathleen Cadena, the property manager at the appellant's apartment complex, received a call from an answering service, which reported several calls about a car with its lights on that belonged to the tenant in apartment 424, the appellant's apartment. At 9:00 a.m., Cadena received another similar call, and Shelley Selzor, the leasing agent, took another call about fifteen minutes later. Cadena told Selzor to contact Velia.

Cadena said a woman, later identified as Minnie Salinas, came by the office at about 8:45 a.m. The office was not yet open, so the woman returned between 9:15 and 9:30 a.m. The woman asked to use the phone. Cadena offered the office phone, but the woman asked for a pay phone. Cadena directed the woman to the pay phone at the back of the club house. The woman was gone for a short time, and then came back through the leasing office without stopping. George Garza, the maintenance man, also recalled [**3] seeing the woman. At about 10:00 a.m., Velia came to the leasing office to say her car lights were not on. That was the last time she was seen alive.

The appellant had left the apartment early that morning and played golf until about 1:00 or 2:00 p.m. Then he spent the next three hours at the San Antonio Light career services office pursuing prospective employment opportunities. At about 4:00 p.m., he returned to his apartment, where he found his wife inside the apartment, lying dead on the hallway floor.

During the trial, there was no dispute by either the appellant or the State that Salinas was the principal actor in the commission of the murder. There was also no dispute that the appellant had an alibi for the time when Velia was shot. Since the appellant had an alibi for the time of the murder, the State had to prove that he was criminally responsible for Salinas's actions in committing the murder.

[HN1] The Texas Penal Code provides three separate ways by which a person can be criminally responsible for the conduct of another. [1] The first way encompasses a situation in which a person causes an innocent person to engage in criminal conduct. [2] The second situation occurs when a [**4] person "solicits, encourages, directs, aids, or attempts to aid" another person in committing an offense. [3] The last situation allows a person to

Page 4

152 S.W.3d 45, *; 2004 Tex. Crim. App. LEXIS 1750, **

be convicted of a crime if he does not make a reasonable effort to prevent the commission of an offense when he has a legal duty to prevent the commission of that offense. [4]

    1   *TEX. PEN CODE § 7.02(a).*

    2   *TEX. PEN. CODE § 7.02(a)(1).*

    3   *TEX. PEN. CODE § 7.02(a)(2).* [HN2] We refer to this section as the "aiding" theory of criminal responsibility for the conduct of another.

    4   *TEX. PEN. CODE § 7.02(a)(3).* [HN3] We refer to this section as the "legal-duty" theory of criminal responsibility for the conduct of another.

[*48] The State relied on *Section 7.02(a)(2) of the Penal Code* to show that the appellant was criminally responsible for Salinas's actions in murdering Velia. The State's theory of the case was that Salinas and the appellant together plotted [**5] to kill Velia.

There was no evidence presented at trial that suggested the State relied on the legal-duty theory to find the appellant to be criminally responsible in the death of his wife. However, in the abstract portion of the jury charge, the party-liability instruction included both the aiding language from *Section 7.02(a)(2)* and the legal-duty language from *Section 7.02(a)(3).* From the record, it appears that neither the appellant nor the State requested or objected to the inclusion of the legal-duty language in the charge.

On direct appeal, the appellant challenged, inter alia, the legal sufficiency of the evidence and the inclusion of the legal-duty language in the jury charge. The appellant argued that the inclusion allowed the jury to convict him for conduct that was not illegal since he had no legal duty to prevent the murder of his wife, and moreover, the misstatement of the law deprived him of a fair and impartial trial.

The Court of Appeals held the evidence presented at trial was legally sufficient to convict the appellant on the aiding theory of being a party to an offense. [5] Therefore, the Court declined to address the sufficiency of the evidence under a legal-duty [**6] theory of liability.

    5   *Guevara v. State, 103 S.W.3d 549, 555 (Tex. App.-San Antonio 2003).*

In addressing the jury-charge error, the Court of Appeals initially found it to be harmless. However, on the appellant's motion for rehearing, the Court of Appeals en banc held that the error was harmful based on its opinion in *Bagheri v. State.* [6]

    6   *87 S.W.3d 657 (Tex. App.-San Antonio 2002), aff'd, 119 S.W.3d 755 (Tex. Crim. App. 2003).*

The Court of Appeals determined that the harm analysis should be conducted under *Texas Rule of Appellate Procedure 44.2(b).* Under *Rule 44.2(b),* a non-constitutional error must be disregarded unless it affects a defendant's substantial rights. Using this analysis, the Court of Appeals determined that the submission of the legal-duty theory [**7] affected appellant's substantial rights, and therefore remanded the case for a new trial.

We granted both the State's and the appellant's petitions for discretionary review to determine (1) whether the evidence presented was sufficient to support the verdict, (2) whether the Court of Appeals applied the correct harm analysis to the jury-charge error, and, if so, (3) whether the Court of Appeals erred in holding that the appellant was harmed. [7]

    7   The precise grounds upon which we granted review include whether the court of appeals erred by: (1) performing a harm analysis of jury-charge error by applying *Rule 44.2(b) of the Rules of Appellate Procedure* instead of *Article 36.19 of the Code of Criminal Procedure,* as construed by *Almanza v. State*; (2) reversing appellant's conviction because the jury might have convicted appellant on one erroneous theory of the offense where there was sufficient evidence to sustain the conviction under an alternative theory; and (3) finding that the State's evidence was legally sufficient to support appellant's conviction where legal sufficiency necessarily depended upon a theory of conduct that was not unlawful or, alternatively, upon the impermissible stacking of inferences.

[**8] II. Legal Sufficiency of the Evidence

First, we address the appellant's assertion that the evidence was legally insufficient to support the conviction due to the impermissible stacking of inferences, [*49] or alternatively, because the conviction rested on conduct which was not illegal. [8]

    8   If the evidence is insufficient to sustain the conviction, then we need not address the other issues presented in the State's petition for discretionary review.

A. Standard of Review

[HN4] The *Fourteenth Amendment's* guarantee of due process of law prohibits a criminal defendant from being convicted of an offense and denied his liberty except upon proof sufficient to persuade a rational fact finder of guilt beyond a reasonable doubt. [9] [HN5] In assessing the legal sufficiency of the evidence to support a conviction,

Page 5

152 S.W.3d 45, *; 2004 Tex. Crim. App. LEXIS 1750, **

we consider all the record evidence in the light most favorable to the jury's verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found the accused guilty **[\*\*9]** of all of the elements of the offense beyond a reasonable doubt. [10] Furthermore, when the trial court's charge authorizes the jury to convict on more than one theory, as it did in this case, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories. [11] The law does not require any further speculation as to the guilt of the appellant. If, given all of the evidence, a rational jury would *necessarily* entertain a reasonable doubt as to the defendant's guilt, the due process guarantee requires that we reverse and order a judgment of acquittal. [12]

> 9      *In re Winship, 397 U.S. 358, 362, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970).*
> 10     *Jackson v. Virginia, 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979); Ladd v. State, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999).*
> 11     *Rabbani v. State, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992).*
> 12     *Narvaiz v. State, 840 S.W.2d 415, 423 (Tex. Crim. App. 1992)* (emphasis added).

**[\*\*10]** B. The Aiding Theory

The appellant contends that the evidence was legally insufficient to convict him due to the impermissible stacking of inferences. The evidence used to convict the appellant was solely circumstantial. However, the lack of direct evidence is not dispositive of the issue of a defendant's guilt. [HN6] Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. [13] Circumstantial evidence alone is sufficient to establish guilt. [14] Furthermore, the standard of review on appeal is the same for both direct and circumstantial evidence cases. [15]

> 13     *Templin v. State, 711 S.W.2d 30, 33 (Tex. Crim. App. 1986).*
> 14     *Miles v. State, 73 Tex. Crim. 493, 165 S.W. 567, 570 (Tex. Crim. App. 1914).*
> 15     *Carlsen v. State, 654 S.W.2d 444, 449 (Tex. Crim. App. 1983); Freeman v. State, 654 S.W.2d 450, 456 (Tex. Crim. App. 1983); Denby v. State, 654 S.W.2d 457, 464 (Tex. Crim. App. 1983); Wilson v. State, 654 S.W.2d 465, 471 (Tex. Crim. App. 1983).*

**[\*\*11]** [HN7] In reviewing the sufficiency of the evidence, we should look at "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." [16] Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts are sufficient to support the conviction. [17]

> 16     *Cordova v. State, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985); Thompson v. State, 697 S.W.2d 413, 416 (Tex. Crim. App. 1985).*
> 17     *Alexander v. State, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987); Russell v. State, 665 S.W.2d 771, 776 (Tex. Crim. App. 1983)* [HN8] (The evidence is sufficient "if the conclusion [of guilt] is warranted by the combined and cumulative force of all the incriminating circumstances.").

[HN9] **[\*50]** Motive is a significant circumstance indicating guilt. [18] Intent may also be inferred from **[\*\*12]** circumstantial evidence such as acts, words, and the conduct of the appellant. [19]

> 18     *Harris v. State, 727 S.W.2d 537, 542 (Tex. Crim. App. 1987).*
> 19     *Patrick v. State, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995).*

The evidence demonstrated that the appellant had a motive to kill his wife. The appellant was involved in a long-standing affair with Salinas, which was consummated three days before he married Velia. Three years after the affair began, and one month before the murder, Salinas issued an ultimatum to the appellant that they would separate "if something didn't happen by June." The appellant was distressed over this, and stated that he "didn't want to give Minnie [Salinas] up and couldn't think of a way to end it." The appellant apparently did not want to divorce Velia because he did not want to cause his family distress. [20] He and Salinas also talked about getting married, but the appellant stated that he "didn't see how it was possible." Velia had a substantial **[\*\*13]** retirement account that was to go to the appellant in the event of her death. Once the money was certain to go to the appellant, [21] Salinas and the appellant almost immediately got married in Las Vegas. These facts show that the appellant had a strong motive for murdering his wife.

> 20     Apparently, the appellant's brother had recently gotten divorced. The appellant's parents took the brother's divorce extremely hard. Therefore, the appellant said he did not want to put his parents through another divorce.
> 21     Velia's family filed a civil suit to prevent appellant from receiving the retirement benefits, due to his alleged involvement in her death. The civil suit was subsequently dropped so the criminal investigation would not be impeded.

Page 6

152 S.W.3d 45, *; 2004 Tex. Crim. App. LEXIS 1750, **

[HN10] Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt. [22] Lies about an actor's relationship with an accomplice are probative of unlawful acts. [**14] [23]

> 22    *Graham v. State, 566 S.W.2d 941, 951 (Tex. Crim. App. 1978); United States v. Cano-Guel, 167 F.3d 900, 905 (5th Cir. 1999).*
> 23    *Hartson v. State, 59 S.W.3d 780, 788 (Tex. App.- Texarkana 2001, no pet.).*

The appellant made several false statements to the authorities. When the appellant gave his first statement to the police, he claimed that he and Velia had a good relationship with no problems and that no one else had any problems with Velia. He mentioned Salinas's name in the statement, but only as a person to whom he lent a gun, not as a person with whom he was having an affair, and not a person whom he knew had a motive to kill Velia. It was only after the police discovered his omissions and confronted him with them that he detailed his relationship with Salinas. The appellant later lied about his relationship with Salinas during a deposition taken for a civil case.

On the day of the murder, the appellant claimed that he dropped Salinas off [**15] at work at 6:30 am, but Salinas called in sick and did not arrive at work until later in the day. The appellant explained that he had to drive Salinas to work because she told him that her car had been stolen two days before the murder. However, Salinas rented a car *five* days before the murder. Then, on the day of the murder, after the murder had occurred, she extended her rental contract and switched to [*51] a different rental vehicle. Later, when Salinas's car was recovered, it showed no signs of having been stolen. Based on the appellant's inconsistent statements, it would be reasonable for a jury to conclude that he attempted to mislead the police about driving Salinas to work and about her access to transportation.

In addition to the evidence of motive and inconsistent statements, other evidence was presented that suggested the appellant's complicity in the crime. One month before the murder, the appellant took Velia to a shooting range to practice firing a rented 9mm gun, the same caliber gun that was used in the murder. He also told a friend, Paul Knauss, that he was researching how to make a silencer. The day of the murder, the appellant ensured that he had an alibi for the [**16] time of the murder because he was playing golf with Knauss. Knauss testified that it was out of character for the appellant to ask him to play golf. It was unusual because Knauss was a bad golfer and appellant had, on previous occasions, said that people who could not shoot under 100 should not be allowed to play on eighteen-hole golf courses because they slow everyone down. It had also been some period of time since the appellant had played golf with Knauss, and on previous occasions, they played only par-three courses or went to the driving range. The jury could have reasonably concluded that the appellant was attempting to manufacture an alibi so the police would not be able to connect him to the murder.

The police found two casings in the appellant's car and a third casing on the couch in the appellant's apartment that were all fired from the same gun. Velia was shot three times. The firearms expert testified that the casing found on the couch was probably ejected from the murder weapon when Velia was shot. Knauss testified that the casings were not in the appellant's car earlier in the day during the golf outing. In addition, the police found a box of shell casings under some [**17] clothes in the appellant's closet, thirty of which matched the casings from the murder scene and the appellant's car. After the appellant discovered his wife's body, he had access to both the apartment and his car before emergency personnel arrived. The appellant had opportunity to retrieve two casings from the crime scene and put them in his car, hoping to conceal evidence. Presumably, he did not notice the third casing which was found in an inconspicuous location. The jury could reasonably conclude that the shell-casing evidence connected the appellant to the murder weapon.

During the trial, the State claimed that Velia had been lured from her apartment with a phone call so Salinas could surreptitiously enter the Guevara's apartment using a key from the appellant. There was no sign of forced entry into the apartment, nor was anything stolen, despite the obvious presence of valuables. The lack of evidence of burglary suggested that the murder was pre-meditated, not a robbery gone bad. Finally, the appellant showed little to no emotion after discovering his wife, nor did he appear to be upset at the crime scene.

The appellant argues that in order to be convicted as a party to the [**18] murder, there must be proof that he was assisting in the commission of the offense at the time it was actually committed and that he had knowledge that he was assisting in the commission of the offense. However, [HN11] the Penal Code does not require that the party actually participate in the commission of [*52] the offense to be criminally responsible. [24] The Penal Code also does not require that a party to the crime be physically present at the commission of the offense. [25]

> 24    *Cross v. State, 550 S.W.2d 61, 63-64 (Tex. Crim. App. 1977)* (The defendant was criminally responsible as a party because he planned the robbery with the actual robbers, even though the

Page 7

152 S.W.3d 45, *; 2004 Tex. Crim. App. LEXIS 1750, **

defendant did not actually participate in the robbery).

25    *Morrison v. State, 608 S.W.2d 233, 234 (Tex. Crim. App. 1980).*

Based on the totality of the evidence, a jury could have reasonably concluded that the appellant was a participant in the murder of his wife and that he knew he was assisting in the offense. While each piece **[\*\*19]** of evidence lacked sufficiency in isolation, the consistency of the evidence and the reasonable inferences drawn therefrom were sufficient to support the verdict. Therefore, after examining all the evidence in the case in the light most favorable to the prosecution, we conclude that a rational jury could have found all the elements proved, based on the aiding theory of party responsibility, beyond a reasonable doubt.

C. The Legal-Duty Theory

The appellant alternatively alleges that his conviction was based on conduct that was not illegal. The rationale for this claim is that, because the appellant had no legal duty to prevent his wife's murder, he could not be convicted on a legal-duty theory of liability. Regardless of whether the appellant had or did not have a legal duty to prevent injury to his wife, [26] the evidence was sufficient to support the State's other theory of the case, that the appellant aided Salinas in murdering Velia. We have consistently held that, [HN12] when multiple theories are submitted to the jury, the evidence is sufficient to support a conviction so long as the evidence is sufficient to support conviction for one of the theories submitted to the jury. [27] **[\*\*20]**

26    While generally a spouse does not have a legal duty to prevent harm to the other spouse, there can be circumstances under which one spouse could have a legal duty to the other. For example, if one spouse was a law enforcement official, he or she would have a legal duty to prevent a crime from being perpetrated on the other spouse. *See Medrano v. State, 612 S.W.2d 576, 578 (Tex. Crim. App. 1981).* Another example could arise where one spouse is incapacitated and the other spouse has legal guardianship of the incompetent one. However, there was no evidence presented in this case that the appellant and his wife fell into any of these categories. The question of legal duty between spouses also arises in civil litigation. *See Rampel v. Wascher, 845 S.W.2d 918, 925 (Tex. App.-San Antonio 1992, writ denied)* ("spouses and other family members have no legal right of action against each other arising from failure to take affirmative action to prevent injury").

27    *Kitchens v. State, 823 S.W.2d 256, 258 (Tex. Crim. App.1991).*

**[\*\*21]**    III. The Jury Charge

The appellant argued in the Court of Appeals that, because the jury charge included language that allowed the jury to convict him based on either a legal-duty theory *or* an aiding theory, it is unknown under which theory the jury convicted. Therefore, since the jury could not have *legally* convicted him on legal-duty theory, and there is a possibility that they did, the appellant argues that the verdict cannot stand. So despite the fact that the conviction may be upheld under the aiding theory, we still must decide if the error in the jury charge affected the appellant's trial in such a way that his conviction should be reversed. [28]

28    We do not address whether the inclusion of the legal-duty theory in the charge was error.

**[\*53]**    The Court of Appeals applied *Texas Rule of Appellate Procedure 44.2(b)* to the jury charge in its harm analysis. On original submission, the Court of Appeals held that the jury-charge error in this case was harmless because, although **[\*\*22]** an erroneous theory of culpability was submitted to the jury, there was sufficient evidence to convict appellant under a valid theory. The en banc Court of Appeals granted the appellant's motion for rehearing and reviewed its holding based on their decision in *Bagheri v. State.* [29] Based on its reasoning in *Bagheri*, the Court of Appeals applied *Rule of Appellate Procedure 44.2(b)* and concluded that the error affected the appellant's substantial rights. The Court of Appeals reversed the conviction. We must determine whether the harm analysis used in *Bagheri* was the appropriate one under which the jury-charge error in this case should be reviewed.

29    *87 S.W.3d 657 (Tex. App.-San Antonio 2002), aff'd, 119 S.W.3d 755 (Tex. Crim. App. 2003).*

*Bagheri* involved a driving while intoxicated conviction in which retrograde extrapolation evidence was erroneously submitted to the jury. [30] The jury was charged with alternative theories of intoxication: **[\*\*23]** (1) absence of the normal use of mental or physical faculties and (2) a blood-alcohol concentration of 0.10. [31] It was unclear under which theory the jury convicted the defendant. [32] Without the erroneous admission of evidence, one of the two theories could not legally have been the basis for a conviction due to insufficient evidence.

30    *Id., at 659.*

Page 8

152 S.W.3d 45, *; 2004 Tex. Crim. App. LEXIS 1750, **

31    Under the version of *Penal Code Section 49.01* in effect when Bagheri was arrested, a person could be shown to be intoxicated for (1) the impairment of physical or mental faculties or (2) having a blood-alcohol content over 0.10. That section has been amended so that a person may be shown to be intoxicated if he has a blood-alcohol concentration of 0.08. Act of May 11, 1999, 76th Leg., R.S., ch. 234, § 1, 1999 Tex. Gen. Laws 1082.

32    *Id., at 660.*

In conducting a harm analysis in *Bagheri*, the Court of Appeals relied on *Rule 44.2(b) of the Rules of Appellate Procedure.* **[\*\*24]** 33 According to *Rule 44.2(b)*, non-constitutional errors must be disregarded if the error did not affect the appellant's substantial rights. "Substantial rights are not affected by the erroneous admission of evidence 'if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.'" 34 The Court of Appeals concluded that it could not tell whether the erroneous admission of evidence "did not influence the jury, or have but a slight effect," and therefore, held the error to be harmful. 35

33    *Id., at 659.*

34    *Solomon v. State, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001).*

35    *Bagheri, 87 S.W.3d 657 at 661.*

We affirmed the lower court, holding that, although the Court of Appeals reached the correct conclusion in *Bagheri*, its reasoning was flawed. 36 The Court of Appeals based their holding on the fact that the general verdict made it impossible to determine which **[\*\*25]** theory the jury had relied on. 37 We stated that "this fact alone is not determinative, because evidence to prove intoxication under either definition is relevant to the single question of whether **[\*54]** the appellant was, in fact intoxicated." 38 After reviewing the record for the relevant factors outlined in *Motilla v. State* 39 and *Solomon v. State*, *supra*, we held that we could not determine whether the erroneous admission of evidence "prejudiced the jury's consideration of the other evidence or substantially affected their deliberation." 40

36    *Bagheri v. State, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003).*

37    *Ibid.*

38    *Ibid.*

39    *78 S.W.3d 352, 355 (Tex. Crim. App. 2002).*

40    *Bagheri, 119 S.W.3d at 763.* We noted that the issue in *Bagheri* was not whether the jury charge set out valid and proper means of committing the offense, or whether there was sufficient evidence to prove one of the alleged means by which the appellant committed the offense, but instead whether the erroneous admission of evidence affected the verdict. *Id. at 762 n.5.*

**[\*\*26]**   The Court of Appeals in the instant case used the same harm analysis as it did in its *Bagheri* opinion. The harm analysis under *Rule 44.2(b)* was appropriate in *Bagheri* because the issue involved the erroneous admission of evidence and its effect on the jury's deliberations.

This case is distinguishable from *Bagheri*. The issue in the appellant's case is whether an *erroneous theory in the jury charge* affected the verdict, not whether the *erroneous admission of evidence* affected the verdict. [HN13] It is settled law in Texas that error in a criminal jury charge is reviewed under *Article 36.19 of the Code of Criminal Procedure* as interpreted by this Court in *Almanza v. State.* 41 As a result, we hold that the Court of Appeals erred in assessing harm under the standard found in *Rule 44.2(b)*.

41    *686 S.W.2d 157 (Tex. Crim. App. 1985).*

III. Conclusion

We hold that the Court of Appeals did not err in holding that the evidence was legally sufficient to **[\*\*27]** support the conviction. We also hold that the Court of Appeals erred in using *Rule 44.2(b)* as the standard by which to assess harm for the jury-charge error. As a result of this holding, we need not address whether the Court of Appeals erred in concluding that the appellant was harmed. We reverse the judgment of the Court of Appeals and remand the case to that Court to conduct a harm analysis under *Code of Criminal Procedure 36.19*.



🛑

Warning
As of: Aug 02, 2017

JACKSON v. VIRGINIA ET AL.

No. 78-5283

SUPREME COURT OF THE UNITED STATES

*443 U.S. 307*; *99 S. Ct. 2781*; *61 L. Ed. 2d 560*; *1979 U.S. LEXIS 10*

March 21, 1979, Argued
June 28, 1979, Decided

**SUBSEQUENT HISTORY:** Petition for Rehearing Denied October 1, 1979.

**PRIOR HISTORY:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT.

**DISPOSITION:** *580 F.2d 1048*, affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Petitioner inmate was convicted after a state bench trial of first degree murder. The Court of Appeals for the Fourth Circuit reversed the district court's grant of habeas corpus relief on the basis that there was no evidence of premeditation because some evidence existed that the inmate intended to kill the victim. The inmate was granted certiorari.

**OVERVIEW:** The inmate claimed that a federal habeas court did not have to consider whether there was any evidence to support his state court conviction, but had to determine whether there was sufficient evidence. The Court held that, assuming the procedural prerequisites were satisfied, the inmate was entitled to habeas relief if there was evidence that no rational trier of fact could have found proof of guilt beyond a reasonable doubt. The *Due Process Clause of the Fourteenth Amendment* protected a criminal defendant against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime charged. A state prisoner who alleged the evidence could not be fairly character-

ized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt stated a constitutional claim cognizable in a federal habeas proceeding. Review of the record in the light most favorable to the prosecution established a rational factfinder could readily have found the inmate guilty beyond a reasonable doubt of first degree murder under state law.

**OUTCOME:** The judgment of the appellate court reversing the district court's order granting habeas corpus relief to the inmate was affirmed.

**LexisNexis(R) Headnotes**

*Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution*
[HN1] The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt.

*Criminal Law & Procedure > Criminal Offenses > Homicide > Murder > Definitions > Malice*
*Criminal Law & Procedure > Criminal Offenses > Homicide > Murder > Second-Degree Murder > Elements*
*Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution*
[HN2] Under Virginia law, murder is defined as the unlawful killing of another with malice aforethought. Premeditation, or specific intent to kill, distinguishes murder

in the first from murder in the second degree. Proof of this element is essential to conviction of the former offense, and the burden of proving it clearly rests with the prosecution.

***Criminal Law & Procedure > Criminal Offenses > Homicide > Murder > First-Degree Murder > Elements***
***Criminal Law & Procedure > Criminal Offenses > Homicide > Murder > Second-Degree Murder > Elements***
***Criminal Law & Procedure > Sentencing > Capital Punishment > General Overview***
[HN3] The degrees of murder in Virginia are specified in *Va. Code Ann. § 18.2-32* (1975). Murder, other than capital murder, by poison, lying in wait, imprisonment, starving, or by any willful, deliberate, and premeditated killing, or in the commission of, or attempt to commit, arson, rape, robbery, burglary or abduction is murder of the first degree, punishable as a Class 2 felony. All murder other than capital murder and murder in the first degree is murder of the second degree and is punishable as a Class 3 felony. Class 2 felonies carry a term of 20 years to life. *Va. Code Ann. § 18.2-10(b)* (1975). The sentence for Class 3 felonies can range from 5 to 20 years. *Va. Code Ann. § 18.2-10(c)*. Murder itself takes its definition in Virginia from the common law.

***Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > General Overview***
***Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution***
***Criminal Law & Procedure > Trials > Defendant's Rights > Right to Due Process***
[HN4] It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitutes a denial of due process. These standards no more than reflect a broader premise that has never been doubted in our constitutional system: that a person cannot incur the loss of liberty for an offense without notice and a meaningful opportunity to defend. A meaningful opportunity to defend, if not the right to a trial itself, presumes as well that a total want of evidence to support a charge will conclude the case in favor of the accused. Accordingly, a conviction based upon a record wholly devoid of any relevant evidence of a crucial element of the offense charged is constitutionally infirm. The "no evidence" doctrine thus secures to an accused the most elemental of due process rights: freedom from a wholly arbitrary deprivation of liberty.

***Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution***

***Criminal Law & Procedure > Trials > Defendant's Rights > Right to Due Process***
[HN5] The *Due Process Clause of the Fourteenth Amendment* protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

***Criminal Law & Procedure > Trials > Defendant's Rights > Right to Due Process***
***Criminal Law & Procedure > Appeals > Reversible Errors > Jury Instructions***
***Evidence > Procedural Considerations > Weight & Sufficiency***
[HN6] The Winship doctrine requires more than simply a trial ritual. A doctrine establishing so fundamental a substantive constitutional standard must also require that the factfinder will rationally apply that standard to the facts in evidence. A "reasonable doubt," at a minimum, is one based upon "reason." Yet a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt, and the same may be said of a trial judge sitting as a jury. In a federal trial, such an occurrence has traditionally been deemed to require reversal of the conviction. Under Winship, which established proof beyond a reasonable doubt as an essential of *Fourteenth Amendment* due process, it follows that when such a conviction occurs in a state trial, it cannot constitutionally stand.

***Criminal Law & Procedure > Appeals > Standards of Review > General Overview***
***Criminal Law & Procedure > Habeas Corpus > Appeals > General Overview***
[HN7] A federal court has a duty to assess the historic facts when it is called upon to apply a constitutional standard to a conviction obtained in a state court. For example, on direct review of a state-court conviction, where the claim is made that an involuntary confession was used against the defendant, the court reviews the facts to determine whether the confession was wrongly admitted in evidence. The same duty obtains in federal habeas corpus proceedings.

***Criminal Law & Procedure > Habeas Corpus > Review > Standards of Review > General Overview***
***Evidence > Procedural Considerations > Weight & Sufficiency***
[HN8] The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence

could reasonably support a finding of guilt beyond a reasonable doubt. This inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

***Criminal Law & Procedure > Appeals > Standards of Review > General Overview***
***Evidence > Procedural Considerations > Weight & Sufficiency***
[HN9] A mere modicum of evidence may satisfy a "no evidence" standard. Any evidence that is relevant -- that has any tendency to make the existence of an element of a crime slightly more probable than it would be without the evidence -- could be deemed a "mere modicum." But it could not seriously be argued that such a "modicum" of evidence could by itself rationally support a conviction beyond a reasonable doubt.

***Criminal Law & Procedure > Habeas Corpus > Custody Requirement > Custody Determinations > Satisfaction of Custody***
***Criminal Law & Procedure > Habeas Corpus > Custody Requirement > In-Custody Requirement***
***Criminal Law & Procedure > Habeas Corpus > State Grounds > Independent & Adequate Principle***
[HN10] Under *28 U.S.C.S. § 2254*, a federal court must entertain a claim by a state prisoner that he or she is being held in custody in violation of the Constitution or laws or treaties of the United States. A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim. Thus, assuming that state remedies have been exhausted and that no independent and adequate state ground stands as a bar, it follows that such a claim is cognizable in a federal habeas corpus proceeding.

***Criminal Law & Procedure > Habeas Corpus > Cognizable Issues > General Overview***
[HN11] In a challenge to a state criminal conviction brought under *28 U.S.C.S. § 2254*, if the settled procedural prerequisites for such a claim have otherwise been satisfied, the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial that no rational trier of fact could have found proof of guilt beyond a reasonable doubt. The standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.

***Criminal Law & Procedure > Criminal Offenses > Homicide > Murder > Definitions > Deliberation & Premeditation***
***Criminal Law & Procedure > Scienter > Specific Intent***
[HN12] Under Virginia law, premeditation need not exist for any particular length of time, and an intent to kill may be formed at the moment of the commission of the unlawful act.

***Criminal Law & Procedure > Habeas Corpus > Appeals > General Overview***
[HN13] A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

**DECISION:**

Appropriate standard of review in federal habeas corpus proceedings resulting from claim of insufficient evidence to support state criminal conviction, held to be proof of guilt beyond reasonable doubt as determined by rational trier of fact.

**SUMMARY:**

A criminal defendant was convicted after a bench trial in the Circuit Court of Chesterfield County, Virginia, of first-degree murder. The defendant did not dispute at trial that he had in fact shot and killed the victim, but rather argued that he had been too intoxicated at the time to form the specific intent necessary to sustain a conviction of murder in the first-degree. Under Virginia law, premeditation, or specific intent to kill, is a necessary element of the first-degree murder offense, with the burden of proof being on the prosecution to prove such element. After his contention was rejected by the trial judge and a conviction resulted, the defendant ultimately commenced a habeas corpus proceeding in the United States District Court of the Eastern District of Virginia. The District Court, applying the "no evidence" criterion announced in *Thompson v Louisville, 362 US 199, 4 L Ed 2d 654, 80 S Ct 624*, which held that a conviction based upon a record wholly devoid of any relevant evidence of an element of the offense charged is unconstitutional, found the record devoid of evidence of premeditation and granted the writ. The United States Court of Appeals for the Fourth Circuit, applying the same criterion, reversed, holding that there was some evidence that

the defendant had intended to kill the victim (*580 F2d 1048*).

On certiorari, the United States Supreme Court affirmed. In an opinion by Stewart, J., joined by Brennan, White, Marshall, and Blackmun, JJ., it was held that (1) in a habeas corpus proceeding arising out of a claim that a person has been convicted in a state court upon insufficient evidence, a federal court, rather than restricting its inquiry merely to whether there is any evidence to support the conviction, must consider whether there is sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt, and therefore, in a challenge to a state court conviction under *28 USCS 2254*, the applicant is entitled to habeas corpus relief, assuming settled precedural prerequisites for such relief have otherwise been satisfied, if it is found that upon the record evidence adduced at trial no rational trier of facts could have found proof of guilt beyond a reasonable doubt in terms of the substantive elements of the criminal offense as defined by state law, and (2) viewed in the light most favorable to the prosecution, sufficient evidence existed for a rational factfinder to conclude beyond a reasonable doubt that the criminal defendant in the case at bar possessed the necessary intent and committed first-degree murder under the law of Virginia, notwithstanding evidence that he had been intoxicated on the day of the killing, since (a) uncontradicted evidence established that the defendant had shot the victim twice, (b) the defendant himself admitted that the fatal shooting had occurred only after he had first fired several shots into the ground and then reloaded his gun, (c) the evidence was clear that the two shots that killed the victim were fired at close and thus predictably fatal range by a person who was experienced in the use of the murder weapon, (d) immediately after the shooting the defendant drove without mishap into another state, and (e) shortly before the fatal episode, the defendant had publicly expressed an intention to have sexual relations with the victim, whose body had been found partially unclothed.

Stevens, J., joined by Burger, Ch. J., and Rehnquist, J., concurring in the judgment, expressed the view that the new rule of law established by the court--that it is unconstitutional to convict any person, including an individual found guilty beyond a reasonable doubt by a jury, a trial judge, and one or more levels of state appellate judges, except upon proof sufficient to convince a federal judge that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt--was unnecessary to the decision in the case at bar, constituting an unwise act of lawmaking which would adversely affect the quality of justice administered by federal judges.

Powell, J., did not participate.

## LAWYERS' EDITION HEADNOTES:

### LAW §840.3

criminal conviction -- proof beyond reasonable doubt --

Headnote:[1]

The due process clause of the Federal Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt.

### CORPUS §17

criminal conviction -- sufficiency of evidence -- standard of review --

Headnote:[2A][2B][2C][2D]

In a habeas corpus proceeding arising from a claim that a person has been convicted in a state court upon insufficient evidence, a federal court must consider whether there is sufficient evidence to justify a rational trier of fact to find guilt beyond a reasonable doubt, and should not restrict its inquiry to whether there is any evidence to support the conviction; accordingly, in a challenge to a state court conviction under *28 USCS 2254*, the applicant is entitled to habeas corpus relief, assuming settled procedural prerequisites for such a claim have otherwise been satisfied, if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt in terms of the substantive elements of the criminal offense as defined by state law. (Stevens, J., Burger, Ch. J., and Rehnquist, J., dissented from this holding.)

### EVIDENCE §178

### HOMICIDE §1

element of premeditation -- Virginia law --

Headnote:[3]

Under Virginia law, murder is defined as the unlawful killing of another with malice aforethought; premeditation, or specific intent to kill, distinguishes murder in the first degree from murder in the second degree, and proof of this element is essential to the conviction of the former offense, with the burden of proof on the matter clearly resting upon the prosecution.

### EVIDENCE §862

### HOMICIDE §3

second degree murder -- voluntary intoxication -- Virginia law --

Headnote:[4A][4B]

Under Virginia law, voluntary intoxication, although not an affirmative defense to second degree murder, is material to the element of premeditation and may be found to have negated it.

ERROR §831

criminal conviction -- availability of appeal -- Virginia law --

Headnote:[5A][5B]

Under Virginia law, there is no appeal as of right from a criminal conviction; however, each petition for writ of error under the applicable state statute is reviewed on the merits, and the effect of a denial is to affirm the judgment of conviction on the merits.

LAW §831.5

criminal conviction -- denial of due process --

Headnote:[6]

A conviction upon a charge not made or upon a charge not tried constitutes a denial of due process.

LAW §831.5

criminal offense -- notice and opportunity to defend -- due process --

Headnote:[7]

A person cannot incur the loss of liberty for a criminal offense without notice and a meaningful opportunity to defend, and such opportunity, if not the right to trial itself, presumes as well that a total want of evidence to support a charge will conclude the case in favor of the accused; accordingly, a criminal conviction based upon a record wholly devoid of any relevant evidence of a crucial element of an offense is constitutionally infirm, the most elemental of due process rights being freedom from a wholly arbitrary deprivation of liberty.

LAW §840.3

due process of law -- criminal conviction -- sufficiency of evidence --

Headnote:[8A][8B]

As an essential of the due process guaranteed by the *Fourteenth Amendment*, no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof, which is defined as the evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense; accordingly, a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim.

LAW §840.3

EVIDENCE §982

criminal conviction -- due process guarantee -- reasonable doubt --

Headnote:[9]

The rule that no person, consistently with due process, may be convicted of a crime except upon proof of guilt beyond a reasonable doubt requires also that the factfinder will rationally apply that standard to the facts in evidence, a "reasonable doubt" being, at a minimum, one based upon "reason."

ERROR §1650.5

LAW §840.3

criminal conviction -- proof beyond reasonable doubt -- federal and state trials --

Headnote:[10]

In a federal trial, reversal of a criminal conviction rendered by a properly instructed jury, or judge sitting without a jury, is required where no rational trier of fact could find guilt beyond a reasonable doubt; similarly, when such a conviction occurs in a state trial, it cannot constitutionally stand, since proof beyond a reasonable doubt is an essential of *Fourteenth Amendment* due process.

ERROR §77

TRIAL §299

criminal case -- role of factfinder -- reasonableness of verdict --

Headnote:[11A][11B]

While the factfinder in a criminal case may enter an unassailable but unreasonable verdict of not guilty--this being the logical corollary of the rule that there can be no appeal from a judgment of acquittal, even if the evidence of guilt is overwhelming--this power does not include a power to enter an unreasonable verdict of guilty, the application of the beyond-a-reasonable-doubt standard to the evidence not being irretrievably committed to jury discretion.

ERROR §213

LAW §62

criminal case -- testing evidentiary sufficiency --

Headnote:[12A][12B]

Evidentiary sufficiency in a criminal case may be tested through a motion for judgment of acquittal and a post-verdict appeal from the denial of such a motion.

ERROR §806.5

Supreme Court review of criminal conviction -- constitutionality -- historic facts --

Headnote:[13]

On direct review of a state court conviction where the claim is made that an involuntary confession was used against the defendant, the United States Supreme Court will review the facts to determine whether the confession was wrongly admitted in evidence, since a federal court has a duty to assess the historic facts when called upon to apply a constitutional standard to a conviction obtained in a state court.

CORPUS §121

duty of court -- state criminal conviction --

Headnote:[14]

In federal habeas corpus proceedings, a federal court has a duty to assess the historic facts when called upon to apply a constitutional standard to a conviction obtained in a state court.

ERROR §1463

criminal conviction -- sufficiency of evidence -- critical inquiry --

Headnote:[15]

On review of the sufficiency of the evidence to support a criminal conviction, the critical inquiry is not simply whether the jury was properly instructed, but also whether the record evidence can reasonably support a finding of guilt beyond a reasonable doubt; this inquiry does not, in preserving the factfinder's role as weigher of the evidence, require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt, the relevant question being whether, after viewing all the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

LAW §62

motion for acquittal -- standard of inquiry --

Headnote:[16A][16B]

In judging motions for acquittal in federal criminal trials, a judge must require acquittal if reasonable jurors would necessarily have a reasonable doubt as to guilt.

TRIALS §299

criminal -- responsibility of trier of fact --

Headnote:[17]

In a criminal trial, it is the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

CORPUS §17

federal court -- standard of review --

Headnote:[18A][18B]

The standard to be utilized by a federal habeas corpus court in assessing a state prisoner's claim of conviction in state court upon insufficient evidence--namely, that there must be sufficient evidence for a rational trier of the facts to find guilt beyond a reasonable doubt--neither permits a court to make its own subjective determination of guilt or innocence, nor requires scrutiny of the reasoning process actually used by the factfinder, the question of the constitutional sufficiency of the evidence being wholly unrelated to the question of how rationally the verdict was actually reached.

LAW §840.3

proof beyond reasonable doubt -- relevant evidence --

Headnote:[19]

Evidence which has a tendency to make the existence of an element of a crime slightly more probable than it would be without the evidence (that is, "relevant" evidence) cannot, by itself, rationally support a conviction of a crime beyond a reasonable doubt, as is required by due process.

ERROR §1603

LAW §840.3

harmless error -- jury instruction -- evidence -- due process of law --

Headnote:[20A][20B]

Failure to instruct a jury in a criminal case on the necessity of proof of guilt beyond a reasonable doubt can never be harmless error, so that a defendant whose guilt was proven by overwhelming evidence would be denied due process if the jury was instructed that he could be found guilty on a mere preponderance of the evidence; a defendant against whom there was but one slender bit of evidence would likewise be denied due process upon conviction even though the jury was properly instructed on the prosecution's burden of proof beyond a reasonable doubt.

CORPUS §17

habeas corpus claim -- sufficiency of evidence -- state appellate court --

Headnote:[21A][21B]

The fact that a state appellate court, in gauging the sufficiency of the evidence to support a criminal conviction, invoked the "proof beyond a reasonable doubt" standard, does not totally bar a properly presented claim by a state prisoner under *28 USCS 2254* alleging conviction in a state court upon insufficient evidence, although such action by the state court is entitled to great weight.

CORPUS §41

function of writ -- state criminal trial --

Headnote:[22]

The federal writ of habeas corpus may be utilized to correct the occasional abuse of federal constitutional rights implicated in a state criminal trial which are not vindicated in the course of state appellate review.

COURTS §708

challenge to evidentiary sufficiency -- state appellate court judgment -- federal courts --

Headnote:[23]

A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is entitled to deference by the federal courts, as is any judgment affirming a criminal conviction.

LAW §840.3

proof beyond reasonable doubt -- scope of constitutional protection --

Headnote:[24]

The constitutional necessity in a criminal trial of proof of guilt beyond a reasonable doubt, as guaranteed by due process, is not confined to those defendants who are morally blameless; even a thief is entitled to claim that he has been unconstitutionally convicted and imprisoned as a burglar.

EVIDENCE §991

first-degree murder -- sufficiency of evidence --

Headnote:[25]

Viewed in the light most favorable to the prosecution, sufficient evidence exists for a rational factfinder to conclude beyond a reasonable doubt that a criminal defendant possessed the necessary intent, and therefore committed first-degree murder under state law, notwithstanding evidence that the defendant had been intoxicated on the day of the killing, where (1) uncontradicted evidence establishes that the defendant shot the victim not once, but twice, (2) the defendant himself admitted that the fatal shooting had occurred only after he had first fired several shots into the ground and then reloaded his gun, (3) the evidence clearly shows that the two shots that killed the victim were fired at close, and thus predictably fatal range by a person experienced in the use of the murder weapon, (4) it had been shown that immediately after the shooting, the defendant drove without mishap from the state where the murder took place to another state, and (5) shortly before the fatal episode, the defendant had publicly expressed an intention to have sexual relations with the victim, whose body was found partially unclothed.

HOMICIDE §3

premeditation -- Virginia law --

Headnote:[26]

Under Virginia law, premeditation need not exist for any particular length of time, and an intent to kill may be formed at the moment of the commission of the unlawful act.

EVIDENCE §419

criminal case -- duty of prosecution --

Headnote:[27]

The prosecution in a criminal case is not under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt.

CORPUS §120

conflicting inferences on record -- presumption in favor of prosecution --

Headnote:[28]

A federal habeas corpus court, faced with a record of historical facts that supports conflicting inferences, must presume, even if it does not affirmatively appear in the record, that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

## SYLLABUS

Petitioner was convicted of first-degree murder after a bench trial in a Virginia court, and his motion and petition in the state courts to set aside the conviction on the ground that there was insufficient evidence of premeditation, a necessary element of first-degree murder, were denied. He then brought a habeas corpus proceeding in Federal District Court, which, applying the "no evidence" criterion of *Thompson v. Louisville, 362 U.S. 199*, found the record devoid of evidence of premeditation and granted the writ. Applying the same criterion, the Court of Appeals reversed, holding that there was some evidence that petitioner had intended to kill the victim.

*Held*:

1. A federal habeas corpus court must consider not whether there was *any* evidence to support a state-court conviction, but whether there was sufficient evidence to justify a rational trier of fact to find guilt beyond a reasonable doubt. *In re Winship, 397 U.S. 358*. Pp. 313-324.

(a) *In re Winship* presupposes as an essential of the due process guaranteed by the *Fourteenth Amendment* that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof -- defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense. Pp. 313-316.

(b) After *In re Winship*, the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed on reasonable doubt, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. The relevant question is whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The *Thompson* "no evidence" rule is simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt. Pp. 316-320.

(c) In a challenge to a state conviction brought under *28 U. S. C. § 2254*, which requires a federal court to entertain a state prisoner's claim that he is being held in "custody in violation of the Constitution or laws or treaties of the United States," the applicant is entitled to habeas corpus relief if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt. Pp. 320-324.

2. A review of the record in this case in the light most favorable to the prosecution shows that a rational factfinder could have found petitioner guilty beyond a reasonable doubt of first-degree murder under Virginia law. Pp. 324-326.

**COUNSEL:** Carolyn J. Colville, by appointment of the *Court, 439 U.S. 1064*, argued the cause pro hac vice and filed briefs for petitioner.

Marshall Coleman, Attorney General of Virginia, argued the cause for respondents. With him on the brief was Linwood T. Wells, Assistant Attorney General. *

* Briefs of amici curiae urging affirmance were filed by George Deukmejian, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, and Eddie T. Keller, Willard F. Jones, and Jane K. Fischer, Deputy Attorneys General, for the State of California; by Arthur K. Bolton, Attorney General, Robert S. Stubbs II, Executive Assistant Attorney General, Don A. Langham, First Assistant Attorney General, John C. Walden, Senior Assistant Attorney General, and Susan V. Boleyn, Assistant Attorney General, for the State of Georgia; by Frank J. Kelley, Attorney General, Robert A. Derengoski, Solicitor General, and Thomas L. Casey, Assistant Attorney General, for the State of Michigan; and for their respective States by Theodore L. Sendak, Attorney General, David A. Arthur, Deputy Attorney General, and Donald P. Bogard, of Indiana, Robert B. Hansen, Attorney General of Utah, Edward G. Biester, Jr., Attorney General of Pennsylvania, Paul L. Douglas, Attorney General of Nebraska, and Chauncey H. Browning, Attorney General of West Virginia.

**JUDGES:** STEWART, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, in which BURGER, C. J., and REHNQUIST, J., joined, post, p. 326. POW-

ELL, J., took no part in the consideration or decision of the case.

**OPINION BY:** STEWART

**OPINION**

[*309] [***567] [**2783] MR. JUSTICE STEWART delivered the opinion of the Court.

[***LEdHR1] [1] [***LEdHR2A] [HN1] The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt. *In re Winship, 397 U.S. 358.* The question in this case is what standard is to be applied in a federal habeas corpus proceeding when the claim is made that a person has been convicted in a state court upon insufficient evidence.

I

[***LEdHR3] [3]The petitioner was convicted after a bench trial in the Circuit Court of Chesterfield [**2784] County, Va., of the first-degree murder of a woman named Mary Houston Cole. [1][HN2] Under Virginia law, murder is defined as "the unlawful killing of another with malice aforethought." *Stapleton v. Commonwealth, 123 Va. 825, 96 S. E. 801.* Premeditation, or specific intent to kill, distinguishes murder in the first from murder in the second degree; proof of this element is essential to conviction of the former offense, and the burden of proving it clearly rests with the prosecution. *Shiflett v. Commonwealth, 143 Va. 609, 130 S. E. 777;Jefferson v. Commonwealth, 214 Va. 432, 201 S. E. 2d 749.*

> 1 [HN3] The degrees of murder in Virginia are specified in *Va. Code § 18.2-32* (1975) as follows:
>
> "Murder, other than capital murder, by poison, lying in wait, imprisonment, starving, or by any willful, deliberate, and premeditated killing, or in the commission of, or attempt to commit, arson, rape, robbery, burglary or abduction . . . is murder of the first degree, punishable as a Class 2 felony.
>
> "All murder other than capital murder and murder in the first degree is murder of the second degree and is punishable as a Class 3 felony."
>
> Class 2 felonies carry a term of 20 years to life. *§ 18.2-10 (b)* (1975). The sentence for Class 3 felonies can range from 5 to 20 years, *§ 18.2-10 (c).* Murder itself takes its definition in Virginia from the common law. *Stapleton v. Commonwealth, 123 Va. 825, 96 S. E. 801.*

That the petitioner had shot and killed Mrs. Cole was not in dispute at the trial. The State's evidence established that [*310] she had been a member of the staff at the local county jail, that she had befriended him while he was imprisoned there on a disorderly conduct charge, and that when he was released she had arranged for him to live in the home of her son and daughter-in-law. Testimony by her relatives indicated that on the day of the killing the petitioner had been drinking and had spent a great deal of time shooting at targets with his revolver. Late in the afternoon, according to their testimony, he had unsuccessfully attempted to talk the victim into driving him to North Carolina. She did drive the petitioner to a local diner. There the two were observed by several police officers, who testified that both the petitioner and the victim had been drinking. The two were observed by a deputy sheriff as they were preparing to leave the diner in her car. The petitioner was then in possession of his revolver, and the sheriff also observed a kitchen knife in the automobile. The sheriff testified that he had offered to keep the revolver until the petitioner sobered [***568] up, but that the latter had indicated that this would be unnecessary since he and the victim were about to engage in sexual activity.

Her body was found in a secluded church parking lot a day and a half later, naked from the waist down, her slacks beneath her body. Uncontradicted medical and expert evidence established that she had been shot twice at close range with the petitioner's gun. She appeared not to have been sexually molested. Six cartridge cases identified as having been fired from the petitioner's gun were found near the body.

[***LEdHR4A] After shooting Mrs. Cole, the petitioner drove her car to North Carolina, where, after a short trip to Florida, he was arrested several days later. In a postarrest statement, introduced in evidence by the prosecution, the petitioner admitted that he had shot the victim. He contended, however, that the shooting had been accidental. When asked to describe his condition at the time of the shooting, he indicated that he had not been drunk, but had been "pretty high." His [*311] story was that the victim had attacked him with a knife when he resisted her sexual advances. He said that he had defended himself by firing a number of warning shots into the ground, and had then reloaded his revolver. The victim, he said, then attempted to take the gun from him, and the gun "went off" in the ensuing struggle. He said that he fled without seeking help for the victim because he was afraid. At the trial, his position was that he had acted in self-defense. Alternatively, he claimed that in any event the State's own evidence showed that he had been too intoxicated to form the specific intent necessary [**2785] under Virginia law to sustain a conviction of murder in the first degree. [2]

[***LEdHR4A] Under Virginia law, voluntary intoxication -- although not an affirmative defense to second-degree murder -- is material to the element of premeditation and may be found to have negated it. *Hatcher v. Commonwealth, 218 Va. 811, 241 S. E. 2d 756.*

The trial judge, declaring himself convinced beyond a reasonable doubt that the petitioner had committed first-degree murder, found him guilty of that offense. [3] The petitioner's motion to set aside the judgment as contrary to the evidence was denied, and he was sentenced to serve a term of 30 years in the Virginia state penitentiary. A petition for writ of error to the Virginia Supreme Court on the ground that the evidence was insufficient to support the conviction was denied. [4]

3   When trial without a jury is had on a not guilty plea in Virginia, the court is to "have and exercise all the powers, privileges and duties given to juries . . . ." *Va. Code § 19.2-257* (1975).

4   [***LEdHR5A] There is no appeal as of right from a criminal conviction in Virginia. *Saunders v. Reynolds, 214 Va. 697, 204 S. E. 2d 421.* Each petition for writ of error under *Va. Code § 19.2-317* (1975) is reviewed on the merits, however, and the effect of a denial is to affirm the judgment of conviction on the merits. *Saunders v. Reynolds, supra.*

The petition for writ of error alleged that "the trial Court erred in finding the Petitioner guilty of first-degree murder in light of the evidence introduced on behalf of the Commonwealth, and on unwarranted inferences drawn from this evidence." The petitioner contended that an affirmance would violate the *Due Process Clause of the Fourteenth Amendment.* In its order denying Jackson's petition, the Virginia Supreme Court stated it was "of [the] opinion that there is no reversible error in the judgment complained of . . . ." Virginia law requires sufficiency claims to be raised on direct appeal; such a claim may not be raised in a state habeas corpus proceeding. *Pettus v. Peyton, 207 Va. 906, 153 S. E. 2d 278.*

[*312]   [***LEdHR5A] The [***569] petitioner then commenced this habeas corpus proceeding in the United States District Court for the Eastern District of Virginia, raising the same basic claim. [5] Applying the "no evidence" criterion of *Thompson v. Louisville, 362 U.S. 199,* the District Court found the record devoid of evidence of premeditation and granted the writ. The Court of Appeals for the Fourth Circuit reversed the judgment. [6] The court noted that a dissent from the denial of certiorari in a case in this Court had exposed the question whether the constitutional rule of *In re Winship, 397 U.S. 358,* might compel a new criterion by which the validity of a state criminal conviction must be tested in a federal habeas corpus proceeding. See *Freeman v. Zahradnick, 429 U.S. 1111* (dissent from denial of certiorari). But the appellate court held that in the absence of further guidance from this Court it would apply the same "no evidence" criterion of *Thompson* v. *Louisville* that the District Court had adopted. The court was of the view that some evidence that the petitioner had intended to kill the victim could be found in the facts that the petitioner had reloaded his gun after firing warning shots, that he had had time to do so, and that the victim was then shot not once but twice. The court also concluded that the state trial judge could have found that the petitioner was not so intoxicated as to be incapable of premeditation.

5   The District Court correctly found that the petitioner had exhausted his state remedies on this issue. See n. 4, *supra.*

6   The opinions of the District Court and the Court of Appeals are not reported. The Court of Appeals' judgment order is reported at *580 F.2d 1048.*

[***LEdHR2A] We granted certiorari to consider the petitioner's claim that under *In re Winship, supra,* a federal habeas corpus court must [*313] consider not whether there was *any* evidence to support a state-court conviction, but whether there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt. *439 U.S. 1001.*

II

Our inquiry in this case is narrow. The petitioner has not seriously questioned any [**2786] aspect of Virginia law governing the allocation of the burden of production or persuasion in a murder trial. See *Mullaney v. Wilbur, 421 U.S. 684*; *Patterson v. New York, 432 U.S. 197.* As the record demonstrates, the judge sitting as factfinder in the petitioner's trial was aware that the State bore the burden of establishing the element of premeditation, and stated that he was applying the reasonable-doubt standard in his appraisal of the State's evidence. The petitioner, moreover, does not contest the conclusion of the Court of Appeals that under the "no evidence" rule of *Thompson v. Louisville, supra,* his conviction of first-degree murder is sustainable. [***570] And he has not attacked the sufficiency of the evidence to support a conviction of second-degree murder. His sole constitutional claim, based squarely upon

*Winship*, is that the District Court and the Court of Appeals were in error in not recognizing that the question to be decided in this case is whether any rational factfinder could have concluded beyond a reasonable doubt that the killing for which the petitioner was convicted was premeditated. The question thus raised goes to the basic nature of the constitutional right recognized in the *Winship* opinion.

III

A

This is the first of our cases to expressly consider the question whether the due process standard recognized in *Winship* constitutionally protects an accused against conviction except upon evidence that is sufficient fairly to support a conclusion **[*314]** that every element of the crime has been established beyond a reasonable doubt. Upon examination of the fundamental differences between the constitutional underpinnings of *Thompson v. Louisville, supra*, and of *In re Winship, supra*, the answer to that question, we think, is clear.

**[***LEdHR6]** [6] **[***LEdHR7]** [7][HN4] It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitutes a denial of due process. *Cole v. Arkansas, 333 U.S. 196, 201*; *Presnell v. Georgia, 439 U.S. 14*. These standards no more than reflect a broader premise that has never been doubted in our constitutional system: that a person cannot incur the loss of liberty for an offense without notice and a meaningful opportunity to defend. *E. g., Hovey v. Elliott, 167 U.S. 409, 416-420*. Cf. *Boddie v. Connecticut, 401 U.S. 371, 377-379*. A meaningful opportunity to defend, if not the right to a trial itself, presumes as well that a total want of evidence to support a charge will conclude the case in favor of the accused. Accordingly, we held in the *Thompson* case that a conviction based upon a record wholly devoid of any relevant evidence of a crucial element of the offense charged is constitutionally infirm. See also *Vachon v. New Hampshire, 414 U.S. 478*; *Adderley v. Florida, 385 U.S. 39*; *Gregory v. Chicago, 394 U.S. 111*; *Douglas v. Buder, 412 U.S. 430*. The "no evidence" doctrine of *Thompson* v. *Louisville* thus secures to an accused the most elemental of due process rights: freedom from a wholly arbitrary deprivation of liberty.

The Court in *Thompson* explicitly stated that the due process right at issue did not concern a question of evidentiary "sufficiency." *362 U.S., at 199*. The right established in *In re Winship*, however, clearly stands on a different footing. *Winship* involved an adjudication of juvenile delinquency made by a judge under a state statute providing that the prosecution must prove the conduct charged as delinquent -- which in *Winship* would have been a criminal offense if engaged in by an adult --

by a preponderance of the evidence. **[*315]** Applying **[***571]** that standard, the judge was satisfied that the juvenile was "guilty," but he noted that the result might well have been different under a standard of proof beyond **[**2787]** a reasonable doubt. In short, the record in *Winship* was not totally devoid of evidence of guilt.

The constitutional problem addressed in *Winship* was thus distinct from the stark problem of arbitrariness presented in *Thompson* v. *Louisville*. In *Winship*, the Court held for the first time that [HN5] the *Due Process Clause of the Fourteenth Amendment* protects a defendant in a criminal case against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *397 U.S., at 364*. In so holding, the Court emphasized that proof beyond a reasonable doubt has traditionally been regarded as the decisive difference between criminal culpability and civil liability. *Id., at 358-362*. See *Davis v. United States, 160 U.S. 469*; *Brinegar v. United States, 338 U.S. 160, 174*; *Leland v. Oregon, 343 U.S. 790*; 9 J. Wigmore, Evidence § 2495, pp. 307-308 (3d ed. 1940). Cf. *Woodby v. INS, 385 U.S. 276, 285*. The standard of proof beyond a reasonable doubt, said the Court, "plays a vital role in the American scheme of criminal procedure," because it operates to give "concrete substance" to the presumption of innocence, to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding. *397 U.S., at 363*. At the same time, by impressing upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused, the standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself. *Id., at 372* (Harlan, J., concurring).

**[***LEdHR8A]** The constitutional standard recognized in the *Winship* case was expressly phrased as one that protects an accused against a conviction except on *"proof* beyond a reasonable doubt . . . ." In subsequent cases discussing the reasonable-doubt standard, we have never departed from this definition of the rule or from **[*316]** the *Winship* understanding of the central purposes it serves. See, *e. g., Ivan V. v. City of New York, 407 U.S. 203, 204*; *Lego v. Twomey, 404 U.S. 477, 486-487*; *Mullaney v. Wilbur, 421 U.S. 684*; *Patterson v. New York, 432 U.S. 197*; *Cool v. United States, 409 U.S. 100, 104*. In short, *Winship* presupposes as an essential of the due process guaranteed by the *Fourteenth Amendment* that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof -- defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.

B

Although several of our cases have intimated that the fact-finder's application of the reasonable-doubt standard to the evidence may present a **[\*\*\*572]** federal question when a state conviction is challenged, *Lego v. Twomey, supra, at 487*; *Johnson v. Louisiana, 406 U.S. 356, 360*, the Federal Courts of Appeals have generally assumed that so long as the reasonable-doubt instruction has been given at trial, the no-evidence doctrine of *Thompson* v. *Louisville* remains the appropriate guide for a federal habeas corpus court to apply in assessing a state prisoner's challenge to his conviction as founded upon insufficient evidence. See, *e. g., Cunha v. Brewer, 511 F.2d 894* (CA8). [7] We cannot agree.

7 The Court of Appeals in the present case, of course, recognized that *Winship* may have changed the constitutional standard in federal habeas corpus. And the Court of Appeals for the Sixth Circuit recently recognized the possible impact of *Winship* on federal habeas corpus in a case in which it held that "a rational trier of fact could have found the defendant . . . guilty beyond a reasonable doubt." *Spruytte* v. *Koehler*, affirmance order, *590 F.2d 335*. An even more recent case in that court provoked a lively debate among three of its members regarding the effect of *Winship* upon federal habeas corpus. The writ was granted in that case, even though the trial record concededly contained "some evidence" of the applicant's guilt. See *Speigner v. Jago, 603 F.2d 1208*.

**[\*\*\*LEdHR9]** [9] **[\*\*\*LEdHR10]** [10] **[\*\*\*LEdHR11A]** **[\*\*\*LEdHR12A]** [HN6] The **[\*\*2788]** *Winship* doctrine requires more than simply a trial **[\*317]** ritual. A doctrine establishing so fundamental a substantive constitutional standard must also require that the factfinder will rationally apply that standard to the facts in evidence. [8] A "reasonable doubt," at a minimum, is one based upon "reason." [9] Yet a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt, and the same may be said of a trial judge sitting as a jury. In a federal trial, such an occurrence has traditionally been deemed to require reversal of the conviction. *Glasser v. United States, 315 U.S. 60, 80*; *Bronston v. United States, 409 U.S. 352*. See also, *e. g., Curley v. United States, 81 U. S. App. D. C. 389, 392-393, 160 F.2d 229, 232-233*. [10] Under **[\*\*\*573]** *Winship*, which established **[\*318]** proof beyond a reasonable doubt as an essential of *Fourteenth Amendment* due process, it follows that when such a conviction occurs in a state trial, it cannot constitutionally stand.

8 The trier of fact in this case was a judge and not a jury. But this is of no constitutional significance. The record makes clear that the judge deemed himself "properly instructed."

9 A "reasonable doubt" has often been described as one "based on reason which arises from the evidence or lack of evidence." *Johnson v. Louisiana, 406 U.S. 356, 360* (citing cases). For a discussion of variations in the definition used in jury instructions, see *Holland v. United States, 348 U.S. 121, 140* (rejecting contention that circumstantial evidence must exclude every hypothesis but that of guilt).

10 **[\*\*\*LEdHR11A]** **[\*\*\*LEdHR12A]** This, of course, does not mean that convictions are frequently reversed upon this ground. The practice in the federal courts of entertaining properly preserved challenges to evidentiary sufficiency, see *Fed. Rule Crim. Proc. 29*, serves only to highlight the traditional understanding in our system that the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion. To be sure, the factfinder in a criminal case has traditionally been permitted to enter an unassailable but unreasonable verdict of "not guilty." This is the logical corollary of the rule that there can be no appeal from a judgment of acquittal, even if the evidence of guilt is overwhelming. The power of the factfinder to err upon the side of mercy, however, has never been thought to include a power to enter an unreasonable verdict of guilty. *Carpenters & Joiners v. United States, 330 U.S. 395, 408*. Cf. *Capital Traction Co.* v. *Hof, 174 U.S. 1, 13-14*. Any such premise is wholly belied by the settled practice of testing evidentiary sufficiency through a motion for judgment of acquittal and a postverdict appeal from the denial of such a motion. See generally 4 L. Orfield, Criminal Procedure Under the Federal Rules §§ 29:1-29:29 (1967 and Supp. 1978).

**[\*\*\*LEdHR13]** [13] **[\*\*\*LEdHR14]** [14][HN7] A federal court has a duty to assess the historic facts when it is called upon to apply a constitutional standard to a conviction obtained in a state court. For example, on direct review of a state-court conviction, where the claim is made that an involuntary confession was used against the defendant, this Court reviews the facts to determine whether the confession was wrongly admitted in evidence. *Blackburn v. Alabama, 361 U.S. 199, 205-210*. Cf. *Drope v. Missouri, 420 U.S. 162, 174-175*, and n. 10. The same duty obtains in federal habeas corpus proceedings. See *Townsend v. Sain, 372 U.S. 293, 318*;

*Brown v. Allen, 344 U.S. 443, 506-507* (opinion of Frankfurter, J.).

[***LEdHR15] [15] [***LEdHR16A] [***LEdHR17] [17] [***LEdHR18A] After *Winship*[HN8] the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a [**2789] reasonable doubt. [11] But this inquiry does not require a court to "ask [*319] itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Woodby v. INS, 385 U.S., at 282* (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Johnson v. Louisiana, 406 U.S., at 362*. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. [12] The criterion [***574] thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law. [13]

[11]

[***LEdHR16A] Until 1972, the Court of Appeals for the Second Circuit took the position advanced today by the opinion concurring in the judgment that the beyond-a-reasonable-doubt standard is merely descriptive of the state of mind required of the factfinder in a criminal case and not of the actual quantum and quality of proof necessary to support a criminal conviction. Thus, that court held that in a jury trial the judge need not distinguish between criminal and civil cases for the purpose of ruling on a motion for judgment of acquittal. *United States v. Feinberg, 140 F.2d 592, 594*. In *United States v. Taylor, 464 F.2d 240* (CA2), *Feinberg* was overruled, partly on the strength of *Winship*. The *Taylor* court adopted the directed-verdict criterion articulated in *Curley v. United States, 81 U. S. App. D. C. 389, 392-393, 160 F.2d 229, 232-233* (If "reasonable" jurors "must necessarily have . . . a reasonable doubt" as to guilt, the judge "must require acquittal, because no other result is permissible within the fixed bounds of jury considera-

tion"). This is now the prevailing criterion for judging motions for acquittal in federal criminal trials. See generally 2 C. Wright, Federal Practice and Procedure § 467 (1969 and Supp. 1978).

[12] Contrary to the suggestion in the opinion concurring in the judgment, the criterion announced today as the constitutional minimum required to enforce the due process right established in *Winship* is not novel. See, *e. g., United States v. Amato, 495 F.2d 545, 549* (CA5) ("whether, taking the view [of the evidence] most favorable to the Government, a *reasonably-minded jury* could accept the relevant evidence as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt") (emphasis added); *United States v. Jorgenson, 451 F.2d 516, 521* (CA10) (whether, "considering the evidence in the light most favorable to the government, there is substantial evidence from which a jury might *reasonably find* that an accused is guilty beyond a reasonable doubt") (emphasis added). *Glasser v. United States, 315 U.S. 60, 80*, has universally been understood as a case applying this criterion. See, *e. g., Harding v. United States, 337 F.2d 254, 256* (CA8). See generally 4 Orfield, *supra* n. 10, § 29.28.

[13] [***LEdHR18A] The question whether the evidence is constitutionally sufficient is of course wholly unrelated to the question of how rationally the verdict was actually reached. Just as the standard announced today does not permit a court to make its own subjective determination of guilt or innocence, it does not require scrutiny of the reasoning process actually used by the factfinder -- if known. See generally 3 F. Wharton, Criminal Procedure § 520 (12th ed. 1975 and Supp. 1978).

[*320] [***LEdHR19] [19] [***LEdHR20A] That the *Thompson* "no evidence" rule is simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt is readily apparent. [HN9] "[A] mere modicum of evidence may satisfy a 'no evidence' standard . . . ." *Jacobellis v. Ohio, 378 U.S. 184, 202* (Warren, C. J., dissenting). Any evidence that is relevant -- that has any tendency to make the existence of an element of a crime slightly more probable than it would be without the evidence, cf. *Fed. Rule Evid. 401* -- could be deemed a "mere modicum." But it could not seriously be argued that such a "modicum" of evidence could by itself rationally support a conviction beyond a reasonable doubt. The [**2790] *Thompson* doctrine simply fails to supply a workable or even a predictable

standard for determining whether the due process command of *Winship* has been honored. [14]

14

[***LEdHR20A] Application of the *Thompson* standard to assess the validity of a criminal conviction after *Winship* could lead to absurdly unjust results. Our cases have indicated that failure to instruct a jury on the necessity of proof of guilt beyond a reasonable doubt can never be harmless error. See *Cool v. United States, 409 U.S. 100.* Cf. *Taylor v. Kentucky, 436 U.S. 478.* Thus, a defendant whose guilt was actually proved by overwhelming evidence would be denied due process if the jury was instructed that he could be found guilty on a mere preponderance of the evidence. Yet a defendant against whom there was but one slender bit of evidence would not be denied due process so long as the jury has been properly instructed on the prosecution's burden of proof beyond a reasonable doubt. Such results would be wholly faithless to the constitutional rationale of *Winship*.

C

[***LEdHR8A] [HN10] Under *28 U. S. C. § 2254*, a federal court must entertain a claim by a state prisoner that he or she is being held in "custody in violation of the Constitution or laws or treaties of the [*321] United States." Under the *Winship* decision, it is clear that a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim. Thus, assuming that state remedies have been exhausted, see *28 U. S. C. § 2254 (b)*, and that no independent and adequate state ground stands as a bar, see [***575] *Estelle v. Williams, 425 U.S. 501;Francis v. Henderson, 425 U.S. 536;Wainwright v. Sykes, 433 U.S. 72;Fay v. Noia, 372 U.S. 391, 438*, it follows that such a claim is cognizable in a federal habeas corpus proceeding. The respondents have argued, nonetheless, that a challenge to the constitutional sufficiency of the evidence should not be entertained by a federal district court under *28 U. S. C. § 2254*.

In addition to the argument that a *Winship* standard invites replication of state criminal trials in the guise of *§ 2254* proceedings -- an argument that simply fails to recognize that courts can and regularly do gauge the sufficiency of the evidence without intruding into any legitimate domain of the trier of fact -- the respondents have urged that any departure from the *Thompson* test in federal habeas corpus proceedings will expand the number of meritless claims brought to the federal courts, will

duplicate the work of the state appellate courts, will disserve the societal interest in the finality of state criminal proceedings, and will increase friction between the federal and state judiciaries. In sum, counsel for the State urges that this type of constitutional claim should be deemed to fall within the limit on federal habeas corpus jurisdiction identified in *Stone v. Powell, 428 U.S. 465*, with respect to *Fourth Amendment* claims. We disagree.

[***LEdHR21A] First, the burden that is likely to follow from acceptance of the *Winship* standard has, we think, been exaggerated. Federal-court challenges to the evidentiary support for state convictions have since *Thompson* been dealt with under *§ 2254*. *E. g., Freeman v. Stone, 444 F.2d 113* (CA9); *Grieco v.* [*322] *Meachum, 533 F.2d 713* (CA1); *Williams v. Peyton, 414 F.2d 776* (CA4). A more stringent standard will expand the contours of this type of claim, but will not create an entirely new class of cases cognizable on federal habeas corpus. Furthermore, most meritorious challenges to constitutional sufficiency of the evidence undoubtedly will be recognized in the state courts, and, if the state courts have fully considered the issue of sufficiency, the task of a federal habeas court should not be difficult. Cf. *Brown v. Allen, 344 U.S., at 463.* [15] [**2791] And this type of claim can almost always be judged on the written record without need for an evidentiary hearing in the federal court.

15 [***LEdHR21A] The Virginia Supreme Court's order denying Jackson's petition for writ of error does not make clear what criterion was applied to the petitioner's claim that the evidence in support of his first-degree murder conviction was insufficient. See n. 4, *supra*. At oral argument, counsel for the petitioner contended that the Virginia sufficiency standard is not keyed to *Winship*. Counsel for the State disagreed. Under these circumstances, we decline to speculate as to the criterion that the state court applied. The fact that a state appellate court invoked the proper standard, however, although entitled to great weight, does not totally bar a properly presented claim of this type under *§ 2254*.

[***LEdHR22] [22]Second, the problems of finality and federal-state comity arise whenever a state prisoner invokes the jurisdiction of a federal court to redress an alleged constitutional violation. A challenge to a state conviction brought on the ground that the evidence cannot fairly be deemed [***576] sufficient to have established guilt beyond a reasonable doubt states a federal constitutional claim. Although state appellate review undoubtedly will serve in the vast majority of cases to vindicate the due process protection that follows from *Winship*, the same could also be said of the vast

majority of other federal constitutional rights that may be implicated in a state criminal trial. It is the occasional abuse that the federal writ of habeas corpus stands ready to correct. *Brown v. Allen, supra, at 498-501* (opinion of Frankfurter, J.).

[*323] [***LEdHR23] [23]The respondents have argued nonetheless that whenever a person convicted in a state court has been given a "full and fair hearing" in the state system -- meaning in this instance state appellate review of the sufficiency of the evidence -- further federal inquiry -- apart from the possibility of discretionary review by this Court -- should be foreclosed. This argument would prove far too much. A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. But Congress in *§ 2254* has selected the federal district courts as precisely the forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law. The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error. See *28 U. S. C. §§ 2254 (b), (d).* What it does not presume is that these state proceedings will always be without error in the constitutional sense. The duty of a federal habeas corpus court to appraise a claim that constitutional error did occur -- reflecting as it does the belief that the "finality" of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at the expense of a constitutional right -- is not one that can be so lightly abjured.

[***LEdHR24] [24]The constitutional issue presented in this case is far different from the kind of issue that was the subject of the Court's decision in *Stone v. Powell, supra.*The question whether a defendant has been convicted upon inadequate evidence is central to the basic question of guilt or innocence. The constitutional necessity of proof beyond a reasonable doubt is not confined to those defendants who are morally blameless. *E. g., Mullaney v. Wilbur, 421 U.S., at 697-698* (requirement of proof beyond a reasonable doubt is not "[limited] to those facts which, if not proved, would wholly exonerate" the accused). Under our system of criminal justice even a thief [*324] is entitled to complain that he has been unconstitutionally convicted and imprisoned as a burglar.

[***LEdHR2A] We hold that [HN11] in a challenge to a state criminal conviction brought under *28 U. S. C. § 2254* -- if the settled procedural prerequisites for such a claim have otherwise been satisfied -- the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no

[**2792] rational trier of fact could have found proof of guilt beyond a reasonable [***577] doubt. [16]

16

[***LEdHR2A] The respondents have suggested that this constitutional standard will invite intrusions upon the power of the States to define criminal offenses. Quite to the contrary, the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law. Whether the State could constitutionally make the conduct at issue criminal at all is, of course, a distinct question. See *Papachristou v. Jacksonville, 405 U.S. 156*; *Robinson v. California, 370 U.S. 660.*

IV

[***LEdHR25] [25]Turning finally to the specific facts of this case, we reject the petitioner's claim that under the constitutional standard dictated by *Winship* his conviction of first-degree murder cannot stand. A review of the record in the light most favorable to the prosecution convinces us that a rational factfinder could readily have found the petitioner guilty beyond a reasonable doubt of first-degree murder under Virginia law.

[***LEdHR26] [26]There was no question at the trial that the petitioner had fatally shot Mary Cole. The crucial factual dispute went to the sufficiency of the evidence to support a finding that he had specifically intended to kill her. This question, as the Court of Appeals recognized, must be gauged in the light of applicable Virginia law defining the element of premeditation. [HN12] Under that law it is well settled that premeditation need not exist for any particular length of time, and that an intent to kill may be formed at the moment of the commission of the unlawful act. *Commonwealth v. Brown, 90 Va. 671, 19 S. E. 447.*From the circumstantial evidence in the record, it is [*325] clear that the trial judge could reasonably have found beyond a reasonable doubt that the petitioner did possess the necessary intent at or before the time of the killing.

The prosecution's uncontradicted evidence established that the petitioner shot the victim not once but twice. The petitioner himself admitted that the fatal shooting had occurred only after he had first fired several shots into the ground and then reloaded his gun. The evidence was clear that the two shots that killed the victim were fired at close, and thus predictably fatal, range by a person who was experienced in the use of the murder weapon. Immediately after the shooting, the petitioner drove without mishap from Virginia to North Carolina, a fact quite at odds with his story of extreme intoxication. Shortly before the fatal episode, he had pub-

licly expressed an intention to have sexual relations with the victim. Her body was found partially unclothed. From these uncontradicted circumstances, a rational fact-finder readily could have inferred beyond a reasonable doubt that the petitioner, notwithstanding evidence that he had been drinking on the day of the killing, did have the capacity to form and had in fact formed an intent to kill the victim.

The petitioner's calculated behavior both before and after the killing demonstrated that he was fully capable of committing premeditated murder. His claim of self-defense would have required the trial judge to draw a series of improbable inferences from the basic facts, prime among them the inference that he was wholly uninterested in sexual [***578] activity with the victim but that she was so interested as to have willingly removed part of her clothing and then attacked him with a knife when he resisted her advances, even though he was armed with a loaded revolver that he had just demonstrated he knew how to use. It is evident from the record that the trial judge found this story, including the petitioner's belated contention that he had been so intoxicated as to be incapable of premeditation, incredible.

[*326] [***LEdHR27] [27] [***LEdHR28] [28]Only under a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt could this petitioner's [**2793] challenge be sustained. That theory the Court has rejected in the past. *Holland v. United States, 348 U.S. 121, 140*. We decline to adopt it today. Under the standard established in this opinion as necessary to preserve the due process protection recognized in *Winship*, [HN13] a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. Applying these criteria, we hold that a rational trier of fact could reasonably have found that the petitioner committed murder in the first degree under Virginia law.

For these reasons, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

MR. JUSTICE POWELL took no part in the consideration or decision of this case.

**CONCUR BY:** STEVENS

**CONCUR**

MR. JUSTICE **STEVENS**, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, concurring in the judgment. The Constitution prohibits the criminal conviction of any person except upon proof *sufficient to convince the trier of fact* of guilt beyond a reasonable doubt. Cf. *ante*, at 309. This rule has prevailed in our courts "at least from our early years as a Nation." *In re Winship, 397 U.S. 358, 361*.

Today the Court creates a new rule of law -- one that has never prevailed in our jurisprudence. According to the Court, the Constitution now prohibits the criminal conviction of any person -- including, apparently, a person against whom the facts have already been found beyond a reasonable doubt by a jury, a trial judge, and one or more levels of state appellate judges -- except upon proof sufficient to convince a *federal* [*327] *judge* that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Ante*, at 319.

The adoption of this novel constitutional rule is not necessary to the decision of this case. Moreover, I believe it is an unwise act of lawmaking. Despite its chimerical appeal as a new counterpart to the venerable principle recognized in *Winship*, I am persuaded that its [***579] precipitous adoption will adversely affect the quality of justice administered by federal judges. For that reason I shall analyze this new brainchild with some care.

I shall begin by explaining why neither the record in this case, nor general experience with challenges to the sufficiency of the evidence supporting criminal convictions, supports, much less compels, the conclusion that there is *any* need for this new constitutional precept. I shall next show that it is not logically compelled by either the holding or the analysis in *In re Winship, supra*. Finally, I shall try to demonstrate why the Court's new rule -- if it is not just a meaningless shibboleth -- threatens serious harm to the quality of our judicial system.

I

It is, of course, part of this Court's tradition that new rules of law emerge from the process of case-by-case adjudication of constitutional issues. Widespread concern that existing constitutional doctrine is unjust often provides the occasion, and is sometimes even relied upon as a justification, for the exercise of such lawmaking authority by the Court. Without entering the debate over the legitimacy of this justification for judicial action, it is at least certain that it should not be the basis for dramatic -- indeed, for *any* -- constitutional lawmaking efforts unless (1) those efforts are necessary to the decision of the case at hand and (2) powerful reasons favor a change in the law. See *Ashwander v. TVA, 297 U.S. 288, 345-348* (Brandeis, J., concurring).

**[*328]** In this case, the Court's analysis fails on both counts. It has accordingly formulated a new constitutional principle under the **[\*\*2794]** most dangerous possible circumstances -- *i. e.*, where the exercise of judicial authority is neither necessitated nor capable of being limited by "the precise facts to which [the rule is originally] to be applied," *Liverpool, N. Y. & P. S. S. Co.* v. *Emigration Comm'rs, 113 U.S. 33, 39*, nor even by some broader set of identifiable experiences with the evil supposedly involved.

Most significantly, the Court has announced its new constitutional edict in a case in which it has absolutely no bearing on the outcome. The only factual issue at stake is whether petitioner intended to kill his victim. If the evidence is viewed "in the light most favorable to the prosecution," *ante*, at 319 -- and, indeed, we may view it through the eyes of the actual factfinder, whose observations about the evidence are recorded in the trial transcript -- there can be only one answer to that question no matter *what* standard of appellate review is applied. In Part IV of its opinion, the Court accepts this conclusion. There is, therefore, no need to fashion a broad new rule of constitutional law to dispose of this squalid but rather routine murder case. Under any view, the evidence is sufficient.

The Court's new rule is adopted simply to forestall some hypothetical evil that has not been demonstrated, and in my view is not fairly demonstrable. Although the Judiciary has received its share of criticism -- principally because of the delays and costs associated with litigation -- I **[\*\*\*580]** am aware of no general dissatisfaction with the accuracy of the factfinding process or the adequacy of the rules applied by state appellate courts when reviewing claims of insufficiency.

What little evidence the Court marshals in favor of a contrary conclusion is unconvincing. See *ante*, at 317-318, n. 10. The Court is simply incorrect in implying that there are a significant number of occasions when federal convictions are **[*329]** overturned on appeal because no rational trier of fact could have found guilt beyond a reasonable doubt. The two opinions of this Court cited *ante*, at 317, stand for no such proposition. In neither was a conviction reversed for insufficiency. See *Glasser v. United States, 315 U.S. 60*; *Bronston v. United States, 409 U.S. 352.*

Moreover, a study of the 127 federal criminal convictions that were reviewed by the various Courts of Appeals and reported in the most recent hardbound volume of the Federal Reporter, Second Series, Volume 589, reveals that only 3 were overturned on sufficiency grounds. And of those, one was overturned under a "no evidence" standard, while the other two, in which a total of only 3 out of 36 counts were actually reversed, arguably involved legal issues masquerading as sufficiency questions. [1] It is difficult to believe that the federal courts will turn up more sufficiency problems than this on habeas review when, instead of acting as the first level of **[*330]** review, as in the cases **[\*\*2795]** studied, they will be acting as the second, third, or even fourth level of appellate review. In short, there is simply no reason to tinker with an elaborate mechanism that is now functioning well.

> 1    In *United States v. Tarr, 589 F.2d 55 (CA1 1978)*, the court overturned one of two counts of which appellant was convicted because there was insufficient evidence to prove that he had the intent to aid and abet the unauthorized transfer of a machinegun in violation of *26 U. S. C. § 5861 (e)* and *18 U. S. C. § 2*. The court found "no evidence" that appellant had the requisite knowledge. *589 F.2d, at 60.*
>
> In *United States v. Whetzel, 191 U. S. App. D. C. 184, 589 F.2d 707 (1978)*, the court overturned 2 of the 35 counts of appellant's conviction because "the Government failed to offer proof that would permit a jury to reasonably infer that the merchandise [appellant] transported had a value of $ 5,000." *Id., at 188, 589 F.2d, at 711.* However, the basis for this determination was that the Government's valuation method, which the trial court allowed the jury to consider, was legally erroneous. Similarly, in *United States v. Fearn, 589 F.2d 1316 (CA7 1978)*, the court overturned the conviction based on a federal nonconstitutional rule, which surely would not apply in habeas review of state convictions, "that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused." *Id., at 1321.* The court did not independently analyze whether the uncorroborated confession involved in that case could itself have allowed a rational trier of fact to find guilt beyond a reasonable doubt.

    II

There is nothing in the facts of this case or, so far as the Court has demonstrated, in those of cases like it to warrant today's excursion into constitutional rulemaking. The Court instead portrays its rule as the logical corollary of the principle recognized in *Winship* regarding the subjective state of mind that persons charged with the responsibility of evaluating the credibility of evidence must possess before they find the **[\*\*\*581]** defendant guilty in a criminal case. But an examination of *Winship* reveals that it has nothing to do with appellate, much less habeas corpus, review standards; that the reasoning used in that case to reach its conclusion with re-

spect to the trier of fact does not support, and indeed counsels against, the Court's conclusion with respect to federal habeas judges; and that there is no necessary connection between the rule recognized in *Winship* and the rule invented by the Court today.

In distinct contrast to the circumstances of this case, the facts of *Winship* presented "a case where the choice of the standard of proof has made a difference: the [trial] judge below forthrightly acknowledged that he believed by a preponderance of the evidence [in], but was not convinced beyond a reasonable doubt" of, the juvenile's guilt. *397 U.S., at 369* (Harlan, J., concurring). Because the trier of fact entertained such a doubt, this Court held that the juvenile was constitutionally entitled to the same verdict that an adult defendant in a criminal case would receive. In so holding, the Court merely extended to juveniles a protection that had traditionally been available to defendants in criminal *trials* in this Nation. *Id., at 361*.

But nothing in the *Winship* opinion suggests that it also **[*331]** bore on appellate or habeas corpus procedures. Although it repeatedly emphasized the function of the reasonable-doubt standard as describing the requisite "subjective state of certitude" of the *"factfinder,"* [2] it never mentioned the question of how appellate judges are to know whether the trier of fact really was convinced beyond a reasonable doubt, or, indeed, whether the factfinder was a "rational" person or group of persons.

[2]  In *In re Winship, 397 U. S., at 364*, the Court stated: "As we said in *Speiser v. Randall, [357 U.S. 513,]* 525-526: 'There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value -- as a criminal defendant his liberty -- this margin of error is reduced as to him by the process of placing on the other party the burden of . . . *persuading the factfinder* at the conclusion of the trial of his guilt beyond a reasonable doubt. Due process commands that no man shall lose his liberty unless the Government has borne the burden of . . . *convincing the factfinder of his guilt.'* To this end, the reasonable-doubt standard is indispensable, for it *'impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue.'* Dorsen & Rezneck, In Re Gault and the Future of Juvenile Law, 1 Family Law Quarterly, No. 4, pp. 1, 26 (1967)." (Emphasis added.)

Later on the same page, the Court added:

"It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense *without convincing a proper factfinder of his guilt with utmost certainty." Ibid.* (emphasis added).

See also *id., at 370* (Harlan, J., concurring) ("[A] standard of proof represents an attempt to instruct *the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions* for a particular type of adjudication") (emphasis added).

Moreover, the mode of analysis employed in *Winship* finds no counterpart in the Court's opinion in this case. For example, in *Winship*, the Court pointed out the **[**2796]** breadth of both the historical and the current acceptance of the reasonable-doubt **[***582]** *trial* standard. [3] In this case, by contrast, the Court **[*332]** candidly recognizes that the Federal Courts of Appeals have "generally" *rejected* the habeas standard that it adopts today. *Ante*, at 316. [4]

[3]  The Court, relying on treatises that analyzed the law in all 50 States as well as in the federal system, determined both that the reasonable-doubt standard has prevailed at the *trial* level "at least from our early years as a Nation" and that it "is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the *trier* of all the essential elements of guilt." *Id., at 361* (emphasis added). See also *id., at 372* (Harlan, J., concurring) ("It is only because of the nearly complete and long-standing acceptance of the reasonable-doubt standard by the States in criminal *trials* that the Court has not before today had to hold explicitly that due process, as an expression of fundamental procedural fairness, requires a more stringent standard for criminal trials than for ordinary civil litigation") (emphasis added).

[4]  The Court has undertaken no systematic analysis of the standards for reviewing the sufficiency of the evidence that prevail either in state habeas corpus and other collateral proceedings or in state appellate courts. What sources I have discovered suggest that "varied standards" are in use and that each is "subject to shifting and elastic definitions." Winningham, The Dilemma of the Directed Acquittal, 15 Vand. L. Rev. 699, 705-706 (1962). See ALI Code of Criminal Procedure, Commentary on § 321, pp. 961-962 (1930); Rules of Criminal Procedure 481 (c), 522 (a) and commentary, 10 U. L. A. (1974).

The *Winship* court relied on nine prior opinions of this Court that bore directly on the issue presented. *397 U.S., at 362*. Here, the Court purportedly relies on two prior decisions, but as is pointed out, *supra, at 329*, neither of these cases itself applied a "reasonable doubt" appellate standard to overturn a conviction, neither purported to be interpreting the Constitution, and neither expressed any view whatsoever on the appropriate standard in collateral proceedings such as are involved in this case. [5] As the Court itself notes, we have instead repeatedly endorsed the "no evidence" test, and have continued to do so after *Winship* was decided. *Vachon v.* **[\*333]** *New Hampshire, 414 U.S. 478*; *Douglas v. Buder, 412 U.S. 430*; *Gregory v. Chicago, 394 U.S. 111*; *Adderley v. Florida, 385 U.S. 39*; *Thompson v. Louisville, 362 U.S. 199*. See also *Clyatt v. United States, 197 U.S. 207, 222*.

> [5] It hardly bears repeating that habeas corpus is not intended as a substitute for appeal, nor as a device for reviewing the merits of guilt determinations at criminal trials. See generally *Stone v. Powell, 428 U.S. 465*. Instead, it is designed to guard against extreme malfunctions in the state criminal justice systems.

The primary reasoning of the Court in *Winship* is also inapplicable here. The Court noted in that case that the reasonable-doubt standard has the desirable effect of significantly reducing the risk of an inaccurate factfinding and thus of erroneous convictions, as well as of instilling confidence in the criminal justice system. *397 U.S., at 363-364*. See also *id., at 370-372* (Harlan, J., concurring). In this case, however, it would be impossible (and the Court does not even try) to demonstrate that there is an appreciable risk that a factfinding made by a jury beyond a reasonable doubt, and twice reviewed **[\*\*\*583]** by a trial judge in ruling on directed verdict and post-trial acquittal motions and by one or more levels of appellate courts on direct appeal, as well as by two federal habeas courts under the *Thompson* "no evidence" rule, is likely to be erroneous. [6] Indeed, the very premise of *Winship* is that properly selected **[\*\*2797]** judges and properly instructed juries act rationally, that the former will tell the truth when they declare that they are convinced beyond a reasonable doubt and the latter will conscientiously obey and understand the reasonable-doubt instructions they receive before retiring to reach a verdict, and therefore that either factfinder will itself provide the necessary bulwark against erroneous factual determinations. To presume otherwise is to make light of *Winship*. [7]

> [6] As I discuss earlier, see *supra, at 329*, the incidence of factual error at the trial level in federal courts appears to be exceedingly low, even when

measured by the relatively strict appellate standard used by the Federal Courts of Appeals. Presumably the incidence of errors that survive that first level of review is even smaller.

> [7] Indeed, the Court makes light of *Winship* by suggesting that, in the absence of its new habeas procedure, the result of that case is simply "a trial ritual." *Ante*, at 316-317. Far more likely in my view is that the Court's difficult-to-apply but largely unnecessary rule will itself result in a "collateral-attack ritual" that will undermine the integrity of both the state and federal judiciaries. See *infra*, at 336-339.

**[\*334]** Having failed to identify the evil against which the rule is directed, and having failed to demonstrate how it follows from the analysis typically used in due process cases of this character, the Court places all of its reliance on a dry, and in my view incorrect, syllogism: If *Winship* requires the factfinder to apply a reasonable-doubt standard, then logic requires a reviewing judge to apply a like standard.

But, taken to its ultimate conclusion, this "logic" would require the reviewing court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Woodby v. INS, 385 U.S. 276, 282* (emphasis added). The Court, however, rejects this standard, as well as others that might be considered consistent with *Winship*. For example, it does not require the reviewing court to view just the evidence most favorable to the prosecution and then to decide whether that evidence convinced it beyond a reasonable doubt, nor whether, based on the entire record, rational triers of fact could be convinced of guilt beyond a reasonable doubt. Instead, and without explanation, it chooses a still narrower standard that merely asks whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Ante*, at 319. [8] It seems to me that if "logic" allows **[\*335]** **[\*\*\*584]** this choice after *Winship* it should also allow the presumption that the Court has rejected -- that trial judges and juries will act rationally and honestly in applying the reasonable-doubt standard, at least so long as the trial is free of procedural error and the record contains evidence tending to prove each of the elements of the offense.

> [8] So far as I can determine, this standard first appeared in our jurisprudence in MR. JUSTICE STEWART's opinion dissenting from the Court's denial of certiorari in *Freeman v. Zahradnick, 429 U.S. 1111, 1112, 1113, 1114, 1116*. At that time, it gave the impression of being somewhat narrower than -- if only because it was stated

quite differently from -- the test used by the Courts of Appeals in reviewing federal convictions on direct appeal. See *Curley v. United States, 81 U. S. App. D. C. 389, 392-393, 160 F.2d 229, 232-233 (1947).* Although the Court twice repeats the *Freeman* test, see *ante*, at 313, 319, it now appears either to equate that standard with the -- in my view -- broader federal direct-review standard, or to endorse both standards despite their differences. See *ante*, at 318, and nn. 11, 12.

Time may prove that the rule the Court has adopted today is the wisest compromise between one extreme that maximizes the protection against the risk that innocent persons will be erroneously convicted and the other extreme that places the greatest faith in the ability of fair procedures to produce just verdicts. But the Court's opinion should not obscure the fact that its new rule is not logically compelled by the analysis or the holding in *Winship* or in any other precedent, or the fact that the rule reflects a new policy choice rather than the application of a pre-existing rule of law.

### III

The Court cautions against exaggerating the significance of its new rule. *Ante*, at 321. It is true that in practice there may **[**2798]** be little or no difference between a record that does not contain at least some evidence tending to prove every element of an offense and a record containing so little evidence that no rational factfinder could be persuaded of guilt beyond a reasonable doubt. Moreover, I think the Court is quite correct when it acknowledges that "most meritorious challenges to constitutional sufficiency of the evidence undoubtedly will be recognized in the state courts." *Ante*, at 322. But this only means that the new rule will seldom, if ever, provide a convicted state prisoner with any tangible benefits. It does not mean that the rule will have no impact on the administration of justice. On the contrary, I am persuaded that it will be seriously harmful both to the state and federal judiciaries.

**[*336]** The Court indicates that the new standard to be applied by federal judges in habeas corpus proceedings may be substantially the same as the standard most state reviewing courts are already applying. *Ante*, at 322. The federal district courts are therefore being directed simply to duplicate the reviewing function that is now being performed adequately by state appellate courts. In my view, this task may well be inconsistent with the prohibition -- added by Congress to the federal habeas statute in order to forestall undue federal interference with state proceedings, see *Wainwright v. Sykes, 433 U.S. 72, 80* -- against overturning "a determination after a hearing on the merits of a factual issue, made by a

State court of competent jurisdiction." *28 U. S. C. § 2254 (d).* See *LaVallee v. Delle Rose, 410 U.S. 690.* In any case, to assign a single federal district judge the responsibility of directly reviewing, and inevitably supervising, the most routine work of the highest courts of a State can only undermine the morale and the esteem of the state judiciary -- particularly when the stated purpose of the additional layer of review is to determine whether the State's factfinder **[***585]** is "rational." [9] Such consequences are intangible but nonetheless significant.

> [9] In the past, collateral review of state proceedings has been justified largely on the grounds (1) that federal judges have special expertise in the federal issues that regularly arise in habeas corpus proceeding, and (2) that they are less susceptible than state judges to political pressures against applying constitutional rules to overturn convictions. See, *e. g.*, Bartels, Avoiding a Comity of Errors, 29 Stan. L. Rev. 27, 30 n. 9 (1976). Cf. *Steffel v. Thompson, 415 U.S. 452, 464*; *Mitchum v. Foster, 407 U.S. 225, 242.* But neither of these justifications has any force in the present context. State judges are more familiar with the elements of state offenses than are federal judges and should be better able to evaluate sufficiency claims. Moreover, of all decisions overturning convictions, the least likely to be unpopular and thus to distort state decisionmaking processes are ones based on the inadequacy of the evidence. Indeed, once federal courts were divested of authority to second-guess state courts on *Fourth Amendment* issues, which are far more likely to generate politically motivated state-court decisions, see *Stone v. Powell, 428 U.S. 465*, a like result in this case would seem to be *a fortiori.*

**[*337]** The potential effect on federal judges is even more serious. Their burdens are already so heavy that they are delegating to staff assistants more and more work that we once expected judges to perform. [10] The new standard will invite an unknown number of state prisoners to make sufficiency challenges that they would not have made under the old rule. Moreover, because the "rational trier of fact" must certainly base its decisions on *all* of the evidence, the Court's broader standard may well require that the entire transcript of the state trial be read whenever the factfinders' rationality is challenged under the Court's rule. [11] **[**2799]** Because this task will confront the courts of appeals as well as district courts, it will surely impose countless additional hours of unproductive labor on federal judges and their assistants. [12] The increasing volume **[*338]** of work of this character has **[***586]** already led some of our most distinguished lawyers to discontinue or reject service on the

federal bench. [13] The addition of a significant volume **[\*339]** of pointless labor can only impair the quality of justice administered by federal judges and thereby undermine "the respect and confidence of the community in applications of the . . . law." *In re Winship, 397 U.S., at 364.*

10    For example, the heavy federal workload has required the 13 regular and 7 senior judges on the Ninth Circuit to hire 30 staff attorneys and 33 law clerks to assist them in their labors.

11    Additional burdens will also be imposed if the Court's rule is extended to federal habeas proceedings reviewing federal criminal trials, as well as to ones reviewing state civil commitment proceedings in which we have recently required at least the "clear and convincing" test to be applied as a matter of federal constitutional law. *Addington v. Texas, 441 U.S. 418.*

This Court's work load will also increase, of course, when its certiorari docket expands to accommodate the challenges generated by the Court's new rule. The effect will be even greater if the Court's opinion is read to require state appellate courts to apply the reasonable-doubt test on direct review and to require this Court to apply it when reviewing the decisions of those courts on certiorari.

12    Professor Bator has persuasively explained how the law of diminishing returns inevitably makes it unwise to have duplicative review processes on the "merits" in criminal cases:

"[If] a criminal judgment is ever to be final, the notion of legality must at some point include the assignment of final competencies to determine legality.  But, it may be asked, why should we seek a point at which such a judgment becomes final? Conceding that no process can assure ultimate truth, will not repetition of inquiry stand a better chance of approximating it?  In view of the awesomeness of the consequences of conviction, shouldn't we allow redetermination of the merits in an *attempt* to make sure that no error has occurred?

"Surely the answer runs, in the first place, in terms of conservation of resources -- and I mean not only simple economic resources, but all of the intellectual, moral, and political resources involved in the legal system.  The presumption must be, it seems to me, that if a job can be well done once, it should not be done twice. If one set of institutions is as capable of performing the task at hand as another, we should not ask both to do it.  The challenge really runs the other way: if a

proceeding is held to determine the facts and law in a case, and the processes used in that proceeding are fitted to the task in a manner not inferior to those which would be used in a second proceeding, so that one cannot demonstrate that relitigation would not merely consist of repetition and second-guessing, why should not the first proceeding 'count'?  Why should we duplicate effort?  After all, it is the very purpose of the first go-around to decide the case.  Neither it nor any subsequent go-around can assure ultimate truth.  If, then, the previous determination is to be ignored, we must have some reasoned institutional justification why this should be so.

"Mere iteration of process can do other kinds of damage.  I could imagine nothing more subversive of a judge's sense of responsibility, of the inner subjective conscientiousness which is so essential a part of the difficult and subtle art of judging well, than an indiscriminate acceptance of the notion that all the shots will always be called by someone else.  Of course this does not mean that we should not have appeals.  As we shall see, important functional and ethical purposes are served by allowing recourse to an appellate court in a unitary system, and to a federal supreme court in a federal system.  The acute question is the effect it will have on a trial judge if we then allow still further recourse where these purposes may no longer be relevant.  What seems so objectionable is second-guessing merely for the sake of second-guessing, in the service of the illusory notion that if we only try hard enough we will find the 'truth.'" Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 450-451 (1963).

See also F. James, Civil Procedure 518 (1965).

13    The testimony of Griffin Bell at his confirmation hearings for Attorney General is particularly relevant.  When asked by Senator Scott of Virginia why he had earlier resigned from his seat on the Court of Appeals for the Fifth Circuit, Judge Bell responded:

"I found it not to be a rewarding experience any longer.  Whether it was because there was no more excitement after the 1960's, or whether it was because the case load changed, but the work load was oppressive.  I would not have minded the work load, but the character of the cases changed.  It was almost like serving on a criminal court.  I did not want to do that any longer." Hearings on the Prospective Nomination of Griffin B. Bell, of Georgia, to be Attorney General,

before the Senate Committee on the Judiciary, 95th Cong., 1st Sess., 27 (1977).

For these reasons, I am unable to join the Court's gratuitous directive to our colleagues on the federal bench.

**REFERENCES**
*39 Am Jur 2d, Habeas Corpus 62*

10 Federal Procedural Forms L Ed, Habeas Corpus 36:11 et seq.

11 Am Jur Pl & Pr Forms (Rev), Federal Practice and Procedure, Forms 41 et seq.; 13 Am Jur Pl & Pr Forms (Rev), Forms 2181 et seq.

20 Am Jur Trials 1, Federal Habeas Corpus Practice

*28 USCS 2254*

US L Ed Digest, Habeas Corpus 17

L Ed Index to Annos, Habeas Corpus

ALR Quick Index, Habeas Corpus

Federal Quick Index, Habeas Corpus

Annotation References:

Lack of evidence supporting state conviction of criminal offense as violation of federal due process. *15 L Ed 2d 889*; *80 ALR2d 1362*.



Positive
As of: Aug 02, 2017

FERNANDO LANCON, Appellant v. THE STATE OF TEXAS

NO. 0182-07

COURT OF CRIMINAL APPEALS OF TEXAS

*253 S.W.3d 699*; *2008 Tex. Crim. App. LEXIS 640*

**May 14, 2008, Delivered**

**NOTICE:** PUBLISH

**SUBSEQUENT HISTORY:** On remand at Lancon v. State, 2008 Tex. App. LEXIS 8517 (Tex. App. San Antonio, Nov. 12, 2008)

**PRIOR HISTORY:** [**1]
ON STATE'S PETITION FOR DISCRETIONARY REVIEW FROM THE FOURTH COURT OF APPEALS WEBB COUNTY.
*Lancon v. State, 220 S.W.3d 57, 2006 Tex. App. LEXIS 11028 (Tex. App. San Antonio, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant was convicted of murder, attempted murder, and deadly conduct. The Fourth Court of Appeals, Webb County (Texas) remanded the case for a new trial. The State filed a petition for discretionary review.

**OVERVIEW:** The State argued that the court of appeals incorrectly applied the factual-sufficiency standard of review. The court of criminal appeals agreed. The court of appeals correctly stated the standard set forth in Watson, but incorrectly applied the standard in conducting the factual-sufficiency review. There was no physical evidence linking defendant to the crime, and the State's evidence boiled down to the testimony of the witnesses and police officers. The evidence presented by the defense also consisted of testimony, including defendant, his family members, and his co-defendant. All of that

was presented to the jury and the jury was to decide upon the credibility of the testimony. The court of appeals tried to satisfy the requirement with the proclamation that the testimony was unreliable. But it was as equally plausible that those witnesses were telling the truth as it was that they were lying when they testified. None of the testimony definitively favored or contradicted the jury's verdict. Because the jury was the sole judge of a witness's credibility, and the weight to be given the testimony, it could choose to believe some testimony and disbelieve other testimony.

**OUTCOME:** The judgment of the court of appeals was vacated and the case was remanded for the court of appeals to consider the sufficiency of the evidence under the standard set forth in Watson v. State.

**LexisNexis(R) Headnotes**

*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > General Overview*
*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Right to Jury Trial*
*Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence > Sufficiency of Evidence*
[HN1] The Factual Conclusivity Clause of the Texas Constitution states that courts of appeals shall be conclusive on all questions of fact brought before them on appeal or error. *Tex. Const. art. V, § 6*. This means that the Texas Court of Criminal Appeals is not permitted to

Page 2

253 S.W.3d 699, *; 2008 Tex. Crim. App. LEXIS 640, **

conduct a de novo review of a court of appeals' factual sufficiency determination. However, the decision of the court of appeals is not completely unreviewable, as the question of whether the court of appeals applied the correct rule of law is a legal question. Therefore, review is centered upon whether the court of appeals applied the correct standard of review and considered all of the relevant evidence. The court of criminal appeals cannot simply do its own factual-sufficiency analysis, it can review only whether the court of appeals misapplied the standard of review. In deciding whether the court of appeals applied the correct standard of review when it has reversed for factual-insufficiency, the court of criminal appeals must also examine whether the court of appeals carried out the judicially-imposed requirements for safeguarding a defendant's right to trial by jury. These safeguards include deference to the jury's verdict and an examination of all of the evidence.

*Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence > Sufficiency of Evidence*
[HN2] There are three basic ground rules that guide a court of appeals in conducting a factual-sufficiency analysis. First, the court of appeals must be cognizant of the fact that a jury has already passed on the facts and must give due deference to the determinations of the jury. While the court of appeals may disagree with the factfinder, it should afford the appropriate deference in order to avoid substituting its judgment for that of the jury. Second, the court of appeals' opinion should clearly lay out and explain how the evidence supporting the verdict is too weak on its own, or state how the contradicting evidence greatly outweighs evidence in support of the verdict. This is particularly important because it assists the Texas Court of Criminal Appeals in determining whether the court of appeals applied the standard of review properly. Third, the appellate court should review all of the evidence in a neutral light, as opposed to a legal-sufficiency review in which the evidence is viewed in the light most favorable to the verdict. A verdict should be set aside only if the evidence supporting the verdict is so weak as to render the verdict clearly wrong or manifestly unjust.

*Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence > Sufficiency of Evidence*
[HN3] There are two ways in which the evidence may be insufficient. The first is that the evidence supporting the verdict, though legally sufficient, is nonetheless too weak to support it. The second is that, when considering con-

flicting evidence, the jury's verdict is against the great weight and preponderance of the evidence.

*Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Credibility of Witnesses*
*Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Weight of the Evidence*
*Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence > Sufficiency of Evidence*
[HN4] *Tex. Code Crim. Proc. Ann. art. 36.13* and *38.04* states that the jury is the exclusive judge of the facts and of the weight given to testimony. Appellate courts should afford almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility. The jury is in the best position to judge the credibility of a witness because it is present to hear the testimony, as opposed to an appellate court who relies on the cold record.

*Evidence > Hearsay > Exceptions > Present Sense Impression > General Overview*
[HN5] Present sense impression statements are considered exceptionally reliable because they are safe from error of memory and there is little or no time for a calculated misstatement, therefore, they are excluded from the hearsay rule.

*Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Credibility of Witnesses*
*Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Weight of the Evidence*
*Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence > Sufficiency of Evidence*
[HN6] An appellate court must give deference to a jury's decision regarding what weight to give contradictory testimonial evidence because the decision is most likely based on an evaluation of credibility and demeanor, which the jury is in the better position to judge.

**COUNSEL:** For APPELLANT: J. Eduardo Pena, Laredo, TX.

For STATE: Norberto Cardenas, III, ASST. D.A., Laredo, TX; Jeffrey L. Van Horn, STATE'S ATTORNEY, Austin, TX.

**JUDGES:** MEYERS, J., delivered the opinion of the Court, in which KELLER, P.J., KEASLER, HERVEY, and COCHRAN, JJ., joined. JOHNSON, J., filed a dis-

Page 3

253 S.W.3d 699, *; 2008 Tex. Crim. App. LEXIS 640, **

senting opinion, in which PRICE and HOLCOMB, JJ., joined. WOMACK, J., dissented.

**OPINION BY:** MEYERS

**OPINION**

[*701] **OPINION**

Appellant, Fernando Lancon, stood trial with two co-defendants, Alfonoso Villareal and Jorge Zuniga. Appellant was convicted of one count each for murder, attempted murder, and deadly conduct. The jury assessed punishment at twenty-five years', fifteen years', and ten years' confinement, respectively. Villareal was also found guilty, but Zuniga was acquitted. Appellant appealed the convictions based on factual insufficiency of the evidence to sustain his convictions, the failure of the prosecutor to disclose exculpatory evidence, and the improper admission of two photographs into evidence. The court of appeals held that it was not an abuse of discretion to admit the two photographs into evidence, and that Appellant failed to establish that it was reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure of [**2] the alleged exculpatory evidence. *Lancon v. State, 220 S.W.3d 57 (Tex. App. -- San Antonio, 2006)*(mem. op.). The court of appeals also held that the evidence was factually insufficient to support the convictions and remanded the case for a new trial. The State filed a petition for discretionary review, which we granted to consider whether the court of appeals correctly applied the factual-sufficiency standard of review. We determine that the standard was not correctly applied. We vacate the judgment of the court of appeals and remand the case for the court of appeals to consider the sufficiency of the evidence under the standard set forth in *Watson v. State, 204 S.W.3d 404 (Tex. Crim. App. 2006)*.

**FACTS**

We first lay out the undisputed facts of this case. On June 11, 2003, Appellant's co-defendant, Alfonso Villareal, was at his neighborhood recreation center. Another boy, Hector Dominguez, was also visiting the rec center with his friend, Daniel Diaz. While at the rec center, Dominguez started a verbal altercation with Villareal. When the argument was over, Villareal made a phone call and was soon picked up in a maroon car. Shortly thereafter, Dominguez and Diaz left the rec center and [**3] began walking to Freddie Soliz's house, which was approximately one block away. When Dominguez and Diaz arrived at the Soliz house, Freddie Soliz came out to the sidewalk in front of the house to talk to the two boys. A maroon or purple car with three people inside stopped in front of the Soliz house, and Villareal got out

of the car to fight Dominguez. A second person, holding a gun, also got out of the car. This second individual fired two shots in the direction of Dominguez, Diaz, and Soliz, who were standing in front of the Soliz house. When the shooting started, Dominguez ran toward the back of the house, while Soliz and Diaz stayed in the front yard. After firing two shots, the shooter jumped back into the car, as did Villareal, and the car sped away. This entire incident lasted for less than one minute. While neither of the shots hit the three [*702] boys in the front yard, one bullet went through the wall of the Soliz residence and hit and killed eleven-month-old Federico Soliz III.

The first 911 call the police received was made at 9:20 p.m. When the Detectives arrived at the scene at 9:30 p.m., they asked Dominguez who had shot at him, and Dominguez told them that the shooter was [**4] Appellant, a cousin of Villareal. A second 911 call was received at 9:26 p.m., in which the caller said that the suspects might be at 1418 Kearney Street, the address at which Appellant lived with his grandmother. Officers were sent to the address, but they did not find Appellant or the maroon vehicle. While officers were at the scene of the shooting, Dominguez saw Appellant drive by in a white Cadillac and informed the officers. Roughly four minutes after that, Investigator Rodriguez noticed that the white Cadillac had stopped in the street about a half a block away from the scene. Police approached the Cadillac and detained Appellant and Jorge Zuniga. Detective Cantu administered gunshot-residue tests on both Appellant and Zuniga and took the clothing that they were wearing.

Dominguez and Diaz gave videotaped statements to the police. They were also shown photo lineups and asked if Appellant was in the lineup. Both identified Appellant correctly. Soliz also told police that Appellant was the shooter, but did not identify him in a lineup. Police were never able to locate the maroon vehicle, nor did they recover the weapon that was used in the shooting. Although Zuniga's gunshot-residue [**5] came back positive, Appellant's gunshot-residue test came back negative, so there was no physical evidence linking Appellant to the crime.

The rest of the facts surrounding the case are contested, as Appellant claimed that his younger brother, Eduardo, committed the crime. At trial, both Dominguez and Diaz testified, as did three girls who were witnesses to the shooting and several police officers and detectives. Dominguez testified that Villareal exited the maroon vehicle and asked him if he wanted to fight, and when Appellant got out of the car, Villareal ordered Appellant to shoot. Although Dominguez ran either when the gun was cocked or when the shooting began, he testified that he saw Appellant shoot the gun. He also stated that he

Page 4

253 S.W.3d 699, *; 2008 Tex. Crim. App. LEXIS 640, **

was shown three lineups on the night of the shooting. At first Dominguez testified that he did not recognize anyone, but he later stated that he identified Appellant. When Dominguez was asked about the appearance of the shooter, he first said that he didn't remember what the shooter was wearing, but moments later he said that Appellant had been wearing a white shirt, blue shorts, and a blue New York Yankees cap and had held the gun in his right hand. [**6] Dominguez also admitted that he smoked marijuana almost every day, including the day of the shooting. However, Dominguez testified that he was 100% sure that Appellant was the shooter and not his brother, Eduardo, whom Dominguez also knew.

Daniel Diaz testified that he knew Appellant because he had seen him before, but that he did not know Villareal prior to the shooting. Diaz also said that he did not see who was driving the vehicle and that he identified Appellant and Villareal from lineups. The day after the shooting, Diaz identified Zuniga as the driver. Diaz testified that the shooter was wearing a white shirt and pants, but no baseball cap. He also admitted on the stand that, while he could not be positive that he smoked marijuana the day of the shooting, it was possible because he often smoked marijuana.

Kimberly Sanchez, a girl who was also at the rec center on the day of the shooting, [*703] testified that she witnessed the argument between Dominguez and Villareal. She said that, after the argument, she saw Villareal make a phone call and heard him ask for "Moiky," Appellant's nickname. Sanchez testified that she did not know who Moiky was or if Villareal even spoke to him on the phone. [**7] She had left the rec center with her friends, Monica and Melissa Soliz, and had started walking to their house when she saw the maroon car stop in front of the Soliz house and saw someone in a white shirt get out of the car. Sanchez testified that when they heard the gunshots, she and her friends ran back to the rec center.

The police officers and detectives testified about their investigation of the case, including their arrival at the scene and the lineups shown to Dominguez and Diaz. Detective Cantu testified that his theory of what happened in the 14 minutes between the first 911 call and Appellant and Zuniga driving by in the Cadillac was that the three men drove away from the shooting, Appellant dropped Villareal off, Appellant and Zuniga disposed of the car and their clothing, Appellant washed his hands, and then Appellant and Zuniga got in Appellant's white Cadillac to return to the scene. Detective Cantu admitted that he had no evidence to prove his theory. Detective Cantu also testified about a search warrant that was executed at the home of Lydia Fernandez, an aunt of Villareal and Appellant. Several people were arrested at

Fernandez's home and weapons were seized, although [**8] none matched the murder weapon.

All three defendants, including Appellant, testified at trial. Appellant and Zuniga testified about the events leading up to their detention and said that they were together on that evening but that neither of them had been with Villareal or involved in the shooting. Appellant also testified that he and his brother, Eduardo, had been raised in separate households, and he demonstrated that he was left-handed by signing his name in front of the jury. Villareal testified that Eduardo was the shooter, but that he did not know that Eduardo had a gun and he did not order Eduardo to shoot at Dominguez and Diaz. Villareal admitted that he fled to Mexico following the shooting.

Additionally, several family members of Appellant and Villareal testified, including Jose Gonzalez, the cousin of Appellant, Eduardo, and Villareal, who testified that he was the driver and Eduardo was the shooter. Gonzalez stated that he was told by his Aunt Lydia to pick Villareal up at the rec center because Villareal was getting beaten up and Eduardo came along. Gonzalez said that, after he and Eduardo picked up Villareal, they were driving back home when Eduardo and Villareal jumped [**9] out of the car, argued with some boys on the street, and then Eduardo started shooting. Gonzalez testified that he did not know that Eduardo had a gun and that after the shooting he dropped both Eduardo and Villareal off at his aunt's house. He also said that he had not talked to Eduardo since that evening and thought that the police would arrest Eduardo because he heard that they were looking for Villareal.

Gonzalez's mother, Ava Maria Gonzalez, testified that she owned the maroon car and that her son had driven it on June 11. Mrs. Gonzalez admitted that when she was questioned by the police, she told them that her son had arrived home at 7:45 p.m. and had never left the house after that.

Several aunts of Appellant and Eduardo testified that on the day of the shooting and in the days after, they heard Eduardo confess that he had been the shooter, but that he thought he had shot one of the boys in front of the house. One aunt even [*704] told the police that she believed that Eduardo had wrapped the gun in a towel and hidden it, which resulted in the subsequent search of Lydia Fernandez's home. Villareal's mother, Yolanda, testified that she also heard Eduardo admit to the shooting on two separate [**10] occasions, and she gave Detective Cantu a statement about this five days after the shooting.

## COURT OF APPEALS DECISION

On appeal, Appellant argued that the evidence to support his conviction was factually insufficient, that the

Page 5

253 S.W.3d 699, *; 2008 Tex. Crim. App. LEXIS 640, **

prosecutor failed to disclose exculpatory evidence, and that the trial judge abused his discretion by admitting two photographs into evidence. The court of appeals determined that the evidence was factually insufficient to support Appellant's convictions. The court also held that Appellant failed to show that it was reasonably probable that the trial outcome would have been different had the exculpatory evidence been properly disclosed, and that it was not an abuse of discretion to admit the photographs into evidence.

In addressing its decision that the evidence was factually insufficient, the court laid out, verbatim, the standard of review discussed in *Watson.* The court then stated that its decision was based on the "objective unreliability of Dominguez's and Diaz's testimony that Fernando Lancon was the shooter coupled with the weight and quantity of the evidence that the shooter was not Fernando but Eduardo Lancon." *Lancon v. State, 220 S.W.3d 57, 67 (Tex. App. -- San Antonio, 2006)*(mem. **[**11]** op.). The court detailed the discrepancies in Dominguez's and Diaz's testimony and explained that their conflicting testimony, coupled with the unvarying testimony of Appellant's defense witnesses, led them to find that vacating Appellant's conviction and remanding the cause for a new trial was "necessary to arrest the occurrence of a manifest injustice." *220 S.W.3d at 68, quoting Johnson v. State, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000).*

## ANALYSIS

### Factual Sufficiency Review, Generally

[HN1] The Factual Conclusivity Clause of the Texas Constitution states that "[courts of appeals] shall be conclusive on all questions of fact brought before them on appeal or error." *TEX. CONST. art. V, §6.* We have previously determined that this means that we are not permitted to conduct a *de novo* review of a court of appeals' factual sufficiency determination. *Cain v. State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997).* However, the decision of the court of appeals is not completely unreviewable, as the question of whether the court of appeals applied the correct rule of law is a legal question. *Id.* Therefore, our review is centered upon whether the court of appeals applied the correct standard of review and considered **[**12]** all of the relevant evidence. We cannot simply do our own factual-sufficiency analysis, we can review only whether the court of appeals misapplied the standard of review. *Zuniga v. State, 144 S.W.3d 477, 482 (Tex. Crim. App. 2004).* In deciding whether the court of appeals applied the correct standard of review when it's reversed for factual-insufficiency, this Court must also examine whether the court of appeals carried out the judicially-imposed requirements for safeguarding

a defendant's right to trial by jury. These safeguards include deference to the jury's verdict and an examination of all of the evidence. *Roberts v. State, 221 S.W.3d 659 (Tex. Crim. App. 2007).*

[HN2] There are three basic ground rules that guide a court of appeals in conducting a factual-sufficiency analysis. First, the court of appeals must be cognizant **[*705]** of the fact that a jury has already passed on the facts and must give due deference to the determinations of the jury. While the court of appeals may disagree with the factfinder, it should afford the appropriate deference in order to avoid substituting its judgment for that of the jury. *Clewis v. State, 922 S.W.2d 126 (Tex. Crim. App. 1996).* Second, the court of appeals' **[**13]** opinion should clearly lay out and explain how the evidence supporting the verdict is too weak on its own, or state how the contradicting evidence greatly outweighs evidence in support of the verdict. This is particularly important because it assists this Court in determining whether the court of appeals applied the standard of review properly. Third, the appellate court should review all of the evidence in a neutral light, as opposed to a legal-sufficiency review in which the evidence is viewed in the light most favorable to the verdict. *Watson v. State, 204 S.W.3d 404, 415 (Tex. Crim. App. 2006).* A verdict should be set aside only if the evidence supporting the verdict is so weak as to render the verdict clearly wrong or manifestly unjust. *Cain, 958 S.W.2d at 406.*

### Review of the Court of Appeals' Decision

As we explained in *Goodman v. State, 66 S.W.3d 283 (Tex. Crim. App. 2001),* [HN3] there are two ways in which the evidence may be insufficient. The first is that the evidence supporting the verdict, though legally sufficient, is nonetheless too weak to support it. The second is that, when considering conflicting evidence, the jury's verdict is against the great weight and preponderance of **[**14]** the evidence. In this case, the court of appeals vacated the conviction and remanded the cause for a new trial based upon the conflicting evidence.

To support this conclusion, the court of appeals accurately stated the standard of review and addressed all of the evidence. The court of appeals included a detailed description of the undisputed facts, as well as the evidence supporting and contrary to the conviction. *Lancon, 220 S.W.3d at 59-67.* However, the court of appeals failed to adhere to the three factual-sufficiency ground rules described above.

The majority of the evidence that the court of appeals points to is contradictory witness testimony, and although the evidence is compelling, the jury is the sole judge of what weight to give such testimony. *See* [HN4] *TEX. CRIM. PROC. CODE ANN. art. 36.13* and *38.04*

Page 6

253 S.W.3d 699, *; 2008 Tex. Crim. App. LEXIS 640, **

(stating that the jury is the exclusive judge of the facts and of the weight given to testimony). Appellate courts should afford almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility. The jury is in the best position to judge the credibility of a witness because it is present to hear the testimony, as opposed to an appellate court **[\*\*15]** who relies on the cold record. *See Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006).*

The court of appeals determined that Dominguez's and Diaz's testimony was "objectively unreliable," and concluded that it was not unreasonable to distrust their eyewitness testimony given the circumstances surrounding the shooting. There were many inconsistencies within Dominguez's and Diaz's testimony, as well as inconsistencies between their testimony. Dominguez contradicted himself several times. He testified that he did not remember what Appellant was wearing, and then moments later gave a description of the clothing. Dominguez also had trouble describing his actions when the shooting started, saying that he started running when the gun was cocked, while still maintaining that he saw Appellant actually pull the trigger when he was running toward the back of the house with his back turned. **[\*706]** The descriptions given by Dominguez and Diaz were also inconsistent, with Dominguez declaring that he remembered Appellant wearing a baseball cap and Diaz testifying that the shooter was not wearing a baseball cap. In addition, Kimberly Sanchez did not include a baseball cap in her description of the **[\*\*16]** shooter. Both Dominguez and Diaz admitted to smoking marijuana often, Dominguez even testified that he had smoked marijuana on the day of the shooting. And Diaz admitted on cross-examination that he might have mistaken Appellant for his brother, Eduardo. As part of the evidence contrary to the verdict, the court of appeals explained that the testimony of the defense witnesses was consistent, and that two of the witnesses admitted their own complicity in the crime. However, the court of appeals seems to have failed to consider evidence that supported the jury's verdict. One example of this is Detective Cantu's testimony that Dominguez said Appellant was the shooter mere minutes after the shooting. [1] As a matter of law, evidence of this sort is considered especially trustworthy given the surrounding circumstances. *See Rabbani v. State, 847 S.W.2d 555, 560 (Tex. Crim. App. 1992)*(explaining that [HN5] present sense impression statements are considered exceptionally reliable because they are safe from error of memory and there is little or no time for a calculated misstatement, therefore, they are excluded from the hearsay rule).

1   The following is Detective Cantu's testimony regarding his arrival **[\*\*17]** on the scene:

[The State]: Okay. And what happened--what were your observations when you got there to the house?

[Cantu]: The three individuals that were there, one was Hector Dominguez, Fernando Soliz, and Daniel Diaz. Daniel Diaz, I want to say was in shock. He was just standing there. Fernando Soliz was screaming that the baby--the baby was shot. He was shot. I tried to calm him down. Hector Diaz [sic] was excited, you know. He was--I couldn't understand. They were all talking at the same time.

[The State]: Did you ask him at any--did you ask him any questions?

[Cantu]: I asked him what happened and he said that he got shot at, and then said--I told him--

\* \* \*

[Cantu]: I told him, Who did this to you? Who shot? And he said Fernando Lancon.

\* \* \*

[The State]: When you showed lineups to the witnesses how was Fernando Lancon identified?

[Cantu]: He was identified--Hector Dominguez knew Fernando Lancon. Okay. He already knew who he was, and--

\* \* \*

[Cantu]: So he knew who was at the scene, and he mentioned at the time when I arrived that Fernando Lancon was the one who shot at him.

As we said before, there was no physical evidence linking Appellant to the crime, and the State's evidence boiled **[\*\*18]** down to the testimony of the witnesses and police officers. The evidence presented by the defense also consisted of testimony, including Appellant, his family members, and his co-defendant. All of this was presented to the jury and the jury is to decide upon the credibility of the testimony. As we explained in *State v. Johnson, 23 S.W.3d 1 (Tex. Crim. App. 2000)*, [HN6] an appellate court must give deference to a jury's decision regarding what weight to give contradictory testimonial evidence because the decision is most likely based on an evaluation of credibility and demeanor, which the jury is in the better position to judge.

Under *Watson,* we further explained that there must be an objective basis in the record in order to say that the great weight and preponderance of the evidence contradicts the jury's verdict. *204 S.W.3d at 417.* The court of appeals tries to satisfy this requirement with the proclamation that Dominguez's and Diaz's **[\*707]** testimony

Page 7

253 S.W.3d 699, *; 2008 Tex. Crim. App. LEXIS 640, **

is unreliable. But it is as equally plausible that Dominguez and Diaz were telling the truth as it is they were lying when they testified. It is for the jury to determine if they believe that Dominguez and Diaz are lying or telling the truth. None **[**19]** of the testimony at trial definitively favors or contradicts the jury's verdict, it all bears on credibility. Because the jury is the sole judge of a witness's credibility, and the weight to be given the testimony, it may choose to believe some testimony and disbelieve other testimony. *See Margraves v. State, 34 S.W.3d 912, 919 (Tex Crim. App. 2000).* A decision is not manifestly unjust solely because the court of appeals would have resolved the conflicting evidence in a different way. *Watson, at 417.*

## CONCLUSION

The court of appeals correctly stated the standard set forth in *Watson,* but incorrectly applied the standard in conducting the factual-sufficiency review. Because the evidence in the case was largely based on a determination of the credibility of the witnesses, and the court of appeals' factual-sufficiency review failed to defer to the jury's verdict, we vacate the decision of the court of appeals and remand this cause for the court to conduct a factual sufficiency review in accordance with this opinion.

Meyers, J.

Delivered: May 14, 2008

Publish

**DISSENT BY:** JOHNSON

**DISSENT**

JOHNSON, J., filed a dissenting opinion in which PRICE and HOLCOMB, JJ., joined.

DISSENTING OPINION

The court of appeals, after thoroughly **[**20]** reviewing all of the evidence in a neutral light, concluded that the jury's determination of guilt was "against the great weight and preponderance of the evidence," and therefore reversed the trial court's judgment and remanded the cause for a new trial. *Lancon v. State, 220 S.W.3d 57 (Tex. App.--San Antonio 2006).* Because I believe that the court of appeals correctly stated and properly applied the standard of review, I dissent.

"The factual-conclusivity clause in *Article V, § 6, of the Texas Constitution,* makes a direct-appeal court's factual-sufficiency decision final and conclusive upon this Court. *Watson, 204 S.W.3d at 439.* [1] This Court's review of a direct-appeal court's factual-sufficiency decision is limited by the factual-conclusivity clause to de-

termining only whether the direct-appeal court properly applied 'rules of law.'" *Roberts v. State, 221 S.W.3d 659, 662-63 (Tex. Crim. App. 2007).* Our disagreement with the court of appeals' factual-sufficiency decision is simply not a basis for reversing that decision.

> 1 *Watson v. State, 204 S.W.3d 404 (Tex. Crim. App. 2006). See also Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006).*

Although review of factual sufficiency has been, **[**21]** and continues to be, subject to much dispute, in *Watson* a majority of this Court reiterated that, in order for an appellate court to reverse for factually insufficiency, it must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's guilty verdict. In this case, that is precisely what the court of appeals did. In its section entitled "Evidence Contrary to the Verdict," it detailed a great deal of evidence, which adequately provides that objective basis for overturning the jury's verdict. *Lancon, 220 S.W.3d at 63-66.* [2]

> 2 "These weaknesses and inconsistencies in Dominguez's and Diaz's testimony certainly detract from its reliability. But, standing alone, these factors would not convince us that the evidence is factually insufficient to support the jury's implicit finding that Fernando, rather than [his brother] Eduardo, was the shooter. . . . But what does convince us that the evidence is factually insufficient to support the jury's verdict is viewing the eyewitnesses' testimony-complete with the weaknesses, inconsistencies, and equivocations outlined above-in light of the consistent, detailed testimony set **[**22]** forth above from the defense witnesses, including two of the three participants who admitted their complicity in the shooting . . . and identified Eduardo Lancon as the shooter, and the aunts of both Eduardo and Fernando . . ., each of whom testified that she heard Eduardo admit to having been the shooter moments after the shooting took place. Both factors, taken together, convince us that reversing the judgment against Fernando Lancon and ordering a new trial is 'necessary to arrest the occurrence of a manifest injustice.'(Cite omitted.)" Other testimony indicated that the shooter, like Eduardo, was right-handed, while Fernando is left-handed.

**[*708]** The majority opinion asserts that, because the court of appeals determined that the testimony of two of the state's witnesses was objectively unreliable, it had "concluded that it was not unreasonable to distrust their eyewitness testimony given the circumstances surround-

Page 8

253 S.W.3d 699, *; 2008 Tex. Crim. App. LEXIS 640, **

ing the shooting." *Lancon v. State,* No. PD-0182-07 (Tex. Crim. App. delivered ___, 2008, slip op. at 12). The court of appeals's opinion did not articulate any particular "distrust" of those witnesses, but rather determined, after reviewing all of the evidence in the requisite [**23] neutral light, that the jury's implicit finding in its guilty verdicts that appellant, rather than his brother Eduardo, was the shooter, was greatly outweighed by the contrary evidence. It therefore concluded that the evidence of appellant's guilt was factually insufficient. *Lancon, 220 S.W.3d at 66-67.* It reached this conclusion after viewing the state's eyewitness testimony, complete with weaknesses, inconsistencies, and equivocations, which it detailed in its opinion, in light of the consistent, detailed testimony from the defense witnesses, which it also detailed in its opinion. *Id. at 68.* It concluded "that reversing the judgment against [appellant] and ordering a new trial is 'necessary to arrest the occurrence of a manifest injustice.'" *Id., quoting Johnson v. State, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000).*

As the majority opinion concedes, "the court of appeals accurately stated the standard of review and addressed all of the evidence" and "included a detailed description of the undisputed facts, as well as the evidence supporting and contrary to the conviction." *Lancon v. State,* No. PD-0182-07, slip op. at 11). The majority also notes that "[a]ppellate courts should afford almost [**24] complete deference to a jury's decision when that decision is based upon an evaluation of credibility." [3] *Id.* But "almost complete" is not "complete" or "total," even when the jury's decision is based upon a credibility evaluation. The majority opinion seems to say that, from now on, the level of deference due a jury's decision will be total deference when the decision is based on an evaluation of credibility. This eviscerates our case law for re-

viewing the factual sufficiency of evidence and effectively precludes any sufficiency review when the jury's decision is based upon an evaluation of credibility, which virtually each and every jury verdict is to some extent. "The legal and factual sufficiency standards both require the reviewing court [*709] to consider **all** of the evidence. . . . The difference between the two standards is that the former requires the reviewing court to defer to the jury's credibility and weight determinations while the latter permits the reviewing court to substitute its judgment for the jury's on these questions 'albeit to a very limited degree.'" *Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006)*(quoting *Watson at 417*)(emphasis in original).

> 3 The majority [**25] opinion asserts that "it is equally plausible that [two of the state's witnesses] were telling the truth as it is that they were lying when they testified[,]" and that "it is for the jury to determine if they [sic] believe that [those two witnesses] are lying or telling the truth." *Id.,* slip op. at 14.

The analysis by the court of appeals is very much in line with our prior factual-sufficiency case law, and we should respect its decision, especially in light of the fact that its factual-sufficiency decision is final and conclusive upon this Court pursuant our constitution's factual-conclusivity clause. Because the court of appeals properly applied our rules of law and because this Court has no jurisdiction to re-evaluate factual sufficiency, I respectfully dissent.

Filed: May 14, 2008

Publish





Positive
As of: Aug 02, 2017

**SEDRICK TYRONE LEE, Appellant v. THE STATE OF TEXAS, Appellee**

**No. 10-06-00240-CR**

**COURT OF APPEALS OF TEXAS, TENTH DISTRICT, WACO**

*239 S.W.3d 873*; *2007 Tex. App. LEXIS 8407*

**October 24, 2007, Opinion Delivered**
**October 24, 2007, Opinion Filed**

**NOTICE:** PUBLISH

**SUBSEQUENT HISTORY:** Petition for discretionary review refused by *In re Lee, 2008 Tex. Crim. App. LEXIS 206 (Tex. Crim. App., Feb. 6, 2008)*

**PRIOR HISTORY:** [**1]
From the 54th District Court McLennan County, Texas. Trial Court No. 2004-1281-C.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** A jury of the 54th District Court McLennan County, Texas, convicted defendant of aggravated assault under *Tex. Penal Code Ann. §§ 22.02(a)(2), 22.01(a)(1)* (Supp. 2006) and sentenced him to 15 years in prison. Defendant appealed.

**OVERVIEW:** Defendant argued that the issue of guilt was not joined because his plea of not guilty was not entered before the jury. The court found that defendant did not preserve that issue because at no time did he object to the trial court's failure to enter the plea before the jury or request that the indictment be read, a plea entered, and the evidence reintroduced. The court also held that the victim's testimony was legally sufficient evidence to support the identification of defendant as the shooter. The evidence was also legally sufficient to support a deadly weapon finding under *Tex. Penal Code*

*Ann. § 1.07(17)(A)* (Supp. 2006), even though the gun was never recovered, because the victim testified that defendant used a gun and officers heard the gun shots and observed a gun in the hands of the person chasing the victim. The evidence was also legally sufficient to support a finding that defendant intentionally, knowingly, or recklessly caused bodily injury by shooting a victim. The jury could reasonably infer that the wound from a bullet that entered the back of the victim's calf and exited through the front caused the victim to suffer physical pain from the injury.

**OUTCOME:** The court affirmed the trial court's judgment.

**LexisNexis(R) Headnotes**

*Criminal Law & Procedure > Accusatory Instruments > Indictments > General Overview*
*Criminal Law & Procedure > Trials > General Overview*
*Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > Requirements*
[HN1] *Tex. Code Crim. Proc. Ann. art. 36.01* (2007) requires that the indictment be read and the plea entered in the jury's presence. *Tex. Code Crim. Proc. Ann. art. 36.01* (2007). Otherwise, the issue of guilt is not joined. This rule is intended to inform the accused of the charges against him, to inform the jury of the charge at issue, and to allow the jury to hear the defendant refute or admit the

charge. Failure to follow this rule may be corrected by reading the indictment to the jury and entering the defendant's plea, followed by the State's reintroduction of the evidence or the parties stipulation to the evidence. If the error is discovered after trial, error is preserved through a motion for new trial, bill of exception, or motion to arrest judgment.

*Criminal Law & Procedure > Accusatory Instruments > Indictments > General Overview*
*Criminal Law & Procedure > Trials > General Overview*
*Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > Requirements*
[HN2] There are two relatively small categories of errors to which a contemporaneous objection is not required to preserve error: violations of rights which are waivable only and denials of absolute systemic requirements. These errors may be raised for the first time on appeal. A complaint under *Tex. Code Crim. Proc. Ann. art. 36.01* (2007) does not fit within these small categories; thus, an objection is required to preserve error.

*Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*
[HN3] Under legal sufficiency review, the court determines whether, after viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. The court does not resolve any conflict of fact or assign credibility to the witnesses, as this was the function of the trier of fact. Inconsistencies in the evidence are resolved in favor of the verdict.

*Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Assault & Battery > Aggravated Offenses > Elements*
[HN4] A person commits aggravated assault if he intentionally, knowingly, or recklessly caused bodily injury to another and used or exhibited a deadly weapon during commission of the assault. *Tex. Penal Code Ann. § 22.02(a)(2)* (Supp. 2006); *Tex. Penal Code Ann. § 22.01(a)(1)* (Supp. 2006).

*Criminal Law & Procedure > Criminal Offenses > Weapons > Definitions*
[HN5] A firearm is a "deadly weapon." *Tex. Penal Code Ann. § 1.07(a)(17)(A)* (Supp. 2006).

*Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Assault & Battery > General Overview*
[HN6] "Bodily Injury," in the context of criminal assault, means physical pain, illness, or any impairment of physical condition. *Tex. Penal Code Ann. § 1.07(a)(8)* (Supp. 2006).

**COUNSEL:** For APPELLANT/RELATOR: Richard G. Ferguson, ATTORNEY at LAW, Waco, TX.

For APPELLEE/RESPONDENT: John W. Segrest, McLENNAN COUNTY DISTRICT ATTORNEY, Waco, TX.

**JUDGES:** Before Chief Justice Gray, Justice Vance, and Justice Reyna. Chief Justice Gray concurs in the judgment but a separate opinion will not be issued.

**OPINION BY:** FELIPE REYNA

**OPINION**

[*875] A jury convicted Sedrick Tyrone Lee of aggravated assault and sentenced him to fifteen years in prison. [1] On appeal, Lee argues that: (1) the issue of guilt was not joined at trial; and (2) the evidence is legally insufficient to support his conviction. We affirm.

> 1 Lee was also charged with attempted murder, but the State elected to pursue the aggravated assault charge alone.

**JOINDER OF GUILT**

In his first issue, Lee contends that the issue of guilt was not joined because his plea of "not guilty" was not entered before the jury.

[HN1] *Article 36.01 of the Code of Criminal Procedure* requires that the indictment be read and the plea entered in the jury's presence. *See TEX. CODE CRIM. PROC. ANN. art. 36.01* (Vernon 2007). Otherwise, the issue of guilt is not joined. *See Martinez v. State, 155 S.W.3d 491, 495 (Tex. App.--San Antonio 2004, no pet.).* This rule is intended to "inform the accused of the charges against him, to inform the jury of the charge [**2] at issue, and to allow the jury to hear the defendant refute or admit the charge." *Id.* Failure to follow this rule may be corrected by reading the indictment to the jury and entering the defendant's plea, followed by the State's reintroduction of the evidence or the parties' stipulation to the evidence. *See Limon v. State, 838 S.W.2d 767, 768-69 (Tex. App.--Corpus Christi 1992, pet. ref'd)* (citing *Warren v. State, 693 S.W.2d 414, 416 (Tex. Crim. App. 1985)*). If the error is discovered after trial, error is preserved through a motion for new trial, bill of excep-

tion, or motion to arrest judgment. *See Martinez, 155 S.W.3d at 495* (citing *Warren, 693 S.W.2d at 416*).

At the beginning of the guilt/innocence phase, the State read the indictment and the trial court asked for Lee's plea. Lee responded, "I plead the 5th, Your Honor." Trial then proceeded to opening arguments. After the State rested, the trial court made the following statement outside the presence and hearing of the jury:

> Before you put anything else on the record there's one thing I -- when I asked the defendant this morning how he plead, whether he plead guilty or not guilty, I thought he said, not guilty, but I just didn't hear **[**3]** it. The court reporter has told me and the parties that he said that he took the *5th Amendment.* The court is entering a plea of not guilty on his behalf.

The trial proceedings then continued.

Because Lee did not object to the trial court's failure to enter his plea before the jury, the State argues that Lee has not preserved his complaint for appellate review. In reliance on *Turner v. State,* Lee urges that "the reading of the indictment to which a plea is then entered is a category-II **[*876]** right under *Marin v. State*" that must be expressly waived. *See Turner, 897 S.W.2d 786, 787 (Tex. Crim. App. 1995)*; *see also Marin, 851 S.W.2d 275, 279 (Tex. Crim. App. 1993).* However, *Turner* is distinguishable because it: (1) addresses the failure to read enhancement paragraphs and receive a plea at any point during the punishment phase; and (2) it predates the Court of Criminal Appeals' decision in *Cain v. State* in which the Court held that "[e]xcept for **[**4]** certain federal constitutional errors labeled by the United States Supreme Court as 'structural,' no error, whether it relates to jurisdiction, voluntariness of a plea, or any other mandatory requirement, is categorically immune to a harmless error analysis." [2] *See Turner, 897 S.W.2d at 787*; *see also Cain, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997).*

> 2 Because *article 36.01* violations are not structural, "decisions since *Turner* suggest that *article 36.01* violations are subject to a harm analysis." *Hernandez v. State, 190 S.W.3d 856, 868 (Tex. App.--Corpus Christi 2006, no pet.)*; *see Linton v. State, 15 S.W.3d 615, 620 (Tex. App.--Houston [14th. Dist.] 2000, pet. ref'd)* ("Because the failure to read enhancements paragraphs and a defendant's plea to the jury is statutory error, the proper harm analysis is that for reviewing non-constitutional error").

In *Hervey v. State,* we addressed a similar issue, namely whether "fundamental error was committed when the indictment was not read to the jury prior to the trial on punishment." [3] *131 S.W.3d 561, 565 (Tex. App.--Waco 2004, no pet.).* We noted that [HN2] "[t]here are two relatively small categories of errors to which a contemporaneous objection is not **[**5]** required: violations of 'rights which are waivable only' and denials of 'absolute systemic requirements.'" *Id.* (quoting *Aldrich v. State, 104 S.W.3d 890, 895 (Tex. Crim. App. 2003)*). These errors may be raised for the first time on appeal. *Id.* An *article 36.01* complaint does not fit within these small categories; thus, an objection is required to preserve error. *See id. at 565-66* (citing *Cantu v. State, 939 S.W.2d 627, 646 (Tex. Crim. App. 1996)*); *see also Cox v. State, 422 S.W.2d 929, 930 (Tex. Crim. App. 1968)* (absent an objection, a violation of *article 36.01* is waived); *Robinson v. State, No. 05-01-00702-CR, 2002 Tex. App. LEXIS 615, at *2 (Tex App.--Dallas Jan. 30, 2002, no pet.)* (not designated for publication) (argument that "trial court committed fundamental error by failing to read the indictment and accept appellant's plea in the presence of the jury" not preserved for appeal in absence of objection); *Hardin v. State, 951 S.W.2d 208, 211 (Tex. App.--Houston [14th Dist.] 1997, no pet.).*

> 3 At voir dire on punishment, the trial court denied Hervey's request that the indictment be read to the jury panel. *See Hervey v. State, 131 S.W.3d 561, 565 (Tex. App.--Waco 2004, no pet.).* **[**6]** On appeal, Hervey complained that the indictment should have been read to the jury that was *seated* and he should have been allowed to plead to the indictment. *See id.*

At no time did Lee object to the trial court's failure to enter his plea before the jury or request that the indictment be read, a plea entered, and the evidence reintroduced. *See Hervey, 131 S.W.3d at 565*; *see also Cantu, 939 S.W.2d at 646*; *Cox, 422 S.W.2d at 930*; *Robinson, 2002 Tex. App. LEXIS 615, at *2*; *Hardin, 951 S.W.2d at 211*; *Limon, 838 S.W.2d at 769.* Any error could have been corrected had Lee timely called it to the trial court's attention. *See Hervey, 131 S.W.3d at 565* (citing *Cantu, 939 S.W.2d at 646*). Lee could have preserved error after trial by filing a motion for new trial, bill of exception, or motion to arrest judgment, but did not do so. *See Martinez, 155 S.W.3d at 495* (citing *Warren, 693 S.W.2d at 416*). Accordingly, Lee **[*877]** has failed to preserve his complaint for appellate review; we overrule his first issue.

## LEGAL SUFFICIENCY

Lee's second issue challenges the legal sufficiency of the evidence to support his aggravated assault conviction.

**Standard of Review**

[HN3] Under legal sufficiency review, we determine whether, **[**7]** after viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000)* (citing *Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)*). We do not resolve any conflict of fact or assign credibility to the witnesses, as this was the function of the trier of fact. *See Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999)*; *see also Adelman v. State, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992)*; *Matson v. State, 819 S.W.2d 839, 843 (Tex. Crim. App. 1991)*. Inconsistencies in the evidence are resolved in favor of the verdict. *Curry, 30 S.W.3d at 406*; *Matson, 819 S.W.2d at 843*.

**Procedural Challenge**

Lee contends that, presuming guilt was later joined when the trial court entered a plea on Lee's behalf, the evidence was not reintroduced and the only other evidence before the jury is insufficient to establish aggravated assault. However, Lee did not request that the jury disregard the previously admitted evidence, direct that the State be required to reintroduce the evidence, or object to the **[**8]** trial court's failure to do so. *See Limon, 838 S.W.2d at 769*. Any complaint regarding the failure to reintroduce evidence is not preserved for appeal. *See Limon, 838 S.W.2d at 769*; *see also Castillo v. State, 530 S.W.2d 952, 954 (Tex. Crim. App. 1976)*. We have previously reached the same conclusion in an unpublished, memorandum opinion. *See Laningham v. State, No. 10-06-00099-CR, 2007 Tex. App. LEXIS 5511, at *8-9 (Tex. App.--Waco July 11, 2007, no pet.)* (not designated for publication). Because this is a procedural issue unrelated to sufficiency of the evidence, we will consider all the admitted evidence when evaluating Lee's legal sufficiency challenge. *See Marshall v. State, 185 S.W.3d 899, 902 (Tex. Crim. App. 2006)*; *see also Limon, 838 S.W.2d at 769*.

**Analysis**

The indictment alleges that Lee "intentionally, knowingly, or recklessly caused bodily injury to DAVID HARRISON by shooting DAVID HARRISON, and the Defendant did then and there use or exhibit a deadly weapon, to-wit: a firearm, during the commission of said assault." [4]

[4]   [HN4] A person commits aggravated assault if he intentionally, knowingly, or recklessly caused bodily injury to another and used or exhibited a deadly weapon during **[**9]** commission of the assault. *TEX. PEN. CODE ANN. § 22.02(a)(2)* (Vernon Supp. 2006); *TEX. PEN. CODE ANN. § 22.01(a)(1)* (Vernon Supp. 2006).

**Identity**

The record contains conflicting evidence regarding whether Lee was the shooter. Harrison testified that Lee's girlfriend had been living with Harrison's sister-in-law. When Lee came looking for his girlfriend and "causing trouble," Harrison asked him to leave. A few days later, Lee approached Harrison with a gun. A chase ensued during which Lee fired several shots, one of which entered Harrison's calf. Detective Paul Hacker and Officer Matthew McCallister, while investigating an **[*878]** unrelated incident, observed a person chasing and shooting at Harrison.

Harrison later identified the shooter as "Choo-Choo," which led police to Lee. Harrison identified Lee from a photographic lineup. Lee admitted that his nickname is "Choo-Choo," but testified that other people also have this nickname. Lee denied ever meeting or shooting Harrison. Lee, who resided in Arlington at the time, testified that he could not have shot Harrison because he had no transportation to Waco where the shooting occurred. He also denied knowing the girl that Harrison identified as **[**10]** Lee's girlfriend. However, the State produced recorded conversations made by Lee from jail that instructed the listener to contact Lee's alleged girlfriend. At trial, Harrison identified Lee as the shooter. Detective Hacker testified that Lee's height and physique matched that of the shooter.

As the sole judge of the weight and credibility of witness testimony, the jury was entitled to disregard Lee's testimony and accept Harrison's. *See Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997)*; *see also Perez v. State, 113 S.W.3d 819, 838 (Tex. App.--Austin 2003, pet. ref'd)*. The evidence is legally sufficient to show that Lee was the person who shot Harrison.

**Deadly Weapon**

[HN5] A firearm is a "deadly weapon." *TEX. PEN CODE ANN. § 1.07(a)(17)(A)* (Vernon Supp. 2006). Although the gun was never recovered, Harrison testified that Lee shot him with a gun. Detective Hacker and Officer McCallister heard the gun shots and observed a gun in the hands of the person chasing Harrison. The evidence is legally sufficient to support a deadly weapon finding.

**Bodily Injury**

[HN6] "Bodily Injury" means "physical pain, illness, or any impairment of physical condition." *TEX. PEN. CODE ANN. § 1.07(a)(8)* (Vernon Supp. **[**11]** 2006).

Harrison, Hacker, and McCallister all testified that Harrison had been shot. The bullet entered the back of Harrison's calf and exited through the front of his calf. Lee continued shooting even after striking Harrison, forcing Harrison to continue running with an injured leg. Photographs were admitted into evidence that reflect the gunshot wound. The jury could reasonably infer that the wound caused Harrison to suffer physical pain from the injury. *See Arzaga v. State, 86 S.W.3d 767, 778 (Tex. App.--El Paso 2002, no pet.)* ("the jury is permitted to draw reasonable inferences from the evidence, including an inference that the victim suffered pain as a result of her injuries") (citing *Goodin v. State, 750 S.W.2d 857, 859 (Tex. App.--Corpus Christi 1988, pet. ref'd)*). The evidence is legally sufficient to support a finding that Lee intentionally, knowingly, or recklessly caused bodily injury to Harrison by shooting him.

In summary, the evidence is legally sufficient to sustain Lee's conviction for aggravated assault with a deadly weapon. Lee's second issue is overruled.

**CONCLUSION**

Having overruled both of Lee's issues, we affirm the trial court's judgment.

FELIPE REYNA

Justice

Before **[**12]** Chief Justice Gray,

Justice Vance, and

Justice Reyna

(Chief Justice Gray concurs in the judgment but a separate opinion will not be issued)

Affirmed

Opinion delivered and filed October 24, 2007

Publish

 LexisNexis®


Questioned
As of: Aug 02, 2017

URFAN S. MALIK, Appellant v. THE STATE OF TEXAS, Appellee

NO. 472-96

COURT OF CRIMINAL APPEALS OF TEXAS

*953 S.W.2d 234*; *1997 Tex. Crim. App. LEXIS 60*

September 10, 1997, Delivered

**SUBSEQUENT HISTORY:** [**1] Opinion on Remand September 23, 1999, Reported at: 1999 Tex. App. LEXIs 7150.

**PRIOR HISTORY:** Petition for Discretionary Review from the Fourteenth Court of Appeals. [HARRIS County].

**DISPOSITION:** Judgment vacated and cause remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** After defendant's concealed weapon conviction was reversed by the Fourteenth Court of Appeals, Harris County (Texas), the State filed a petition for discretionary review.

**OVERVIEW:** After defendant's conviction for unlawfully carrying a handgun was overturned, the State filed a petition for discretionary review. The State disagreed with the lower court's holding that legality of detention was a proper part of a review of the sufficiency of the evidence. Defendant contended that sufficiency of the evidence was measured by the jury charge and, even if erroneous, the State failed to object. The State contended that it had, in fact, previously objected. The court vacated and remanded the lower court's decision. The jury instruction actually given concerning the legality of defendant's detention should not have been used to measure the sufficiency of the evidence. The court directed the lower court to apply a new, correct standard for a suffi-

ciency review. The sufficiency of the evidence was properly measured by elements of the offense as defined by the hypothetically correct jury charge, which would accurately set forth the law, be authorized by the indictment, not unnecessarily increase the State's burden of proof, and adequately describe the particular offense charged.

**OUTCOME:** The court granted the State's petition for discretionary review and vacated and remanded the decision of the lower court.

**LexisNexis(R) Headnotes**

*Criminal Law & Procedure > Witnesses > Presentation*
[HN1] If a witness was an accomplice to the crime on trial, then his testimony must be corroborated. *Tex. Code Crim. P. art. 38.14*.

*Criminal Law & Procedure > Jury Instructions > Particular Instructions > Reasonable Doubt*
*Evidence > Procedural Considerations > Weight & Sufficiency*
[HN2] Generally, the sufficiency standard is limited to situations in which the increased burden upon the State appears in the application paragraph of the charge. But, the court also utilizes that standard when an abstract portion of the charge functions as a kind of application paragraph.

Page 2

953 S.W.2d 234, *; 1997 Tex. Crim. App. LEXIS 60, **

*Governments > Courts > Judicial Precedents*
[HN3] When a court's precedents appear to require it to stray far afield from the holding that originated a constitutional doctrine, the court should reexamine those precedents to determine their continuing validity. In conducting such a reexamination, however, the court should take into account the interests underlying the rule of stare decisis. Often, it is better to be consistent than right. But, when a particular court-made rule does not produce consistency or the rule regularly produces results unanticipated by the constitutional doctrine on which it is based, then the court should be prepared to disavow the rule and overrule the line of cases embodying the rule.

*Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*
*Evidence > Procedural Considerations > Weight & Sufficiency*
[HN4] Legal insufficiency means that the State's case was so lacking that it should not have ever been submitted to the jury. Insufficiency means that the State's case could be cured or satisfied only by the introduction of new evidence to prove, if possible, their theory of the case.

*Criminal Law & Procedure > Jury Instructions > Particular Instructions > Elements of the Offense*
*Criminal Law & Procedure > Appeals > Standards of Review > General Overview*
[HN5] Due process prevents an appellate court from affirming a conviction based upon legal and factual grounds that were not submitted to the jury. However, due process is not necessarily violated by affirming a conviction in which the jury charge contains extra, unnecessary elements that are not supported by the evidence. Appellate courts are not free to revise the basis on which a defendant is convicted simply because the same result would likely obtain on retrial.

*Criminal Law & Procedure > Accusatory Instruments > Indictments > Appellate Review*
*Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution*
*Evidence > Procedural Considerations > Weight & Sufficiency*
[HN6] No longer shall sufficiency of the evidence be measured by the jury charge actually given. Nevertheless, measuring sufficiency by the indictment is an inadequate substitute because some important issues relating to sufficiency, such as the law of parties and the law of transferred intent, are not contained in the indictment.

Hence, sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the state's burden of proof or unnecessarily restrict the state's theories of liability, and adequately describes the particular offense for which the defendant was tried. This standard can uniformly be applied to all trials, whether to the bench or to the jury, whether or not the indictment is facially complete, and regardless of the specific wording of the jury charge actually given.

*Criminal Law & Procedure > Witnesses > Presentation*
[HN7] Although the accomplice witness rule is also a mere rule of evidence, it is statutorily worded as a sufficiency standard. *Tex. Code Crim. P. art, 38.14.* Insufficient corroboration of accomplice witness testimony mandates a judgment of acquittal, assuming the witness in question would be an accomplice as a matter of law under the hypothetically correct jury charge.

**COUNSEL:** Jules L. Laird, Jr., Houston.

Rikke Burke Graber, Assist. DA, Carol M. Cameron, Assist. DA, Houston.

**JUDGES:** KELLER, J. MEYERS, J., concurs. Baird and Overstreet, J.J, join in the concur.

**OPINION BY:** KELLER

**OPINION**

 [*234] OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

A jury found appellant guilty of unlawfully carrying a weapon, namely, a handgun. The trial court assessed punishment at 90 days confinement in the Harris County Jail, probated for one year, and a $ 300 fine. The [*235] Fourteenth Court of Appeals reversed appellant's conviction with an order to the trial court to enter a judgment of acquittal. *Malik v. State, 1994 Tex. App. LEXIS 2751*, No. C14-92-01293-CR (Tex. App.--Houston [14th Dist], delivered November 10, 1994)(unpublished). The Court of Appeals reasoned that the evidence was insufficient to support appellant's conviction because the evidence was insufficient to show reasonable suspicion to justify a traffic stop of appellant. Id. The State petitioned for discretionary review, and we vacated the Court [**2] of Appeals opinion. Malik v. State, No. 1369-94 (Tex. Crim. App., delivered March 29, 1995)(unpublished). We held that the legality of the detention, an admissibility of evidence issue, was irrelevant to a sufficiency re-

Page 3

953 S.W.2d 234, *; 1997 Tex. Crim. App. LEXIS 60, **

view, and we remanded the case to the Court of Appeals to conduct a "correct" sufficiency review. Id. On remand, the Court of Appeals held that the legality of the detention was a proper part of the sufficiency review because a jury instruction concerning the issue was submitted. Malik v. State, No. C14-92-01293-CR (Tex. App.--Houston [14th Dist], delivered February 15, 1996)(unpublished).

The State has again petitioned for discretionary review (which we granted), and it contends that: (1) including the detention issue in a sufficiency review is not appropriate because *Jackson v. Virginia, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979)* applies only to the elements of the criminal offense, and (2) even if there were error, it is merely trial error because the instruction was erroneous and the State objected to including the detention issue in the jury charge. Appellant responds that sufficiency of the evidence is measured by the jury charge, **[**3]** citing *Boozer v. State, 717 S.W.2d 608, 610 (Tex. Crim. App. 1984)*, and he argues that the State failed to properly object to the erroneous jury instruction. We will reverse.

The present issue arises out of a line of cases beginning with *Benson v. State, 661 S.W.2d 708 (Tex. Crim. App. 1982)*(opinion on State's second motion for r'hrg), cert. denied, *467 U.S. 1219, 81 L. Ed. 2d 372, 104 S. Ct. 2667(1984)*. In Benson, we held that the sufficiency of the evidence is measured by the indictment as incorporated into the jury charge. *Id. at 715*. We decided that the State's failure to object to an unnecessary narrowing, in the jury charge, of the description of an element of the offense meant that the State was bound to prove the element as described, and a failure to do so would result in an acquittal due to insufficient evidence. *Id. 715-716*. Subsequently, in Boozer, we held that, by failing to object to an erroneously submitted accomplice witness instruction, the State acquiesced in an increase in its burden of proof, requiring corroboration of testimony that would not have needed corroboration absent the instruction. [1] *717 S.W.2d at 610-612*. These cases **[**4]** have spawned a line of decisions in which the sufficiency of the evidence is measured by the jury charge if that charge is more favorable to the defendant than the law requires and if the State fails to object.

> 1 [HN1] If a witness was an accomplice to the crime on trial, then his testimony must be corroborated. See *Texas Code of Criminal Procedure, Article 38.14*.

[HN2] Generally, this sufficiency standard has been limited to situations in which the increased burden upon the State appears in the application paragraph of the charge. *Plata v. State, 926 S.W.2d 300, 304 (Tex. Crim. App. 1996)*. But, we have also utilized that standard when an abstract portion of the charge functions as a kind of application paragraph. *Arceneaux v. State, 803 S.W.2d 267, 271 (Tex. Crim. App. 1990)* In Arceneaux, the jury charge contained an instruction requiring the jury to find "beyond a reasonable doubt that the exhibit introduced in evidence by the State is cocaine" before the defendant could be convicted. Id. We held **[**5]** that, by failing to object to the cocaine instruction, the State assumed the (unnecessary) burden to offer a cocaine exhibit into evidence. Id. Because no cocaine exhibit had been introduced into evidence (the cocaine had been destroyed through testing), we found the evidence to be insufficient to support the conviction and ordered a judgment of acquittal. *Id. at 271-272*.

As in Arceneaux, the present charge involves the use of an application-type charge in connection with the admission of certain **[*236]** evidence. The relevant portion of the instruction reads as follows:

If you fail to believe beyond a reasonable doubt that the defendant, URFAN S. MALIK, was driving his vehicle in a suspicious manner as if some activity out of the ordinary had occurred or that activity related to a crime had occurred, then you are not to consider the pistol or holster that was found in the defendant's car following the stop by the deputy, and thereby find the defendant, URFAN S. MALIK, not guilty.

(Emphasis added). The present situation is in all relevant respects identical to Arceneaux. Although Arceneaux involved evidence that was not admitted and the **[**6]** present case involved evidence that arguably should not have been admitted, we do not find that to be a significant distinction. Nor do we perceive a material distinction between the Arceneaux instruction requiring the admission of evidence before the jury can be permitted to find guilt and the present instruction which requires the jury to acquit if the evidence is illegally obtained. In either case, the defendant's guilt turns, according to instruction, upon the status of a particular piece of evidence. As we stated in Arceneaux, "the wording...of the charge may also authorize the trier of fact to reach or not reach the ultimate issue in the case." *Id. at 271*. (Ellipsis and emphasis added).

Arceneaux would appear to require an acquittal due to insufficient evidence as the Court of Appeals has done unless we find that the instruction was erroneous and that the State properly objected. But the State's contention that Jackson, by its wording, applies only to elements of the offense is a cogent one. [HN3] When, as in the present case, our precedents appear to require us to stray far afield from the holding that originated a constitutional doctrine, we **[**7]** should reexamine those precedents to determine their continuing validity. In conducting such a reexamination, however, we should take into ac-

Page 4

953 S.W.2d 234, *; 1997 Tex. Crim. App. LEXIS 60, **

count the interests underlying the rule of stare decisis: Often, it is better to be consistent than right. But, when a particular court-made rule does not produce consistency and/or the rule regularly produces results unanticipated by the constitutional doctrine on which it is based, then we should be prepared to disavow the rule and overrule the line of cases embodying the rule. With these considerations in mind, we now reexamine the court-made rule established in the Benson/Boozer line of cases.

For its holding, Benson relied upon federal constitutional precedent. [2] We at least implied that our view about measuring sufficiency by the jury charge was inherent in the Jackson standard. *Benson, 661 S.W.2d at 714-715*. We later expressly held that the Benson/Boozer rule was based upon Jackson:

> 2   Boozer implied that the Benson/Boozer rule has a statutory basis by referencing a number of different statutes in a footnote before its citation to Benson. *Boozer, 717 S.W.2d at 611 n. 5*. After reviewing those statutes, however, we find that none of them requires the rule formulated in Benson and Boozer.

**[**8]**

The Jackson standard is the foundation for all this Court's later machinations concerning exactly what "standard" should be used to define error in a jury charge. The first such example was *Benson, supra*, in which the defendant attacked the sufficiency of the evidence to sustain his conviction for retaliation.

*Arceneaux, 803 S.W.2d at 269-270*. In Benson, we also relied upon *Forman v. United States, 361 U.S. 416, 4 L. Ed. 2d 412, 80 S. Ct. 481 (1980)* and *Burks v. United States, 437 U.S. 1, 57 L. Ed. 2d 1, 98 S. Ct. 2141 (1978)* for the proposition "that [HN4] legal insufficiency means that the government's case was so lacking that it should not have ever been submitted to the jury." *Benson, 661 S.W.2d at 715-716* (internal quotation marks omitted; emphasis in Benson). We further explained that "insufficiency means that the State's case could be cured or satisfied only by the introduction of new evidence to prove, if possible, their theory of the case." *Id. at 716* (emphasis added).

A review of the relevant precedents shows that the federal constitutional cases relied upon in Benson and other cases as the foundation for the Benson/Boozer **[**9]** rule do not in fact support that rule. Under Jackson, the sufficiency review question is "whether, after viewing the evidence in the light most favorable **[*237]** to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *443 U.S. at 319* (emphasis on "any" in

original; other emphasis added). If an element to be proved is incorporated into the charge merely because the State failed to object, and hence, unnecessarily increased its burden of proof, then that element cannot be an "essential" element of the crime. The only answer to this observation would be to claim that whether an element is "essential" depends upon the wording of the particular jury charge. But Jackson held that its standard is not concerned with the rationality of the verdict actually rendered. *Id. at 319 n. 13*. See also *Benson, 661 S.W.2d at 717-718* (McCormick, J. dissenting). Moreover, Benson's reliance upon Forman and Burks for the proposition that insufficient evidence means the case should never have been submitted to the jury underscores the inappropriateness of using the jury charge as a measurement **[**10]** of sufficiency. If the case should never have been submitted to the jury, that means there should not have been a jury charge in the case. If the question is whether a jury charge should even exist, how can the jury charge be the measurement of evidentiary sufficiency? See *Boozer, 717 S.W.2d at 618-619* (Onion, P.J. dissenting)(impropriety of using charge to determine entitlement to instructed verdict where motion for instructed verdict made before charge was given). Benson's further contention that insufficiency means the State's case could be cured or satisfied only by the introduction of new evidence also undercuts the validity of the rule announced in that case. If the charge unnecessarily increased the State's burden of proof, then the State's case could be cured by merely altering the charge to eliminate the unnecessary burden. *Benson, 661 S.W.2d at 719* (McCormick, J. dissenting); *Boozer, 717 S.W.2d at 613* (McCormick, J. dissenting).

Further, the Supreme Court case of Forman, cited by Benson in support of its holding, is completely inconsistent with the Benson/Boozer rule. In Forman, the jury charge erroneously required the jury to find **[**11]** a "subsidiary conspiracy" before convicting the defendant, and the government failed to object. *361 U.S. at 422 &* 424. See also, *Stephens v. State, 806 S.W.2d 812, 821 (Tex. Crim. App. 1990)*(McCormick, P.J. dissenting), cert. denied, *502 U.S. 929, 116 L. Ed. 2d 289, 112 S. Ct. 350 (1991)*. No subsidiary conspiracy was ever proven. *Forman, 361 U.S. at 424*. See also *Stephens, 806 S.W.2d at 821*. Nevertheless, the Supreme Court held that a judgment of acquittal was inappropriate, noting that: "Here there was no lack of evidence in the record....The jury was simply not properly instructed." *Forman, 361 U.S. at 426* (ellipsis inserted and internal quotation marks omitted). See also *Stephens, 806 S.W.2d at 821*. Forman viewed the more burdensome charge as mere trial error rather than a sufficiency of the evidence problem. In a concurring opinion, Justice Whittaker went even further, opining that the trial error was harmless:

Page 5

953 S.W.2d 234, *; 1997 Tex. Crim. App. LEXIS 60, **

There being neither charge in the indictment nor evidence in the record of "subsidiary conspiracy," the requested and obtained charge to the jury amounted to a virtual direction to acquit. And if the jury, in obedience to that **[**12]** charge, had acquitted, its verdict would, of course, have ended the case. Therefore, petitioner, by requesting and inducing the court to give this erroneous charge, got much more than he was entitled to under the law. Yet, he claimed in the Court of Appeals that this very charge, because unsupported by evidence, was erroneous and required an outright reversal....I realize there is no profit in decrying a spent transaction, but I cannot resist observing the obvious, namely, that in these circumstances, the law required affirmance of the judgment....Petitioner, instead of complaining that he was given only a new trial, should be thankful that his conviction was not affirmed.

*361 U.S. at 429-430* (Whittaker, J. concurring)(ellipses inserted).

Moreover, subsequent developments in federal case law regarding the Jackson standard have failed to lend any support to the reasoning of the Benson/Boozer line of cases; in fact, the opposite has occurred. The Supreme Court has never imposed on any jurisdiction a requirement to measure the sufficiency **[*238]** of the evidence by the jury charge. *Stephens, 806 S.W.2d at 820* (McCormick, P.J. dissenting). Our research of the federal **[**13]** case law has failed to uncover any such requirement imposed by any of the federal circuits. In fact, the Fifth Circuit has held that the Benson/Boozer doctrine is not a rule of federal constitutional law. *Brown v. Collins, 937 F.2d 175, 182* (5th Cir.), rehearing en banc denied, *945 F.2d 403 (1991)*. Instead, it is "a state procedural nuance foreign to federal constitutional norms." *Id. at 181*. In Brown, the jury charge contained general instructions on the law of parties, and the evidence was sufficient to convict the defendant as an accomplice. *Id. at 182*. But, the application paragraph of the charge required the jury to convict the defendant as the primary actor, and the evidence was insufficient to support that theory. Id. Nevertheless, this variation between the evidence and the charge did not rise to constitutional proportions. Id. The Fifth Circuit held that, under Jackson, "we look merely to the substantive elements of the criminal offense as defined by state law, [citation omitted], not...to a state's procedural requirements." *Id. at 181* (emphasis in original; ellipsis inserted; bracketed material replacing internal citation; **[**14]** internal quotation marks omitted). [3]

3   We recognize that [HN5] due process prevents an appellate court from affirming a conviction based upon legal and factual grounds that were not submitted to the jury. *McCormick v.*

*United States, 500 U.S. 257, 269-270 & 270 n. 8, 114 L. Ed. 2d 307, 111 S. Ct. 1807 (1991)*; *Dunn v. United States, 442 U.S. 100, 60 L. Ed. 2d 743, 99 S. Ct. 2190 (1979)*; *Cole v. Arkansas, 333 U.S. 196, 201-202, 92 L. Ed. 644, 68 S. Ct. 514 (1948)*. Perhaps recognizing this principle, the Fifth Circuit implied that the complete absence of a parties instruction from the jury charge may present constitutional problems. *Brown, 937 F.2d at 182*. However, we do not believe that due process is necessarily violated by affirming a conviction in which the jury charge contains extra, unnecessary elements that are not supported by the evidence. Moreover, the Supreme Court has indicated that the McCormick/Dunn/Cole rule does not bar retrial of a criminal defendant. *Dunn, 442 U.S. at 107* ("appellate courts are not free to revise the basis on which a defendant is convicted simply because the same result would likely obtain on retrial").

**[**15]** The Benson/Boozer rule has been characterized as "among the most controversial of the last decade." *Mireles v. State, 901 S.W.2d 458, 466 (Tex. Crim. App. 1995)*(Meyers, J. dissenting). The rule has been strongly criticized for being inconsistently applied. *Jones v. State, 815 S.W.2d 667, 674 (Tex. Crim. App. 1991)*(McCormick, P.J. dissenting); *Morrow v. State, 753 S.W.2d 372, 382 (Tex. Crim. App. 1988)*(Onion, P.J. dissenting). Presiding Judge McCormick criticized the Court for being inconsistent on whether sufficiency of the evidence should be measured solely by the application paragraph or by the charge as a whole. *Jones, 815 S.W.2d at 674*. His criticism was on target, as this Court has vacillated between the two positions. In Garrett v. State, we held that evidentiary sufficiency should be measured by the entire charge rather than solely by the application paragraphs. *749 S.W.2d 784, 802-803 (Tex. Crim. App. 1986)*(opinion on State's Motion for Rehearing). At least one court of appeals relied upon that holding, only to be reversed by this Court. *Jones v. State, 774 S.W.2d 7, 11-12* (Tex. App.--Dallas 1989), reversed, *815 S.W.2d 667 (Tex. Crim.* **[**16]** *App. 1991)*; *Biggins v. State, 824 S.W.2d 179, 180 (Tex. Crim. App. 1992)*. To complicate matters further, we have held that abstract portions of the charge that act like an application paragraph must be used in measuring evidentiary sufficiency. *Arceneaux, 803 S.W.2d at 271* (critical question is whether a paragraph "authorizes a conviction").

Consequently, the rule that evidentiary sufficiency is measured by the application paragraph of the charge has been difficult to apply. We have reversed court of appeals decisions for failing to determine accurately what paragraphs of the charge are application paragraphs or "authorize a conviction." *Jackson v. State, 898 S.W.2d*

Page 6

953 S.W.2d 234, *; 1997 Tex. Crim. App. LEXIS 60, **

*896, 899-900 (Tex. Crim. App. 1995)*; *Arceneaux, 803 S.W.2d at 271-272*. The futility of these exercises becomes even more apparent in light of our recent observation that "it may well be that application paragraphs are an anachronism, and that jurors could perform just as well without them." *Plata, 926 S.W.2d at 304*.

Former Presiding Judge Onion complained that the Benson/Boozer rule produced different **[*239]** measurements for evidentiary sufficiency depending upon whether the State or **[**17]** the defendant benefitted from the instructions given. If the jury charge requires more than the law requires, and the State fails to object, then the State acquiesces in an increase in its burden of proof, and sufficiency of the evidence is measured by the charge. *Morrow, 753 S.W.2d at 381 n. 5* (Onion, P.J. dissenting). But, if the jury charge requires less than the law requires, and the defendant fails to object, the defendant is not treated as having acquiesced in a lesser burden of proof, and sufficiency of the evidence is measured by the elements of the offense rather than the charge. Id. Presiding Judge Onion concluded that "there appear[] to be different standards applied depending upon whose ox is gored." Id. The inconsistency with respect to measuring sufficiency is especially apparent when comparing different scenarios involving a variance between the indictment and the jury charge. If the indictment is facially complete, [4] and the jury charge unnecessarily narrows the permissible bases for a conviction or requires more proof than the indictment, then the Benson/Boozer rule requires measuring the sufficiency of the evidence by the jury charge. *Fisher* **[**18]** *v. State, 887 S.W.2d 49, 55 (Tex. Crim. App. 1994)*. But, if the indictment is facially complete, and the jury charge impermissibly broadens the permissible bases for conviction, sufficiency is measured by the indictment rather than the charge (or perhaps more precisely, by the jury charge without the impermissible broadening language). *Id. at 57*. Further, if the indictment is facially incomplete, then sufficiency of the evidence is measured by the jury charge so long as the charge remains consistent with the indictment and the controlling penal provision. *Id. at 57-58*. And of course, sufficiency of the evidence can never be measured by the jury charge in a bench trial because there is no jury charge. *Stephens, 806 S.W.2d at 821* & *821 n. 4* (McCormick, P.J. dissenting). Instead of producing one simple, coherent standard to measure the sufficiency of the evidence, the Benson/Boozer rule has spawned several standards, depending on the completeness of the indictment, whether the jury charge requires more or less proof from the State than the indictment, and whether the trial was to the bench or to the jury. While these disparate standards may in theory be justified **[**19]** under the single, unified theory of measuring sufficiency by "the indictment as properly incorporated into the jury charge," *Fisher, 887 S.W.2d at 57*, in

practice this Court has fashioned a maze of complex rules for different situations.

4   That is, it alleges all of the essential elements of a criminal offense.

In addition to producing uncertainty and inconsistency, the Benson/Boozer rule is inherently at odds with the purpose of the Jackson sufficiency standard. The Jackson standard was established to ensure that innocent persons would not be convicted. *Jackson, 443 U.S. at 323* ("The question whether a defendant has been convicted upon inadequate evidence is central to the basic question of guilt or innocence"). The Benson/Boozer rule permits, and in fact contemplates, that persons who are guilty of the crime charged and convicted by a jury may nevertheless be acquitted on appeal because the State failed to object to an erroneous and/or unnecessary instruction favorable to the defendant. **[**20]** In essence, the rule permits the greatest form of relief in the criminal system -- an acquittal -- to be granted because the defendant received a windfall in the jury instructions.

The Benson/Boozer rule is based upon a misinterpretation of federal constitutional precedent, results in complex and inconsistent standards for reviewing sufficiency of the evidence, and is fundamentally at odds with the purpose behind the Jackson standard of sufficiency review. Therefore, we overrule the Benson/Boozer line of cases and abolish the standard of sufficiency review that they formulated. [HN6] No longer shall sufficiency of the evidence be measured by the jury charge actually given. Nevertheless, we recognize that measuring sufficiency by the indictment is an inadequate substitute because some important issues relating to sufficiency -- e.g. the law of parties and the law of transferred intent -- are not contained in the indictment. *Boozer, 717 S.W.2d at 610 n. 4*; **[*240]** *Jones, 815 S.W.2d at 675* (McCormick, P.J. dissenting). Hence, sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. Such a charge would be one that accurately sets out the law, is authorized by the **[**21]** indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. [5] This standard can uniformly be applied to all trials, whether to the bench or to the jury, whether or not the indictment is facially complete, and regardless of the specific wording of the jury charge actually given. Moreover, the standard we formulate today ensures that a judgment of acquittal is reserved for those situations in which there is an actual failure in the State's proof of the crime rather than a mere error in the jury charge submitted.

Page 7

953 S.W.2d 234, *; 1997 Tex. Crim. App. LEXIS 60, **

5    This list is not necessarily exhaustive.

Turning to the present case, we find that the jury instruction concerning the legality of appellant's detention should not have been used to measure the sufficiency of the evidence. The legality of appellant's detention is not an element of the offense charged but merely relates to the admissibility of evidence. **[**22]** Moreover, a hypothetically correct jury charge would not have made the admissibility of a particular piece of evidence a precondition for conviction. [6]

> 6    [HN7] Although the accomplice witness rule is also a mere rule of evidence, and is not required under Jackson, see *Brown, 937 F.2d at 182 n. 12*, it is statutorily worded as a sufficiency standard. See *Texas Code of Criminal Procedure, Article 38.14*. Nothing in this opinion changes the rule that insufficient corroboration of accomplice witness testimony mandates a judgment of acquittal -- assuming the witness in question would be an accomplice as a matter of law under the hypothetically correct jury charge.

We vacate the opinion of the Court of Appeals and remand this cause to that Court to apply the correct standard of review in analyzing appellant's points of error regarding the sufficiency of the evidence.

KELLER, J.

Judgment of Court of Appeals vacated; Cause remanded to Court of Appeals

DELIVERED: September 10, 1997

**CONCUR BY:** MEYERS

**CONCUR**

**[**23] CONCURRING OPINION**

The majority expressly "overrules the Benson/Boozer line of cases," and describes that line of decisions as holding that "the sufficiency of the evidence is measured by the jury charge if that charge is more favorable to the defendant than the law requires and if the State fails to object." *Majority opinion* at 2. But in this case *the State objected*. Therefore the majority's holding is dicta and I decline to join it. I concur in the judgment of the Court, however, because application of the controlling caselaw calls for a reversal of the judgment of the Court of Appeals.

The trial court erroneously included in the jury charge an instruction on the legality of appellant's detention (whether or not appellant had been driving his vehicle in a suspicious manner, thereby justifying a stop). The State objected at trial to the inclusion of the charge.

On appeal, appellant claimed the evidence was insufficient to support the jury's finding that appellant had been driving in a suspicious manner. The Court of Appeals noted that the legality of a detention is normally "irrelevant" for purposes of a sufficiency review, but decided to "assume" the charge was **[**24]** correct and review the sufficiency of the evidence to support it. Upon reviewing the evidence, the Court of Appeals determined it was insufficient to support "the jury's determination that appellant was driving his vehicle in a suspicious manner," reversed the judgment of the trial court, and ordered a judgment of acquittal. *Malik v. State, 1996 Tex. App. LEXIS 607*, *10, No. 14-92-01293-CR (Tex. App.--Houston [14th Dist.] Feb. 15, 1996)(opinion on remand)(unpublished).

We granted the State's petition on the following ground for review:

The Court of Appeals erred in failing to properly apply the correct standard of review in analyzing the sufficiency of the evidence and in reversing and remanding for an order of acquittal. The State argues the Court of Appeals erred in its sufficiency analysis in two respects: (1) *Jackson v. Virginia* does not apply here since the legality of the detention is not one of the "elements of the offense"; and (2) since the State objected to the charge, the **[*241]** issue should be treated as trial error rather than a sufficiency problem, citing *Ortega v. State, 668 S.W.2d 701 (Tex. Crim. App. 1983)*(opinion on original submission) **[**25]** and *Stephens v. State, 717 S.W.2d 338, 341 (Tex. Crim. App. 1986)*.

The State is correct on its second argument. [1] In *Ortega*, we explained that when the trial court unnecessarily increases the State's burden in the jury instructions and the State objects to the increase, the matter should be viewed as trial error on appeal:

> 1    Addressing the second argument would resolve the case and I therefore decline to comment on the State's first argument.

But once the [additional burden] is incorporated into the court's instructions to the jury in such a way that the jury must find it before a verdict of guilt is authorized, *Article 36.13, V.A.C.C.P.*, it must be proved, or the verdict will be deemed "contrary to the law and evidence." See Article 40.03(9), V.A.C.C.P. In sum, there is no such thing as "surplusage" in the part of the court's instructions to the jury which authorizes a conviction, and if the prosecutor believes that portion of the charge unnecessarily increases his burden of proof, it behooves **[**26]** him specially to request a charge which correctly allocates the burden placed on him by law. This is nothing more than the course of law which is due before a person may be deprived of liberty. *Article 1.04, V.A.C.C.P.*

Page 8

953 S.W.2d 234, *; 1997 Tex. Crim. App. LEXIS 60, **

And if the record reflects the prosecutor has pursued this course to protect his lawful obligations, but the trial court has nevertheless refused the amendment to the indictment or submission of the requested charge, and the evidence is found insufficient to support the verdict because of the trial court's errors in this regard, those reviewable rulings of the trial court found erroneous by the appellate court constitute "trial error," and the State is free to pursue another prosecution. Cf. *Burks v. United States, 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978)*; and *Greene v. Massey, 437 U.S. 19, 98 S. Ct. 2151, 57 L. Ed. 2d 15 (1978)*.

*Ortega, 668 S.W.2d at 705 n.10*. We further explained in *Stephens* that when the charge imposes a greater burden on the State than placed upon it by the controlling statute, and the State does not object to the increased burden, it can be assumed that the State voluntarily shouldered that burden. But if the State objects **[**27]** to the greater burden, then the increased burden is not assumed by the State so as to bar it from retrying the case if the evidence is insufficient under the increased burden in the charge. [2] S*tephens*, *717 S.W.2d at 341*.

> [2] Judge Clinton best explained this notion in concurring in the denial of the State's motion for rehearing in *Boozer*:
>
> > . . . in the event the State had objected to the trial court's unnecessarily increasing its burden of proof, we would be in a position to point to the accomplice witness charge and say, "that charge was erroneous just as the prosecutor argued," then hold *that* error was the direct cause of the reversal of the conviction and as such was "trial" charge error.
>
> > *Boozer, 717 S.W.2d at 614* (Clinton, J., concurring in denial of State's motion for leave to file motion for rehearing).

The State argues that an article 38.23 instruction is required only if there is a factual dispute about how the evidence was obtained and there was no factual dispute in this case. **[**28]** [3] The State objected to inclusion of the instruction.

> [3] Article 38.23(a) provides that no evidence obtained in violation of the Constitutions or laws shall be admitted against the accused. Further,
>
> > In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the

jury shall disregard any such evidence so obtained.

> We have interpreted this provision as only requiring a charge thereunder "if there is a factual dispute as to how the evidence was obtained." *Thomas v. State, 723 S.W.2d 696, 707 (Tex. Crim. App. 1986)*. In other words, a defendant is not entitled to a charge if the defendant does not controvert or challenge the State's facts, as opposed to the legal conclusions to be drawn from the facts. *Id*.

The State is exactly right. The instruction should not have been given because there was no dispute about the **[**29]** facts leading to the stop. By objecting to charge, the State did not assume the greater burden. *See Ortega, supra*; *Stephens, supra.* The Court of Appeals erred in reversing and ordering a **[*242]** judgment of acquittal based upon insufficiency of the evidence as to the legality of the detention. This case should be reversed due to trial error, and the State afforded the opportunity to reprosecute. [4] *Ortega, 668 S.W.2d at 705 n.10* (if State objects to increased burden in charge and evidence is found insufficient to support the verdict because of trial court's error in this regard, "those reviewable rulings of the trial court found erroneous by the appellate court constitute 'trial error,' and the State is free to pursue another prosecution").

> [4] This rule is consistent with the Court's holdings as to reprosecution of a lesser included offense upon a finding on appeal of insufficiency of the evidence on the aggravating element of the greater offense. In *Granger v. State, 850 S.W.2d 513 (Tex. Crim. App. 1993)*, the defendant was convicted of capital murder, but on direct appeal, we found the evidence insufficient as to the capital element. The defendant claimed his subsequent prosecution for murder was barred by double jeopardy. We disagreed. We explained that allowing the State to reprosecute placed the defendant in the position he would have been in absent the trial court's error in submitting the capital charge. Because the evidence was only insufficient as to the capital element, if the lesser included offense alone had gone to the jury, the defendant would have been convicted. We emphasized, however, that *had no charge been included on the lesser offense, the defendant could not have been retried for that offense*:
>
> > . . . We were careful to point out repeatedly in our opinion [in another case where a jury instruction was *not* given on the lesser included offense at the first trial] that at the original trial, the State had chosen not to request an instruction on

Page 9

953 S.W.2d 234, *; 1997 Tex. Crim. App. LEXIS 60, **

the lesser included offense of rape. *In other words, the State had, at the first trial, failed to pursue the lesser included offense charge after jeopardy attached to it and was, therefore, forever barred from prosecuting it again.*

As the court correctly explained in [another case] when faced with essentially the same facts:

. . . the jury ... was not instructed on [the lesser offense]. It appears that the state simply chose not to pursue a conviction for that offense, although the [defendant] was in jeopardy as to that offense. Had it so elected, the state could have requested the additional instruction [on the lesser offense]. Therefore, with respect to the [lesser] offense ..., the trial was abandoned or aborted by the state without manifest necessity.

*Id. at 520*(emphasis in original).

**[\*\*30]** The majority does not mention the Court's opinions in *Ortega* and *Stephens*, even though those cases provide an exception to application of the *Benson/Boozer* doctrine which applies in this case. The State does not cite to *Benson* and *Boozer*, much less present an argument for overruling those opinions. It has always been my understanding that this Court should not strain to overrule precedent when not called for on the facts at hand, but should wait for the appropriate case where the parties raise and have the opportunity to argue the issue, and where the precedent to be overruled would be otherwise be applicable and control the disposition of the case at hand. *See Blanco v. State*, No. 098-97 (State's pet. granted April 30, 1997)(State urges Court to re-examine *Benson/Boozer*). As a believer in the adversarial system, I would wait for the appropriate case where the Court could entertain the best arguments on the issue from both sides of the table before rendering a decision.

I concur in the judgment of the Court.

MEYERS, J.

Delivered September 10, 1997

Baird and Overstreet, J.J, join.



⚠
Caution
As of: Aug 02, 2017

**James Norris WELCH, Appellant v. The STATE of Texas, Appellee**

**No. 04-97-00973-CR**

**COURT OF APPEALS OF TEXAS, FOURTH DISTRICT, SAN ANTONIO**

***993 S.W.2d 690*; *1999 Tex. App. LEXIS 998***

**February 17, 1999, Delivered**
**February 17, 1999, Filed**

**SUBSEQUENT HISTORY:** **[**1]** Motion for Rehearing Denied April 14, 1999.

**PRIOR HISTORY:** From the 226th Judicial District Court, Bexar County, Texas. Trial Court No. 97-CR-4415. Honorable Sid L. Harle, Judge Presiding.

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant prisoner challenged his convictions for aggravated sexual assault and aggravated robbery from the 226th Judicial District Court, Bexar County (Texas).

**OVERVIEW:** Appellant prisoner contended that it was error for him to have been convicted of aggravated sexual assault and aggravated robbery. Prisoner argued that the prosecution failed to produce evidence he was the assailant. The court stated that prisoner, in effect, argued that in-court identification by the victim was incredible because the victim was unable to identify him before taking the stand. The court held that credibility issues were for the jury, to decide and therefore prisoner's complaint was without merit. Prisoner also contended that the DNA evidence was improperly admitted. The court noted that prisoner's counsel stated there was no objection when the written report that confirmed prisoner's DNA matched the DNA sampled from the rape kit was offered. The court stated that because prisoner had no objection

to the evidence when it was offered, he waived his right to complain about the admissibility of the DNA evidence on appeal. The court also held that the lower court did not abuse its discretion when it declined to change venue because prisoner failed to demonstrate that an impartial jury could not have been selected with even a careful voir dire. Convictions were affirmed.

**OUTCOME:** Appellant prisoner's convictions for aggravated sexual assault and aggravated robbery were confirmed. The court held that there was sufficient legal evidence to support the convictions and prisoner waived his right to review regarding the admissibility of the DNA evidence because he failed to object to its admission at trial.

**LexisNexis(R) Headnotes**

*Criminal Law & Procedure > Appeals > Standards of Review > General Overview*
*Evidence > Procedural Considerations > Weight & Sufficiency*
[HN1] Reviewing the legal sufficiency of the evidence, the appellate court views all of the evidence in the light most favorable to the prosecution and inquire whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This standard applies to direct and circumstantial evidence alike.

*Evidence > Procedural Considerations > Circumstantial & Direct Evidence*
[HN2] Identity may be established either through direct or circumstantial evidence.

*Criminal Law & Procedure > Appeals > Standards of Review > General Overview*
[HN3] While reviewing the evidence, the appellate court is mindful that the jury alone judges the weight and credibility of the evidence. The jury also maintains the power to draw reasonable inferences from basic facts to ultimate facts.

*Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > General Overview*
[HN4] Credibility issues are for the jury, not the appellate court, to decide.

*Evidence > Procedural Considerations > Exclusion & Preservation by Prosecutor*
*Evidence > Procedural Considerations > Objections & Offers of Proof > Objections*
*Evidence > Procedural Considerations > Rulings on Evidence*
[HN5] When a defendant challenges the admissibility of certain evidence in a hearing outside the presence of the jury, he need not renew his objection when the evidence is offered at trial in order to preserve his complaint for review. *Tex. R. Evid. 103(a)(1).*

*Criminal Law & Procedure > Appeals > Reviewability > Waiver > General Overview*
*Evidence > Procedural Considerations > Exclusion & Preservation by Prosecutor*
*Evidence > Scientific Evidence > DNA*
[HN6] If at trial the defendant states he has no objection when the evidence is offered, he waives his admissibility complaint.

*Civil Procedure > Venue > General Overview*
*Criminal Law & Procedure > Juries & Jurors > Challenges to Jury Venire > Pretrial Publicity > Prejudice*
*Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion > Venue*
[HN7] The appellate court reviews the trial court's venue determination for an abuse of discretion. Thus, the appellate court may not reverse the ruling unless it is unreasonable in light of the record evidence.

*Civil Procedure > Venue > General Overview*
*Civil Procedure > Trials > Jury Trials > Jurors > Selection > Voir Dire*
*Criminal Law & Procedure > Juries & Jurors > Challenges to Jury Venire > Pretrial Publicity > Venue Considerations*
[HN8] A change of venue is required only where pretrial publicity is so pervasive and prejudicial as to create a reasonable probability that an impartial jury cannot be empanelled even with the most careful voir dire.

*Criminal Law & Procedure > Jury Instructions > Particular Instructions > Lesser Included Offenses*
[HN9] A defendant is entitled to a jury charge on a lesser included offense if (1) the lesser included offense is subsumed in the proof necessary to establish the offense charged, and (2) some evidence in the record would permit a jury rationally to find that the defendant, if guilty, is guilty only of the lesser offense.

*Criminal Law & Procedure > Jury Instructions > Particular Instructions > Lesser Included Offenses*
[HN10] If a defendant presents no evidence, and no evidence otherwise raises the issue of a lesser offense, a charge is not required.

*Criminal Law & Procedure > Appeals > Standards of Review > General Overview*
[HN11] In reviewing a court's decision not to give a charge on a lesser offense, the appellate court examines all of the evidence presented at trial regardless of whether it is credible, controverted, or conflicting. However, the evidence may not be plucked out of the record and examined in a vacuum.

*Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion > Evidence*
[HN12] The appellate court reviews the trial court's decision to admit extraneous offense evidence with the abuse of discretion standard.

*Criminal Law & Procedure > Sentencing > Imposition > Evidence*
[HN13] Extraneous offense evidence may be offered during the sentencing phase to assist the jury in determining punishment and is admissible as to any matter the court deems relevant to sentencing, including but not limited to evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have

been committed by the defendant. *Tex. Code Crim. P. Ann. art. 37.07, § 3* (Supp. 1998).


*Evidence > Procedural Considerations > General Overview*
[HN14] The appellate court bears in mind that while the trial court maintains authority to decide threshold issues of admissibility, the jury holds the power to decide whether the State has met its burden of proof.


**COUNSEL:** ATTORNEYS FOR APPELLANT: Kimberly E. Young, San Antonio, TX.

ATTORNEYS FOR APPELLEE: Daniel Thornberry, Assistant Criminal District Attorney, San Antonio, TX.

**JUDGES:** Opinion by: Paul W. Green, Justice. Sitting: Catherine Stone, Justice, Paul W. Green, Justice, Karen Angelini, Justice.


**OPINION BY:** PAUL W. GREEN


**OPINION**

[*692] A jury convicted James Welch of aggravated sexual assault and aggravated robbery and sentenced him to life imprisonment plus a $ 10,000 fine. On appeal, Welch complains about legal insufficiency, the admission of DNA evidence, the denial of a change of venue, the absence of a jury instruction on a lesser included offense, and the admission of evidence of extraneous offenses during the punishment phase. We affirm.


**BACKGROUND**

On December 17, 1996 around 10:00 p.m., Alice Lopez fell asleep on the sofa in the sitting area outside her second-story bedroom. At approximately 1:00 a.m., she woke to find a stranger sifting through her belongings. When she asked him who he was, he motioned for her to be quiet and to go over to him. Alice saw a sharp object in his hand, which she believed was a box cutter. The stranger warned Alice not to speak or he would "cut her up."

When Alice approached [**2] him, he dragged her downstairs to the living room where he forced her to have sexual intercourse. While assaulting Alice, he ordered her to remove her rings and bracelets. After assaulting Alice, he ordered her not to move until he was gone or he would kill her. He left with Alice's jewelry, as well as a black leather jacket belonging to Alice's daughter Evelyn. The jacket contained Evelyn's wallet, keys, and an eyeliner pencil.

[*693] After the man left, Alice ran to Evelyn's room and ordered her to call for help. While Alice waited in Evelyn's room, Evelyn woke her father and called the police. Officer Mendoza arrived at the Lopez home to find Alice shaken and crying. He observed a pair of women's underwear near the front door and a wet spot on Evelyn's bed, which he thought might contain semen. After recording Alice's description of her attacker, Officer Mendoza escorted the Lopezes to University Hospital.

Nurse practitioner Nancy Sugarek examined Alice. Sugarek observed small ruptured blood vessels on Alice's back where her bra contacted her skin. Sugarek also noted redness in the vaginal area. These observations, combined with Alice's apparent emotional state and account of the [**3] trauma, led Sugarek to conclude Alice had been sexually assaulted. Sugarek also collected hair and fluid samples for the rape kit.

In the months following this incident, other sexual assaults were reported in Alice's neighborhood. The police and media referred to the perpetrator of these crimes as the "Southeast Side Rapist." Ultimately, Welch was identified as Alice's attacker through tests comparing DNA from the rape kit's vaginal swab to that found in Welch's blood. [1] In fact, the test results, combined with those arising from other attacks in southeast Bexar County, led authorities to suspect Welch was the serial rapist.

> 1 Welch's blood was drawn during the investigation of another sexual assault.

During trial, the State produced additional evidence to prove Welch robbed the Lopez home. During a search of Welch's mother's dining room, where Welch had been storing some of his belongings, police recovered a box cutter, Evelyn's black wallet and eyeliner, and several items of dark clothing. Furthermore, officers [**4] on pawn shop detail testified they located Alice's jewelry at various pawnshops on the southeast side of town. Pawn slips indicated Welch pawned these items within days of the attack at the Lopez home-- December 18, 1996 and December 20, 1996.


**LEGAL SUFFICIENCY**

In his second point of error, Welch argues the evidence of his guilt is legally insufficient to sustain his conviction. He claims the trial court should have granted his motion for directed verdict because the State failed to produce evidence he was the assailant. In particular, Welch contends neither Alice's in-court identification, the stolen property, nor the DNA evidence proves he committed the sexual assault and robbery. The State, on the other hand, argues "the cumulative evidence of ap-

pellant's identity is overwhelming." We agree with the State.

In [HN1] reviewing the legal sufficiency of the evidence, we view all of the evidence in the light most favorable to the prosecution and inquire whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979)*; *King v. State, 895 S.W.2d* [**5] *701, 703 (Tex. Crim. App. 1995)*. This standard applies to direct and circumstantial evidence alike. *King, 895 S.W.2d at 703*; *McGoldrick v. State, 682 S.W.2d 573, 577 (Tex. Crim. App. 1985)*. Furthermore, [HN2] identity may be established either through direct or circumstantial evidence. *Earls v. State, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986)*; *Krebsbach v. State, 962 S.W.2d 728, 734 (Tex. App.--Amarillo 1998, pet. ref'd)*.

[HN3] While reviewing the evidence, we are mindful that the jury alone judges the weight and credibility of the evidence. *Alvarado v. State, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995)*. The jury also maintains the power to draw reasonable inferences from basic facts to ultimate facts. *Hernandez v. State, 939 S.W.2d 692, 693 (Tex. App.--Fort Worth 1997, pet. ref'd)*. [*694] Moreover, it is within the province of the jury to reconcile evidentiary conflicts. *Bowden v. State, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982)*.

Although Welch complains the State produced no proof he was the assailant, he acknowledges Alice identified him at trial. In effect, he argues the in-court identification was incredible because Alice was unable to identify him before taking the [**6] stand. [2] [HN4] Credibility issues are for the jury, not this Court, to decide. Accordingly, Welch's complaint is without merit.

> 2  Welch does not argue the identification procedure at trial was impermissibly suggestive.

Second, Welch argues his possession of Evelyn's property, as well as his pawning of Alice's jewelry, proves only that he was in possession of stolen property. This evidence, however, was also circumstantial proof that he robbed the Lopezes. From this evidence, the jury could have believed Welch merely possessed stolen property or inferred that he stole it himself. By its verdict, the jury indicated it inferred Welch robbed the Lopezes of the property; we may not disturb its decision.

Finally, Welch claims the DNA evidence failed to establish identity because it was scientifically unreliable and should not have been admitted. Regardless of whether this evidence was properly admitted, we must consider it when reviewing for legal sufficiency. *Rodriguez v. State, 819 S.W.2d 871, 872 (Tex. Crim. App.*

[**7] *1991)*. Accordingly, the DNA results were some evidence he committed the sexual assault.

In conclusion, all of this evidence supports the jury's verdict. *See Villalon v. State, 791 S.W.2d 130, 132 (Tex. Crim. App. 1990)* (holding that evidence may not be isolated for scrutiny but that all evidence must be considered). We therefore overrule Welch's second point of error.

## ADMISSION OF DNA EVIDENCE

In his first point of error, Welch argues the trial court erred in admitting DNA test results that were scientifically unreliable. In particular, he complains the State's DNA expert (1) deviated from the protocol required for the test and (2) lacked expertise to sponsor the DNA evidence. The State maintains Welch failed to preserve these complaints for review because he stated he had "no objection" when the written DNA results were offered. We agree with the State.

[HN5] When a defendant challenges the admissibility of certain evidence in a hearing outside the presence of the jury, he need not renew his objection when the evidence is offered at trial in order to preserve his complaint for review. *See TEX. R. EVID. 103(a)(1)*; *Moraguez v. State, 701 S.W.2d 902,* [**8] *904 (Tex. Crim. App. 1986)*. [HN6] However, if at trial the defendant states he has "no objection" when the evidence is offered, he waives his admissibility complaint. *Moraguez, 701 S.W.2d at 904*. Counsel for Welch stated there was "no objection" when the State offered the written report confirming Welch's DNA matched the DNA sampled from the rape kit to a certainty of 1/125,000,000. Thus, Welch waived his right to complain about the admissibility of the DNA evidence. We therefore overrule his first point of error.

## VENUE

Welch's third point of error challenges the court's denial of his request for a change of venue. Welch argues that extensive media coverage of the Southeast Side Rapist story, combined with the news of his arrest for the crimes, before his trial deprived him of his right to an unbiased jury. The State maintains the trial court correctly denied the change because Welch failed to meet his burden of proof. We agree with the State.

[HN7] We review the trial court's venue determination for an abuse of discretion. *McGinn v. State, 961 S.W.2d 161, 163 (Tex. Crim. App. 1998)*. Thus, we may not reverse the ruling unless it is unreasonable [*695] in light of the record evidence. [**9] *Id.* The occurrence of pretrial publicity creates no automatic presumption of prejudice; jurors need not come to court com-

pletely ignorant of the facts. *Narvaiz v. State, 840 S.W.2d 415, 428 (Tex. Crim. App. 1992)*. Rather, [HN8] a change of venue is required only where pretrial publicity is "so pervasive and prejudicial as to create a reasonable probability that an impartial jury cannot be empaneled even with the most careful voir dire." *Id.*

At the venue hearing, Welch presented evidence of television, radio, and print media coverage. James Forsyth, news division manager at WOAI radio, testified his station provided extensive coverage of the story with emphasis of the crimes' effect on the community. Forsyth estimated the majority of the stories aired near the time of the assaults and recalled Welch's name mentioned only in conjunction with the news of his arrest. Finally, Forsyth recalled no coverage since Welch's arrest and stated his belief that the level of publicity in this case was not unusual. Dale Rankin, coordinating producer for KENS television, sponsored the transcript and video of approximately eighty new stories and press conferences. He recalled the bulk of the **[**10]** coverage aired while the suspect was still at large and suggested this story received publicity out of concern for the safety of the southeast Bexar County community. He was only vaguely familiar with Welch, recalling stories about Welch's bond proceeding and the DNA test results. In sum, Rankin disagreed with the defense's position that his station's coverage was inflammatory or biased against Welch.

A private investigator hired by Welch produced twenty-one newspaper articles printed in the *San Antonio Express-News*. Only five of them mentioned Welch in connection with the Southeast Side Rapist, and the front page of one article displayed Welch's picture. The majority of these articles were written around the time the attacks occurred. Circulation of the paper for the period from January through August 1997 ran approximately 238,000 on weekdays and 387,000 on Sundays. In addition, the investigator stated he believed Welch's name was synonymous with the term Southeast Side Rapist.

Finally, Welch examined three criminal defense attorneys, all with extensive trial experience in Bexar County, who opined Welch could not get a fair trial in the county. The State presented six affidavits **[**11]** asserting Welch could receive a fair trial in Bexar County. Denying Welch's request, the trial court told him he could reassert his request at the close of jury selection.

The exchange between counsel and venire during voir dire supports the State's contention that publicity about Welch did not rise to the level of prejudice that would prevent him from securing an impartial jury. Although approximately one-half of the panel stated they were exposed to media coverage of the Southeast Side Rapist story, hardly any of them recalled any details of

the stories or Welch being named as the suspect. Only one member stated he would be unable to set aside his personal knowledge about the case, and he was excused for cause. Closer inspection of the voir dire dialogue with the jury members eventually chosen reveals only two members had heard of Welch prior to trial. Four had never heard the Southeast Side Rapist story, and six had heard the story but never heard of Welch.

In light of all this evidence, we cannot say the trial court abused its discretion in denying Welch's request for a change of venue. Due process does not guarantee Welch a jury completely ignorant of the facts of his case. **[**12]** Because Welch failed to demonstrate an impartial jury could not be selected even with a careful voir dire, we overrule his third point of error.

## JURY INSTRUCTION ON LESSER-INCLUDED OFFENSE

In his fourth point of error, Welch argues the trial court erred in denying his request for a jury instruction on the "lesser **[*696]** included offense" of misdemeanor theft because the evidence merely showed he possessed stolen property. The State maintains the trial court properly denied Welch's request because the evidence did not support it. We agree with the State.

[HN9] A defendant is entitled to a jury charge on a lesser included offense if (1) the lesser included offense is subsumed in the proof necessary to establish the offense charged, *Aguilar v. State, 682 S.W.2d 556, 558 (Tex. Crim. App. 1985)*; and (2) some evidence in the record "would permit a jury rationally to find" that the defendant, if guilty, is guilty only of the lesser offense, *Rousseau v. State, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993)*. [HN10] If a defendant presents no evidence, and no evidence otherwise raises the issue of a lesser offense, a charge is not required. *Aguilar, 682 S.W.2d at 558*.

[HN11] In reviewing a court's **[**13]** decision not to give a charge on a lesser offense, we examine all of the evidence presented at trial, *Lugo v. State, 667 S.W.2d 144, 147 (Tex. Crim. App. 1984)*, regardless of whether it is credible, controverted, or conflicting, *Hobson v. State, 644 S.W.2d 473, 477 (Tex. Crim. App. 1983)*. However, the evidence may not be "plucked out of the record and examined in a vacuum." *Godsey v. State, 719 S.W.2d 578, 584 (Tex. Crim. App. 1986)*.

### 1. Aggravated Sexual Assault

With regard to the charge of aggravated sexual assault, our inquiry ends with the first part of the test because the State did not have to prove Welch committed misdemeanor theft to secure a conviction for aggravated sexual assault. *Compare TEX. PEN. CODE ANN. § 22.021 with § 31.03* (Vernon 1994). *See also Ramos v.*

*State, 865 S.W.2d 463, 465 (Tex. Crim. App. 1993)* (recognizing sexual assault as a lesser included offense); *Cunningham v. State, 726 S.W.2d 151, 153 (Tex. Crim. App. 1987)* (recognizing indecency with a child as same). Accordingly, the trial court did not err in denying Welch's request with respect to the charge of aggravated sexual assault.

### 2. Aggravated Robbery

[**14] The State was required, however, to prove theft to successfully convict Welch of aggravated robbery. *See Campbell v. State, 571 S.W.2d 161, 162 (Tex. Crim. App. 1978).* Therefore, Welch survives the first part of the test. Welch cannot pass the second part of the test, however, because the jury could not have rationally found Welch guilty only of theft.

The jury encountered substantial evidence upon which it could have based its verdict that Welch committed aggravated robbery. Alice identified him as the man who entered her home, exhibited a deadly weapon, threatened her with imminent bodily injury, sexually assaulted her, stole property from her home, and escaped. DNA evidence confirmed Welch as the assailant. Finally, pawn shop receipts indicated Welch pawned most of the stolen items.

On the other hand, the evidence did not demonstrate Welch could be guilty only of theft. There was no evidence Welch merely appropriated property without consent. *See TEX. PEN. CODE ANN. § 31.03(b)(1)* (Vernon 1994). Furthermore, the evidence neither showed Welch received the property from another nor indicated Welch knew the property was stolen by another. *Id. § 31.03(b)(2).* Accordingly, [**15] Welch's fourth point of error is overruled.

## ADMISSION OF EXTRANEOUS OFFENSE EVIDENCE DURING PUNISHMENT

In his final point of error, Welch asserts the trial court erred during the punishment phase by admitting evidence of extraneous offenses without first hearing the evidence outside the jury's presence to determine whether the State proved those offenses beyond a reasonable doubt. The State contends that its written proffer presented to the court, combined with the court's subsequent oral ruling, [*697] satisfied its statutory burden. We agree with the State.

[HN12] We review the trial court's decision to admit extraneous offense evidence with the abuse of discretion standard. *Mitchell v. State, 931 S.W.2d 950, 953 (Tex. Crim. App. 1996).* [HN13] Extraneous offense evidence may be offered during the sentencing phase to assist the jury in determining punishment and is admissible "as to any matter the court deems relevant to sentencing, in-

cluding but not limited to . . . evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant[.]" *TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3* (Vernon Supp. 1998). Furthermore, [HN14] we [**16] bear in mind that while the trial court maintains authority to decide threshold issues of admissibility, the jury holds the power to decide whether the State has met its burden of proof. *Mitchell, 931 S.W.2d at 953.*

During Welch's punishment hearing, the State made a written proffer of how it would prove Welch sexually assaulted four other victims. [3] Welch objected, arguing the court should hold a hearing outside the jury's presence to determine whether the State had proved these offenses beyond a reasonable doubt. The court denied this request, and the punishment phase proceeded. The victims testified, and DNA evidence identifying Welch as the assailant in all instances was admitted. The trial court instructed the jury it could not consider the extraneous offenses unless it believed the State proved them beyond a reasonable doubt. [4] Finally, outside the jury's presence, the trial court orally ruled it found the State's written proffer satisfied article 37.07. [5]

> 3 These victims included an eleven year-old girl, a seventy-four year-old woman, and a woman eight months pregnant.
> 4 Welch makes no complaint about the court's charge as it relates to the extraneous offenses.
> [**17]
> 5 The court announced, "Also for the record . . . I will find that the State did prove each and every extraneous offense beyond a reasonable doubt pursuant to the written proffer that was tendered at the beginning of the punishment proceeding. So that is just a finding that I made at the beginning based upon the written proffer."

The trial court's treatment of Welch's objection complied with both the Code of Criminal Procedure's requirement regarding the burden of proof, as well as *Mitchell's* mandate that the jury ultimately decide whether the State met the burden. Welch supplies no authority for the proposition that a court must hear evidence of extraneous offenses outside the presence of the jury to determine admissibility during the punishment stage. Neither the statute nor precedent require a hearing. *Contra Alvarado v. State, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995)* (recognizing requirement of hearing, outside jury's presence, regarding a confession's voluntariness). Furthermore, even if the trial court erred, there was no harm. *See Mitchell, 931 S.W.2d at 954* (directing harm [**18] analysis where error found). Notably, Welch does not argue the State failed to prove the offenses be-

yond a reasonable doubt. We therefore overrule Welch's final point of error.

**CONCLUSION**

Because we find the evidence legally sufficient and the trial court's rulings correct, we affirm Welch's conviction.

Paul W. Green, Justice